1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  DOUGLAS R. BRITTON (188769)
   BRIAN O. O'MARA (229737)
3  ERIC I. NIEHAUS (239023)
   655 West Broadway, Suite 1900
4  San Diego, CA 92101
   Telephone: 619/231-1058
5  619/231-7423 (fax)
   dougb@csgrr.com
6  bo'mara@csgrr.com

7  Lead Counsel for Plaintiffs

8  [Additional counsel appear on signature page.]

9           UNITED STATES DISTRICT COURT

10         SOUTHERN DISTRICT OF CALIFORNIA

| 11 | MAUREEN BACKE, et al., Individually and on Behalf of All Others Similarly Situated, | ) | Lead Case No. 08-CV-01689-H(RBB) |
|---|---|---|---|
| 12 | | ) | (**Consolidated**) |
| 13 | Plaintiffs, | ) | CLASS ACTION |
| | vs. | ) | |
| 14 | | ) | CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| 15 | NOVATEL WIRELESS, INC., PETER V. LEPARULO, GEORGE B. WEINERT, ROBERT M. HADLEY, SLIM S. SOUISSI | ) | |
| 16 | and CATHERINE F. RATCLIFFE, | ) | |
| 17 | Defendants. | ) | |
| 18 | | ) | DEMAND FOR JURY TRIAL |

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2    1.    This is a class action for violations of the federal securities laws on behalf of all

3  purchasers of Novatel Wireless, Inc. ("Novatel" or the "Company") common stock between

4  February 27, 2007, and November 10, 2008 (the "Class Period") who were damaged thereby.

5    2.    Novatel is a provider of wireless broadband access solutions for the worldwide

6  mobile communications market.  During the Class Period, defendants caused Novatel to report

7  extremely strong financial results and repeatedly exceeded Novatel's financial guidance in the face

8  of a market that analysts believed would experience slow growth through the 2007 fiscal year.

9  Defendants explained that Novatel's products were technically superior to the competition and that,

10  as a result, the Company's flagship USB modem was seeing strong acceptance by Novatel's

11  customers, which was driving the Company's results.  In fact, defendants told investors that

12  "[a]doption of USB wireless modems has been a primary growth driver" for Novatel as evidenced by

13  "over $85 million in sales in the nine months since its introduction."  Sales of this flagship product

14  would account for more than 50% of Novatel's sales during the Class Period.

15    3.    Defendants' statements misled investors and analysts.  At the same time that they

16  were reporting extraordinary results and highlighting the demand for Novatel's products, defendants

17  knew that Novatel was losing market share because of increased competition.  For example,

18  defendants saw the Company's most popular 720 USB modem canceled at Sprint (months before

19  Novatel would have a replacement) and later replaced by Sierra Wireless's new USB modem, which

20  was introduced to the market just months earlier.  In a brazen disregard for investors and the

21  securities laws, defendants unloaded $23.8 million of their holdings (61% of the stock they would

22  sell the entire Class Period) only days before the market learned of the Sprint cancellation.  Indeed,

23  analysts directly attributed a collapse in Novatel's stock price to this loss of Sprint business, which

24  defendants had known "for some time" but failed to disclose prior to unloading their shares:

25

> NVTL shares were off sharply this morning, we believe in response to a rumor that
> NVTL may lose market share at Sprint, who was a 38% customer for NVTL in Q1.

26

> We agree with the notion making the rounds indicating that the popular EU 720 USB
> card from NVTL will in fact be end-of-lifed at Sprint as early as next week . . . .

27

28

4.    Defendants' sales were extremely suspicious in timing and amount.  They sold their shares just days before the market learned of the Sprint cancellation, and despite the fact that Novatel was securing certifications with large wireless carriers (and gaining access to millions of subscribers), and during a time when analysts believed that the industry was in the "early-innings" of the wireless broadband game.  Instead of purchasing shares in this environment, as one would expect, defendants bailed out of their stock.  In fact, defendants' sales in May-July 2007 were even more suspicious as defendants either established or amended Rule 10b5-1 plans to increase their sales immediately before the Sprint revelation.

5.    Things grew worse for Novatel as the Class Period progressed.  Novatel was eliminated from the list of vendors for a popular new WiMAX platform offered by Sprint and was being replaced at Verizon with lower cost products as carriers shifted to the consumer market, which Novatel's "enterprise" modems could not support.  Instead of disclosing a loss of market share to investors, defendants explained that "we're certainly in a leadership position, in both the express card and USB markets and we're adding a lot of value with the next generation, so I certainly would expect to be able to continue to demand a premium because of the quality and the class of the products."  In fact, defendants were boasting as late as 2008 of Novatel's "industry-leading USB products" and emphasizing an ability "to bring highly innovative products to market well ahead of our competitors" as key to Novatel's success.  Novatel's loss of market share directly undermined these statements.

6.    In the meantime, defendants also knew but failed to disclose that Novatel's purported strong financial performance in 2007 resulted not from legitimate demand but instead from what a former employee described as a "regular practice" of shipping product early to meet Wall Street expectations.  In fact, Novatel would admit after the Class Period that its internal controls were insufficient to prevent this practice because of "material weaknesses," and the Company's auditors have forced it to move revenue out of the final quarter of the Class Period because of these practices. Tellingly, Novatel's Days Sales Outstanding ("DSOs") – a measure of the average number of days that a company takes to collect revenue after a sale – almost doubled in 3Q07 as Novatel filled its channel with product sold on credit with extended payment terms.  The act of shipping product early

1   enabled defendants to paint a false picture of the then-current financial state of the Company, and

2   would lead to a collapse as customers inevitably cleared their inventory.  Not surprisingly, analysts

3   would confirm later that Novatel's two most important customers would do just that at the beginning

4   of 2008 because they were flush with inventory:

5         •     Avondale Partners – "[A] larger impact is expected [in 1Q08] from an inventory
                surplus at one of NVTL's chief North American customers . . . ."
6
7         •     Morgan Joseph – "In the U.S., operators appear to be ordering more frequently [in
                1Q08], but requesting smaller lots due to concerns about inventory levels."
8
9         7.     Defendants' scheme began to unravel at the beginning of 2008.  After reporting a

10  successful 2007, defendants caught investors and analysts by complete surprise on February 20,

11  2008, when they announced guidance for 1Q08 that was $10 million below analyst revenue

12  estimates.  Analysts were bewildered by defendants' explanation for the shortfall – that Verizon and

13  Sprint were consolidating vendors – first, because they were not aware of it, and second, because

14  none of Novatel's competitors mentioned it when they raised their guidance for the same time

15  period.  Defendants also disclosed that carriers were emphasizing the consumer market where

16  Novatel "historically had not placed an emphasis," which meant that it did not have a competitive

17  product.  Novatel's stock collapsed in response, falling 23% in a single day of trading on volume of

18  11 million shares.

19        8.     Then, after reiterating Novatel's 1Q08 guidance throughout the quarter (less than one

20  month before announcing preliminary results) and shortly after boasting that "we are very pleased

21  with the long-term trends and how we are positioned to fulfill them," defendants shocked the market

22  again on April 14, 2008, by announcing preliminary results for the quarter that were $19 million

23  short of Novatel's own revenue projections and $0.08 (36%) short of its earnings per share ("EPS")

24  projection.  This time, Novatel explained that demand for its modem was weak and next that it had

25  lost out to the competition for a key promotional slot at Verizon.  The reason – Novatel's products

26  were too expensive for the consumer market.  As one analyst put it – "NVTL's products are priced

27  and geared for the enterprise segment and the [C]ompany has little shelf space at the store level."

28  Novatel's stock collapsed another 23% on volume of nearly 12 million shares.

9.    Defendants wrapped it up on November 10, 2008, by admitting that the Company had improperly recognized revenue in 1Q08 in violation of Generally Accepted Accounting Principles ("GAAP") and its own revenue cut-off procedures (increasing Novatel's revenue miss by an additional $3.4 million and $0.01 per share) and by disclosing that their Sarbanes-Oxley certifications were false – "[O]ur principal executive officer and our principal financial and accounting officer concluded that there were several control deficiencies in our internal control over financial reporting that in the aggregate constituted a material weakness."  Novatel's stock fell another 12% in the days following this disclosure.

10.    The following chart depicts how defendants unloaded their shares at inflated prices and how Novatel's stock crashed each time investors learned the truth about Novatel's operations:



**Novatel Wireless Inc.**
January 3, 2007 to December 31, 2008

## STATEMENT OF THE CASE

11.     Novatel is a child of the internet craze and the telecom stock market bubble.  Founded in 1996, it originally went public in November 2000 – at the very height of the internet and telecom boom.  Like many of the companies that went public during that time, it generated little by way of revenues, yet its stock price immediately soared on the wings of the promise of the digital age.  Only months later in 2001, its stock price came back to earth with a thud, collapsing 98% from $220 per share to $5 per share in less than a year as investors returned to valuing publicly-traded companies based upon more traditional measures – revenues, earnings and real prospects for growth.

12.     The years that immediately followed for Novatel were difficult, to say the least.  The Company suffered the slings and arrows of an unforgiving, bottom-line oriented market.  Shortly after its stock price crashed to earth, its business prospects dried up along with the rest of the telecom industry.  And the Company shrank substantially by every measure – especially market cap.  Not surprisingly, the Company's stock price did not fair well during the years leading up to the Class Period.  Indeed, the Company's stock price traded in the single digits for most of the preceding six years.  And the Company's executives had lost a fortune on their Novatel holdings as a result.  For defendants to sell their substantial holdings in the Company at a profit, its stock had to be trading at a price higher then what they paid for it.  As such, defendants engaged in a fraudulent scheme to inflate its value and unload their stock.

**Defendants Bail Out of Their Novatel Holdings with Knowledge that Sprint Had Canceled Its Popular 720 USB Modem and Opened the Door to Novatel's Competitors**

13.     The industry in which the Company operates is intensely competitive and was growing more so throughout the Class Period.  Five companies entered the marketplace in 2007 alone to directly compete with Novatel – Huawei, Kyocera, Pantech, ZTE and Qualcomm.  And one of its closest competitors, Sierra Wireless, was set to launch its first USB product in the second quarter of 2007, which would directly compete with Novatel's popular 720 USB modem – the very modem that Sprint was telling defendants it would cancel in early 2007.

14.     Novatel's success was largely dependent on its ability to supply wireless modems to its two largest customers, Sprint and Verizon.  A shift in demand from either of these two companies

1   would dramatically impact Novatel's fortunes.  In 2006, the year before the Class Period, Sprint

2   represented 38.2% of Novatel's revenue while Verizon added another 19.7%.  Combined, these two

3   companies controlled 57.9% of Novatel's sales.  As a result, defendants knew that the market was

4   particularly sensitive to information about these customers.  Strong financial results would surely

5   spur an increase in Novatel's stock price whereas any negative information regarding these

6   customers would reduce it.

7       15.     At the beginning of 2007, Novatel reported strong financial results and exceeded

8   increasingly aggressive guidance.  They told investors that its USB modem was extremely successful

9   in the market and that Novatel was seeing strong sales to Verizon and, more importantly, Sprint.  At

10  the same time, defendants were unloading massive amounts of their Novatel holdings.  During the

11  Class Period, defendants sold 1,258,466 shares of Novatel stock for almost $29 million in insider

12  trading proceeds.  Defendants sold their shares predominantly between May 2007 and November

13  2007, at prices near the Class Period high of approximately $29 per share.

14      16.     Defendants' sales were extremely suspicious in timing and amount.  Including vested

15  options, each defendant sold at least 39% of their Novatel holdings and their sales were dramatically

16  out of line with their prior trading habits.  In fact, while defendants told the Securities and Exchange

17  Commission ("SEC") that many of their sales were made pursuant to Rule 10b5-1 trading plans,

18  those sales increased dramatically just days prior to the market learning that Sprint would no longer

19  be purchasing Novatel's 720 USB modem.  ***In fact, an extraordinary 62% of defendants' Class***

20  ***Period sales occurred in June and July – just before analysts attributed a collapse in Novatel stock***

21  ***to the Sprint cancellation***.  Defendants knew of Sprint's decision when they sold their stock.

22  According to a July 20, 2007 Craig-Hallum analyst report, Novatel had known "for some time" that

23  Sprint would transition away from Novatel's 720 USB modem.  And while defendants tried to

24  characterize Sprint's decision as a mere "transition," Novatel did not and would not have its next

25  generation modem ready for shipment until months later.  Novatel's competitors, especially Sierra

26  Wireless and its new USB modem, were perfectly positioned to replace or largely minimize Novatel

27  as its largest customer.

28

17.     As defendants knew and expected, the market reacted harshly to this information. Novatel's stock price collapsed from $29 in late July to almost $20 by the beginning of August on learning of a "rumor" that Novatel was losing position at Sprint.  In fact, analysts attributed a drop in Novatel stock directly to Sprint's decision to "end-of-life" Novatel's popular EU720 USB card – "NVTL shares were off sharply this morning, we believe in response to a rumor that NVTL may lose market share at Sprint, who was a 38% customer for NVTL in Q1.  We agree with the notion making the rounds indicating that the popular EU 720 USB card from NVTL will in fact be end-of-lifed at Sprint as early as next week."  All told, Novatel's stock collapsed 31% as a result of Sprint's decision to abandon Novatel's popular modem.   Defendants were obligated to disclose this information or abstain from trading.  By failing to do either, they avoided a multi-million dollar loss in their Novatel investment.

18.     Defendants' sales were even more suspicious given the environment in which they occurred.  Beyond losing share at Sprint, defendants unloaded their stock at the same time that Novatel was certified by Vodafone to sell its products in late June 2007, and when Novatel was on the verge of being certified at Telefonica and T-Mobile.  Vodafone alone was the world's largest wireless carrier and this one certification gave Novatel access to nearly 200 million subscribers.  The Vodafone certification was supposed to be even more promising for Novatel as Vodafone had just slashed its data pricing plan to make it more affordable for the consumer market, which analysts in turn had believed would be a boon to Novatel's sales.  Indeed, analysts spoke of a "broad consumer adoption" as other wireless carriers would likely follow suit and purportedly open up a tremendous opportunity for Novatel.  Instead of purchasing Novatel shares in this environment, as one would expect, Novatel's executives bailed out of the stock – and did so even though the industry was considered to be in the "early innings" of the broad-band wireless game.

