1                  UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF CALIFORNIA

3

4  BACKE,                          )   Case No. 08CV1689-H(RBB)
                                   )
5          Plaintiff,              )   San Diego, California
                                   )
6  vs.                             )   Friday,
                                   )   June 5, 2009
7  NOVATEL WIRELESS, INC.,         )   10:30 a.m.
   et al.,                         )
8                                  )
           Defendants.             )
9  _____ )

10

11                 TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE MARILYN L. HUFF
12                UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Plaintiff:          DOUGLAS R. BRITTON, ESQ.
                                LUCAS F. OLTS, ESQ.
15                              ERIC I. NEIHAUS, ESQ.
                                Coughlin, Stoia, Geller,
16                               Rudman & Robbins, LLP
                                655 West Broadway, Suite 1900
17                              San Diego, California 92101
                                (619) 231-1058

18  For the Defendants:         ERIC LANDAU, ESQ.
                                SHAWN HARPEN, ESQ.
19                              TRAVIS BIFFAR, ESQ.
                                Jones Day
20                              3 Park Plaza, Suite 1100
                                Irvine, California 92614
21                              (949) 553-7556

22  Transcript ordered by:      TRAVIS BIFFAR, ESQ.

23

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

ii

Court Recorder:                 Lynnette Lawrence
                                United States District Court
                                940 Front Street
                                San Diego, California  92101

Transcriber:                    Shonna D. Mowrer
                                Echo Reporting, Inc.
                                6336 Greenwich Drive
                                Suite B
                                San Diego, California  92122
                                (858) 453-7590

1

1    <u>SAN DIEGO, CALIFORNIA  FRIDAY, JUNE 5, 2009  10:30 AM</u>

2                              --oOo--

3       (Call to order of the Court.)

4            THE CLERK:  Three on calendar, 08CV1689, Backe

5    versus Novatel Wireless, Inc. for motion hearing.

6            THE COURT:  State your appearances.

7            MR. BRITTON:  Good morning, your Honor.  Doug

8    Britton with Coughlin, Stoia on behalf of Plaintiffs.

9            MR. OLTS:  And Lucas Olts, also with the Kava &

10   Stoy firm on behalf of Plaintiffs.

11           MR. NIEHAUS:  Eric Niehaus, also Coughlin, Stoia

12   on behalf of Plaintiffs.

13           MR. LANDAU:  Good morning, your Honor.  Eric

14   Landau with Jones, Day on behalf of the Defense.  With me at

15   counsel table are Ms. Shawn Harpen and Mr. Travis Biffar.

16   And with us today in the courtroom, the chief executive

17   officer of Novatel Wireless, Mr. Peter Leparulo and general

18   counsel, Kathleen Radcliffe.

19           THE COURT:  Thank you.

20           This is the Defendant's motion for reconsideration

21   on the order of the motion to dismiss.  And it's also a

22   motion for certification.  On the certification, I'm

23   disinclined to do that, but I would like you to address the

24   merits of the motion for reconsideration.  And you may

25   proceed.

2

1        MR. LANDAU:  Thank you, your Honor.

2        Does your Honor have a particular order in which

3  the issues should be addressed?

4        THE COURT:  Well, I think one of the issues is

5  whether the 10(b)(5) plan defense is viable.  Did the

6  Plaintiff adequately allege the plans were adopted or

7  amended while in possession of material information and

8  whether there are sufficient inferences in their

9  allegations.

10        As you recall, one of the issues is whether the

11  Defendants knew of the cancellation of the Sprint program.

12  But the references in the complaint are not precise as to

13  the dates.  Now, the Defense has offered to have an in

14  camera review for the Court of the 10(b)(5) plans.  I'm

15  assuming that's on whether it's plausible that these dates

16  of the plans are in sync with the dates of the cancellation

17  of the program.

18        This is a motion to dismiss, so on an in camera

19  review, I'd like to discuss that, what the Plaintiff's

20  position is with respect to that.  And then you properly

21  said you would prefer that they would stipulate that this

22  isn't converting this into a motion for summary judgment.

23        And I do note that the Supreme Court in Iqball in

24  May has probably strengthened Twombly and at least clearly

25  indicated that before there was a question as to whether it

3

1 only applied to anti-trust or not, that's been now resolved.

2 So the Court had asked the parties to be prepared to address

3 that.  So that's one broad issue.

4         And then the second broad issue, as I see it --

5 and perhaps you have others -- is whether the Court properly

6 evaluated scienter for each alleged misrepresentation or

7 whether the Court can do the holistic approach with respect

8 to the totality of information as to scienter.

9         So you may proceed.

10         MR. LANDAU:  Thank you, your Honor.  Why don't we

11 start off with the reason for proffering on a limited basis

12 the 10(b)(6)(1) plans is because, upon reviewing the

13 Plaintiff's argument and the Court's order, there appears to

14 be the notion that there needs to be some form of

15 discernible pattern or trigger.

16         And there also seems to be the notion that there

17 should be sales on particular days, whether they be the 1st

18 of the month or the 15th of the month.  Rule 10(b)(5)(1)

19 does not provide for that.  And what we wanted to proffer

20 the plans to demonstrate is, number one, to show there was

21 consistency in the trading dates that match precisely the

22 triggers, and two, that the triggers are of all types,

23 whether they are the day something reaches a particular

24 stock price, whether it's a specific volume trigger, whether

25 or not it's a percentage trigger, whatever it is.  That was

4

1  the reason for proffering those.

2         And in fact, I'll make that offer for the Court

3  that that is, in fact, what we believe the Court would find

4  if an in camera review were conducted.  But that's, again,

5  our reason for wanting to submit those plans.

6         THE COURT:  Thank you.

7         MR. LANDAU:  Now, your Honor, the Defense believes

8  that Iqball did just what the Court has recited, and that

9  is, number one, it applies and strengthens Twombly, but it

10  applies it not just in the anti-trust context, but to all

11  civil actions.

12        And then it does something else.  What Twombly did

13  not do -- because the issue of scienter was not front and

14  center because they had respondeat superior to hold people

15  liable.  That was not the case for a Bivens cause of action

16  under Iqball.  And therefore, Iqball applies Twombly to

17  specific scienter allegations, what the Supreme Court did

18  not do before.

19        And therefore, we believe it does change the lay

20  of the land and the way the Court reviews allegations in two

21  ways.  But I want to put a pin in that because what I do

22  want to do is to go over some of the allegations in Iqball

23  which did not make it under Rule 8(a).

24        Now, there's a two-step approach which the Supreme

25  Court instructs the District Courts to follow in Iqball.

5

1   And the first is to identify those pleadings, those

2   allegations which do not deserve any presumption or

3   assumption of truth.  Those generally fall within the

4   conclusory allegations.

5           However, they are not simply the conclusory

6   allegations that one might think of in day-in day-out civil

7   litigation.  These are more precise.  And the Court looks to

8   see, are you reaching your conclusion -- if you're just

9   reaching your conclusion that someone is a bad person,

10  someone had knowledge, someone acted, then the Court is

11  saying we don't have a presumption of truth.

12          And those allegations in Iqball, just to point out

13  a few, are that Defendants -- and that's grouping all of

14  them together -- Defendants knew of, condoned and willfully

15  and maliciously agreed to subject Plaintiff to harsh

16  conditions of confinement as a matter of policy solely on

17  account of religion, race and/or national origin and for no

18  legitimate penalogical interest, closed quote.

19          Number two, that Mr. Ashcroft was the, quote,

20  principal architect of the individual policy.  And number

21  three, that director Mueller (phonetic) was instrumental in

22  adopting and executing it.

23          Now, these go further than simply conclusory

24  allegations that someone acted with scienter.  These are

25  deeper.  But the Court was saying as a matter of policy, we

6

1  do not want discovery proceeding in -- whether it's large

2  anti-trust cases, these huge cases against the Government,

3  or presumably in large security cases.  We don't want to

4  burden the Defense with having to go through all the

5  discovery.

6          And second -- and this is right out of _Twombly_ --

7  we don't want to give the Plaintiffs a big club, actually

8  the leverage, once you get by the pleading stage.

9          THE COURT:  So part of this -- I had a procedural

10 question.  _Iqball_ came out May 18, 19?

11         MR. LANDAU:  May 18th.

12         THE COURT:  May 18th.  And your initial briefing

13 on your motion for reconsideration was --

14         MR. LANDAU:  Was submitted beforehand, your Honor.

15         THE COURT:  Was beforehand.  So part of me -- and

16 then I've only said you should be prepared to address it at

17 the hearing.  But we really have ships passing in the night.

18 I actually think -- and this will go to the Plaintiffs --

19 that in light of _Iqball_, I should reconsider because the

20 standard is different.

21         MR. LANDAU:  Yes.

22         THE COURT:  Or more clarified.  And so that one --

23 I should reconsider, maybe wipe the slate clean, and then

24 instead of just having you be prepared to address it --

25 giving you a couple of days of notice to say, well, maybe

7

1  you should take a look at this case, maybe I should

2  reconsider just on that ground alone and then permit

3  additional briefing which would be responsive to that case.

4          MR. LANDAU:  Your Honor, we believe that is a more

5  than acceptable way to proceed.  It takes more than a day or

6  two after one reads Iqball to look at the policy

7  permutations.  Because one thing that doesn't leap out is

8  Iqball's impact on Dura Pharmaceutical.  Now, why do I say

9  that?  Which is why I would like the Court to keep an open

10 mind, if necessary, on the certification issue as it

11 pertains to proximate cause.  But if the Court is going to

12 reconsider, then it really doesn't matter.

13          THE COURT:  Let me just give you -- so let me give

14 you the thoughts on reconsideration.  If I decide that there

15 are sufficient allegations to go forward and start the

16 discovery process, the certification is a -- that's a two to

17 three-year road.  We'll be done with the case.  We'll

18 have -- if you actually have nothing and it's all in your

19 favor, yes, you have the hammer of discovery, but if you

20 have -- if they have nothing, then you do summary judgment,

21 and we'll do summary judgment well before three years.  And

22 so then the Appellate Court on reasoned review of the record

23 will have the full complete record to address these issues.

24          So I actually think one of the prongs of

25 certification is, is there something that is just purely a

1  legal issue that they have to -- but also, would it speed up

2  resolution of the case?  No, it would slow it way down.  And

3  so I just think on the prongs of certification, you're not

4  going to have it.

5        And you've tried to frame it in this purely legal

6  issue.  I'm not so sure that that's the way to go.  I don't

7  see that that was what the import of the Court's order was.

8  But anyway, so that's just my generalized thoughts on the

9  certification.  But you may proceed.

10       MR. LANDAU:  Thank you, your Honor.  But focusing

11  on reconsideration, I believe that Iqball not only changes

12  the lay of the land on the substance of the scienter

13  allegations and how the Court should view them, but it also

14  impacts the proximate causation analysis under Dura, which

15  is why I touched on certification.

16       This will be the first District Court in the

17  country, much less Federal Appellate Court or even the

18  Supreme Court, to revisit Dura under the heightened Rule

19  8(a) standard.  If the Court will recall, the Supreme Court

20  did not find a need to look at proximate causation under

21  9(b) or the PSLRA because under Dura, the allegations failed

22  under then Connelly vs. Gibson, which is the is the

23  body breathing test.

24       But here, now we have Iqball, which is requiring

25  scrutiny.  Now we have a new game plan under Dura, which is

9

1  why I believe -- another reason why reconsideration is

2  warranted because that could not have been briefed at the

3  time.  And therefore, now we have not only scienter

4  allegations, but the much heightened levels of scrutiny.