**Novatel Was Losing Market Share Even as Defendants Reported Remarkably Strong Financial Results**

19.     To neutralize a perception that Novatel was indistinguishable from its competitors, defendants represented the Company as adept at managing the delivery of quality wireless modems to their two main domestic customers.  Defendants repeatedly stated that the Company had

committed sufficient resources to research and development projects, which gave the Company a competitive advantage in quickly supplying state-of-the-art wireless modems to its customers and ramping up volume manufacturing.  Novatel pointed to its strong financial results, quarter after quarter, as proof that it was leading the market in providing unrivaled, industry-leading technology. And each time they did, defendants told the SEC and investors through Sarbanes-Oxley certifications that Novatel's financial results were supported by disclosure controls that defendants themselves were responsible for establishing, and that those controls ensured that Novatel's financial statements were accurate and not misleading.

20.     Defendants' statements were false and misleading.  Beyond losing market share with the 720 USB modem at Sprint, Novatel continued to lose market share to its competitors throughout 2007.  In fact, Novatel continued to lose its position at Sprint even as defendants reported extraordinary results.  By the third quarter of 2007, Sprint decided to implement a new WiMax platform and planned to spend approximately $2.5 billion to $3 billion deploying this new technology.  But in a dramatic loss for Novatel, Sprint initially selected Samsung, ZTE and ZyXEL as its partners for providing WiMax data cards and USB modems to customers.  Left out of the mix – Novatel.  In fact, analysts and investors expressed hope that Novatel would rebound and compete for this contract "later in 2008."  Regardless, Novatel was losing considerable market share at its largest customer.  Indeed, one analyst reported on November 2, 2007, that "[o]ur quarterly channel checks suggest that Novatel did not gain any share at Sprint where the Pantech PX500 PC Card and Sierra U595 USB modem fared well, similar to Q2."  In truth, Novatel was losing market share at Sprint but defendants told no one.

21.     While investors knew that Sprint would adopt the WiMax platform and that they excluded Novatel, defendants concealed the reasons that Novatel was losing its market share – Novatel's products did not enable it to compete for this valuable business when needed.  According to Sprint's press release, WiMAX was a nationwide mobile broadband network that was designed to offer faster access speeds at a much lower cost.  Indeed, media reports reveal that Sprint planned to price WiMAX similar to DSL, which ranged from $15 to $38 per month.  But Novatel's modem was what analysts characterized as a "long in the tooth" enterprise modem that was much more feature

1   rich and expensive than the modems offered by Novatel's customers.  Indeed, Novatel's USB

2   modem offered features not offered by its competitors, but those features and its higher speeds came

3   at a cost of $149.99, which was more expensive than the USB modems offered by Sierra and

4   Pantech.  Given the shift in the market to USB modems and the reduced rate plans offered to the

5   end-user by Novatel's customers, defendants knew that Novatel's products were not a viable option

6   for the users that Sprint (and ultimately Verizon) were trying to reach.

7   **Novatel Continued to Lose Market Share as the Industry Shifted to the Retail Market**

8         22.    Simultaneously, defendants also knew, or recklessly disregarded, that Novatel would

9   continue to lose market share.  In early 2007, the wireless modem market was shifting its preference

10  from PC cards to USB devices.  Indeed, in the second quarter of 2007, Novatel attributed its strong

11  financial results predominantly to the Company's increased sales in USB products, which

12  incidentally offset the Company's weak PC card sales.  USB products alone, according to

13  defendants, had been a "primary growth driver" for Novatel with $85 million in sales in just nine

14  months since its introduction.  This was also the same quarter that Sierra announced the launch of its

15  new USB product, subsequently chosen by Sprint in late July 2007.

16        23.    During the same period, wireless carriers were slashing monthly service fees to target

17  the consumer market – a market that defendants knew they could not adequately serve because of the

18  demand for low-cost wireless access.  In June 2007, Vodafone announced that it would be cutting

19  monthly data rates in half.  And, in November 2007, T-Mobile made dramatic cuts to its data rates in

20  Europe.  Analysts expected domestic carriers to quickly follow suit – and they did.  Weeks after T-

21  Mobile announced their rate cut, Sprint began testing $30 data plans in the U.S.  This represented a

22  50% discount to Sprint's previous data rates – which were $60 per month.  The significant decrease

23  in monthly service fees resulted in a surge of sales of USB modems to retail consumers who could

24  utilize those devices on laptop or desktop computers.

25        24.    But as defendants knew and concealed from the market, Novatel did not have a viable

26  USB product at the time to immediately compete in this retail market.  As an analyst from Craig-

27  Hallum later confirmed on April 15, 2008 (*only after defendants disclosed that they were losing*

28  *market share because demand had shifted to lower-end consumer products*) "NVTL's products are

1    priced and geared for the enterprise segment and the [C]ompany has little shelf space at the store

2    level."  By the time Novatel was ready to compete in this retail space, other competitors such as

3    Pantech and Sierra Wireless had already secured business at Novatel's largest and most important

4    customers, including Sprint and Verizon.  In fact, a 2007 industry study later confirmed that

5    Novatel's competitors were stealing considerable market share during this time period not only at

6    Sprint, but also with Verizon.  Sierra Wireless had increased its modem penetration at Verizon by

7    50% compared to Novatel's 14% and competitors categorized as "Other," which excluded Sierra

8    Wireless and Option, had increased penetration at Sprint 100% compared to Novatel's 0%.  And in

9    Europe, with the exception of Vodafone, Novatel's competitors had surpassed Novatel's penetration

10   rate at all carriers, including T-Mobile, Telefonica/O2, and Orange.

11   **Novatel Focuses on Low-Margin International Sales Because of Domestic Market Share**
12   **Loss**

13       25.     Because defendants knew that Novatel was losing market share in the U.S., the

     Company shifted its focus to the European market in the second half of 2007.  In fact, the

14   Company's international sales were trending upward throughout the year (1Q07 – 21%; 2Q07 –

15   23%; 3Q07 – 26%), even though Novatel came out with its second-generation USB modem in

16   September of that year.  Although some sales of this new USB product were expected to come from

17   the U.S., analysts explained that defendants' initial projections for 4Q07, the first quarter after

18   Novatel introduced the modem, showed international sales outpacing domestic sales.

19       26.     Defendants' decision to shift the Company's focus to Europe establishes their

20   knowledge that Novatel's domestic market share was suffering.  In fact, unlike Novatel's domestic

21   sales, its international sales were plagued by lower margins and reduced the overall profitability of

22   the Company.  As one analyst from Morgan Joseph reported on November 6, 2007, the Company's

23   3Q07 results were highlighted by sales in the European data market, which was considered a

24   business swing that significantly reduced the Company's margins.

25           Contributing to the 90% Y-Y and 7% Q-Q sales growth was the European data
             market, driven by the uptake of Novatel's new MC950 USB modem addressing new
26           HSPA networks.  ***This business caused a swing in Novatel's sales mix*** that now
             represents 30% HSPA, up from 26% HSPA in June, while CDMA-based technology
27           is now 70% of the mix, down from 74% in June, ***and brought a corresponding***

28

*change to gross margin, which fell about 180 bpt to 29.8% in 3Q07 from 31.6% in 2Q07.*[1]

27.     To make matters worse, the industry was suffering from component shortages during the Class Period that prevented Novatel from meeting international demand. In fact, the Company was not able to supply a power amplifier for its MC950 HSUPA USB modem and ran out of a key radio chain component used in several of its modems, which required Novatel to pay expensive "expedite charges" to create and ship its products. These charges further eroded Novatel's margins on international sales. Defendants' shift to Europe in the face of these problems shows that they knew that their domestic operations were suffering.

**Mature Inventory Levels Lead to an Expected Drop in Future Revenues**

28.     Novatel's financial results and its statements about the demand for its products were false and misleading for another reason. At the same time that defendants were making these statements, defendants failed to disclose that Novatel was prematurely shipping products into a channel that had become over-saturated. In 2007, Novatel began prematurely shipping as much product as it could to its customers to meet its quarterly and year-end forecasts. As one former Novatel employee (who had frequent discussions with shipping department employees about Novatel's early shipments) explained it, "there was always a 'crunch time' at the end of each quarter." The Company would frequently ship large amounts of product up to "four weeks" early so they could recognize the revenue up front in the current quarter and meet or exceed Wall Street expectations. Indeed, Novatel would admit after the Class Period that its internal controls suffered from material weaknesses that permitted these early shipments.

29.     By employing this practice, defendants took advantage of a lack of internal controls and continued to post strong results throughout fiscal 2007. Novatel's financial results clearly misled analysts about end-market demand and sales execution. In fact, while an analyst at JP Morgan on November 5, 2007, noted that the industry was "at peak sell-in," he told investors that his view had been wrong in the past – "That said, we have clearly under-estimated end-market demand,

---

[1]     Here, as elsewhere, emphasis is added and citations omitted unless otherwise noted.

1  to-date, and execution had been first-rate in 2007." Defendants' false statements were having their

2  intended effect – they were convincing analysts and investors that Novatel was in a different position

3  than its competitors.

4         30.     As the scheme went on, Novatel's receivables and DSOs, which is a measure of the

5  average number of days that a company takes to collect revenue after a sale, increased materially in

6  3Q07 due to large premature shipments to Sprint and Verizon shortly before quarter-end. Indeed,

7  Novatel's DSOs almost doubled from 38 in 2Q07 to 61 in 3Q07, which demonstrates that Novatel

8  sold the product on credit with extended payment terms. In other words, it was shipping product

9  early to increase its results.

10         31.     By 4Q07, PC Card sales were down 11% quarter-to-quarter and embedded modem

11  sales were down 12% quarter-to-quarter. Although USB sales remained consistently strong,

12  Novatel's top domestic customers, Sprint and Verizon, were flush with inventory by 4Q07 and were

13  actively working on reducing their inventories. In fact, an analyst from Avondale Partners stated on

14  February 21, 2008 (after the Company disclosed that its results would be far below consensus

15  estimates in 1Q08 because of inventory issues) that "a larger impact is expected from an inventory

16  surplus at one of NVTL's chief North American customers . . . ." And an analyst from Morgan

17  Joseph stated a month later on March 24, 2008 that "In the U.S., operators appear to be ordering

18  more frequently, but requesting smaller lots due to concerns about inventory levels." These post-

19  disclosure confirmations directly undermined defendants' claims that Verizon and Sprint were

20  flushing inventory from other vendors who they no longer intended to use.

21  **Defendants Prematurely Recognized Revenue in Violation of its Own Revenue Cut-Off**
   **Procedures and Generally Accepted Accounting Principles**

22

23         32.     Defendants' scheme to inflate revenues started to unravel in the first quarter of 2008.

    After announcing consecutive quarters of extremely impressive financial results, defendant shocked

24

25  the market on February 20, 2008, by announcing that the bottom had fallen out of Novatel's

    aggressive growth streak. They forecasted $110 million in revenues for 1Q08 – $10 million below

26

27  consensus estimates – and attributed the slowdown to a consolidation issue at Sprint and Verizon.

    Defendants also disclosed that its customers were clearly focusing on the consumer market where

28

1    the Company did not historically focus.  Defendants' forecast, and their explanation for it, took

2    analysts by complete surprise as none of Novatel's competitors had mentioned the consolidation

3    issue at Verizon and Sprint when raising their outlooks for the quarter.  In reality, Novatel's main

4    customers were over-extended because of early shipments and had to clear their inventory.

5    Novatel's stock price dropped from approximately $14 to as low as $10.20, or roughly 27%, after

6    defendants' disclosures.

7            33.    Through 1Q08, defendants repeated the Company's guidance and told analysts that

8    "we are very pleased with the long-term trends and how we are positioned to fulfill them."  But on

9    April 14, 2008, less than a month after reiterating guidance, defendants shocked the market again by

10   reducing Novatel's 1Q08 guidance from $110 million to $91 million – $30 million below analysts'

11   original estimates.  As the market began losing confidence in the Company, defendants began

12   scrambling to meet its newly-forecasted revenues.  Knowing that it would still fall short because

13   demand was shifting to an area where Novatel did not have a competitive product,  the Company

14   began improperly "pulling in" revenue into the first quarter of 2008 – revenue that it was not yet

15   permitted to recognize under GAAP.  By prematurely recognizing future revenues, defendants gave

16   a boost to the revenues reported in the current quarter to minimize an already sizeable miss.

17   Defendants repeatedly told the SEC and investors that they had designed and implemented

18   disclosure controls to prevent this type of accounting manipulation – claims that Novatel would later

19   admit were false.

20           34.    As the Company's top executives were also Audit Committee members, the scheme

21   was relatively simple to carry out.  The Company was small, consisting of approximately 300

22   employees throughout the entire Class Period.  The vast majority of these employees were on sales

23   and research and development.  The defendants essentially controlled the Company, including its

24   accounting practices, earnings announcements and SEC filings.  According to the Company's 2007

25   10-K, of the 301 employees as of December 31, 2007, only 44 of the Company's employees worked

26   in "operations," including the Chief Executive Officer and Chief Financial Officer.

27

28

35.     On May 13, 2008, defendants told investors that the Company was unable to file its Form 10-Q with the SEC on time because of a review of a single customer contract which they represented was "substantially completed today."  The release stated in part:

> Novatel Wireless, Inc. (the "Company") was unable to finalize preparation of its financial statements in sufficient time to file its Quarterly Report on Form 10-Q for the period ended March 31, 2008 (the "Form 10-Q") by the prescribed due date without unreasonable effort and expense.  The Company and its Audit Committee undertook an enhanced review of the accounting for a specific customer contract, which review was substantially completed today.  As a result of such review, the Company and its Audit Committee do not expect any change to the accounting under that contract, or to any previously reported financial statements or earnings disclosed in the Company's Current Report on Form 8-K filed on May 1, 2008.  However, the Company has filed this Form 12b-25 for an extension to finalize its Form 10-Q, and expects to file its Form 10-Q on or before May 19, 2008, the fifth calendar day following its prescribed due date.