5          THE COURT:  So were you -- so you can sense where

6  I think I'm going just on the timing of the issue is that

7  typically we give 28 days for the Plaintiff and then two

8  weeks to respond, and then the reply, and then the Court has

9  an opportunity to evaluate the totality.

10         Here we did this wonderful -- we did actually a

11 longer briefing schedule originally, and the Court did an

12 analysis, but under a standard that may now be in question.

13         MR. LANDAU:  Uh-huh.

14         THE COURT:  And so I actually think perhaps,

15 without addressing which way the Court goes, that the best

16 way to approach it is to start over.

17         MR. LANDAU:  Well, your Honor, then why don't we

18 stop for the moment, and I'll set for the Defense position,

19 and perhaps just on that one issue we could hear from the

20 Plaintiffs rather than burden the Court for the next

21 whatever amount of time the Court wants to give.

22         THE COURT:  I would like to hear the -- I would,

23 though, like to -- since we have time today, to hear it on

24 the merits as well.

25         MR. LANDAU:  Terrific.

1       THE COURT:  I do want to -- even if we said what

2  I -- what did I have in my papers before, my order that you

3  think was legally erroneous.  So I would like you to address

4  that, and then it may help clarify the Court's thinking on

5  this matter.

6       It was a close question originally, and that's why

7  I'm having some doubts, especially with what I think legal

8  scholars are saying is a fairly significant issue, even

9  though it was -- you'd think the subject matter wouldn't

10  translate over to -- necessarily to securities, I think that

11  the legal scholars are saying that the reading of it

12  reinforces Twombly plus.

13       MR. LANDAU:  Well, I believe so.  And your Honor,

14  I'd like to go, then, further and look at -- remember, there

15  are two steps in the approach under Iqball.  They identify

16  what is now called the conclusory allegation much broader

17  than before.  And second, now that we have particularity and

18  we know which allegations are considered actually factual --

19  it sounds a little like 9(b), but now that we know which

20  ones are sufficiently particularized, now let's look to see

21  if they plausibly suggest a violation.

22       And the key here is, alleging conduct that is

23  consistent with the asserted violation is not sufficient.

24  What did we have?  I'll just mention just two of the points

25  in Iqball.  The FBI, under the direction of director Mueller

1 arrested and detained thousands of Arab Muslim men as part

2 of its investigation of the events under September 11th.

3 And two, the policy of holding post-September 11th detainees

4 in highly restricted conditions of confinement until they

5 were cleared by the FBI was approved by Defendants Ashcroft

6 and Mueller in discussions in the weeks after September 11,

7 2001.

8          That is -- those are direct quotes from <u>Iqball</u>.  I

9 won't go further, but those are allegations which one might

10 assume under <u>Connelly vs. Gibson</u> would suffice.

11          THE COURT:  Absolutely.  We were required to take

12 them as true, and if they were alleged, then that was

13 sufficient.  And I think that has now changed.

14          MR. LANDAU:  And I think it has.  And I believe we

15 look at these allegations under Rule 8(a) before we even get

16 to the PSLRA, just the way the Supreme Court did in <u>Dura</u>.

17 Let's see if the threshold has been reached before we go to

18 the higher standard.

19          Because what the Supreme Court has done, it

20 shifted the standard up the line.  We have shifted 8(a) up,

21 which automatically shifts the PSLRA up because Congress

22 intended there to be greater scrutiny under the PSLRA.  So

23 if they don't cut it under Rule 8(a), then we don't need to

24 get to the next level.

25          Your Honor, I would like now to focus on what the

12

1   Court identified initially, the 10(b)(5)(1) plans.  Why does

2   the Defense come forward and contest the Court's conclusion?

3   For two reasons.  Among others, the first is that there

4   wasn't a Sprint cancellation.  How do we know this?  Well,

5   I'll just apply Iqball, and I'll look beyond the conclusion

6   there was a Sprint cancellation.

7            There is a quote in the -- in the complaint which

8   says -- and this is to support the Sprint -- the Sprint

9   cancellation.  "Novatel shares were off sharply this

10  morning.  We believe, in response to a rumor that Novatel

11  may lose market share at Sprint, who was a 38-percent

12  customer for Novatel in Q-1, we agree with the notion making

13  the rounds indicating that the popular EU-720 USB card from

14  Novatel will, in fact, be end-of-lifed at Sprint as early as

15  next week."

16           Now, if that's all the Court reads in the

17  complaint, then, well, that's established a material fact in

18  the Court's mind, and therefore, accepting that as true, why

19  doesn't that then support an insider trading allegation that

20  people knew this beforehand.  Okay.

21           The problem is, Plaintiffs put their hands -- all

22  that comes from the analyst's report, which they quote from

23  extensively.  They put their hand figuratively on the quote

24  so the Court couldn't see the rest of it.  In fact, they put

25  an ellipsis after the words "next week" instead of the comma

13

1 which leads into the word "however."

2          So what I would like to do, your Honor, is if I

3 may have -- if we may approach, hand out the full quote,

4 which both gives the Court the benefit of the allegation and

5 what was left out.

6          THE COURT:  You may.

7          MR. LANDAU:  Counsel has been given a copy.  Your

8 Honor, tell me when I should proceed.

9          THE COURT:  You may proceed.

10          MR. LANDAU:  If one were only to look under the

11 old standard of accepting whatever the Plaintiffs say as

12 true, one is saying, okay, maybe they do have a leg up on

13 this Sprint cancellation rumor, but now let's look at what

14 they rely on.  Well, Plaintiffs rely on completely for the

15 Sprint cancellation allegation.  There's nothing else, your

16 Honor, in the complaint.  This is it.

17          And what they did -- let's take that ellipsis out.

18 Let's put back the quote which says, comma, however, usually

19 telling me, your Honor, that whatever follows is going to

20 undercut what preceded.

21          "Our sources have indicated that Sprint has ample

22 inventory and that the courts will continue to be sold at

23 Sprint stores likely through the end of August.  We further

24 believe that Novatel will begin shipping the new smaller

25 form factor USB product in August, earlier than expected,

14

1 and that the cards will likely begin showing up on Sprint
2 shelves in early September immediately after the EU-720
3 inventory sells out," period.  "We understand this
4 transition has been jointly planned for some time by Novatel
5 and Sprint."  And here's the kicker.  "As a result, we think
6 there will be little or no gap in the sales of the two
7 cards, and as a result, no loss of market check."

8       It's very interesting.  One puts the hand on the
9 bottom half of the quote, and it looks as if there's inside
10 information that people may have been trading on.  But when
11 one looks at the entire source of the allegation, which we
12 believe the Court could do independently, your Honor, of
13 Iqball, but Iqball just strengthens our argument, we see
14 that, number one, it was a false rumor from an unattributed
15 source that caused the stock price to drop.

16       We'll accept that for the moment as true, that the
17 end-of-life rumor caused the stock price to drop.  It wasn't
18 Novatel.  So we didn't put that rumor in the market.  And
19 the analyst clarifies -- after the stock drop begins, the
20 analyst clarifies it's a false rumor.  It's not a
21 cancellation of a big product.  It's what all tech companies
22 do.  You have an old modem, it's going to the new one.  You
23 wait for the old inventory to be sold, you introduce the new
24 product.  There will be no gap in the sales of the two
25 products, no loss of market share.

15

1        Okay.  Why does that make the Court hopefully

2   rethink the analysis?  Because this was allegedly the inside

3   information.  If there's no inside information, then no one

4   was trading on the inside.  There's no basis for scienter.

5   There can't be.  This was a false rumor.

6        If we are going to observe the policy in Iqball,

7   let's stop a claim based on a false rumor -- this is the

8   only source of the allegation -- so we can save everybody

9   time.  Because this is it.  This is the allegation.  This is

10  the source of it.  It's not fair to allow a plaintiff to

11  selectively quote, change the entire meaning of a quote in

12  order to get by on the pleading stage.

13        Second, your Honor, and I think equally as telling

14  why there was error, is that the Plaintiffs do not even

15  allege that the Defendants knew of this Sprint cancellation

16  when they adopted or modified their plans.

17        Now, this is crucial because if the Defense

18  weathers the attack on the 10(b)(5)(1) plans, the Plaintiffs

19  cannot then establish their scienter.  They can't say there

20  was suspicious stock sales because they were pursuant to

21  10(b)(5)(1) plans.

22        THE COURT:  Did each -- there's five individual

23  Defendants; is that right?

24        MR. LANDAU:  Yes.

25        THE COURT:  And did each of them have a plan?

16

1          MR. LANDAU:  Yes, your Honor.  Now, I do want to

2  point out, each did have a plan.  Each adopted it at

3  different times, and that was pointed out -- or modified it.

4  Each was done approximately a month and a half before the

5  Sprint rumor.  Some well before then.

6          THE COURT:  Uh-huh.

7          MR. LANDAU:  There were sales before the plans

8  were adopted, remote sales by Mr. Leparulo and one by Ms.

9  Radcliffe.  We confirmed this because we went through the

10  10(b)(5)(1) plans last night.  Those were the most remote

11  ones.  As you get closer to the alleged Sprint rumor, they

12  were all pursuant to the 10(b)(5)(1) plans.

13          THE COURT:  All trading was --

14          MR. LANDAU:  All the trading was, yes.

15          THE COURT:  -- you're talking about?

16          MR. LANDAU:  Yes.

17          Now, if we look at this when they sold their

18  stock, well, wait a second.  You don't even make the

19  allegation when we put the plans in place.  It's when we

20  sold our stock.  Now, I expect Plaintiffs are going to come

21  up and say, but the core operations inference.  It applies

22  to Novatel, even though there are 300 employees.  It's not

23  mom and pop, but all the core operations inference does is

24  try to bolster the conclusion that Defendants knew at the

25  time they sold their stock.

17

1          Okay.  That's a conclusion.  And whether it's

2   under Iqball or the PSLRA, we know we have to look behind

3   that to see what do you have to support that knowledge.

4   Where did that knowledge come from?  You can't just allege

5   it anymore.  Where does it come from?

6          Well, the Plaintiffs don't have anything else, so

7   they go to the core operations inference.  Okay.  That can

8   only support the conclusory allegation.  It can't support a

9   nonexistent allegation.  And there is no allegation that,

10  when these plans were adopted, that's when these people

11  knew.

12          And that, we believe, is clear error, your Honor.

13  It would be unfair to use an inference which we don't even

14  believe applies, but to use it to support an allegation

15  which doesn't exist.

16          THE COURT:  What about their point that the

17  10(b)(5) plan could be a defense, but it's not an absolute

18  defense?  What about that?

19          MR. LANDAU:  Well, I'm glad the Court asked that.

20  The first is, it's not the law in the Ninth Circuit.  There

21  is not a case which has thrown out a motion to dismiss on a

22  10(b)(5)(1) plan because of this so-called good-faith

23  affirmative defense.

24          It's not, in fact, the case in any Appellate

25  Court.  We have two District Courts which we believe have

18

1  engrafted a good-faith standard, one from, I believe, within

2  the Third Circuit, and then one in the District of Nevada

3  quoting the earlier District Court, saying, we can't

4  consider this on a motion to dismiss.

5           THE COURT:  So is there -- what Ninth Circuit law,

6  then, or case supports you or could the Court rely on to

7  say, here's an example where they upheld the Defendant's

8  motion to dismiss and there was similar evidence there that

9  they were trading, and they had a plan, and that it was not

10 sufficient for the Plaintiffs to say, yeah, but they traded

11 more in their plan when they knew of this allegedly adverse

12 information?