36.     Over three months later, on August 19, 2008, defendants admitted that the review was still ongoing, that it involved at least six transactions representing $9.1 million in revenue, and that it would be moving $3.4 million in improperly recognized revenue out of 1Q08.  As a result of this disclosure, Novatel's stock price dropped from $8.40 to $6.29 the next day, a 25% decline.  This decrease in Novatel's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price as investors learned that defendants engaged in accounting manipulation to inflate 1Q08 results.

37.     Finally, on November 10, 2008, Novatel issued its delayed Form 10-Qs for the quarters ended March 31, 2008 and June 30, 2008.  As a result of the Company's accounting review, Novatel disclosed that the revenues for the quarter ended March 31, 2008 were false.  The Company confirmed that $3.4 million in revenue had been improperly recognized in violation of revenue cutoff procedures.  The Company also revealed that defendants' Sarbanes-Oxley certifications were false.   Indeed, the Company admitted that there were "several control deficiencies in [the Company's] internal control over financial reporting that in the aggregate constituted a material weakness" during the Class Period.  The Form 10-Qs stated:

> 1.     The Company's policies and procedures did not provide sufficient detail regarding revenue recognition requirements related to cutoff periods across time zones, continuing performance obligations and shipping terms for such transactions resulting from a design deficiency in our internal control.

2.      The Company did not have effective processes in place to ensure that all relevant contractual and sales information was communicated in a timely manner among the sales, operations and accounting organizations for non-standard and modified sales transactions resulting from a design and operating deficiency in our internal control.

3.      The Company did not provide adequate training for certain personnel regarding the Company's revenue recognition cutoff policies and procedures to ensure that revenues from these transactions were recognized in the proper period resulting from an operating deficiency in our internal control.

38.     After this disclosure, Novatel's stock slid below $5 per share, trading as low as $3.90 per share by November 17, 2008, a 27% decline from its November 10, 2007 open of $15.33 per share.

39.     Defendants' unlawful conduct had the effect of artificially inflating Novatel's stock price during the Class Period, which traded as high as $29 per share. When defendants revealed the truth of their fraud, investors suffered hundreds of millions of dollars of losses.  The entire debacle has decimated Novatel's stock price, and it has not recovered.  It continues to decline and currently trades in the $5 range – a range in which the stock traded before the Class Period.

## JURISDICTION AND VENUE

40.     The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the 1934 Act.  Venue is proper pursuant to §27 of the 1934 Act. Novatel's headquarters are located in San Diego, California and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

41.     Lead Plaintiff Plumbers & Pipefitters' Local #562 Pension Fund purchased Novatel securities during the Class Period as set forth in the certification filed with the Court and was damaged thereby.

42.     Lead Plaintiff Western Pennsylvania Electrical Employees Pension Fund purchased Novatel securities during the Class Period as set forth in the certification filed with the Court and was damaged thereby.

43.     Defendant Novatel is a provider of wireless broadband access solutions for the worldwide mobile communications market, with its headquarters located in San Diego, California. Novatel's stock is traded under the symbol NVTL on the Nasdaq, which is an efficient market.

44.     Defendant Peter V. Leparulo ("Leparulo") was, at relevant times, Chairman and Chief Executive Officer ("CEO") of the Company.  During the Class Period, Leparulo prepared and signed the Company's Form 10-K, attesting that he had reviewed the contents of the filings to confirm that they did not contain untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.  At no time during the Class Period did Leparulo or any other defendant assert that they were not aware of material aspects of Novatel's business or finances.  Moreover, Leparulo issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as a primary person with knowledge about the Company's business, outlook, financial reports and business practices.  While in possession of non-public material information, defendant Leparulo sold 473,357 shares of his Novatel stock for insider trading proceeds of $11,530,258 during the Class Period.

45.     Defendant George Brad Weinert ("Weinert") was, at relevant times, President of the Company.  During the Class Period, Weinert prepared and signed the Company's Forms 10-K and 10Q, and Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications filed with the SEC, attesting that he had reviewed the contents of the filings to confirm that they did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.  At no time during the Class Period did Weinert or any other defendant assert that they were not aware of material aspects of Novatel's business or finances.  Moreover, Weinert issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as a primary person with knowledge about the Company's business, outlook, financial reports and business practices.  While in possession of non-public material information, defendant Weinert sold 121,985 shares of his Novatel stock for insider trading proceeds of $3,305,560 during the Class

1   Period.  On December 8, 2008, defendant Weinert resigned shortly after the full extent of Novatel's

2   accounting fraud was disclosed to the public.

3          46.     Defendant Robert M. Hadley ("Hadley") was, at all relevant times, Senior Vice

4   President of Worldwide Sales and Marketing.   While in possession of non-public material

5   information, defendant Hadley sold 247,198 shares of his Novatel stock for insider trading proceeds

6   of $4,681,696 during the Class Period.

7          47.     Defendant Slim S. Souissi ("Souissi") was, at all relevant times, Senior Vice

8   President and Chief Technology Officer.  While in possession of non-public material information,

9   defendant Souissi sold 272,560 shares of his Novatel stock for insider trading proceeds of

10  $5,488,870 during the Class Period.

11         48.     Defendant Catherine F. Ratcliffe ("Ratcliffe") was, at all relevant times, Senior Vice

12  President of Business Affairs and General Counsel.  While in possession of non-public material

13  information, defendant Ratcliffe sold 143,366 shares of her Novatel stock for insider trading

14  proceeds of $3,646,804 during the Class Period.

15         49.     As the senior executive officers and as controlling persons of a publicly traded

16  company whose stock was, and is, registered with the SEC pursuant to the Securities Act of 1933,

17  and was traded on the NASDAQ and governed by the federal securities laws, the defendants had a

18  duty to promptly disseminate accurate and truthful information with respect to Novatel's financial

19  condition and performance, growth, operations, financial statements, business, products, markets,

20  management, earnings and present and future business prospects, and to correct any previously

21  issued statements that had become materially misleading or untrue, so that the market price of

22  Novatel's stock would be based upon truthful and accurate information.   The defendants'

23  misrepresentations and omissions during the Class Period violated these specific requirements and

24  obligations.

25         50.     Further, the defendants violated their duty to abstain or disclose inside information

26  before trading Novatel stock.  While in possession of material non-public information, defendants

27  improperly sold 1,258,466 shares of Novatel stock for almost $29 million in insider trading

28  proceeds.

**FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

51.    On February 27, 2007, Novatel issued a press release announcing Novatel's financial results for 4Q06 and the full fiscal year.  With respect to the first quarter of 2007, defendant Weinert stated:

> "Our record backlog and strong Q1 order flow has increased our visibility and we are expecting sequential and year-over-year growth in what has historically been a seasonally softer first quarter for us . . . . Our focus is primarily on execution and innovation, as we continue to ramp to meet increasing demand in the marketplace . . . ."

52.    On February 27, 2007, on the Company's earnings conference call, Weinert made the following statements:

[Weinert:]

> I think that, as we talked about a little bit in the script, there certainly will continue to be competitors entering the space. But I think Novatel has also done a very good job of differentiating ourselves and adding value to the proposition for the OEM customers, in particular. So you're seeing a lot of things we're doing now from customization and value adds with software. And we're really diversifying, as well as continuing to lead the pack in terms of innovative solution and new technologies. When you see these larger companies start to try to enter the market, they're typically trying to do so with fairly well tried out, older technologies and really the market isn't ready for that right now. So, we think we'll continue to see that from time to time but we think we have a very defensible position going forward.

53.    On May 1, 2007, Novatel issued a press release entitled "Novatel Wireless Reports Record Results Driven by Strong Sales Across Multi-Pronged 3G Product Portfolio; First Quarter Revenue Increases 174% Year Over Year and 43% Sequentially GAAP EPS of $0.34 Per Share and Non-GAAP EPS of $0.40 Per Share 2007 Non-GAAP EPS Guidance Increases by Over 50% to $1.00 to $1.05 Per Share," which stated:

> Revenue for the first quarter was up 43% sequentially to approximately $110 million  versus revenues of $77 million in the prior quarter and up 174% over revenue of $40.2 million reported in the same period last year.  First quarter GAAP net income was $10.1 million or $0.34 per diluted share.  This compares to GAAP net loss of $1.3 million or a loss of $0.05 per diluted share in the prior year period.

54.    In the press release, defendant Weinert stated:

> "Our first quarter performance was the best in Company history, with record sales, strong gross margins and impressive operating leverage . . . . Sales were even higher than forecasted in our revised guidance due to strong end-of-the-quarter momentum for newly introduced ExpressCards and Ovation USB devices.  During the quarter, shipments of the Company's ExpressCards – the most successful new product introduction in our history – grew to almost $50 million in sales.

Additionally, some initial stocking orders for Ovation USB modems, previously expected to be shipped in Q2, were shipped within the quarter contributing to the higher-than-expected revenue.  Over the last month, we have received more follow-on orders for Ovation devices and are seeing strong demand across our multi-pronged 3G product portfolio, offering clear evidence of the success of our diversification strategy and the increasing demand for innovative wide-area wireless data solutions."

55.     On May 1, 2007, on the Company's earnings conference call, Leparulo and Weinert made the following statements:

[Leparulo:]

The market for 3G Wireless is taking off and we believe we're perfectly positioned to take advantage of that growth.

[Weinert:]

We certainly see very strong demand for [our first generation] products, and we're leading the way, we're certainly in a leadership position, in both the express card and the USB markets and we're adding a lot of value with the next generation, so I certainly would expect to be able to continue to demand a premium because of the quality and the class of the products.

56.     On May 10, 2007, Novatel filed its Quarterly Report on Form 10-Q with the SEC. The Company's Form 10-Q was signed by defendant Weinert, and reaffirmed the Company's financial results previously announced on May 1, 2007.  The Company's Form 10-Q also contained Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications, signed by defendant Weinert who stated:

1.     I have reviewed this quarterly report on Form 10-Q of Novatel Wireless, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions);

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

57.    As alleged in detail in ¶¶11-39, the statements alleged in ¶¶51-56 were each materially false and/or misleading when made because:

(a)    Novatel's financial results concerning revenues and earnings, reported in press releases, SEC filings and conference calls, were materially misleading and did not fairly present the financial condition of the Company throughout fiscal quarter ended March 31, 2007 for the following reasons:

(i)    Novatel failed to disclose that the Company was prematurely shipping product to meet or exceed its quarterly and year-end forecasts;

1         (ii)      Novatel failed to disclose that one of the Company's largest customers,

2 Sprint, would discontinue all further orders of the Company's popular 720 USB card by the end of

3 July 2007; and

4         (iii)      Novatel concealed that the Company's product mix failed to

5 adequately meet the immediate needs of its two largest domestic customers, Sprint and Verizon,

6 which was causing Novatel to lose considerable market share.

7         (b)      The Sarbanes-Oxley certifications signed by defendant Weinert in Novatel's

8 SEC filings, attesting to the accuracy of the financial results and effectiveness of the Company's

9 internal controls, were false. As the Company admitted on November 10, 2008 in its delayed Form

10 10-Qs for the quarters ended March 31, 2008 and June 30, 2008, there were several control

11 deficiencies in the Company's internal control over financial reporting that in the aggregate

12 constituted a material weakness during the Class Period. Specifically, the Form 10-Qs stated:

13       1.    The Company's policies and procedures did not provide sufficient
14 detail regarding revenue recognition requirements related to cutoff periods across time zones, continuing performance obligations and shipping terms for such transactions resulting from a design deficiency in our internal control.

15

16       2.    The Company did not have effective processes in place to ensure that all relevant contractual and sales information was communicated in a timely manner among the sales, operations and accounting organizations for non-standard and modified sales transactions resulting from a design and operating deficiency in our internal control.

17

18

19       3.    The Company did not provide adequate training for certain personnel regarding the Company's revenue recognition cutoff policies and procedures to ensure that revenues from these transactions were recognized in the proper period resulting from an operating deficiency in our internal control.

20

21     58.    On June 8, 2007, Novatel issued a press release entitled "Novatel Wireless Increases

22 Second Quarter Guidance; Company Announces Resignation of CFO Dan Halvorson," which stated:

23       "We are currently seeing strong demand across our major product lines, most notably for our ExpressCards and Ovation USB devices," commented Brad Weinert, Novatel Wireless' acting Chief Executive Officer. "Wireless data is clearly becoming a vital component of carrier plans, as enterprises and consumers increasingly recognize the benefits of the technology."

24

25

26     59.    On August 6, 2007, Novatel issued a press release entitled "Novatel Wireless Reports

27 Strong Second Quarter Financial Results; Revenue Grows 113% Year Over Year, Gross Margins

28 Increase as Company Raises 2007 Guidance." Therein, the Company stated:

Novatel Wireless, Inc., . . . a leading provider of wireless broadband access solutions, today reported financial results for the second quarter ended June 30, 2007.

Revenue for the second quarter was up 113% to $97.4 million compared to revenue of $45.7 million reported in the same period last year.  Second quarter GAAP net income was $8.0 million, or $0.25 per diluted share.  This compares to GAAP net income of $95,000, or $0.00 per diluted share in the prior year period. 2007 second quarter GAAP results include approximately $1.8 million of non-cash share-based compensation, or $0.06 per diluted share, net of taxes.  Excluding the effect of these charges, non-GAAP net income was $9.8 million or $0.31 per diluted share for the second quarter of 2007.

"Results for the second quarter 2007 continued to demonstrate that Novatel Wireless is executing ahead of plan and capitalizing on the growing worldwide demand for 3G wireless broadband access solutions," commented Brad Weinert, president of Novatel Wireless.  "Demand is strong across a wide range of products including Ovation USB devises, Merlin PC and Express cards, and Expedite embedded modems.  Adoption of USB wireless modems has been a primary growth driver with over $85 million in sales in the nine months since its introduction."