13          MR. LANDAU:  Your Honor, I don't know if I can get

14 that specific because then the case would be Backe versus

15 Novatel.  But what I can -- we've cited on page six of our

16 reply brief, starting with Metzler (phonetic) and then, in

17 fact, citing the chief judge's decision in Nurcrene

18 (phonetic) and then this Court's decision in Petco where

19 these -- where these motions to dismiss addressing

20 10(b)(5)(1) plans were handled without the incorporation of

21 the alleged good-faith defense.

22          This is the first time this is starting creeping

23 in to the calculus.  The Appellate Courts are not rejecting

24 these claims and reversing saying, what about the good-faith

25 defense.  That's only an affirmative defense.

19

1          THE COURT:  Uh-huh.

2          MR. LANDAU:  I'm also going to anticipate an

3    argument -- and I'll address right now -- that, oh, that

4    means you have a different standard, a different threshold

5    at the pleading stage than you do at summary judgment or

6    trial.  Absolutely.  And that's exactly what Tel Labs

7    (phonetic) addressed.

8          In fact, I believe from all accounts, the argument

9    focused in Tel Labs before the Supreme Court on that very

10   issue.  Can you have a more stringent standard at the

11   pleading stage for scienter than you do at trial where Ernst

12   vs. Hotfelder (phonetic) would apply.  And the answer is

13   yes, you can.

14         So the fact that later on down the line good faith

15   may be triggered and may come into play is irrelevant.  On

16   the motions to dismiss, the courts -- the Federal Appellate

17   Courts are not requiring that.  And in fact, whether it's

18   Metzler or other cases, the errant two District Court

19   opinions have not been taken up by the Circuit Courts, have

20   not been adopted.

21         And I think it would be unfair to impose that

22   burden on the Defense because here we have people doing what

23   policy says they should pursuant to Rule 10(b)(5)(1),

24   adopting a plan, taking the decision-making process out of

25   their hands, making it automatic, and then saying, oh, by

20

1  the way, though, you can't address that until summary

2  judgment.  You get to be subject to these awful allegations

3  and millions of dollars worth of potential liability.  So I

4  dispute Plaintiff's argument.  It is based on these two

5  district opinions.  I believe those are simply wrong.

6          If I may now continue, your Honor, to the -- to

7  the second point the Court raised, which is what we call the

8  mix-and-match scienter approach.  Now, the Plaintiffs claim

9  that the Defense is ignoring Tel Labs and presumably

10  ignoring Zuko (phonetic) as well, our Circuit's opinion, in

11  asking this Court to reject the holistic approach to

12  scienter.

13          We are not at all, your Honor.  We believe that

14  the Court should follow both the United States Supreme Court

15  and the Ninth Circuit and look at the allegations of

16  scienter individually.  And then if they don't make it, as

17  the Court here found, then look at them holistically.

18          Now, the problem, we believe, and where the error

19  came in is not the fact that a holistic review is permitted,

20  but rather that the Court mixed the facts supporting

21  scienter from let's say the Sprint cancellation in 2007 with

22  another bad act, alleged bad act from 2008 dealing with, for

23  example, the accounting issue.

24          So we say you cannot do that.  The Court may not

25  do that.  The Court views each of the bad acts individually.

21

1  That's what the PSLRA tells us.  We have to look

2  individually at each Defendant and individually at each bad

3  act.  But within each bad act, how do you support scienter?

4  And you can look at -- if there are three things you look

5  at, then apply them.

6         Insider -- suspicious inside trading.  Okay.  That

7  goes to the Sprint cancellation only.  That's not alleged to

8  have occurred with vis-a-vis the accounting issues.  And it

9  would be unfair to say, well, in 2007, you're alleged to be

10 a bad person, so we're just going to assume that carries

11 over to 2008.  That was not Justice Ginford's (phonetic)

12 point on the holistic theory.  And I believe that justice

13 was responsible for the holistic theory.

14        The position was, look within the bad act.  What

15 are the scienter allegations.  Consider them individually

16 and holistically.  But to carry them over from one to the

17 other would be inappropriate.

18        Now, your Honor, within the mix-and-match theory,

19 once we separate them out and we look at the so-called

20 Sprint cancellation, we look at a quote which was taken out

21 of context.  Now we eliminate that.  There's no false rumor.

22 The minute you -- I mean, there is a false rumor.  It's not

23 Novatel's.  Once you eliminate that, you eliminate any

24 concept of insider trading because that supposedly was the

25 inside information.

22

1        We are not there to anticipate third-party rumors

2 perhaps from short sellers who are intentionally putting

3 lies in the market to drive our stock price down.

4        THE COURT:  You say that's one of the prongs of

5 the stool.  The stool is out, and so the 10(b)(5) insider

6 trading claims fail.

7        MR. LANDAU:  That is correct.

8        So now let's go on to look at -- and I'm picking

9 this out from our brief because I want to focus the Court on

10 the accounting issues.  And the Court comes back to say,

11 well, let's look at the various allegations.  Now, put

12 insider trading away.  Even if the Court believes it's

13 extant, even if it's outstanding, that can only support the

14 Sprint cancellation.

15        THE COURT:  Are we now focusing on the SOX

16 certifications --

17        MR. LANDAU:  Yes.

18        THE COURT:  -- attesting to the accuracy of the

19 financial results --

20        MR. LANDAU:  Yes.

21        THE COURT:  -- and the effectiveness of Novatel's

22 internal controls?

23        MR. LANDAU:  Yes.

24        THE COURT:  All right.  This is more like akin to

25 a Petco claim.

23

1          MR. LANDAU:  This would be more akin to <u>Petco</u>.

2          THE COURT:  Okay.

3          MR. LANDAU:  The problem with this is there were

4  no SOX certifications issued.  There were no GAP compliance

5  issues.  Plaintiffs say it, but they weren't issued.  And

6  one only has to look at what happened in 2008, and nobody

7  disagrees with this.  What happened was, there was a revenue

8  announcement in the first quarter of 2008.  Before the

9  financials were filed with the Securities & Exchange

10 Commission --

11         THE COURT:  What date?

12         MR. LANDAU:  Okay.  Excuse me.  May 1.  May 1.

13         THE COURT:  May 1 what year?

14         MR. LANDAU:  2008.  Before the financial

15 statements were filed with the Securities & Exchange

16 Commission, the company pulled up.  No financial statements

17 were filed in the first quarter, covering the first quarter.

18 No financial statements for Q-2.

19         It wasn't until -- it wasn't until the

20 investigation that the company initiated concluded, and at

21 the end on November 10, 2008, the first quarter and the

22 second quarter results, the actual statements were filed

23 with the Securities & Exchange Commission with the

24 disclosure that we had an internal control weakness.  And I

25 believe it was as of March 31, 2008.  An internal control

24

weakness as of that date.  It no longer now exists, but as of that date, that was the one time, the one internal control weakness focus.

There was no SOX certification filed before that revelation for the first quarter.  There was none for the second quarter.  There was no GAP compliance certification filed with the Securities & Exchange Commission.

And so what happens is, we see SOX certifications from 2007.  That has nothing to do with an internal control weakness as of March 31, 2008.  One can't go back in time to say, well, you had an internal control weakness which the investigation -- the accountants found on this one occasion. Not later, but on that one occasion, and then doubt every SOX certification.  And Plaintiffs have no factual basis in their complaint to allege otherwise.  I think that's misleading, and I think the Court unfortunately relied on that argument of the Plaintiffs in reaching at least part of its conclusion in the holistic approach.

THE COURT:  So you're going back -- on the holistic approach, you're saying that by mixing -- what you say, mixing and matching, by going back to the insider trading, which you say didn't exist because they didn't give you the whole quote, that you can't then say, well, yeah, there's insider trading plus then there's this accounting thing that just kind of goes through the whole period 2007

25

1   and 2008, when you're saying it's really only focused on

2   2008.

3           MR. LANDAU:  That is correct, your Honor.  No

4   allegations to the contrary.  And look, we had one internal

5   control weakness found March 31, 2008.

6           THE COURT:  Can you infer that because there's

7   one, that it pre-existed?

8           MR. LANDAU:  I see no reason to do that.  Number

9   one, the burden is on the Plaintiffs.  After all, they

10  brought the lawsuit, and they need an allegation to show me

11  where a weakness is.  The only thing that we have of public

12  record is the fact that the accountants in the company,

13  after thoroughly going through the records, found the single

14  control weakness as of a certain date.

15          If there is a reason for the Plaintiffs to allege

16  that it occurred in 2007, they'd have to do that, number

17  one.  And number two, whether it's under Iqball or the

18  PSLRA, they have to bring the facts to show it.  Because now

19  they would not have an internal control weakness found for

20  2007.  They'd have to find something else.  And they can't

21  simply come back and say, oh, your Honor, we'll allege it.

22  We'll allege that all the Defendants knew when they adopted

23  their plans.  Not good enough.  We'll allege that in 2007,

24  there were accounting problems.  Not enough.

25          And I've just been handed a note.  I want to make

26

1 sure we are accurate here, that we have the internal control

2 weakness -- the earliest was of March 31, 2008 and June 30,

3 2008 as well.  The earliest one that -- we take it back --

4 is March 31, 2008.

5          Thank you very much.

6          Your Honor, I'd like to -- the Court has indulged

7 me for a long period of time.  I'm trying to focus my

8 argument, but I would also like to point out that in the

9 holistic approach, just throwing things at the screen, so to

10 speak -- like we saw that wonderful demonstrative chart that

11 the Plaintiffs argued from last time with a whole bunch of

12 alleged lies there.  And we've now gone through to show

13 hopefully what the real quote is.  There's no Sprint

14 cancellation.

15          My goodness, the Court could go back and take

16 judicial notice and look at every Sprint ad, look at their

17 website to see what a valuable and large customer they are.

18 But they also said things about Y-Max (phonetic).  They

19 actually moved -- this one is amazing to me.  We noted it in

20 Footnote 11 of our reply brief.  To show what bad people we

21 were in the third quarter of 2007, we lost out on a Y-Max

22 trial.  Well, it turns out, of course, it was in the first

23 quarter, and that was publicly disclosed.

24          Put aside the fact that we're not into Y-Max.

25 That's not the company -- where the company's focus is or is

27

1    at all.  But they moved an entire announcement from the

2    third quarter to the first.  We have to be careful, and why

3    Iqbal cautions us, let's drill down.

4          Last point, your Honor, before yielding the floor,

5    unless the Court has some further questions, is the impact

6    not only of Iqbal, but the allegations supporting proximate

7    causation.  There is no argument, I believe, that Iqbal

8    does not -- does not change the lay of the land for Dura

9    Pharmaceuticals.  Since 8(a) has toughened its standard,

10   moved it up, now we have a tougher standard.  We just don't

11   allege that we have a disclosure which caused a stock drop.

12   We have to consider competing inferences as well.

13         And your Honor, number one, we've argued and the

14   Court has seen the actual quote on the Sprint cancellation,

15   a rumor caused the stock drop.  There's the competing

16   inference.  And it's there.  And it's stronger than their

17   inference because our happens to be the full untruncated

18   quote.

19         But more to the point, your Honor, we also pointed

20   out last time that Sierra Wireless, supposedly our

21   competitor that we're losing all this business to -- we

22   pointed out and furnished the Court in the last hearing with

23   the data that our competitor who supposedly was taking our

24   business had the identical stock drop.  It maps right on top

25   of it, on top of Novatel's stock drop.  Our competitor's

28

1    stock drop matches ours for the Sprint cancellation time.

2          Well, number one, I have significant doubts about

3    the Sprint cancellation.  But even if the Court wants to go

4    further, the fact is, how do the Plaintiffs explain

5    plausibly the company we're losing the business to has the

6    identical drop?  Again, going to the plausibility of the

7    conclusions to reach.