60.    On August 6, 2007, on the Company's earnings conference call, Leparulo and Weinert made the following statements:

[Leparulo:]

With innovative products and strong partnerships, we're well positioned to continue to capitalize on this demand and our progress is evident in our second-quarter results.

*          *          *

[Weinert:]

We had an exceptionally strong first half of the year with Sprint and our competitors also did well, a clear testament to a growing market opportunity and expanding market for wireless data products. We think these trends will continue as we sell a broader range of products into our core customers, our focus not just being on fulfilling expanding customer demand and taking market share but seizing the best opportunities with the most differentiated products and leveraging our R&D efforts to sell multiple products into our end customers. . . .

In the second half of the year, we continue to expect strong results, driven by both continuing demand for existing products and the introduction of new products.

*          *          *

While the exact timeline is still unclear and it is still a little early to go into detail on our design effort, we fully expect to be well positioned as WiMAX moves into volume demand which isn't expected until later in 2008. Our recent results demonstrate that we're executing on plan and capitalizing on the tremendous opportunities that lie ahead of the Company.

61.    On August 9, 2007, Novatel filed its Quarterly Report on Form 10-Q with the SEC. The Company's Form 10-Q was signed by defendant Weinert, and reaffirmed the Company's

1    financial results announced on August 6, 2007.  The Company's Form 10-Q also contained

2    Sarbanes-Oxley certifications, substantially similar to the certifications quoted above in ¶56.

3        62.    As alleged in detail in ¶¶11-39, the statements alleged in ¶¶58-61 were each

4    materially false and/or misleading when made because:

5        (a)    Novatel's financial results concerning revenues and earnings, reported in press

6    releases, SEC filings and conference calls, were materially misleading and did not fairly present the

7    financial condition of the Company throughout fiscal quarter ended June 30, 2007 for the following

8    reasons;

9            (i)    Novatel failed to disclose that the Company was prematurely shipping

10   product to meet or exceed its quarterly and year-end forecasts; and

11           (ii)    Novatel concealed that the Company's product mix failed to

12   adequately meet the immediate needs of its two largest domestic customers, Sprint and Verizon,

13   which was causing Novatel to lose considerable market share.

14       (b)    The Sarbanes-Oxley certifications signed by defendant Weinert in Novatel's

15   SEC filings, attesting to the accuracy of the financial results and effectiveness of the Company's

16   internal controls, were false.  As the Company admitted on November 10, 2008, in its delayed Form

17   10-Qs for the quarters ended March 31, 2008 and June 30, 2008, there were several control

18   deficiencies in the Company's internal control over financial reporting that in the aggregate

19   constituted a material weakness during the Class Period. Specifically, the Form 10-Qs stated:

20           1.    The Company's policies and procedures did not provide sufficient
21   detail regarding revenue recognition requirements related to cutoff periods across
     time zones, continuing performance obligations and shipping terms for such
22   transactions resulting from a design deficiency in our internal control.

23           2.    The Company did not have effective processes in place to ensure that
     all relevant contractual and sales information was communicated in a timely manner
24   among the sales, operations and accounting organizations for non-standard and
     modified sales transactions resulting from a design and operating deficiency in our
25   internal control.

26           3.    The Company did not provide adequate training for certain personnel
     regarding the Company's revenue recognition cutoff policies and procedures to
27   ensure that revenues from these transactions were recognized in the proper period
     resulting from an operating deficiency in our internal control.

28

63.    On November 5, 2007, Novatel issued a press release entitled "Novatel Wireless Reports Strong Third Quarter Financial Results; Revenue Grows 90% Year Over Year, GAAP EPS of $0.28 per share and Non-GAAP EPS of $0.31 per share," which stated:

Novatel Wireless, Inc., . . . a leading provider of wireless broadband access solutions, today reported financial results for the third quarter ended September 30, 2007.

Revenue for the third quarter increased 90% to approximately $104.6 million versus revenue of $55.1 million reported in the same period last year. Third quarter GAAP net income was $9.2 million, or $0.28 per diluted share. This compares to GAAP net loss of $895,000 or $0.03 per diluted share in the prior year period. Third quarter GAAP results include approximately $1.1 million of non-cash share-based compensation expense, net of taxes, or $0.03 per diluted share. Excluding the effect of these charges, non-GAAP net income was $10.3 million or $0.31 per diluted share for the third quarter of 2007.

"Revenues were above previous guidance, increasing by 90% year-over-year as we continued to benefit from our leadership position as an innovative provider of 3G wireless products to our strategic customers," said Brad Weinert, president of Novatel Wireless. "Quarterly revenues were spread across a balanced range of products with upside to the quarter from strong performance across our entire USB product line and major contributions from our next generation USB products in Europe and the U.S. which accounted for over $40 million in revenue."

64.    On November 5, 2007, on the Company's earnings conference call, Leparulo and Weinert made the following statements:

[Leparulo:]

The third quarter was another exciting quarter for Novatel. We launched innovative, market-leading products, saw strong demand for these products, and beat guidance and expectations once again. Our market continues to grow rapidly as 3G wireless data proliferates into mainstream technology.

With innovative products and strong partnerships, we are well positioned to continue to lead this market, and our progress is evident in our third-quarter results.

*        *        *

Our relationships with carriers are strong and we continue to leverage our unique position as a trusted supplier across multiple technologies and form factors to expand our addressable market opportunity. New products, added functionality, and new services and software are all on the horizon as we expect to surprise the market with our next generation of innovation, which we will develop in close consultation with our customers.

[Weinert:]

[D]emand for our new products is very encouraging. We have transitioned to Next Generation USB products (technical difficulty) seeing a stronger uptick in both the U.S. and Europe. Due to this demand, we enter the fourth quarter with strong backlog

1  and record order flow. In fact, our major hurdle is tightness in our supply channel for
2  selected components due to the strong demand.

                                    *         *         *

3  [W]e don't see any shortage of demand. . . . we are very optimistic over the long
4  haul, . . . we see very strong demand, . . . we are optimistic.

5       65.    On November 9, 2007, Novatel filed its Quarterly Report on Form 10-Q with the

6  SEC. The Company's Form 10-Q was signed by defendant Weinert, and reaffirmed the Company's

7  financial results previously announced on November 5, 2007. The Company's Form 10-Q also

8  contained Sarbanes-Oxley certifications, substantially similar to the certifications quoted above in

9  ¶56.

10       66.    As alleged in detail in ¶¶11-39, the statements alleged in ¶¶63-65 were each

11  materially false and/or misleading when made because:

12       (a)    Novatel's financial results concerning revenues and earnings, reported in press

13  releases, SEC filings and conference calls, were materially misleading and did not fairly present the

14  financial condition of the Company throughout fiscal quarter ended September 30, 2007 for the

15  following reasons:

16       (i)    Novatel failed to disclose that the Company was prematurely shipping

17  product to meet or exceed its quarterly and year-end forecasts; and

18       (ii)    Novatel concealed that the Company's product mix failed to

19  adequately meet the immediate needs of its two largest domestic customers, Sprint and Verizon,

20  which was causing Novatel to lose considerable market share.

21       (b)    The Sarbanes-Oxley certifications signed by defendant Weinert in Novatel's

22  SEC filings, attesting to the accuracy of the financial results and effectiveness of the Company's

23  internal controls, were false. As the Company admitted on November 10, 2008 in its delayed Form

24  10-Qs for the quarters ended March 31, 2008 and June 30, 2008, there were several control

25  deficiencies in the Company's internal control over financial reporting that in the aggregate

26  constituted a material weakness during the Class Period. Specifically, the Form 10-Qs stated:

27       1.    The Company's policies and procedures did not provide sufficient
   detail regarding revenue recognition requirements related to cutoff periods across

28

time zones, continuing performance obligations and shipping terms for such transactions resulting from a design deficiency in our internal control.

2. The Company did not have effective processes in place to ensure that all relevant contractual and sales information was communicated in a timely manner among the sales, operations and accounting organizations for non-standard and modified sales transactions resulting from a design and operating deficiency in our internal control.

3. The Company did not provide adequate training for certain personnel regarding the Company's revenue recognition cutoff policies and procedures to ensure that revenues from these transactions were recognized in the proper period resulting from an operating deficiency in our internal control.

## THE TRUTH BEGINS TO EMERGE

67. On February 20, 2008, Novatel issued a press release entitled "Novatel Wireless Announces Fourth Quarter and FY2007 Results; Revenues Increase 97% in 2007 and 53% in Q4; GAAP Net Income Reaches $1.19 per Diluted Share in 2007; More than Triples in Q4 Y-Y to $0.34 per Diluted Share," which stated:

Novatel Wireless, Inc., . . . a leading provider of wireless broadband access solutions, today announced financial results for the fourth quarter and year ended December 31, 2007. Novatel Wireless reported fourth quarter revenue increased 53% to $118 million compared to the fourth quarter ended December 31, 2006. Net income on a generally accepted accounting principles (GAAP) basis increased to $11.1 million or $0.34 per diluted share, compared to GAAP net income of $2.6 million or $0.09 per diluted share in the prior year period. GAAP net income includes $2.0 million in stock-based compensation expenses, net of income tax. Excluding these charges, non-GAAP net income was $13.1 million or $0.40 per diluted share, compared to non-GAAP net income of $4.4 million or $0.14 per diluted share for the prior year period.

For the full year, the Company reported revenue of $430 million, GAAP net income of $38.4 million or $1.19 per diluted share, and non-GAAP net income of $45.3 million or $1.40 per diluted share.

"Novatel Wireless delivered outstanding 2007 results with 97% revenue growth year over year, and record order growth driven by our industry-leading USB products," said Peter Leparulo, executive chairman of Novatel Wireless. "Our ability to bring highly innovative products to market well ahead of our competitors has been key to our success. During the year, we introduced seven new products, including two generations of USB products, and made significant progress in our goal to steadily increase our product momentum throughout EMEA. As we enter 2008, our innovation pipeline is in excellent shape, we are focused on profitable growth, and we will continue to execute our long-term diversification strategy."

68. Novatel also issued disappointing revenue guidance for the quarter of $110 million, which was $10 million below analysts' estimates. Defendants attributed their disappointing

guidance to a consolidation issue at its customers who were supposedly focusing on eliminating inventory from Novatel's competitors:

> We believe that the major North American carriers are looking to significantly consolidate vendors down to two suppliers. This allows them to have more volume leverage over suppliers, keep tighter inventory, and have greater quality control. The feedback that we've received is that the carriers are clearly recognizing that the cost of support and repair problems for many low performing devices quickly erases the benefits of the lower priced units. While they want a reasonable price, they are now willing to give market share commitments so that they can get both value and quality it at the lower end of the market. . . .
>
> Over the short term, this may have some modest impact as carriers flush through competitors' products as they consolidate vendors and lower inventory.

69. Defendants' explanation took analysts by surprise. Indeed, one analyst questioned defendants about why Novatel's largest competitor had not mentioned the same inventory flush. Defendants refused to elaborate:

> Anthony Stoss, Analyst, Craig-Hallum Capital
>
> Hi guys, just a little bit more clarity in a couple of things. Peter, if you wouldn't mind, your biggest competitor didn't mention any budget flush. Can you let us know also if it's either Verizon or Sprint, or both? And why do you think your biggest competitor never mentioned it in their call recently? Then I have a follow-up question.
>
> [Leparulo:]
>
> Sure. I can't speak to that, it's certainly in North America and on – the major carriers in North America. So, yes, we see this happening. There's consolidation taking place within both North American operators.

70. Defendants also disclosed that Novatel was seeing the market shift to the consumer segment but told investors that it was a positive for Novatel and its first generation USB modem. They did so even though Novatel did not have any meaningful shelf space at the retail level:

> There are a number of trends that we believe will improve Novatel Wireless over the long term. First, we believe that most of our key carrier customers are moving to a two-tiered approach to wireless broadband, pushing a more expensive, high quality product to the enterprise and a lower cost product to the consumer. We have already seen the impact of these changes in the USB market where we are the clear pioneer and technology leader. Sprint and Verizon are using our MC 727 product for their higher end offering. At the same time, we continue to see robust sales of our first generation USB products, the MCD 3000 at the lower end. ***Clearly, the current emphasis is on driving the most data subscriptions possible and advertising dollars and subsidies have pushed lower end products where we historically have not put our emphasis***.

*Even yesterday, we saw evidence of this shift with Verizon's announcement of its low cost data plan, moving from $59 to $39 a month.  This is a positive move that increases our addressable market.*

71.     The same day, defendants also continued to misrepresent demand for the Company's products:

[Weinert:]

Our next-generation USB products continue to drive revenue and gross margins during the quarter. We are pleased with the ramp of our new MC 727, the most innovative USB modem ever introduced with features like storage, GPS capabilities and Linux support.

*                *                *

As we enter 2008, we are very pleased with the long-term trends and how we are positioned to fulfill them.

[Lebbon:]

Now, turning to the first quarter 2008 guidance, our guidance for the first quarter of 2008 is as follows. We expect solid revenues in the range of approximately $110 million. We expect gross margins to be modestly impacted by a higher percentage of [inaudible] revenues and currently expect gross margins of approximately 28.  We expect operating margins to remain strong in the range of 11% to 12%. Based on our current view, we expect GAAP earnings of approximately $0.22 per diluted share and non-GAAP earnings of approximately $0.27 per diluted share based on approximately 33 million shares outstanding.

72.     On March 3, 2008, Novatel filed its Annual Report on Form 10-K with the SEC.  The Company's Form 10-K was signed by defendants Weinert and Leparulo, and largely reaffirmed the Company's financial results previously announced on February 20, 2008.  The Company's Form 10-K also contained Sarbanes-Oxley certifications, substantially similar to the certifications quoted above in ¶56.