8          Well, I say it's market forces.  I think the

9    Plaintiffs have to go back, account for it, please.  And I

10   think that under Iqball, we have to do more than just say

11   the disclosure of the alleged truth caused a stock drop.

12   You have to start looking at the competing inferences, the

13   competing inferences it was a false rumor and that if it

14   happened to our competitor identically, then it must be

15   market forces.

16         THE COURT:  I wasn't quite clear.  I got the point

17   on the 10(b)(5) plans, but I wasn't quite clear on their

18   allegation about -- they had an allegation about the scheme

19   to inflate revenues, that your company issued press releases

20   forecasting a glowing anticipated amount of revenues in '08,

21   and then they alleged that you had a plan to ship too much,

22   knowing that in order -- for the purpose of inflating your

23   revenues, knowing that some of that was going to come back

24   or something along that line.  Can you address that?

25         MR. LANDAU:  Yes, your Honor.  The first statement

29

1  is puffery.  Saying we're going to do really well is classic

2  puffery.  And if now Iqball means anything, it's that simply

3  adopting that conclusion as true would be improper.

4         Let's, though, look under what I'll call the

5  channel stuffing -- the channel stuffing allegation.  Number

6  one, actually --

7         THE COURT:  Channel stuffing when you're trying to

8  sell --

9         MR. LANDAU:  I'm pushing it out, knowing it will

10  come back.

11         THE COURT:  Pushing it in to get that -- and

12  knowing that it will come back.

13         MR. LANDAU:  Right.  Now, first thing, that's

14  actually the opposite of what ultimately happened.  Because

15  if the Court -- what happened was, it didn't come back.  How

16  do we know that?  We look at the ultimate revenue for the

17  first and second quarter.  We shifted.  We did not restate

18  our financials.  And that, I think, the final order the

19  Court issues should acknowledge.  There was no financial

20  restatement.

21         We shifted revenue from the first quarter to the

22  second quarter, $3.4 million, less than 4-percent.  We

23  shifted it.  Now, it didn't go away.  It's not as if

24  suddenly we boosted -- we boosted revenues in that quarter,

25  and then the next quarter we were going to see a plummeting

30

1   drop.  It didn't happen.  We just shifted it to the second

2   quarter.  And so that's number one.

3        Number two, what I believe the actual allegation

4   is is that we were extending credit to a lot of our

5   customers.  My goodness, the company goes on the line in

6   tougher economic times where there is a credit crunch going

7   on and actually allows customers to buy on credit.

8        And so now we're being castigated for it by

9   saying, you're pushing more out there.  Well, the fact is,

10  we're not selling less.  The fact is, there was no Sprint

11  cancellation.  Looking out in the world and looking out at

12  our large customers, looking out at the success of this

13  wonderful company, it is just amazing that everything one

14  does to strengthen one's self in a very volatile high-tech

15  industry comes back to bite you in a securities case.

16       If you think the future looks good and you have a

17  great product, a quarter later when somebody else introduces

18  a product, suddenly you're a liar because you thought the

19  future looked good for that quarter.  This is -- I also

20  believe, your Honor, under Iqball, under the holistic

21  theory -- and I want to end on this -- one also has to take

22  into consideration the industry we're in.  We're in the

23  high-tech electronics business.

24       This is not a case like a regulated utility where

25  you have a rate base and you know what the return is going

31

1  to be.  And things barring a catastrophe do not change from

2  quarter to quarter.  They do not change from year to year

3  much.  Rather, we're in an industry where they not only

4  change year to year, but quarter to quarter, month to month.

5  And that's something which <u>Iqball</u> says.  This Court can

6  bring common sense and experience in evaluating the

7  allegations.  We don't check those things at the door any

8  longer.  Now we have to bring common sense and experience.

9           And to allow allegations which are puffery or

10 allegations which pertain to one quarter somehow to lapse

11 into another period of time, I think would be inappropriate.

12          If the Court has any other questions, I'll

13 entertain them.

14          THE COURT:  I'll let you file your demonstrative

15 when you get back.

16          MR. LANDAU:  Thank you, your Honor.

17          MR. BRITTON:  Good morning, your Honor.

18          THE COURT:  Good morning.

19          MR. BRITTON:  Lucas Olts will be presenting

20 Plaintiff's side today.

21          THE COURT:  Thank you.

22          Welcome.

23          MR. OLTS:  Good morning, your Honor.  So unless

24 there's a specific issue that the Court would like me to

25 address first, I was planning on addressing the issue

32

1  regarding Iqball that the Court --

2          THE COURT:  You may.

3          MR. OLTS:  -- had previously noted.

4          I think it's very important here, your Honor, and

5  a very careful reading of Iqball demonstrates that the

6  holding is that the Supreme Court affirms its holding in

7  Twombly and says that Twombly applies to all federal

8  cases -- all federal civil cases, not just anti-trust cases.

9  That was the key holding in the case.

10          The court in Iqball, your Honor, repeatedly cites

11  Twombly over and over.  That is really what the court is

12  doing.  It's applying the facts before it to Twombly.  And

13  the Court had mentioned that there -- that you believed that

14  maybe there was a strengthening of Twombly in those

15  application of the facts, which we would say, your Honor, is

16  not true.  There is no real strengthening of Twombly.  It's

17  really a clarification of Twombly and how Twombly is to be

18  applied in that case before it.

19          THE COURT:  True.  But what's significant is the

20  part about the allegations, where under -- previously under

21  Connelly vs. Gibson, if you alleged that Mueller did this

22  and Ashcroft did this for the purpose of doing something,

23  then you would take that as true.  So where Iqball is

24  significant to the Court is we're talking about scienter in

25  a securities case.  It's what the individuals knew, what --

33

1  it's the scienter.

2          MR. OLTS:  Absolutely.

3          THE COURT:  And so if they say in Iqball, this

4  isn't sufficient, that's a little stronger than the Twombly

5  anti-trust limited holding.

6          MR. OLTS:  Absolutely.  And let me -- excuse me.

7  Let me address that issue.  As the Court held in this

8  case -- in your order, the Court cited Twombly and said that

9  we had met that -- met the Twombly standard for the purposes

10  of pleading.

11          So Twombly is specifically cited in the Court's

12  order, and you held that we had met that pleading standard.

13  So -- but then the Court goes on --

14          THE COURT:  But what if in doing so I said, well,

15  you alleged that -- as far as the cancellation of the

16  Sprint,  you alleged that the Sprint contract was ending, an

17  end-of-life contract.

18          MR. OLTS:  Sure.

19          THE COURT:  And now the Defense is saying, well,

20  that one -- so I took that as true, but the Defense is

21  saying now that's not plausible, and you had notice that it

22  wasn't plausible based on the analyst's report.

23          MR. OLTS:  Well, let me address each of those

24  issues.  First let me address the pleading standard issue

25  that you addressed with scienter.

34

1       As this Court specifically held in the Atlas vs.

2 Accredited Homes case -- and the Court lays it out very well

3 there that to survive a 12(b)(6) motion to dismiss in a

4 securities class action such as this, the Plaintiff has an

5 obligation not only under Rule 8(a), which has been

6 strengthened by Twombly -- there's no doubt it's been

7 strengthened by Twombly.  But we must also pass -- on top of

8 that, after we pass that hurdle, then we must also jump over

9 the 9(b) hurdle, which is under -- there's no doubt that the

10 9(b) hurdle is higher than the Rule 8(a) hurdle.

11      And then we must also pass the Rule -- the PSLRA

12 pleading standard, which specifically goes to the scienter

13 element you were just discussing, which is a strong

14 inference of scienter.  That is -- that is how the Ninth

15 Circuit and all courts have held.

16      So the issue here, your Honor, is -- a reading of

17 Twombly dictates what's called a plausible inference

18 standard.  Those are the words that the Court uses.  That

19 the allegation must be all factual allegations sufficient to

20 raise a right to relief above a speculative level and enough

21 facts to state a claim of relief that is plausible on its

22 face.  And what the Supreme Court uses is a plausible

23 inference standard as opposed to the PSLRA, your Honor,

24 which imposes a strong inference standard, which is higher.

25      And so in this case, your Honor, the Court has

35

1  already found that not only have we met the standard in

2  Twombly, we've met the much higher standard under the PSLRA,

3  which is a strong inference standard.

4          So even -- as Defense counsel said, the standard

5  under 8(a) has been raised, but the key thing that he said

6  was that somehow raises the standards for under the PSLRA as

7  well.  And as he was speaking, I was looking through -- I

8  was looking through Iqball, your Honor.  It doesn't mention

9  the PSLRA.  That's because the Supreme Court was in no way

10 altering the standard under the PSLRA.  That standard is

11 exactly the same as it was when this Court ruled on the

12 motion to dismiss.

13          THE COURT:  Well, that's in part why part of the

14 Court's reaction is, well, now we have new law.  It was

15 briefed under old law.  I ruled under old law.  Maybe you're

16 right.  Maybe he's wrong.  But rather than having it

17 addressed at oral argument, isn't it better that the parties

18 then focus and then do a redo under now the new standard,

19 and then the Court has an opportunity to evaluate whether

20 you're right that it didn't address it at all as to the

21 securities PSLRA or whether they're right that now in light

22 of Iqball, we also have to look at Dura a little more

23 carefully.

24          I don't have -- that issue has not been briefed

25 one way or the other.  It's only been argued by both sides,

36

1  who are very good lawyers.  And then what do I do with that?

2  Perhaps it's better to then step back and then have the

3  parties rebrief it in light of new law.

4      MR. OLTS:  Well, if that is the Court's decision,

5  your Honor, I think that what we would request is that --

6  that changes the Defendant's motion, and rightfully so

7  because Iqball has come out since they filed their motion

8  for reconsideration.

9      Their motion for reconsideration was not based on

10 a change of law.  Their motion for reconsideration was based

11 on the fact that -- their allegation that you were clearly

12 erroneous in your order.

13     So what we would ask is that any briefing would

14 just be focused on Iqball and whether or not Iqball has an

15 effect on the standard, whether or not there's any effect on

16 the standard as opposed to rebriefing the entire motion.

17     THE COURT:  I think that would be too narrow.  I

18 think that would actually be too narrow.

19     MR. OLTS:  Well, I think that that -- that would

20 be the standard under which they would be asking for

21 reconsideration.  And I think that once we also address

22 these other issues, such as the 10(b)(5)(1) training plan

23 issue, I think the Court will see there are no other clearly

24 erroneous problems with the order.

25     If there is any question, it's very narrow, and

37

1  it's very tailored to just whether or not Iqball has an

2  effect upon the pleading standard that the Plaintiff must

3  meet.  I think that so far is the only issue that we've --

4  that we've come across, if I'm understanding the Court

5  correctly.

6          So it looks like just briefly, your Honor, to

7  mention -- just because Defense counsel is trying to

8  analogize the allegations in Iqball to the allegations here,

9  which I think is -- it's a very, very far stretch, to say

10 the least, your Honor.  A careful reading of Iqball

11 demonstrates that all that the Plaintiff was alleging for

12 these two individuals -- now, it's just -- the only two

13 Defendants on appeal were Mr. Ashcroft and Mr. Mueller.  And

14 that the only allegations against them were, one, that

15 Ashcroft was, quote, the principal architect.  That was it.

16 It was what the Supreme Court found to be a conclusory

17 allegation that simply because Mr. Ashcroft was the Attorney

18 General, that he had to have known about the abuse and --

19 the abuse that was going on against the Plaintiff.

20         And the allegation against Mr. Mueller that he

21 was, quote, instrumental in adopting and executing this

22 policy.  And the Supreme Court found, well, those are

23 just -- that's just plain conclusion.  There are no facts to

24 back it up.