73.     As alleged in detail in ¶¶11-39, the statements alleged in ¶¶67-72 were each materially false and/or misleading when made because:

(a)     Novatel's financial results concerning revenues and earnings, reported in press releases, SEC filings and conference calls, were materially misleading and did not fairly present the financial condition of the Company throughout fiscal year ended December 31, 2007 for the following reasons:

1     (i)   Novatel failed to disclose that the Company was prematurely shipping

2 product to meet or exceed its quarterly and year-end forecasts; and

3     (ii)   Novatel concealed that the Company's product mix failed to

4 adequately meet the immediate needs of its two largest domestic customers, Sprint and Verizon,

5 which was causing Novatel to lose considerable market share.

6     (b)  The Sarbanes-Oxley certifications signed by defendant Weinert in Novatel's

7 SEC filings, attesting to the accuracy of the financial results and effectiveness of the Company's

8 internal controls, were false. As the Company admitted on November 10, 2008 in its delayed Form

9 10-Qs for the quarters ended March 31, 2008 and June 30, 2008, there were several control

10 deficiencies in the Company's internal control over financial reporting that in the aggregate

11 constituted a material weakness during the Class Period. Specifically, the Form 10-Qs stated:

12    1.  The Company's policies and procedures did not provide sufficient
detail regarding revenue recognition requirements related to cutoff periods across

13 time zones, continuing performance obligations and shipping terms for such
transactions resulting from a design deficiency in our internal control.

14

15    2.  The Company did not have effective processes in place to ensure that
all relevant contractual and sales information was communicated in a timely manner
among the sales, operations and accounting organizations for non-standard and

16 modified sales transactions resulting from a design and operating deficiency in our
internal control.

17

18    3.  The Company did not provide adequate training for certain personnel
regarding the Company's revenue recognition cutoff policies and procedures to
ensure that revenues from these transactions were recognized in the proper period

19 resulting from an operating deficiency in our internal control.

20   74.  On March 24, 2008, an analyst with Morgan Joseph revealed that defendant Weinert

21 had reiterated the guidance that defendants gave for 1Q08 during a discussion with the analyst "early

22 last week":

23    Novatel offered its March quarter guidance of $110.0mm during the third week of
February, and based on our discussions with the company's president early last week,

24 we believe that the company is tracking toward.

25   75.  Defendant Weinert's statement was false. With just four weeks remaining in the

26 quarter, he knew that the Company was not on track to reach its original guidance. Indeed, as

27 defendant Leparulo disclosed on February 20, 2008, Novatel's customers were focused on driving

28 the most subscriptions possible at the retail level, where Novatel did not have any meaningful shelf

1  space.  In fact, Leparulo himself explained that Novatel historically had not put its emphasis on the

2  retail channel.  As a result of this shift and an inability to compete at the retail level, Weinert knew

3  that his statement was false and misleading.

4          76.     On April 14, 2008, the Company shocked the market again with preliminary results

5  for 1Q08 that were $19 million below the Company's original disappointing forecast and $29

6  million below original analyst estimates.  The Company disclosed that demand for its products was

7  weak and that its enterprise modem could not serve what defendants described as "the low-end

8  market":

9          Novatel Wireless, Inc., . . . a leading provider of wireless broadband access solutions,
         today reported preliminary financial results for the first quarter ended March 31,
10        2008 . . . .

11              Revenues for the first quarter are expected to be approximately $91 million,
         lower than the company's prior guidance of $110 million.  GAAP earnings per share
12       are expected to be in the range of $0.13 to $0.15 and non-GAAP EPS is expected to
         be between $0.16 and $0.18 per share.

13
              "We are very disappointed with our first quarter results," said Peter Leparulo.
14       "Approximately $10 million of the shortfall was attributable to a delayed launch of
         the MC930D with a major European carrier customer.  Additionally, we had lower
15       than expected sales of our enterprise-class MC727 USB products to one major
         customer.  We are between product launch cycles for our USB devices and demand
16       in the current environment has shifted toward lower end products.  We continue to
         see solid demand for our first generation MCD3000 USB products selling into this
17       market shift, and we expect our second generation USB products to become the low
         end promotional offering as we introduce our third generation products mid-year."

18
         77.     The same day, Leparulo repeated the explanation on the Company's earnings
19  conference call:

20       [Leparulo:]

21
         I'm very disappointed to report preliminary results for the first quarter which are
22       below our expectations.  Currently, we expect to report revenues of approximately
         $91 million, GAAP EPS in the range of $0.13 to $0.15 per share, and non-GAAP
23       EPS of $0.16 to $0.18 per share.

24            The revenue shortfall was a result of a number of factors.  First, one of our
         carrier partners in Europe delayed the launch of our MC930D products into their
25       network.  That delay, which was due to technical issues unrelated to our products,
         pushed back approximately $10 million in orders.  We have already begun shipping
26       these orders in the new quarter.

27            Secondly, we are between product cycles with one of our key partners.
         Demand has shifted to lower-end products at many carriers.  And while our

28

MCD3000 continues to sell well, sales of our Enterprise class MC727 products were lower than expected at one key customer.

Compounding these two issues, we clearly did not adequately execute both from an operations basis and with our sales effort, especially toward the end of the quarter.  In some cases, we did not have the right products for the right customers.  We were also not able to close other pieces of business in a timely fashion before the quarter end.

Everyone around this table agrees that better execution is required for this unforgiving market, where carriers are looking to maintain leaner inventories.

78.     On May 1, 2008, the Company confirmed the results it announced on April 14, 2008, and issued a press release entitled "Novatel Wireless Reports First Quarter 2008 Results," which stated in part:

Novatel Wireless, Inc., a leading provider of wireless broadband access solutions, today reported financial results for the first quarter ended March 31, 2008.  Revenues for the first quarter of 2008 were $91.3 million compared to $109.8 million in the prior year period.  Net income on a generally accepted accounting principles (GAAP) basis was $4.4 million or $0.14 per diluted share, compared to GAAP net income of $10.1 million or $0.34 per diluted share in the prior year period.  GAAP net income includes $1.2 million in stock-based compensation expenses, net of income tax.  Excluding these charges, non-GAAP net income was $5.6 million or $0.17 per diluted share, compared to non-GAAP net income of $12.1 million or $0.40 per diluted share for the prior year period.

79.     On May 13, 2008, the Company filed a Form 12b-25 with the SEC for an extension of time to file its Form 10-Q.  The Form 12b-25 disclosed that Novatel could not file its Form 10-Q for the quarter because the Company and its Audit Committee undertook an enhanced review of the accounting for a specific customer contract.  The Company also claimed that the review would not impact Novatel's financial results for the quarter:

Novatel Wireless, Inc. (the "Company") was unable to finalize preparation of its financial statements in sufficient time to file its Quarterly Report on Form 10-Q for the period ended March 31, 2008 (the "Form 10-Q") by the prescribed due date without unreasonable effort and expense.  The Company and its Audit Committee undertook an enhanced review of the accounting for a specific customer contract, which review was substantially completed today.  As a result of such review, the Company and its Audit Committee do not expect any change to the accounting under that contract, or to any previously reported financial statements or earnings disclosed in the Company's Current Report on Form 8-K filed on May 1, 2008.  However, the Company has filed this Form 12b-25 for an extension to finalize its Form 10-Q, and expects to file its Form 10-Q on or before May 19, 2008, the fifth calendar day following its prescribed due date.

*     *     *

The Company expects to report that its net income for the quarter ended March 31, 2008 was $4.4 million, or $0.14 per diluted share, compared to net income of $10.1 million, or $0.34 per diluted share, for the quarter ended March 31, 2007. The decrease in net income was primarily due to a decrease in revenue from $109.8 million for the quarter ended March 31, 2007 to $91.3 million for the quarter ended March 31, 2008.

80.     As alleged in detail in ¶¶11-39, the statements alleged in ¶¶76-78 were each materially false and/or misleading when made because:

(a)     Novatel's financial results concerning revenues and earnings, reported in press releases, SEC filings and conference calls, were materially false and misleading throughout fiscal quarter ended March 31, 2008 for the following reasons:

(i)     Novatel failed to disclose that the Company was prematurely shipping product to meet or exceed its quarterly and year-end forecasts; and

(ii)     Novatel failed to disclose that the Company was recognizing revenue in violation of its own revenue cut-off procedures and GAAP, thus rendering the Company's publicly reported financial results materially false. Specifically, the Company has admitted that $3.4 million in revenue had been improperly recognized in violation of revenue cutoff procedures.

81.     On August 19, 2008, the Company shocked the market again by announcing that it had broadened its accounting review and determined to move at least $3.4 million in revenue out of 1Q08:

Review Update

As previously announced, the Audit Committee of the Company's board of directors is conducting an expanded review into the Company's revenue cut-off procedures, internal control and accounting related to certain customer contracts. During the course of the review to date, six transactions have undergone further accounting review, principally as to whether these shipments were recognized as revenue in the appropriate quarter. These shipments involved aggregate revenues of $9.1 million and pre-tax income of $1.1 million. As discussed above, the review has resulted in a preliminary determination to move approximately $3.4 million of revenues from the first quarter to the second quarter of 2008.

As previously noted, the accounting review is ongoing and may identify other issues. The Audit Committee review may, among other things, result in additional revenue moving between quarters or years. To date, no determination has been made as to whether a restatement of our 2007 audited financial statements will be required. Upon completion of the Audit Committee review, a decision will be made as to whether a restatement is required. Following the completion of this review, we will finalize our financial statements for the first and second quarters. The fees and

expenses billed through June 30, 2008 by outside professionals in connection with the review are approximately $2.6 million, on a pre-tax basis.

"We are continuing to work closely with our independent auditors," said Kenneth Leddon, chief financial officer for Novatel Wireless.   "The Audit Committee review is primarily focused on the timing of certain revenue and related income and could result in revenue and income moving from one quarter or year to another.  Although this process has taken us longer and is more expensive than we initially expected, it is important to commit the time and resources required to ensure a thorough and comprehensive review and implement appropriate remedial measures."

82.    On August 19, 2008, on the Company's earnings conference call, defendants made the following statements:

Anthony Stoss – Craig-Hallum Capital – Analyst

Also, Peter, can you talk about what kind of controls you are putting in place on the accounting side?  Are we beefing up staff?  Were we understaffed?  Help us understand why we are so off kilt on Q1 and Q2, and what kind of assurances investors might have for Q3, Q4 or whatever that something is not going to pop-up again?

[Leparulo:]

Sure.  Like we said, these involve principally revenue cut-off procedures relating to the timing of revenue.  We have not seen any significant issue about the validity of any revenue.

So because they involve revenue cut-off procedures, we are putting in place really controls at the end of the quarter to make sure that the items related to deliveries at the end of a quarter tick and tie.

They get fairly technical in terms of what the actual controls will be.  But about suffice it to say that there has not been any control that has been recommended by any outside adviser that we do not intend to implement, if we haven't already, in the next several months.

83.    As a result of those disclosures, Novatel's stock price dropped from $8.40 to $6.29 in one day.  This decrease in Novatel's stock price was a result of the artificial inflation caused by defendants' misleading statements coming out of the stock price.

84.    Finally, on November 10, 2008, Novatel issued its delayed Form 10-Qs for the quarters ended March 31, 2008 and June 30, 2008.  As a result of the Company's accounting review, Novatel disclosed that the revenues for the quarter ended March 31, 2008 were misstated by $3.4 million due to improper revenue cutoff procedures and accounting irregularities relating to certain customer contracts.  The Form 10-Qs also indicate that there were several control deficiencies in the

Company's internal control over financial reporting that in the aggregate constituted a material weakness during the Class Period.  For instance, the Form 10-Qs stated:

>    1.     The Company's policies and procedures did not provide sufficient detail regarding revenue recognition requirements related to cutoff periods across time zones, continuing performance obligations and shipping terms for such transactions resulting from a design deficiency in our internal control.
>
>    2.     The Company did not have effective processes in place to ensure that all relevant contractual and sales information was communicated in a timely manner among the sales, operations and accounting organizations for non-standard and modified sales transactions resulting from a design and operating deficiency in our internal control.
>
>    3.     The Company did not provide adequate training for certain personnel regarding the Company's revenue recognition cutoff policies and procedures to ensure that revenues from these transactions were recognized in the proper period resulting from an operating deficiency in our internal control.

85.     After this disclosure, Novatel's stock slid below $5 per share, trading as low as $3.90 per share by November 17, 2008, a 27% decline from its November 10, 2007 open of $15.33 per share.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

86.     During the Class Period, the defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Novatel securities during the Class Period. The fraudulent scheme: (a) deceived the investing public regarding Novatel's financial statements, operations and management, internal controls and the value of the Company's securities; (b) enabled the defendants to sell almost $29 million worth of their Novatel stock at artificially inflated prices; and (c) caused Plaintiff and other Class members to purchase Novatel stock at artificially inflated prices, causing them damage.

## NOVATEL MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

87.     To overstate Novatel's revenues and EPS during the Class Period, defendants caused Novatel to employ several improper accounting schemes, in violation of GAAP and SEC guidance, including the improper and premature recognition of revenue where:

1          (a)     All or portions of the product in certain sales transactions had not been

2  delivered or formally accepted in the quarter revenue was recognized; and

3          (b)     title and the risks of ownership had not yet transferred to the customer.

4        88.    These accounting shenanigans resulted in the material overstatement of Novatel's

5  revenues in its financial statements filed with the SEC on Forms 10-Q for the first and second

6  quarters of fiscal 2008.  Ultimately, when Novatel's various improper accounting schemes reflected

7  in these financial statements came to light, the Company was forced to admit that the revenues for

8  the quarter ended March 31, 2008 were misstated by $3.4 million due to improper revenue cutoff

9  procedures and accounting irregularities relating to certain customer contracts, which overstated EPS

10  by $0.01 (7.1%).

11        89.    GAAP are those principles recognized by the accounting profession as the

12  conventions, rules, and procedures necessary to define accepted accounting practice at a particular

13  time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the

14  SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate,

15  despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements

16  must also comply with GAAP, with the exception that interim financial statements need not include

17  disclosure that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R.