25         And I think in direct contrast to that, your

38

1  Honor, is the Court's order here where the Court walked

2  through laboriously pages and pages of factual allegations

3  that we set forth not only about the fraud, but about the

4  individuals specifically themselves, about how the

5  Defendants admitted that they falsely reported $3.4 million

6  of revenue of in Q-1.  And that's in your order at page 13.

7  And that they admitted in some cases we did not have the

8  right product for the right customers, which is at page 14.

9       I mean, we can go on about the specific stock

10 sales, which I will address in a minute.  On top of all

11 those, we also have the allegations about the core

12 operations inference, about how this is a small company and

13 about how the Defendants must have known.  As the Ninth

14 Circuit has held, the Defendants must have known that there

15 was issues with their biggest customer.

16      Now, these are all -- I'm just listing these out

17 as examples in contrast to the allegations in Iqball, which

18 are -- I mean, it's night and day.  These are two different

19 standards.  And that's because we were forced to meet the

20 higher pleading standards of the PSLRA.

21      THE COURT:  But you do acknowledge that

22 commentators and legal scholars after that have noted a

23 broad application of Iqball beyond -- I mean, one could say,

24 well, it would be very narrow, and it was limited to an

25 unusual type of case which only occurs once in a generation.

39

1  Not so.  It's been fairly widely acknowledged that it has

2  broad implications for all cases, and particularly

3  securities, employment.  Anyone that has an intent

4  requirement.

5              MR. OLTS:  Absolutely, your Honor.

6              THE COURT:  People are focusing on that, and it's

7  a traumatic shift from the Connelly vs. Gibson approach.

8              MR. OLTS:  Absolutely.  And I think what's very

9  interesting -- just to give you some -- as you know, our

10 firm deals with a lot of these cases.  And to just give you

11 an insight, when this case came down, there was sort of some

12 hubbub about, well, what is this going to do.  Is this going

13 to change the pleading requirements.

14             And I think once you look at it, all the activity

15 and the blogs and the legal research that's getting revved

16 up to deal with this issue is really focusing on the fact

17 that previously -- that it's changing that 8(a) standard.

18 And that's a very big deal for, you know, 99-percent of

19 cases that are handled in Federal Court.  Because that is a

20 real change.  There is a C change from Twombly -- from 8(a)

21 to Twombly.  And then that -- Twombly's application via

22 Iqball.

23             But the issue, at least for my practice, your

24 Honor, is that we -- we stopped pleading to 8(a) standards a

25 long time ago.  We've been pleading to 9(b), first of all.

40

1 But since the mid 1990s, we've been dealing with the PSLRA.

2 So this whole idea of, oh, wow, we can't just plead

3 conclusions, that's old news to us.  We've been pleading

4 those for a long, long, long time.

5         As the Court -- and the Court has already seen

6 that, why applying Twombly, not only here, but in Atlas --

7 in the Atlas case, the Court also applied Twombly.  So I

8 think that there is a C change.

9         THE COURT:  Of course, that was -- that was a sub-

10 prime mortgage case.

11         MR. OLTS:  That's true.

12         THE COURT:  They've had a few issues.  In fact,

13 Accredited filed bankruptcy.  And so --

14         MR. OLTS:  Not surprising.

15         THE COURT:  I think they had a few more bad facts

16 on their side.

17         MR. OLTS:  Well, but I think the issue here is

18 that the hurdle of Twombly has been passed.  And if there is

19 a slight change -- conceding that maybe -- even if it was to

20 increase it slightly or that by seeing Twombly through the

21 lens of Iqball has clarified for the Court that these

22 conclusory standards would not meet.  Well, that's old news

23 to us because we've been pleading to meet the PSLRA, and the

24 Court -- and the most important thing is that the Court

25 already found that we pled to meet the PSLRA in this

41

1 particular case, in this complaint.  We've already met that

2 standard.  But that's a mountain over a molehill.

3          THE COURT:  So you disagree that this has any

4 implication with <u>Dura</u>?

5          MR. OLTS:  I do disagree with that.

6          THE COURT:  What if, in doing so, the Court

7 accepted your allegation about the end of life for Sprint as

8 true?  What if -- what if that's as a practical matter how

9 the Court approached it?

10          MR. OLTS:  Well, I think, your Honor -- I think

11 this leads me -- and I will answer your question.  I just

12 want -- I think I want to answer in the context of

13 discussing the 10(b)(5)(1) trading plan.  And I think that

14 there is -- you know, and we're on brief number four here

15 for this motion against our complaint.  And I think it's

16 been a little bit confusing about what we're talking about

17 in these 10(b)(5)(1) trading plans.

18          And the Court has addressed this in <u>Petco</u> and

19 several other times and laid out the correct standard in

20 this case, but I want to make sure that it's clear for the

21 record.  What our position is is that there are two separate

22 times -- and this is the law.  It's not -- this is the law.

23 There are two separate times really when the Court looks at

24 a 10(b)(5)(1) trading plan.  The first is at the pleading

25 stage.  Okay.

42

1          Plaintiffs are alleging insider trading.  What the

2   Court must do with the pleadings -- and then the second time

3   is at summary judgment motion.  So -- and that -- and under

4   10(b)(5), it specifically says that trading under a Rule

5   10(b)(5)(1) trading plan is a, quote, affirmative defense.

6   The first -- the first is under the pleading stage.

7          So what the Court must do and what this Court did

8   in this case and in Petco is apply the Silicon Graphic

9   standard.  Okay.  I'm looking at your allegations of insider

10  trading, and I'm looking at the amount of percentages sold.

11  I'm looking at the timing of the sales in comparative to the

12  disclosure of adverse information or inside information, and

13  I'm looking at whether or not the sales were consistent with

14  the prior trading history.

15          THE COURT:  In Silicon Graphics, did they have

16  trading plans?

17          MR. OLTS:  They did not, your Honor.  But what

18  they did -- and they had it in several other cases.  They

19  had it in Atlas -- I'm sorry.  Not in Atlas.  They had it

20  in -- obviously in Petco.  They had it in -- we had it in

21  this case.  And I think what they also had -- and this is

22  where Defense counsel is wrong.  Very recently, this exact

23  issue, exact issue has just been decided by Judge Ware

24  (phonetic) up in the Northern District.  I have a copy of

25  the opinion for you.

43

1          THE COURT:  I'm flattered that you cite me, and

2    I'm flattered that you cite Judge Ware, but do we have any

3    Ninth Circuit authority?

4          MR. OLTS:  Yes, we do.  And in Metzler, which is

5    the case that the Defendants rely on, they -- what

6    Metzler -- the court does in Metzler is they walk through

7    the Silicon Graphics analysis, and they say, okay, let's

8    look at each of these issues.  Let's look at the amount

9    of -- let's look at the timing of the sales.  Let's look at

10   whether or not the sales were consistent with prior trading.

11         And in that case they say, okay, looking at that

12   information, we say that it is not -- the trading was not

13   suspicious.  Because that's the issue really for the Court

14   at the pleading stage, is the trading suspicious.  And one

15   of the factors the Court can look at is whether or not the

16   trades were made pursuant to a 10(b)(5)(1) trading plan.

17   And that's exactly what the Court did here where you said,

18   I'm looking at the trades, and I'm looking at these trades,

19   and I'm looking at -- we'll take Mr. Leparulo's trades, for

20   example.

21         And under the application of the Silicon Graphics

22   standard, Mr. Leparulo makes no sales for several years.

23   Then he sells a very large amount of stock right before the

24   Sprint information comes out, then he doesn't sell again.

25   So as the Court found, that on its face would be a

44

1  suspicious sales under <u>Silicon Graphics</u>.

2         And then the Court looks at, well, okay, there

3  was -- the sales were made pursuant to a plan, so I will

4  consider that in the mix of the information at the pleading

5  stage.

6         And as the Court found here, okay, those trades

7  were not made -- they don't look like a normal 10(b)(5)(1)

8  trading plan.

9         THE COURT:  How do I know that?  See, that's where

10 the Defense is saying -- so how do I know that those aren't

11 normal?  Do I know that -- do I really know enough

12 information?  Did the price get up?  Was there a market

13 reason for -- was this 2007 before everything bad happened

14 in the market?  When -- when was this?

15        MR. OLTS:  And I think you nailed it.  I think you

16 hit it right on the head right there.  I think that is the

17 crux of the question.  And let me -- and I think the

18 importance of Judge Ware's order -- I would like to just

19 read it for you just so you understand.  This is in <u>UTC</u>

20 <u>Starcom</u>.  I have a copy for you.  And it's 2009 Westlaw

21 1151993.

22        And what he says here -- he's discussing insider

23 trading.  He says, "The Court finds that the timing and

24 magnitude of the stock sales, as alleged in the complaint,

25 support a strong inference of scienter."  And this is the

45

1  key part.  "Defendants contend that their security sales are

2  not suspicious because they were made according to pre-

3  established 10(b)(5)(1) plans and were thus

4  nondiscretionary."  That sounds exactly like what we just

5  heard.

6          "The Court finds that although evidence of the

7  nondiscretionary nature of Defendant's sales may ultimately

8  provide the basis of an affirmative defense at a later stage

9  in the litigation, it suffices that at the pleading stage,

10  Plaintiffs have alleged sufficient and suspiciously timed

11  security sales."

12          The issue is --

13          THE COURT:  Yeah, but then that sort of goes back

14  to -- so the -- so that goes back to the -- they've alleged

15  it.  Now do we just have to take that as true and then we

16  move to summary judgment.  That's the old Connelly vs.

17  Gibson route.  Or do we have to go behind that and see

18  whether there's additional facts to support a strong -- a

19  suspicious inference or not?

20          MR. OLTS:  And I think that that, your Honor, goes

21  back to the issue of the PSLRA.  The PSLRA has already --

22  the Connelly does not apply to those allegations.  The

23  PSLRA's strong inference applies, which the Court has

24  already found we met.  And the strong inference is found by

25  the Silicon Graphics factors.

46

1        So let's say, for example, we just said --

2        THE COURT:  So then I would kind of go -- so the

3   Silicon Graphics are not 10(b)(5) plans, and then the

4   Defense says, well, the Plaintiffs selectively chose this

5   Sprint end-of-life, which is factually inaccurate, so it's

6   now not plausible so that we're mixing and matching

7   allegations which then the Court takes as true to then reach

8   a conclusion that these are suspicious sales.

9        MR. OLTS:  Well, I mean, just to be clear, I don't

10  think that Silicon Graphics applies to the 10(b)(5)(1)

11  trading plan issue specifically.  I think what Silicon

12  Graphics applies to is the pleading standard under the PSLRA

13  and how that is so much higher than a normal 8(b) or 9(a) --

14  excuse me -- 8(a) or 9(b) pleading standard and how factors

15  such as the sales and the prior trading history demonstrate

16  a strong inference of scienter.

17        If we were just to say, for example, Mr. Leparulo

18  sold his stock with inside knowledge and that was it, then

19  that would be a conclusory statement.  But instead, we've

20  demonstrated, okay, let's look at his prior trading history.

21  Let's look at the amount.

22        THE COURT:  How -- do you have the plans?

23        MR. OLTS:  No.

24        THE COURT:  No.

25        MR. OLTS:  They're not public.

47

1          THE COURT:  So how do you know?

2          MR. OLTS:  How do we know that he amended them?

3          THE COURT:  How do you know that it's suspicious,

4     his sales are suspicious?