18  §210.10-01(a).

19        90.    The original representations that Novatel's financial statements were properly stated

20  and a fair representation of Novatel's financial condition were false and misleading, as the financial

21  information was neither in conformity with GAAP, nor was the financial information a "fair

22  representation" of Novatel's financial condition.

23        91.    The overstatement of revenue is not disputed.  On August 19, 2008, defendants ability

24  to hide their ongoing accounting fraud finally came to an end, and Novatel announced that as a result

25  of their improper accounting practices, Novatel was forced to retroactively adjust its reported or

26  previously announced financial statements for the quarter ended March 31, 2008.  Defendants

27  admitted that Novatel made improper accounting entries to the Company's books and engaged in

28

improper accounting schemes to prematurely recognize revenue totaling $3.4 million for the quarter ended March 31, 2008, representing 4% of the $87.9 million in adjusted revenues during this period.

**Novatel's Revenue Adjustments Establish Scienter**

92.     As a result of employing the improper accounting practices as alleged herein throughout the Class Period, Novatel was ultimately forced to restate its previously released financial statements for the quarter ended March 31, 2008 to comply with GAAP and SEC guidance. This adjustment was material and decreased both revenues by 4% in the first quarter of 2008 and EPS by $0.01 (7.1%).

93.     The fact that Novatel adjusted its previous financial statements is an admission that: (i) the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading; and (ii) the financial statements reported during the Class Period were incorrect based on information available to the defendants at the time the results were originally reported.

94.     The adjustment at issue was not due to simple mathematical error or honest misapplication of an accounting standard or oversight.  It was due to misuse of the facts.  As alleged herein, Novatel knew that revenues were being recorded prematurely and without support.  Despite this knowledge, Novatel refused to make the required adjustments to correct the financial statements because they would have decreased its net revenues, reduced earnings per share and adversely affected the stock price.

95.     Further, the improper accounting corrected by this adjustment did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated, vague, or arcane accounting rules.  The accounting gimmicks used by Novatel are as old, simple and fundamental as they come – namely, improper revenue recognition by failing to meet the fundamental criteria of revenue recognition, such as delivery of the goods and the ability to collect payment from customers.

96.     Moreover, it is more than sheer coincidence that the adjustment had the effect of inflating, not reducing, revenues, and to reducing the Company's earnings per share.

**All or Portions of Products Bundled in Sales Transactions Had Not Been Delivered or Performed in the Quarter Revenue Was Recognized**

97.     Novatel has admitted it improperly and prematurely recognized at least $3.4 million of revenue when all or portions of the products "sold" to certain customers had not yet been provided or accepted, but rather had only been promised to be provided in the future at the time revenue was originally recognized.  Despite the fact that these portions of sales agreements would not be provided or accepted until some future date, if at all, Novatel improperly recognized all the revenue up front rather than properly deferring portions of the sale until the products or services were actually delivered or accepted.

98.     By improperly recognizing this revenue, Novatel failed to comply with the most basic accounting rules governing revenue recognition, including Securities and Exchange Commission Staff Accounting Bulletin ("SAB") 104, SEC Codification of Staff Accounting Bulletins, Topic 13; Revenue Recognition, as amended, and SAB 101, Revenue Recognition in Financial Statements. SAB 104 and the other SEC pronouncements concisely and clearly state that revenue is realized or realizable and earned only if and when all of the following criteria are met:

    (a)     "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction;

    (b)     "Delivery has occurred or services have been rendered";

    (c)     "The seller's price to the buyer is fixed or determinable"; and

    (d)     "Collectibility is reasonably assured."

99.     In addition, Novatel violated the overarching accounting principle that revenues and gains should not be recognized in financial statements until they are both earned and realizable (FASB Statement of Concepts ("CON") No. 5, Recognition and Measurement in Financial Statements of Business Enterprises):

    (a)     "Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash [CON 5 83a]."

(b)  "Revenues are not recognized until earned.  An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues [CON 5, 83b]."

(c)  "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers [CON 5, 84a]."

100.  Defendants intentionally ignored these long-standing accounting rules and, in doing so, improperly recognized at least $3.4 million in revenue in the first quarter of 2008.

**Novatel Improperly Recognized Revenue Before Title and Ownership of Products Passed to Customers**

101.  Novatel improperly tried to squeeze in revenues at the end of each quarter by prematurely shipping product to customers who had not yet requested delivery or requested/received delivery after quarter end.  In doing so, Novatel violated the principle that revenues and gains should not be recognized until they are both earned and realizable (FASB CON 5, 83).

102.  By not disclosing this improper shipping practice, Novatel also violated SEC Staff Accounting Bulletin No. 101, *Revenue Recognition* (SAB 101), which notes the following MD&A disclosure requirement analogous to premature shipments of product at the end of a reporting period:

Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.

**Novatel's Financial Statements Violated Fundamental Accounting Concepts of GAAP and SEC Guidance**

103.  In addition to the above-referenced departures from GAAP and SEC guidance, as a result of the defendants' accounting improprieties, Novatel presented its financial results in a manner that violated GAAP and SEC guidance, including the following fundamental accounting principles and SEC guidance:

(a)  The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the financial reports in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, 34);

(b)  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the

effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, 40);

(c)    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. (FASB Statement of Concepts No. 1, 50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, 79);

(g)    The principle that revenues and gains should not be recognized until they are both earned and realizable (FASB Statement of Concepts No. 5, 83);

(h)    The principle that if collectibility of assets received for products, services, or other assets is doubtful, revenues may be recognized on the basis of the cash received (FASB Statement of Concepts No. 5, 84); and

(i)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, 95).

## NOVATEL LACKED ADEQUATE INTERNAL CONTROLS

104.    Defendants were able to scheme Novatel shareholders and inflate Novatel stock prices through accounting improprieties which resulted in materially misleading financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls. In its delayed Form 10-Qs for the quarters ended March 31, 2008 and June 30, 2008, the Company admitted the following material weaknesses:

1.    The Company's policies and procedures did not provide sufficient detail regarding revenue recognition requirements related to cutoff periods across time zones, continuing performance obligations and shipping terms for such transactions resulting from a design deficiency in our internal control.

2.    The Company did not have effective processes in place to ensure that all relevant contractual and sales information was communicated in a timely manner

1    among the sales, operations and accounting organizations for non-standard and
2    modified sales transactions resulting from a design and operating deficiency in our
     internal control.

3         3.    The Company did not provide adequate training for certain personnel
4    regarding the Company's revenue recognition cutoff policies and procedures to
     ensure that revenues from these transactions were recognized in the proper period
5    resulting from an operating deficiency in our internal control.

6    105.    Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting
7    company must:

8         (A)    make and keep books, records, and accounts, which, in reasonable detail,
          accurately and fairly reflect the transactions and dispositions of the assets of the
9         issuer;

10        (B)    devise and maintain a system of internal accounting controls sufficient to
          provide reasonable assurances that –

11                                    *        *        *

12        (i)    transactions are recorded as necessary . . . to permit
          preparation of financial statements in conformity with [GAAP].

13   15 U.S.C. §78m(b)(2)(A)-(B).

14
15   106.    These provisions require an issuer to employ and supervise reliable personnel, to

16   maintain reasonable assurances that transactions are executed as authorized, to properly record

17   transactions on an issuer's books and, at reasonable intervals, to compare accounting records with

18   physical assets.

19   107.    Defendants caused Novatel to violate §13(b)(2)(A) of the 1934 Act by failing to

20   maintain accurate records concerning its revenue recognition requirements related to cutoff periods

21   across time zones, continuing performance obligations and shipping terms for certain transactions.

22   108.    In addition, defendants caused Novatel to violate §13(b)(2)(B) of the 1934 Act by

23   failing to implement procedures reasonably designed to prevent accounting irregularities.  Novatel

24   failed to ensure that proper review and checks were in place to ensure that it was recording and

25   properly reporting revenues.  In fact, despite knowing the true dismal state of the Company's lack of

26   adequate internal controls, defendants regularly issued quarterly financial statements throughout the

27   Class Period without ever disclosing the deficiencies in Novatel's internal accounting controls and

28   falsely asserted that its financial statements complied with GAAP.

1    109.    Financial reporting includes not only financial statements, but also other means of

2    communicating information that relates directly or indirectly to the information in the financial

3    statements.  *See* Financial Accounting Standards Board Statement of Concepts No. 1, ¶7.  For this

4    reason, in addition to Novatel's failure to make the required disclosures in its financial statements

5    and in its SEC filings, Novatel also shirked its duty to make such disclosures in its conference calls,

6    its press releases and its Annual Reports.

7    110.    As defendants allowed and were responsible for initiating a gross lack of internal

8    controls over financial reporting, defendants were enabled to scheme Novatel shareholders and

9    inflate stock prices through accounting improprieties which resulted in materially misstated publicly

10   filed financial statements.

11                        **SCIENTER ALLEGATIONS**

12   111.    As alleged herein, defendants acted with scienter in that defendants either knew or

13   recklessly disregarded that the public documents and statements issued or disseminated in the name

14   of the Company were materially false and misleading; that such statements or documents would be

15   issued or disseminated to the investing public; and substantially participated or acquiesced in the

16   issuance or dissemination of such statements or documents as primary violations of the federal

17   securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of

18   information reflecting the true facts regarding Novatel, their control over, and/or receipt and/or

19   modification of Novatel's allegedly materially misleading misstatements and/or their associations

20   with the Company which made them privy to confidential proprietary information concerning

21   Novatel, participated in the fraudulent scheme alleged herein.

22   **Red Flags Concerning Premature Product Shipments and Revenue Recognition Practices**

23   112.    Novatel's financial results and its statements about current demand were false and

24   misleading.  Specifically, defendants failed to disclose that Novatel was prematurely shipping

25   products into a channel that had become over-saturated.  In 2007, Novatel shipped product to its

26   customers prematurely to meet its quarterly and year-end forecasts.  As one former Novatel

27   employee (who had frequent discussions during the Class Period with shipping department

28   employees about Novatel's early shipments) explained it, "there was always a crunch time at the end

1   of each quarter."  The Company would frequently ship large amounts of product "up to 4 weeks

2   early" so they could recognize the revenue up front in the current quarter and meet or exceed Wall

3   Street expectations.

4           113.    Defendants knew of, or recklessly disregarded, these practices.  Novatel's revenue

5   recognition practices were of critical importance to Novatel's financial operations such that the

6   defendants would undoubtedly have focused on this aspect of the Company's operations.  Indeed,

7   they were required to investigate and establish procedures directly addressing this type of activity.

8   By certifying that they had done so when, in fact, they had not, defendants acted recklessly, at a

9   minimum.

10          114.    Defendants also knew of the practice of shipping product early through their

11  proximity to Novatel's operations.  The Company was small, consisting of approximately 300

12  employees throughout the entire Class Period.  The vast majority of these employees were on sales

13  and research and development.  According to the Company's 2007 Form 10-K, of the 301 employees

14  as of December 31, 2007, only 44 of the Company's employees worked in "operations," including

15  the CEO and CFO.  Thus, these defendants knew of the fraudulent acts alleged herein.

16          115.    The defendants were, at best, acting in reckless disregard for the truth by ignoring

17  numerous red flags and warnings concerning the improprieties alleged.  Wireless modem suppliers

18  such as Novatel must maintain sophisticated internal controls to monitor vendor shipments and

19  revenue recognition requirements related to cutoff periods.  During the Class Period, defendant

20  Weinert told investors that Novatel had instituted such controls and that they had personally

21  supervised their operation.  Novatel subsequently admitted that these defendants' statements (and

22  certifications) were false when made.  Given the significance of the Company's revenue recognition

23  practices and the substantial internal control deficiencies the Company had during the Class Period,

24  defendants were acting with extreme recklessness in assuring investors that Novatel's controls were

25  effective and its financial statements were prepared in compliance with GAAP and fairly presented

26  the financial condition of the Company.

27

28

**Red Flags Concerning Defendants' Insider Sales**

116.     Defendants were further motivated to engage in this course of conduct in order to sell 1,258,466 shares of their personally held Novatel stock and thereby reap almost $29 million in insider trading proceeds.