5          MR. OLTS:  Because we've looked -- we've alleged

6     the factors under Silicon Graphics that demonstrate there's

7     no sales for a long period of time, then he sells a huge

8     amount, then the stock price goes down, then he doesn't sell

9     again.  That, under controlling Ninth Circuit law, and as

10    your Honor already found in the order, is suspicious by

11    itself.

12         THE COURT:  But what if the Defense says there's

13    other reasons for it because it's part of their plan that

14    then indicates that when the price goes up to this, then the

15    trigger comes in, and then they sell?

16         MR. OLTS:  Then we're at summary judgment.  That

17    is an issue -- that is a question for summary judgment

18    because under Iqball and under all controlling Ninth Circuit

19    authority, the Court should not -- is not allowed to accept

20    an affirmative defense at the pleading stage.  That was what

21    Judge Ware's point was.  He's like, listen, I see this

22    suspicious trading.  It looks suspicious to me.

23         They're telling me it's according to a plan.  All

24    right.  I understand that.  We'll decide that at summary

25    judgment.  Because that's an affirmative defense which

48

1  depends on facts which are not before the Court, which are

2  not contained in the complaint because Plaintiff's don't

3  have that information.  So we need to go out and we need to

4  take some depositions.  We need to ask the Defendants.  We

5  need to look at the plans.  We need to look at the tradings.

6  We need to take the depositions.

7            THE COURT:  So all you would have to do is just

8  simply allege, on information and belief, we think that

9  these sales look suspicious?

10            MR. OLTS:  No, no, we wouldn't have to do that.

11  We would have to meet the high pleading standards of the

12  PSLRA, which demonstrate all the Silicon Graphics factors,

13  which are that the timing is very suspicious, like in this

14  case that the sales occurred -- a huge amount of sales --

15  and this has been rehashed again and again in your order and

16  in our complaint, that the huge amount of the sales occur

17  right before this information comes out.  And that's under

18  Silicon Graphics, and as this Court found, is very

19  suspicious.

20            And likewise, the fact that --

21            THE COURT:  See, I don't find anything.

22            MR. OLTS:  Well, no.

23            THE COURT:  You say I make --

24            MR. OLTS:  You find that we allege it sufficiently

25  to meet the standard under the PSLRA.  That's what I --

THE

49

1  excuse me for that.  But that -- but for the purposes of the

2  order, the Court has found that we sufficiently pled that

3  these sales were suspicious under the PSLRA, which is a much

4  higher standard by anyone's account.

5       And Defendants say this in their brief.  They say

6  this in their reply brief.  They say that the PSLRA is much

7  higher than 8(a) or <u>Iqball</u> because that's how it is.

8       THE COURT:  Now, they were upset that the Court

9  had relied upon demonstratives that were then put into the

10 Court's viewing just at the hearing with no notice to them.

11 And so then they objected strenuously to that.  But it is

12 the Court's practice to let them file demonstratives.

13      So that may argue for -- they didn't -- it's kind

14 of like a surreply where they didn't have a chance to

15 address it.  That may be another reason why the Court should

16 then have a more extensive briefing to let each side raise

17 its own points.

18      MR. OLTS:  Are you referring to the issue of the

19 demonstratives at the motion to dismiss hearing, your Honor?

20      THE COURT:  Correct.

21      MR. OLTS:  And you would like further briefing on

22 that issue?

23      THE COURT:  No.  I'm just saying that the -- that

24 the timing and suspicious nature was illustrated by a

25 demonstrative graphic that the Defense objected to as being

50

1  the equivalent of a surreply, and the Court said that the

2  Plaintiffs could file it in any event.  It's discretionary

3  with the Court whether or not to admit a demonstrative.  I'm

4  going to certainly be affirmed on that ground.

5          But my point is that if the Court then did use

6  that when they didn't have a chance to do a written reply,

7  then maybe that's another reason why the Court should permit

8  them to do a brief.

9          MR. OLTS:  Well, just to that point, your Honor, I

10  would say that everything in that demonstrative exhibit was

11  pulled directly out of our complaint, which is all contained

12  in -- all the insider trading information, which --

13  especially what I've just been speaking of, is all of

14  paragraph 116 of the complaint.  It goes on for many pages.

15  And we can -- if there are any specific trades the Court

16  would like to discuss, they're all laid out here.

17          THE COURT:  In 116?

18          MR. OLTS:  On paragraph 116 of our complaint.  And

19  those were simply the trades that I was referring to in my

20  argument.

21          THE COURT:  Okay.  That's helpful.

22          MR. OLTS:  And I would like to talk about this

23  analyst report that counsel has blown up here.  We have no

24  objection to the Court reading the whole thing.  That's

25  fine.  I think it's important that -- we certainly didn't

51

1  cover our hand up over the rest of the -- the rest of the

2  report as counsel inferred.  We actually cited other parts

3  of it, specifically the second to last sentence where we

4  say, we understand this transition had been jointly planned

5  for some time by Novatel and Sprint.

6          I mean, that's a very important allegation in our

7  complaint, which demonstrates that the Defendants had

8  knowledge about this transition prior to the transition

9  becoming public, on top of the fact that this was their

10 biggest customer, they were a small company, all these other

11 things that the Court has cited to in its order.

12         So this -- you know, the whole analyst report is

13 not quite the gotcha that Defendants would like it to be.  I

14 think also this idea that they are saying that this analyst

15 report is nothing more than a false rumor and they're trying

16 to poke holes in it, I think once again, this goes directly

17 to a motion for summary judgment.  They are really attacking

18 so many of the facts in our complaint.

19         And I think a lot of what counsel was doing up

20 here was attacking the facts, not -- and, you know, it

21 sounded -- if it sounded familiar, it's because a lot of

22 these arguments were made at the motion to dismiss hearing

23 before, and I think the Court correctly found in the order

24 that the facts alleged in the complaint must be taken as

25 we've alleged them.

52

1        Now, of course, under Iqball, if there are merely

2   conclusory allegations, then the Court would not have to

3   accept them as true.  But here we have the very -- the very

4   important fact, your Honor.  And Defense can say this was a

5   false rumor, but the key is that the stock dropped 11-

6   percent on this news.  And that is a very, very important

7   fact here.

8        And whether or not it was a false rumor, which it

9   wasn't, but whether or not it is, that's an issue that we

10  need to take discovery on.  And so this continual attack

11  upon, well, this was a false rumor, we don't know, it

12  actually didn't change, there is no evidence to back up any

13  of this.

14       And so what the Court has to do is look at our

15  complaint, as the Court did in its initial order, and say

16  whether or not we have met the pleading standards under the

17  PSLRA, which are, as we've discussed, much higher than those

18  under Rule 8(a) under Iqball.

19       And I think at this point, your Honor -- I see

20  that you're reading, so I don't want to interrupt you,

21  but --

22       THE COURT:  I'm just -- I'm looking at your -- the

23  complaint paragraphs that you were referencing on the sales

24  data, 118 and 119.

25       MR. OLTS:  Yeah.  And I think if you look at

53

1  those -- if you look at those sales -- and I would point the

2  Court specifically to Mr. Leparulo's sales.  And keeping in

3  mind while we're looking at this, the <u>Silicon Graphics</u>

4  standard that -- and this is all demonstrated in the Court's

5  order as well.  But you see these sales -- you see the

6  amount of the sales jumping up dramatically from zero.

7          Remember, there's no sales for several years

8  before this.  Then there's a huge amount of sales.  Then the

9  Sprint information comes out.  Then no more sales.  Now,

10  what Defendants would like you to believe, your Honor, is

11  that, well, this was all according to Mr. Leparulo's

12  10(b)(5)(1) trading plan, which just so happened to have him

13  sell out all of -- the vast majority of the stock.  I

14  believe it's -- as the complaint says there, it's 90-percent

15  of his unrestricted stock holdings.  So he sold 90-percent

16  of his unrestricted stock holdings within a very short

17  period of time right before this information came out.  And

18  that was all according to a plan.

19          And what -- and the hypothetical situation that

20  they set forth in their papers, which is improper at a

21  motion to dismiss, because that's really a question for

22  summary judgment -- what he did, what they're speculating he

23  could have done is something totally different.  But what

24  the standard -- excuse me.  The example that they try and

25  set forth is that, oh, Mr. Leparulo, maybe he set his stock

54

1   price to sell -- you know, to sell three, four, five, six,

2   seven -- you know, almost $9 million worth of stock at $25.

3   That was the example they gave in their reply.  Maybe that's

4   what his -- they don't say that's what it is.  They say

5   maybe.  Maybe that's what his 10(b)(5)(1) trading plan did.

6            So what they want the Court to believe is, okay,

7   for the purposes of dismissing a complaint, for throwing the

8   complaint out, we want you to believe this idea that Mr.

9   Leparulo set his price at $25, which was just below the

10  overall high, and right before the Sprint disclosure came

11  out, they dump a huge amount of stock over a four-day

12  period, and so therefore, that is not suspicious.

13           That meets every single one of the <u>Silicon</u>

14  <u>Graphics</u> factors for suspicious sales.  And as Judge Ware

15  has pointed out, the fact that they say it was according to

16  a 10(b)(5)(1) trading plan is an issue for summary judgment

17  because it's an affirmative defense, which the Court may not

18  consider at the motion to dismiss stage.

19           There needs to be discovery on this issue, and we

20  need to look at the facts.  We need to get behind the

21  curtain and figure out what is happening as opposed to just

22  taking Defense counsel's representations of what they

23  believe they say could have happened.  That's not the issue

24  here.  The issue is what have we pled.

25           THE COURT:  Do you want to address the accounting

55

1  issues?

2       MR. OLTS:  I do.  I think that -- I do think that

3  we've been playing against a slightly bit of a moving target

4  here.  They do keep changing their arguments every brief

5  that comes out.  And there has been four of them.  And so

6  we're running to play catch-up.  And I think there's almost

7  been a fifth round of new arguments here today on some of

8  these issues.

9       And I think what Defense counsel really is arguing

10 is that the facts that we allege are not true, that that's

11 not really what happened.  They've got other stuff going on.

12 These SOX certifications weren't -- they didn't say what we

13 say they said.  And all of that is not proper at this stage

14 in the litigation.  I think it's a very important fact that

15 really goes back to each one of these issues that they're

16 raising.

17      As to the SOX certifications, your Honor, what

18 they say is that the SOX certifications -- they say that

19 they weren't applicable to 2007.  They were only false in

20 2008.  So what -- first of all, I think even if you took

21 that to be true, that isn't the devastating destruction of

22 our complaint that you would imagine it would be because

23 they are admitting that they were false in 2008.

24      But even to believe what they're saying, you would

25 have to assume that they have these great -- they have these

56

1 internal controls that made sure everything ran right, made

2 sure that their accountings were well in place.  And then

3 they took them out, which to me would indicate an even worse

4 act, that they had these things and they took -- they

5 removed them, as opposed to, well, we just -- we actually

6 never had them.

7        And the reason that they only -- that they were

8 only limited to admitting that they were wrong in 2008 is

9 that's the only time they audited.  There is no audit going

10 back of those specific certifications.  So the issue is, did

11 they -- did they take -- did they take precautions out that

12 would have prevented them from improperly recognizing

13 revenue and improperly shipping product.

14        And the answer to that question first is, well, it

15 doesn't really matter because we allege that they had that

16 going on in 2008, that they admitted that that was false.

17        THE COURT:  2008 or 2007?  2008 they admitted, but

18 you allege that they also had false SOX certificates in

19 2007?

20        MR. OLTS:  Yes, 2007.  That's correct.

21        THE COURT:  And do you know -- they say there

22 weren't any.  Do you know whether there were or weren't?

23        MR. OLTS:  Do I know whether or not there were or

24 weren't SOX certifications?