**Novatel Wireless Insider Sales: 2/27/07 – 8/19/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stock Holdings | % Sold | End of CP Vested In-the-Money Options + Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| Hadley | 3/1/2007 | 15,000 | $12.94 | $194,100 | | | | |
| | 3/7/2007 | 30,214 | $14.00 | $422,996 | | | | |
| | 3/20/2007 | 73,334 | $15.00 | $1,100,010 | | | | |
| | 5/18/2007 | 14,650 | $20.90 | $306,185 | | | | |
| | 6/1/2007 | 83,099 | $23.51 | $1,953,657 | | | | |
| | 6/1/2007 | 8,000 | $23.51 | $188,080 | | | | |
| | 6/1/2007 | 6,901 | $23.51 | $162,243 | | | | |
| | 7/2/2007 | 2,667 | $26.05 | $69,475 | | | | |
| | 8/1/2007 | 2,666 | $20.25 | $53,987 | | | | |
| | 9/4/2007 | 2,667 | $22.75 | $60,674 | | | | |
| | 10/1/2007 | 2,667 | $23.10 | $61,608 | | | | |
| | 11/1/2007 | 2,666 | $25.26 | $67,343 | | | | |
| | 12/3/2007 | 2,667 | $15.50 | $41,339 | | | | |
| | | 247,198 | | $4,681,696 | 3,149 | 98.74% | | |
| Leparulo | 5/18/2007 | 35,658 | $20.99 | $748,461 | | | | |
| | 5/29/2007 | 28,666 | $22.04 | $631,799 | | | | |
| | 5/29/2007 | 27,310 | $22.04 | $601,912 | | | | |
| | 5/29/2007 | 24,024 | $22.04 | $529,489 | | | | |
| | 5/30/2007 | 20,000 | $22.04 | $440,800 | | | | |
| | 7/2/2007 | 137,699 | $25.99 | $3,578,797 | | | | |
| | 7/3/2007 | 100,000 | $25.90 | $2,590,000 | | | | |
| | 7/5/2007 | 100,000 | $24.09 | $2,409,000 | | | | |
| | | 473,357 | | $11,530,258 | 43,754 | 91.54% | 660,420 | 41.75% |
| Ratcliffe | 5/18/2007 | 17,350 | $21.01 | $364,524 | | | | |
| | 7/2/2007 | 25,920 | $26.07 | $675,734 | | | | |
| | 7/2/2007 | 19,080 | $26.07 | $497,416 | | | | |
| | 7/6/2007 | 8,016 | $24.62 | $197,354 | | | | |
| | 7/16/2007 | 45,000 | $28.07 | $1,263,150 | | | | |
| | 8/7/2007 | 7,000 | $22.47 | $157,290 | | | | |
| | 9/7/2007 | 7,000 | $23.33 | $163,310 | | | | |
| | 10/4/2007 | 7,000 | $24.80 | $173,600 | | | | |
| | 11/6/2007 | 5,500 | $22.00 | $121,000 | | | | |
| | 11/6/2007 | 500 | $22.50 | $11,250 | | | | |
| | 11/6/2007 | 500 | $22.30 | $11,150 | | | | |
| | 11/6/2007 | 300 | $22.03 | $6,609 | | | | |
| | 11/6/2007 | 200 | $22.09 | $4,418 | | | | |
| | | 143,366 | | $3,646,804 | 9,160 | 93.99% | 190,061 | 43.00% |

| | | | | | End of CP Unrestricted Stock | | End of CP Vested In-the-Money Options + Unrestricted Stock | |
|---|---|---|---|---|---|---|---|---|
| Last Name | Date | Shares | Price | Proceeds | Holdings | % Sold | Stock | % Sold |
| Souissi | 2/23/2007 | 15,000 | $13.00 | $195,000 | | | | |
| | 3/1/2007 | 15,000 | $13.00 | $195,000 | | | | |
| | 3/15/2007 | 15,000 | $14.65 | $219,750 | | | | |
| | 3/15/2007 | 6,947 | $14.65 | $101,774 | | | | |
| | 4/2/2007 | 15,000 | $15.99 | $239,850 | | | | |
| | 5/1/2007 | 7,963 | $18.20 | $144,927 | | | | |
| | 5/1/2007 | 7,037 | $18.20 | $128,073 | | | | |
| | 5/18/2007 | 78,667 | $20.93 | $1,646,500 | | | | |
| | 5/18/2007 | 16,000 | $20.93 | $334,880 | | | | |
| | 5/18/2007 | 15,991 | $20.93 | $334,692 | | | | |
| | 6/5/2007 | 8,099 | $24.00 | $194,376 | | | | |
| | 6/5/2007 | 6,901 | $24.00 | $165,624 | | | | |
| | 6/5/2007 | 1,333 | $24.00 | $31,992 | | | | |
| | 6/5/2007 | 1,000 | $24.00 | $24,000 | | | | |
| | 7/2/2007 | 15,000 | $25.87 | $388,050 | | | | |
| | 8/17/2007 | 1,015 | $21.35 | $21,670 | | | | |
| | 9/5/2007 | 5,089 | $24.00 | $122,136 | | | | |
| | 9/6/2007 | 9,911 | $24.00 | $237,864 | | | | |
| | 10/3/2007 | 12,677 | $24.00 | $304,248 | | | | |
| | 10/3/2007 | 745 | $24.08 | $17,940 | | | | |
| | 10/3/2007 | 700 | $24.06 | $16,842 | | | | |
| | 10/3/2007 | 478 | $24.01 | $11,477 | | | | |
| | 10/3/2007 | 100 | $24.03 | $2,403 | | | | |
| | 10/3/2007 | 100 | $24.04 | $2,404 | | | | |
| | 10/3/2007 | 100 | $24.05 | $2,405 | | | | |
| | 10/3/2007 | 100 | $24.07 | $2,407 | | | | |
| | 11/1/2007 | 15,000 | $25.35 | $380,250 | | | | |
| | 2/20/2008 | 1,607 | $13.90 | $22,337 | | | | |
| | | 272,560 | | $5,488,870 | 3,264 | 98.82% | 62,597 | 81.32% |
| Weinert | 6/1/2007 | 5,189 | $23.56 | $122,253 | | | | |
| | 6/1/2007 | 4,000 | $23.56 | $94,240 | | | | |
| | 6/1/2007 | 3,000 | $23.56 | $70,680 | | | | |
| | 6/1/2007 | 2,500 | $23.56 | $58,900 | | | | |
| | 6/1/2007 | 1,500 | $23.56 | $35,340 | | | | |
| | 6/1/2007 | 500 | $23.56 | $11,780 | | | | |
| | 6/1/2007 | 100 | $23.56 | $2,356 | | | | |
| | 6/5/2007 | 3,500 | $24.00 | $84,000 | | | | |
| | 7/2/2007 | 4,000 | $25.85 | $103,400 | | | | |
| | 7/2/2007 | 3,500 | $25.85 | $90,475 | | | | |
| | 7/2/2007 | 3,000 | $25.85 | $77,550 | | | | |
| | 7/2/2007 | 2,500 | $25.85 | $64,625 | | | | |
| | 7/2/2007 | 2,000 | $25.85 | $51,700 | | | | |
| | 7/2/2007 | 1,500 | $25.85 | $38,775 | | | | |
| | 7/2/2007 | 500 | $25.85 | $12,925 | | | | |
| | 7/2/2007 | 100 | $25.85 | $2,585 | | | | |
| | 7/16/2007 | 10,871 | $28.05 | $304,932 | | | | |
| | 7/17/2007 | 17,500 | $28.20 | $493,500 | | | | |

**Novatel Wireless Insider Sales: 2/27/07 – 8/19/08**

| Novatel Wireless Insider Sales: 2/27/07 – 8/19/08 | | | | | End of CP Unrestricted Stock Holdings | % Sold | End of CP Vested In-the-Money Options + Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| Last Name | Date | Shares | Price | Proceeds | | | | |
| | 7/17/2007 | 15,500 | $28.20 | $437,100 | | | | |
| | 7/17/2007 | 12,500 | $28.20 | $352,500 | | | | |
| | 7/17/2007 | 9,129 | $28.20 | $257,438 | | | | |
| | 7/17/2007 | 9,096 | $28.20 | $256,507 | | | | |
| | 7/17/2007 | 7,500 | $28.20 | $211,500 | | | | |
| | 7/17/2007 | 2,500 | $28.20 | $70,500 | | | | |
| | | 121,985 | | $3,305,560 | 13,274 | 90.19% | 192,157 | 38.83% |
| | Total: | 1,258,466 | | $28,653,188 | | | | |

*Plaintiff was unable to determine (from publicly available information) defendant Hadley's Class Period vested options holdings. Therefore, this information is omitted from the spreadsheet above.

117.    Defendants' insider sales were suspicious in timing. Defendants' sales were predominantly made between May 2007 and November 2007, at prices near the Class Period high of approximately $29 per share.  Not surprisingly, defendants Leparulo and Weinert's selling spree increased abruptly just days before the market learned in late July that Sprint would no longer be purchasing Novatel's flagship product, the EU720 USB card.  Tellingly, defendants Hadley, Leparulo, Ratcliffe, Souissi and Weinert all adopted or amended their 10b5-1 trading plans – allowing them to sell more shares of stock – months before the market learned of Sprint's decision. Similarly suspicious, defendants Hadley, Ratcliffe and Souissi managed to make over 98% of their insider sales shortly before Novatel's stock tumbled from over $25 per share on November 1, 2007 to almost $15 by November 21, 2007, a 40% decline in three weeks. As illustrated in the stock chart herein, Novatel's stock price never recovered and currently trades in the $5 range.  The suspiciousness of defendants' stock sales and their proximity to the market learning of the Sprint cancellation raises a strong inference that defendants knew of the Sprint cancellation when they sold their shares and used that information in connection with the sales.

118.    Defendants' insider sales were also suspicious in amount.  Defendants Hadley, Leparulo, Ratcliffe, Souissi and Weinert all sold over 90% of their Novatel holdings (excluding

vested options) during the Class Period for a combined total of almost $29 million.  Including vested

options, the percentages remain suspicious at between 39% and 81%.

119.    Further, defendants' insider sales were unusual compared to their prior trading

history. The following chart showing defendants' insider sales in the five years prior to the Class

Period:

**Novatel Wireless Inc.**
Insider Sales: 12/1/03 - 2/27/07

| Last Name | Date | Shares | Price | Proceeds |
|-----------|------|--------|-------|----------|
| Hadley | 2/17/2004 | 42,300 | $16.41 | $694,143 |
| | 8/17/2004 | 44,500 | $18.55 | $825,475 |
| | 8/18/2004 | 5,500 | $18.31 | $100,705 |
| | 9/3/2004 | 4,200 | $21.05 | $88,410 |
| | 9/13/2004 | 4,200 | $23.09 | $96,978 |
| | 9/28/2004 | 4,200 | $23.61 | $99,162 |
| | 10/13/2004 | 3,250 | $23.27 | $75,628 |
| | 10/22/2004 | 3,456 | $25.17 | $86,988 |
| | 10/26/2004 | 3,250 | $24.44 | $79,430 |
| | 10/28/2004 | 10,000 | $26.01 | $260,100 |
| | 11/15/2004 | 3,339 | $20.00 | $66,780 |
| | 12/1/2004 | 6,411 | $21.33 | $136,747 |
| | 12/13/2004 | 180 | $22.48 | $4,046 |
| | 1/12/2007 | 15,000 | $11.05 | $165,750 |
| | 2/1/2007 | 15,000 | $11.61 | $174,150 |
| | 2/5/2007 | 50,000 | $12.50 | $625,000 |
| | | 214,786 | | $3,579,491 |
| | | | | |
| Leparulo | 2/17/2004 | 127,300 | $16.41 | $2,088,993 |
| | 8/18/2004 | 46,579 | $18.78 | $874,754 |
| | 8/19/2004 | 30,000 | $20.17 | $605,100 |
| | 8/20/2004 | 12,500 | $20.31 | $253,875 |
| | 8/23/2004 | 17,500 | $20.46 | $358,050 |
| | 8/24/2004 | 10,000 | $21.78 | $217,800 |
| | 9/3/2004 | 15,000 | $20.68 | $310,200 |
| | 9/13/2004 | 19,000 | $23.02 | $437,380 |
| | 9/28/2004 | 19,000 | $23.26 | $441,940 |
| | 10/13/2004 | 19,000 | $23.20 | $440,800 |
| | 10/22/2004 | 20,104 | $25.07 | $504,007 |
| | 10/22/2004 | 6,500 | $25.07 | $162,955 |
| | 10/27/2004 | 112,500 | $25.08 | $2,821,500 |
| | 11/15/2004 | 19,000 | $19.99 | $379,810 |
| | 11/15/2004 | 4,958 | $19.99 | $99,110 |
| | 12/1/2004 | 20,000 | $21.33 | $426,600 |
| | 12/13/2004 | 20,000 | $22.28 | $445,600 |
| | 12/15/2004 | 32,873 | $22.42 | $737,013 |
| | 1/12/2005 | 15,000 | $15.41 | $231,150 |
| | | 566,814 | | $11,836,637 |

**Novatel Wireless Inc.**
Insider Sales: 12/1/03 - 2/27/07

| Last Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Souissi | 2/20/2004 | 29,654 | $17.95 | $532,289 |
| | 8/16/2004 | 45,000 | $18.16 | $817,200 |
| | 9/13/2004 | 15,642 | $23.08 | $361,017 |
| | 10/13/2004 | 8,142 | $23.16 | $188,569 |
| | 10/15/2004 | 7,500 | $22.41 | $168,075 |
| | 11/12/2004 | 2,842 | $20.72 | $58,886 |
| | 11/15/2004 | 2,800 | $20.56 | $57,568 |
| | 12/13/2004 | 5,642 | $22.36 | $126,155 |
| | 1/13/2005 | 2,821 | $15.03 | $42,400 |
| | 1/14/2005 | 2,821 | $14.16 | $39,945 |
| | 2/14/2005 | 5,642 | $13.39 | $75,546 |
| | 6/13/2005 | 22,568 | $13.50 | $304,668 |
| | 7/14/2005 | 5,642 | $13.60 | $76,731 |
| | | 156,716 | | $2,849,050 |
| | **Total:** | 938,316 | | $18,265,178 |

120.    During the five years prior to the Class Period, defendants Hadley, Leparulo, Ratcliffe, Souissi and Weinert sold only 938,316 shares of their Novatel stock, resulting in proceeds of $18.3 million.  During a nine month span of the Class Period, however, these same defendants engaged in a selling spree of 1,258,466 shares of their Novatel stock for proceeds of almost $29 million.

121.    Defendants had actual knowledge of Sprint's decision when they sold their stock. According to a July 20, 2007 Craig-Hallum analyst report, Novatel had known "for some time" that its largest and most important customer would transition away from Novatel's flagship 720 USB modem.  And while defendants tried to characterize Sprint's decision as a mere "transition," Novatel did not and would not have its next generation modem ready for shipment until months later.  Given the importance of Sprint to Novatel (it accounted for 38% of Novatel's revenue in 2006) and the importance of the flagship 720 USB modem to Novatel's operations, defendants undoubtedly knew of the Sprint cancellation.