25        THE COURT:  False ones in 2007.

57

1          MR. OLTS:  I mean, I'm getting a little bit
2   confused.  I hate to do this, but I want to make sure that
3   my answer is absolutely correct for the Court.  And yes,
4   right?  Absolutely, your Honor.  They're on five -- excuse
5   me.  On August 9th, 2007 and November 9th, 2007.
6          THE COURT:  And those are false?
7          MR. OLTS:  Yes.  They admitted that they were
8   false.
9          Let me clarify that, your Honor, because there has
10  been a little bit of -- I think what I just said was wrong.
11  They admitted that the false -- the SOX certifications
12  during 2008 were false.  And I think it gets confused on the
13  fiscal year.
14          THE COURT:  That's the March 31, 2008 and the June
15  '08.  And then maybe Defense counsel can clarify because I
16  have some dates in my notes also before.
17          MR. BRITTON:  Your Honor, actually, there was a --
18  there was a SOX certification on March 3rd, 2008 as well.
19          THE COURT:  Okay.  2008?
20          MR. BRITTON:  Yes.
21          THE COURT:  What about the 2007 ones?  Are they
22  false, are they not false?  Do we know?
23          MR. OLTS:  I would say that we don't know, right?
24          MR. BRITTON:  No, your Honor.  The position that
25  we're taking, your Honor, is that if you don't have any

58

internal controls in 2008, then there's a reasonable and actually a strong inference that there were no internal controls in 2007.  So what you have to -- if you're going to say that you're not going to accept that, what you do have to accept is the fact that they went in and pulled them out.

So by admitting that there were no internal controls in 2008, there's a strong inference that there were no internal controls -- no meaningful internal controls in 2007.

THE COURT:  In 2007, though, we don't have any indication that they were shipping product to have it reflected in a wrong quarter, do we?

MR. BRITTON:  Absolutely we do, your Honor.  We have the confidential witness that has come forward and said that that was the regular practice every quarter, that they were shipping the stuff out.  And then what happened in the first quarter of 2008 is their largest customer stopped purchasing product.

So their results came in way below expectations.  I think it was 10 million at the beginning of the quarter and then 30 million at the end of the quarter.  So that's how it all ties together.

THE COURT:  That's how it came to head.  Because otherwise, if you always did it, you're always one step ahead of the game.

59

1          MR. BRITTON:  Right.  Exactly.  At some point in

2  time, it's going to end.  Because you're either going to

3  ship it back, which we don't allege that they did, or

4  they're going to say, you know what?  Don't ship any more.

5  We've got too much.  We'll sell what we have, which is, in

6  fact, what happened in the first quarter of 2008.

7          THE COURT:  All right.  Okay.  Have you --

8          MR. OLTS:  Any other questions?

9          THE COURT:  -- addressed all your

10 issues?

11         MR. OLTS:  Yes, unless the Court has any questions

12 for me.

13         THE COURT:  All right.  Thank you.

14         MR. OLTS:  Thank you.

15         MR. LANDAU:  Your Honor, I respectfully request

16 that we put all of this in a renewed motion to dismiss and

17 lay it out for the Court.  My uncle would call what we just

18 heard hogwash.  And I'm going to agree.

19         THE COURT:  He doesn't -- he doesn't think it's

20 hogwash.

21         MR. LANDAU:  You know, but I will point a couple

22 things out.  And I will nail it down right now.  There were

23 no SOX certifications in 2008 during the period they attack

24 us.  They know it.  The Court can take -- and they've asked

25 judicial notice.  And we've asked as well of our Ks and Qs

60

1  during 2008.

2          THE COURT:  They actually make sort of an

3  interesting twist on the issue.  They say, well, if you

4  admit it in 2008, then -- and if you said that there weren't

5  any before, but maybe your internal controls were missing.

6          MR. LANDAU:  Okay.  Your Honor --

7          THE COURT:  Or else you removed them.

8          MR. LANDAU:  There's -- that's why we need to

9  brief this, because things are just being made up.  We said

10  what was -- during the audit, during the internal

11  investigation, a material internal control weakness was

12  found in 2008, the two times we alleged.  That I spoke on

13  before.

14          Now, that's it.  You can't then turn around -- it

15  was not they were missing.  There was a problem.  There was

16  an issue.  It was then addressed and fixed.  And Plaintiffs

17  know better.  Every year you do an internal control audit

18  review as part of the process.  They know that.  And what --

19  this is common knowledge.  And there is no finding of

20  internal control weaknesses for 2007.

21          And let me nail this down.  There were no SOX

22  certifications in 2008.  The one they said for 2008 from

23  March -- well, let's see -- 3 --

24          MR. BRITTON:  March 3rd, Counsel.

25          MR. LANDAU:  -- is for the 10-K for 2007.  And

61

1    counsel wants this Court to believe -- and I'm sorry I'm

2    getting excited, but that pertained to 2007.  There is no

3    review at that point.  That SOX certification was for the

4    prior year.  They know it.  And they put it --

5              THE COURT:  That one, you mean the March 3 or

6    March 31?

7              MR. LANDAU:  Yes.  That's March 3 in 2008

8    accompanied the K, the annual report for 2007.  That's when

9    you -- that's when the companies file it.

10             And so therefore, one can't then say, well, you

11   filed it in 2008.  It had to be false.  First thing, if you

12   admit an error, you're not admitting falsity.  Every

13   decision says that.

14             Number two, there were no SOX certifications filed

15   in 2008.  We found a material internal control weakness

16   during that period of time, and there's no basis to infer

17   that it occurred in 2007.  Weaknesses occur.  Just because

18   suddenly a batter in 2008 develops a hitch doesn't mean that

19   hitch was there earlier or wasn't there earlier.  We have to

20   look at the time in question.

21             Now, I want to go to another issue, and that is

22   the 10(b)(5)(1) trading plans.  We sort of apply Silicon

23   Graphics when we want to according to the Plaintiffs, and we

24   don't otherwise.  Suspicious trading is alleged.  Look at

25   all these new stock sales.  By the way, competing inference,

62

1  the stock was under water, was way low, which the Court is

2  seeing through judicial notice, beforehand.

3          The stock shoots up.  Okay.  They say suspicious

4  trading.  Our response, 10(b)(5)(1) plan.  Now it's your

5  turn.  Plaintiff, it's not suspicious in the context of a

6  10(b)(5)(1) plan, notwithstanding Judge Ware and two other

7  District Courts.  No other Federal Court has gone back and

8  engraphed a good-faith defense.  No other Federal Court has

9  come back and said the Court cannot consider a 10(b)(5)(1)

10 plan on a motion to dismiss.  It is called an inference.

11         It is not a definitive finding.  It's the battle

12 of the inferences.  They show the Court these new stock

13 sales.  We say 10(b)(5)(1) plan.  Now it's their turn.  They

14 have nothing to come back.  What they do is the circular

15 argument, but they were suspicious.  They weren't

16 suspicious, once a 10(b)(5)(1) plan comes into being.  And

17 it's not equally plausible.

18         THE COURT:  Did you have Judge Ware's case before

19 today?

20         MR. LANDAU:  No, your Honor.

21         THE COURT:  All right.

22         MR. LANDAU:  Now, I also -- it's very interesting.

23 And Judge Easterbrook commented, I believe, in a Boston

24 University article that plaintiffs don't want specificity.

25 They don't want new facts because that cuts down on their

63

1  ability to get beyond the pleading stage.

2          I said, don't make stuff up about my 10(b)(5)(1)

3  plans.  Here they are.  Let the record reflect I'm holding

4  them up because the Court has asked us to bring them in the

5  event Plaintiffs actually wanted to see truth instead of

6  making it up.

7          The fact is, they don't -- they made it up.  They

8  have no idea.  The fact is, you must presume we have a valid

9  instrument.  The law doesn't presume invalidity to

10 instruments.  Because we're in a commercial society, the law

11 presumes that contracts are enforceable, that we have

12 complied with the law.

13         The Plaintiffs who attack it can then say, no, you

14 haven't.  But the problem is, you can't simply say a

15 10(b)(5)(1) plan which was put in place should be considered

16 invalid.  Because that's what they're asking the Court to

17 consider.

18         The Court, we believe, mistakenly followed this

19 line of logic and said, well, according to the Plaintiffs,

20 there's this test.  You have to have something on June 1

21 consistently throughout being sold consistently on June 15.

22 That's not the test.  It's not part of the rule, and they

23 know better.

24         The fact is, any set of triggers can be put in

25 place.  That is experience and common sense.  You can do it.

64

1  The rule doesn't say no.  So therefore, we're going to

2  presume a valid instrument.  If the Plaintiffs have a

3  reason, a fact -- and let's go back to Iqball now --

4  something beyond a conclusion to say invalid instrument, let

5  them come forward.  But they don't.

6          THE COURT:  What do you do with their allegations,

7  paragraph 119, 118, that lays out dates and times and

8  percentages?  One looking at it without knowing anything

9  about your 10(b)(5) plan would say -- the first one, for

10 example, says 98.74-percent sold within, I guess, a nine-

11 month period.  What do you say in response?

12         MR. LANDAU:  Well, first thing, your Honor, if one

13 said are these or are they not suspicious, I would ask the

14 question.  Not only did you sell a lot of stock before, but

15 where did the stock trade before?  The whole idea is, if you

16 got stock and the stock was trading at extremely low levels,

17 of course when the stock is up, suddenly you sell.  That's

18 the reason why somebody owns stock.  You buy low, sell high.

19 I think that's the trite phrase, but that applies here.

20         So -- but I'm willing to give the Plaintiffs, even

21 for purposes of just the argument today, because I really

22 want to brief this -- I'm willing to say, okay, suddenly we

23 sell, therefore it looks in your mind suspicious.  It's

24 really not because there were sales in 2004.  And then for a

25 while, the stock is really low, no sales.  Then the sales

65

1  are back up.  When?  In 2007 early.  Early.  January 12,

2  February 1, February 5.  Their rumor circulated on June 20,

3  2007.  Oh, come on, now.  We're going to go back five and

4  six months and claim that the rumor was back then?  How do

5  we know?  Where is the fact to support that?

6          So my come back is, if it is considered

7  suspicious, why?  I don't see suspicion.  I see things six

8  months before an alleged rumor hit the market.

9          Second, I want to know the context.  Because

10 Iqball again said, all of these evaluations of scienter are

11 context-specific.  That was the Supreme Court saying that,

12 not Eric Landau making it up.

13         But even, your Honor, if one were to include -- to

14 conclude at first blush that these were suspicious without

15 taking into account the history of where the price was, we

16 get on a motion to dismiss the ability to put the competing

17 plausible inference.  Even Plaintiff doesn't take that away

18 from us.

19         So we do.  We raised our hand and we say,

20 10(b)(5)(1) plan.  Now, even Metzler drops the footnote and

21 says that even pre-PSLRA law, going back to the Worlds of

22 Wonder case from the Ninth Circuit from 1994 says

23 10(b)(5)(1) plans rebut the inference of scienter.  That

24 carries over into present day.

25         Okay.  I have now rebutted their inference.  It's

66

1 their turn.  The ball is on their side of the court.  Now,

2 don't go back and say, but it's suspicious trading.  Show me

3 why my 10(b)(5)(1) plan is somehow invalid.  And they then

4 try to say, well, there needs to be a discernible pattern.

5 Go back through every case.  Go look at the rule.  I can't

6 find a discernible pattern test.

7          So, your Honor, I come back and say I'm glad you

8 set forth a list of prior trading.  All you've done is

9 corroborated the fact that my people started to sell in

10 2007, months and months and months, two quarters before --

11 two quarters before the alleged rumor took place.