122.    Defendants also knew that Novatel was losing market share throughout the Class Period.  Indeed, more than half of Novatel's sales were to the two largest wireless carriers in the United States, Sprint and Verizon.  Because these companies were critical to Novatel's survival,

1   defendants undoubtedly knew about their choices of product, especially because the market in which

2   Novatel operated was so competitive.   Indeed, Novatel's largest customer, Sprint, cancelled

3   Novatel's flagship product in July 2007 and selected other vendors to supply modems for its new

4   WiMAX technology.  Because of the importance of this customer to Novatel, defendants knew that

5   these decisions cost it market share.  Defendants also knew that the market was transitioning to the

6   retail level as reflected in the reduction in data rates by Sprint, Vodafone, and ultimately Verizon,

7   and that this shift would and did cost Novatel market share.  Defendants themselves admitted that the

8   reduction in rates represented a shift to a part of the market that Novatel had not historically focused

9   and therefore that Novatel could not effectively compete with low-cost suppliers.  As a result of this

10  shift, defendants knew that Novatel could not serve a major part of the market that its customers

11  were targeting to serve and that it was therefore losing market share.

12                          **LOSS CAUSATION/ECONOMIC LOSS**

13          123.    The markets for Novatel common stock were open, well-developed and efficient at all

14  relevant times.  During the Class Period, as detailed herein, defendants made false and misleading

15  statements regarding the Company's financial performance and demand for the Company's products,

16  and engaged in a scheme to deceive the market.  This artificially inflated Novatel's stock price and

17  operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations and

18  fraudulent conduct became apparent to the market, Novatel's stock price fell precipitously, as the

19  prior artificial inflation came out of the stock price.  Plaintiff and other members of the Class

20  purchased or otherwise acquired Novatel's common stock relying upon the integrity of the market

21  price of Novatel's common stock and market information relating to Novatel.  As a result of their

22  purchases of Novatel securities during the Class Period, plaintiff and other members of the Class

23  suffered economic loss, *i.e.*, damages, under the federal securities laws.

24          124.    At all relevant times, the material misrepresentations and omissions particularized in

25  this Consolidated Complaint directly or proximately caused or were a substantial contributing cause

26  of the damages sustained by plaintiff and other members of the Class. As described herein, during

27  the Class Period, defendants made or caused to be made a series of materially false or misleading

28  statements about Novatel's business, prospects and operations. These material misstatements and

1   omissions had the cause and effect of creating in the market an unrealistically positive assessment of

2   Novatel and its business, prospects and operations, thus causing the Company's common stock to be

3   overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading

4   statements during the Class Period resulted in plaintiff and other members of the Class purchasing

5   the Company's common stock at artificially inflated prices, thus causing the damages complained of

6   herein, upon defendants' revelations of the truth and resulting collapse of Novatel's stock price.

7       125.   On July 20, 207, the market learned that Sprint would no longer be purchasing

8   Novatel's flagship product, the 720 USB modem.  As this information (and the fact that Novatel

9   could not immediately provide an adequate replacement product) was digested in the market,

10  Novatel's stock price plummeted from $28.31 on July 20, 2007 to $20.83 by August 1, 2007, a 26%

11  decline.  This immediate decrease in Novatel's stock price was a result of the artificial inflation

12  caused by defendants' misleading statements concerning their well-positioned product mix and

13  strong market share coming out of the stock price.  This partial revelation was a proximate cause of

14  plaintiff's losses.

15      126.   On February 21, 2008, Novatel's stock price dropped from approximately $14 to as

16  low as $10.20 after the Company announced their disappointing 1Q08 outlook of $110 million in

17  revenues and attributed that drop to excess inventory at Novatel's customers and disclosing that the

18  market had shifted to where Novatel had not historically focused.  These partial revelations

19  regarding the truth about Novatel's product mix and demand for Novatel's products caused

20  Novatel's stock to drop 23% from February 20, 2008 to February 21, 2008.

21      127.   On April 14, 2008, Novatel guided the market even lower by adjusting their 1Q08

22  guidance from $110 million to $91 million and disclosing that demand continued to be weak for its

23  enterprise modem and a loss to the competition at a key customer.  As a direct result of defendants'

24  partial revelation regarding the truth about Novatel's previous representations regarding the demand

25  for Novatel's products, Novatel's stock price plummeted over 22% on April 15, 2008, on unusually

26  high volume, falling from a closing price of $10.01 on April 14, 2008 to close at $7.76 on April 15,

27  2008.

28

128.    On August 19, 2008, defendants admitted that the Audit Committee review was still ongoing, that it involved at least six transactions representing $9.1 million in revenue, that it revolved around improper revenue recognition, and that $3.4 million would be moved out of 1Q08 because it violated revenue cut-off procedures.  As a result of this revelation that Novatel inflated its financial results by prematurely recognizing revenue, Novatel's stock price dropped from $8.40 to $6.29 the next day, a 25% decline.

129.    On November 10, 2008, Novatel issued its delayed Form 10-Qs for the quarters ended March 31, 2008 and June 30, 2008.  As a result of the Company's accounting review, Novatel confirmed that the revenues for the quarter ended March 31, 2008 were misstated by $3.4 million due to improper revenue cutoff procedures and accounting irregularities relating to certain customer contracts.  The Form 10-Qs also disclosed that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness during the Class Period.  As a result of this confirmation that Novatel inflated its financial results by prematurely recognizing revenue, Novatel's stock slid below $5 per share, trading as low as $3.90 per share by November 17, 2008, a 27% decline from its November 10, 2007 open of $15.33 per share.

130.    In sum, the significant decline in Novatel's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Novatel's stock price decline negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate Novatel's stock price and the subsequent significant decline in the value of Novatel's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

**NO SAFE HARBOR**

131.    Novatel's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

132.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Novatel who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.  On the contrary, such statements concealed critical information about Novatel's financial performance.

**APPLICABILITY OF PRESUMPTION OF**
**RELIANCE:  FRAUD ON THE MARKET**

133.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased Novatel stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

134.    At all relevant times, the market for Novatel stock was efficient for the following reasons, among others:

1    (a)  Since November 2000, Novatel's stock has been listed and actively traded on

2 the NASDAQ National Market, a highly efficient and automated market;

3    (b)  As a regulated issuer, Novatel filed periodic public reports with the SEC; and

4    (c)  Novatel regularly communicated with public investors via established market

5 communication mechanisms, including through regular disseminations of press releases on the major

6 news wire services and through other wide-ranging public disclosures, such as communications with

7 the financial press, securities analysts and other similar reporting services.

8         **CLASS ACTION ALLEGATIONS**

9    135.  Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

10 of Civil Procedure on behalf of all persons who purchased Novatel common stock during the Class

11 Period (the "Class"). Excluded from the Class are defendants, directors and officers of Novatel and

12 their families and affiliates.

13    136.  The members of the Class are so numerous that joinder of all members is

14 impracticable. The disposition of their claims in a class action will provide substantial benefits to

15 the parties and the Court. Novatel had more than 31 million shares of stock outstanding, owned by

16 thousands of persons.

17    137.  There is a well-defined community of interest in the questions of law and fact

18 involved in this case. Questions of law and fact common to the members of the Class which

19 predominate over questions which may affect individual Class members include:

20    (a)  Whether the 1934 Act was violated by defendants;

21    (b)  Whether defendants omitted and/or misrepresented material facts;

22    (c)  Whether defendants' statements omitted material facts necessary in order to

23 make the statements made, in light of the circumstances under which they were made, not

24 misleading;

25    (d)  Whether defendants knew or recklessly disregarded that their statements were

26 false and misleading;

27    (e)  Whether the price of Novatel stock was artificially inflated; and

28

1    (f)    The extent of damage sustained by Class members and the appropriate

2 measure of damages.

3    138.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

4 sustained damages from defendants' wrongful conduct.

5    139.    Plaintiff will adequately protect the interests of the Class and has retained counsel

6 who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

7 with those of the Class.

8    140.    A class action is superior to other available methods for the fair and efficient

9 adjudication of this controversy.

10    **COUNT I**

11    **For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against Leparulo and Weinert**

12    141.    Plaintiff incorporates ¶¶1-140 by reference.

13    142.    During the Class Period, defendants disseminated or approved the false statements

14 specified above, which they knew or recklessly disregarded were misleading in that they contained

15 misrepresentations and failed to disclose material facts necessary in order to make the statements

16 made, in light of the circumstances under which they were made, not misleading.

17    143.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

18    (a)    Employed devices, schemes and artifices to defraud;

19    (b)    Made untrue statements of material facts or omitted to state material facts

20 necessary in order to make the statements made, in light of the circumstances under which they were

21 made, not misleading; or

22    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or

23 deceit upon plaintiff and others similarly situated in connection with their purchases of Novatel

24 securities during the Class Period.

25    144.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

26 the market, they paid artificially inflated prices for Novatel securities.  Plaintiff and the Class would

27 not have purchased Novatel securities at the prices they paid, or at all, if they had been aware that the

28 market prices had been artificially and falsely inflated by defendants' misleading statements.

1   145.   As a direct and proximate result of these defendants' wrongful conduct, plaintiff and

2   the other members of the Class suffered damages in connection with their purchases of Novatel

3   securities during the Class Period.

4                                              **COUNT II**

5   **For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants**

6   146.   Plaintiff incorporates ¶¶1-140 by reference.

7   147.   During the Class Period, defendants occupied positions with Novatel that allowed

8   access to confidential information concerning the Company, its operations, finances, financial

9   condition and future business prospects.  Defendants' public representations on these subjects set

10  forth herein were materially false or misleading.

11  148.   Notwithstanding their duty to refrain from trading in Novatel common stock unless

12  they disclosed the material adverse facts alleged herein, and in violation of their fiduciary duties to

13  plaintiff and other members of the Class, defendants each sold millions of dollars worth of Novatel

14  common stock during the Class Period.

15  149.   Defendants sold their shares of Novatel common stock, as alleged above, at market

16  prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in

17  the public statements released during the Class Period.

18  150.   Defendants knew that they were in possession of material adverse information which

19  was not known to the investing public, including plaintiff and other members of the Class.  Before

20  selling their stock to the public, they were obligated to disclose that information to plaintiff and other

21  members of the Class.

22  151.   By reason of the foregoing, defendants directly and indirectly, by use of the means

23  and instrumentalities of interstate commerce, the mails, and the facilities of the national securities

24  exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and

25  transactions and a course of business which operated as a fraud or deceit upon members of the

26  investing public who purchased Novatel common stock.

27  152.   Plaintiff and other members of the Class who purchased shares of Novatel common

28  stock: (1) have suffered substantial damages because they relied upon the integrity of the market and

1  paid artificially inflated prices for Novatel common stock as a result of the violations of §10(b) and

2  Rule 10b-5 alleged herein; and (2) would not have purchased Novatel common stock at the prices

3  they paid, or at all, if they had been aware that the market prices had been artificially and falsely

4  inflated by defendants' misleading statements and concealment.  At the time of the purchases by

5  plaintiff and members of the Class, the fair and true value of Novatel common stock was

6  substantially less than the prices paid by them.

7         153.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and

8  the other members of the Class suffered damages in connection with their purchases of Novatel

9  securities during the Class Period.

10                                        **COUNT III**

11              **For Violation of §20(a) of the 1934 Act Against All Defendants**

12         154.    Plaintiff incorporates ¶¶1-153 by reference.

13         155.    The defendants acted as controlling persons of Novatel within the meaning of §20 of

14  the 1934 Act.  By virtue of their positions and their power to control public statements about

15  Novatel, the defendants had the power and ability to control the actions of Novatel and its

16  employees.  Novatel controlled the defendants and its other officers and employees.  By reason of

17  such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

18                                    **PRAYER FOR RELIEF**

19         WHEREFORE, plaintiff prays for judgment as follows:

20         A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

21         B.     Awarding plaintiff and the members of the Class damages and interest;

22         C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

23         D.     Awarding such equitable/injunctive or other relief as the Court may deem just and

24  proper.

25

26

27

28

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3   DATED:  January 9, 2009                     COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
4                                               DOUGLAS R. BRITTON
                                                BRIAN O. O'MARA
5                                               ERIC I. NIEHAUS

6

7                                                     s/ DOUGLAS R. BRITTON
                                                    DOUGLAS R. BRITTON
8
                                                655 West Broadway, Suite 1900
9                                               San Diego, CA  92101
                                                Telephone:  619/231-1058
10                                              619/231-7423 (fax)

11                                              Lead Counsel for Plaintiffs

12                                              CAVANAGH & O'HARA
                                                PATRICK O'HARA
13                                              407 East Adams Street
                                                Springfield, IL  62701
14                                              Telephone:  217/544-1771
                                                217/544-9894 (fax)
15
                                                DYER & BERENS LLP
16                                              JEFFREY A. BERENS
                                                682 Grant Street
17                                              Denver, CO  80203-3507
                                                Telephone:  303/861-1764
18                                              303/395-0393 (fax)

19                                              HOLZER, HOLZER & FISTEL, LLC
                                                COREY D. HOLZER
20                                              MICHAEL I. FISTEL, JR.
                                                MARSHALL P. DEES
21                                              1117 Perimeter Center West, Suite E-107
                                                Atlanta, GA  30338
22                                              Telephone:  770/392-0090
                                                770/392-0029 (fax)
23
                                                Additional Counsel for Plaintiff
24

25
S:\CasesSD\Novatel Wireless\CPT00056653_Consolidated.doc
26

27

28

1

1    <u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that on January 9, 2009, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7    I certify under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.  Executed on January 9, 2008.

9

10               s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

11             COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP

12  655 West Broadway, Suite 1900

13  San Diego, CA  92101-3301
Telephone:  619/231-1058

14  619/231-7423 (fax)

15  E-mail:  dougb@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

08-CV-01689-H(RBB)

# Mailing Information for a Case 3:08-cv-01689-H-RBB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Travis S. Biffar**
  tbiffar@jonesday.com,fswallace@jonesday.com

- **Douglas R Britton**
  DougB@csgrr.com,ldeem@csgrr.com

- **Lionel Z Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Michael M Goldberg**
  info@glancylaw.com,dmacdiarmid@glancylaw.com,mmgoldberg@glancylaw.com,rprongay@glancylaw.com

- **Sabrina S. Kim**
  skim@milberg.com,cchaffins@milberg.com

- **Matthew P Montgomery**
  Mattm@csgrr.com

- **Brian O O'Mara**
  bo'mara@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)