12          If I may, your Honor, I want to talk about Rule

13 8(a) in Iqball.  The fact is, we believe the Court did not

14 drill down into conclusory allegations.  We think that the

15 Court first looked to see what the conclusion -- to see the

16 allegation, accepted it as true, and then to that applied

17 the PSLRA.  And I think that's where the error was.  And I

18 think Iqball brings that home, is that you -- one must not

19 do that at the District Court level in order to be a

20 gatekeeper with these allegations.  We need to look at the

21 allegation under the lens of 8(a) and see what comes in and

22 what doesn't.  And then we can apply the test by the PSLRA.

23          I believe, as the Court said, that the

24 commentators -- and recently Professor Shimerinski

25 (phonetic) gave his lecture before Iqball came out on how

67

1   far <u>Twombly</u> under <u>Iqball</u> was going to be extended.  They see

2   far-ranging impacts and consequences, and so do I.  But even

3   if it doesn't, your Honor, <u>Dura</u> was decided under Rule 8(a).

4   <u>Dura</u> was decided under Rule 8(a), and therefore, I need to

5   be able to address the new standard at the very least under

6   <u>Dura</u>.

7           However, <u>Iqball</u> permeates this case.  Conclusory

8   allegations permeate this case.  I read the allegations the

9   Supreme Court didn't accept.  I also read the ones they said

10  they're not conclusory, but they're not substantiated.

11  They're not plausible.

12          We need to brief the issue under <u>Iqball</u>, and the

13  Court can see where it applies, where it doesn't apply, and

14  then make a decision as to whether or not the PSLRA and 8(a)

15  were applied correctly.

16          One of the things that we look at constantly is

17  what do we look at to test an allegation.  Plaintiff says,

18  we alleged end-of-life at Sprint.  They refer the Court.

19  They quote the analyst's report.  That's the entire basis

20  for the rumor.  They did put their hand on the second half

21  of the quote because it's not there.  They even put in an

22  ellipsis where a comma was that might have given the Court

23  the indication that there was something coming.  And had

24  they put the "however" there, I'm relatively certain the

25  Court would have then looked at the full context of the

68

1 quote.

2         It is unfair to have the Plaintiffs hinge an

3 entire allegation on the single analyst report, distort the

4 purpose -- distort the import of the report and then say,

5 but the Court -- don't look at the man behind the curtain,

6 as in "The Wizard of Oz." Don't look there. Just look at

7 the smoke and the mirrors and the pretty colors.

8         We can't do that. We go back -- if they want to

9 rely on the analyst's report, let's rely on the analyst's

10 report. And there we see it was a false rumor corrected by

11 the analyst, and it was a normal transition. They can't

12 have it both ways. Go to summary judgment. Sure. Go to

13 summary judgment. Millions of dollars later, and then we're

14 going to -- and with the hammer of all of that over our

15 heads, maybe we'll settle. No. Iqball's policy, Twombly's

16 policy is that we test the sufficiency of the allegations

17 now.

18         And your Honor, we do ask for reconsideration. Of

19 course, we'd like the Court to dismiss the complaint, but

20 with full knowledge of all the issues that have been

21 discussed and all of the facts emotionally and calmly being

22 bandied about, I think it would most benefit the Court if

23 the motion for reconsideration were granted, the prior order

24 were vacated and we were allowed to brief our motion to

25 dismiss.

69

1        The Court can then decide the issues with the

2  benefit of full briefing.  We can come back, if the Court

3  will tolerate at least me once again, and we can argue it.

4  And then the Court can come out with an order, and we go

5  from there.

6        THE COURT:  Thank you.

7        MR. LANDAU:  I don't think it's too much to ask.

8  Thank you, your Honor.

9        MR. BRITTON:  Your Honor, may I make one point?

10       THE COURT:  You may.

11       MR. BRITTON:  The hypothetical that counsel has

12  put forward, I can use a 10(b)(5)(1) plan to set a trigger,

13  a stop trigger of $28 per share.  And I'm going to sell 90-

14  percent of my stock.  Hands off that, right?

15       What an incentive for abuse, your Honor.  Now what

16  can do is I can make false statements into that market.  I

17  can drive that stock up to $28, automatic trigger.  I dump

18  out of my stock.  Sorry, you can't sue me, 10(b)(5)(1).

19       THE COURT:  It's not an absolute defense.

20       MR. BRITTON:  Right.  It's not an absolute

21  defense.  And what you're getting at, the regular pattern of

22  trades, that part of it, that goes to the inference part.

23  If I had alleged that you sold stock right before Sprint and

24  Mr. Leparulo had sold stock every single month for two

25  years, I would say, you're right, that rebuts my inference

70

1  of suspiciousness.

2           But when you have a situation where you sell

3  stock, 90-percent days or weeks before bad news comes out,

4  you have now fallen into the affirmative defense camp that

5  you have to prove at summary judgment, or better yet at

6  trial --

7           THE COURT:  Unless the Court takes notice of what

8  the market prices were at the time.

9           MR. BRITTON:  Maybe.

10          THE COURT:  Because if the -- I mean, the flip

11  side would be 2007, I think those were the good days before

12  the bad days, but I don't know that for sure.  So there

13  might be some other explanation.

14          MR. BRITTON:  There may be other -- there may be

15  other explanations going on, but what we have right now is

16  an attempt to use the 10(b)(5)(1) as a hammer.  You don't

17  get to say, why rebut your inference with a 10(b)(5)(1) plan

18  where it's as suspicious as it is here.  You just don't get

19  to do that.

20          You have an affirmative defense, and the very rule

21  itself says the person with the plan has the burden to prove

22  its elements.  Sure, if you have a regular pattern of sales,

23  you can rebut my inference at the pleading stage, but where

24  you don't have a regular pattern of sales, you've got to

25  await the affirmative defense.

71

1           And they haven't cited one case, not one that says

2  that you can.  We've cited three that says, well, okay,

3  those are all District Court cases, not Appellate Court

4  cases.  Well, how many are you going to say?  Okay.  Well,

5  one is not enough.  Two is not enough.  Three is not enough.

6  Well, I'll give you six.  Well, that's not enough.

7           THE COURT:  Well, they still are -- they're

8  just -- and so part of this whole exercise is how is law

9  made.  The District Court does its best job in coming out

10 with its best thinking on the matter, hopefully reflected in

11 a reasoned opinion.  And then those cases go up and are then

12 the subject of appellate review.

13          MR. BRITTON:  Correct.  And what we have now is

14 every court that has considered the issue says yes.  If you

15 have a regular pattern of trades pursuant to a 10(b)(5)(1)

16 plan, we will consider that at the pleading stage.

17          THE COURT:  They say Worlds of Wonder says

18 something different.

19          MR. BRITTON:  Well, if you get all these exotic

20 things going on, we're not going to do that.  But you know

21 what else, your Honor?  The SEC just filed a criminal

22 lawsuit against the CEO of Countrywide.  And guess what he

23 had?

24          THE COURT:  Yes, but of course that's Countrywide.

25          MR. BRITTON:  Right.  You know that.  And guess

72

1    what he had?  He had a 10(b)(5)(1) trading plan.  So

2    there's -- there's --

3              THE COURT:  And he's presumed innocent.

4              MR. BRITTON:  Well, he is presumed innocent, but

5    when you have the ability -- what you're hearing is an

6    argument for abuse.  I'm going to set a trigger, and I'm

7    going to sell all my stock, and you can't touch me because I

8    have a 10(b)(5)(1) plan.

9              THE COURT:  All right.

10             MR. BRITTON:  Your Honor, and we'll -- if you want

11   additional briefing, we'll do that, but we don't think,

12   because we've met the higher standards, that it's necessary.

13             THE COURT:  Thank you.

14             I do want to thank the parties for coming in.  I'm

15   getting some clarification in the Court's thinking on this

16   matter.  I am sufficiently concerned about the procedural

17   posture of this case that I am going to grant

18   reconsideration, vacate my order, and then I'll issue a

19   scheduling order for new briefing.

20             Some of it may be repetition of what you've said

21   in your wonderful briefs before, but I think in light of the

22   way that it's come up and the fact that the Supreme Court

23   weighed in on May 18 in between everything, I think that

24   that's the cleanest way to go.  And that then we'll have a

25   full and complete record for however the Court goes, whether

73

1 I adopt the essence of what I said before or whether, in

2 light of new briefing, I'm persuaded that I should change.

3 I think that's best.

4           I deny the motion for certification.  That

5 obviously is moot.

6           And I'll send out a scheduling order.  I would

7 probably like you to come in on July 31st.  I think that's a

8 Monday.  Is that --

9           THE CLERK:  It's a Friday.

10          THE COURT:  That's a Friday.  No, not a Friday.

11 How about --

12          MR. BRITTON:  Your Honor, if I may.  I have a

13 trial that's scheduled to go through for the second week of

14 August most likely.  Is there --

15          THE COURT:  Is it in town or not in town?

16          MR. BRITTON:  It's in San Francisco.

17          THE COURT:  Ah-ha.

18          MR. BRITTON:  Yes.

19          THE COURT:  Is there any day that they are dark?

20          MR. BRITTON:  Fridays I believe they're dark.

21          THE COURT:  Friday they're dark?  Could we do -- I

22 know.  Are you available -- can you ask John whether we put

23 that 24th in the afternoon?  I think we decided not -- are

24 you available Friday the 24th at 2:00 o'clock?

25          MR. BRITTON:  Of July?

74

1          THE COURT:  Of July.

2          MR. BRITTON:  It's going to be very difficult for

3 me, your Honor, because we're right in the middle of trial.

4 We start July 13th.

5          THE COURT:  But you've got co-counsel.

6          MR. BRITTON:  Yes, we do have co-counsel.

7          THE COURT:  You can do it by phone if you want.

8          MR. BRITTON:  Yeah.  I could do that.

9          THE CLERK:  The 24th is clear.

10          THE COURT:  Is clear.  Okay.  So you could

11 appear -- if you're in San Francisco, if you want to appear

12 by phone, you may, and then your co-counsel could be here.

13          MR. BRITTON:  Sure.  Sure, your Honor.

14          THE COURT:  Because it wouldn't help you to do

15 early August.  That's still bad, right?

16          MR. BRITTON:  Well, the later the better.  Because

17 there's a chance that you get halfway into trial and then

18 settle.  So if we can get it into August, that's --

19          THE COURT:  Yeah.

20          MR. BRITTON:  The latest date that's convenient

21 for the Court.

22          THE COURT:  We have law clerk transition and all

23 that, and so some of it is -- we don't know exactly what

24 those dates are.  Let's -- I do know that I don't have

25 anything for the afternoon of the 24th now that -- so could

75

1   we do 2:00 o'clock on the 24th.  And you may appear

2   telephonically.  I think that will solve your problem.

3            MR. BRITTON:  Yes.  Thank you, your Honor.

4            THE COURT:  And then I'll set a briefing schedule

5   ahead of that time.  So it's going to put the burden on you

6   to crank out your motion, but I think that none of these

7   issues is unknown to you, at least how we've addressed it

8   now.  So we'll come up with a briefing schedule for that.

9            MR. LANDAU:  Thank you, your Honor.

10           THE COURT:  Okay.  Thank you very much.  And then

11  you may file your demonstrative -- file it e-file with a

12  cover sheet.

13           MR. LANDAU:  Thank you, your Honor.

14           THE CLERK:  We're in recess.

15       (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

76

1        I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Shonna Mowrer_____        6/15/09_____
  Transcriber                              Date
6
  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
  /s/L.L. Francisco_____
9 L.L. Francisco, President
  Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*