Robert S. Brewer, Jr. (State Bar No. 65294)
JONES DAY
12265 El Camino Real, Suite 200
San Diego, CA 92130
Telephone:     (858) 314-1200
Facsimile:     (858) 314-1150

Eric Landau (State Bar No. 138849)
elandau@jonesday.com
Travis Biffar (State Bar No. 217593)
tbiffar@jonesday.com
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA 92612
Telephone:     (949) 851-3939
Facsimile:     (949) 553-7539

Attorneys for defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAUREEN BACKE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NOVATEL WIRELESS, INC., PETER V. LEPARULO, GEORGE B. WEINERT, ROBERT M. HADLEY, SLIM S. SOUISSI and CATHERINE F. RATCLIFFE,<br><br>Defendants. | Lead Case No. 08-CV-01689-H (RBB) (Consolidated with No. 08-CV-01714-H (RBB))<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:   April 26, 2010<br>Time:  10:30 a.m.<br>Place:  Courtroom 13<br>         (The Honorable Marilyn L. Huff) |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................... 1

II.  PERTINENT FACTS ............................................................................ 2

    A.   The Insider Trading Class ................................................................. 2

    B.   The Misrepresentation Class ............................................................. 2

    C.   The Curious Timing of Lead Plaintiffs' Stock Purchases ...................... 3

III. STANDARDS GOVERNING THIS MOTION ........................................ 5

IV. ARGUMENT ........................................................................................ 6

    A.   Separate Classes Are Necessary for the Insider Trading and
         Misrepresentation Claims ................................................................. 6

    B.   Lead Plaintiffs Fail to Meet the Typicality and Adequacy Requirements of
         Rule 23 ........................................................................................... 7

         1.   Lead Plaintiffs' Stock Purchases After Public Disclosure of the
             Alleged Fraud Render Them Atypical and Not Proper Class
             Representatives ........................................................................ 7

         2.   Lead Plaintiffs Are Not Adequate Class Representatives Because
             They Have Abdicated All Control to their Attorneys ...................... 8

             (a)   Lead Plaintiffs' Monitoring and Retainer Agreements With
                    Counsel Skirt Ethical Boundaries and Demonstrate
                    Inadequacy ...................................................................... 9

             (b)   Lead Plaintiffs' Actions Confirm They Have Abdicated All
                    Control to Their Attorneys ................................................. 10

                 (i)    Plumbers ............................................................... 11

                 (ii)   Western Penn ......................................................... 11

    C.   An Insider Trading Class Should Not Be Certified Because Lead Plaintiffs
         Lack Standing to Assert the Insider Trading Claims ........................... 12

         1.   The Contemporaneous Trading Requirements Is a Privity
             Substitute, Intended to Filter Out Plaintiffs Who Did Not Trade
             With Defendants ...................................................................... 12

         2.   Given the Manner in Which Trades on National Exchanges Are
             Transacted, the Contemporaneous Trading Period Must Be Limited
             to One Day .............................................................................. 13

         3.   For Purposes of Standing, the Court Need Not Define a
             Contemporaneous Trading Period Where It Is Apparent From
             Market Realities that Plaintiffs Did Not Trade With Any Defendant ....... 15

         4.   Lead Plaintiffs, Who Purchased on Different Days and More than a
             Million Share Sales After Defendants Sold, Did Not Trade
             Contemporaneously With Any Defendant ................................... 15

             (a)   During the Class Period, Lead Plaintiffs Did Not Trade
                 Within One Day of Any Defendant ..................................... 15

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

        (b)    The Nature of the Transactions in the Market and Heavy Trading Volumes Establish that Lead Plaintiffs Could Not Have Traded With Any Defendant .............................................. 16

4

     5.    If An Insider Trading Class Is Certified, It Should Be Limited to Those Who Purchased Novatel Stock on the Same Day of a Sale By a Defendant From May 18, 2007 Until July 18, 2007 ............................ 18

5

6

        (a)    Any Insider Trading Class Cannot Begin Until May 18, 2007 ................................................................................... 18

7

        (b)    The Insider Trading Class Should End on July 18, 2007 and, in Any Event, No Later than July 20, 2007 Because Plaintiffs Allege the Market Learned of the Rumored Sprint Transition on that Date ................................................................. 18

8

9

   D.   The Misrepresentation Class is Overbroad and Should Be Redrawn .................. 19

10

     1.    "In-and-Out" Traders Must Be Excluded ................................................. 19

11

     2.    No Fraud on the Market Presumption Applies to the July 20, 2007 and November 10, 2008 Disclosures ......................................................... 20

12

     3.    Establishing the End of the Misrepresentation Class ................................ 23

13

        (a)    The Class Should Not Include Purchasers After Novatel Disclosed It Would Be Unable to Timely File Its Form 10-Q on May 13, 2008 ................................................................... 23

14

        (b)    Lead Plaintiffs' Expert Only Supports a Class Up to August 19, 2008 ..................................................................................... 23

15

16

        (c)    At the Latest, the Class Must End When Litigation Commenced .................................................................................. 24

17

V.     CONCLUSION ................................................................................................................. 25

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Products, Inc. v. Windsor,*
   521 U.S. 591 (1997) ................................................................................................ 5

*Armstrong v. Davis,*
   275 F.3d 849 (9th Cir. 2001) ................................................................................ 14

*Ballan v. Upjohn Co.,*
   159 F.R.D. 473 (W.D. Mich. 1994) ...................................................................... 10

*Basic v. Levinson,*
   485 U.S. 224 (1988) ........................................................................................ 20, 22

*Brody v. Transitional Hospitals Corp.,*
   280 F.3d 997 (9th Cir. 2002) ..................................................................... passim

*Buban v. O'Brien,*
   No. C94-0331 FMS, 1994 U.S. Dist. LEXIS 8643 (N.D. Cal. June 22, 1994) .... 12, 15, 16, 17

*Desai v. Deutsche Bank Securities Ltd.,*
   573 F.3d 931 (9th Cir. 2009) ................................................................................ 20

*Doninger v. Pacific Northwest Bell, Inc.,*
   564 F.2d 1304 (9th Cir. 1977) ................................................................................ 5

*Dorchester Investors v. Peak Trends Trust,*
   No. 99 Civ. 4696(LMM), 2002 U.S. Dist. LEXIS 3067 (S.D.N.Y. Feb. 26, 2002) .............. 24

*Dura Pharmaceuticals, Inc. v. Broudo,*
   544 U.S. 336 (2005) ........................................................................................ 20, 24

*Feldman v. Motorola, Inc.,*
   No. 90 C 5887, 1994 U.S. Dist. LEXIS 14809 (N.D. Ill. Oct. 14, 1994) ............................ 6, 7

*Ferrari v. Gisch,*
   225 F.R.D. 599 (C.D. Cal. 2004) .......................................................................... 10

*General Telephone Co. of the Southwest v. Falcon,*
   457 U.S. 147 (1982) ................................................................................................ 5

*Greenhouse v. MCG Capital Corp.,*
   392 F.3d 650 (4th Cir. 2004) ................................................................................ 23

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) ............................................................................ 5, 14

*Hells Canyon Preservation Council v. United States Forest Service*,
   593 F.3d 923 (9th Cir. 2010)...................................................................................... 14

*In re Aldus Securities Litigation*,
   No. C92-885C, 1993 U.S. Dist. LEXIS 5008 (W.D. Wash. Mar. 1, 1993)............... 13, 14, 16

*In re American International Group, Inc. Securities Litigation*,
   --- F.R.D. ---, No. 04 Civ. 8141 (DAB), 2010 U.S. Dist. LEXIS 15453 (S.D.N.Y. Feb.
   22, 2010) ............................................................................................................ 20, 21, 22

*In re Applied Micro Circuits Corp. Securities Litigation*,
   No. 01CV0649 K (AJB), 2003 U.S. Dist. LEXIS 14492 (S.D. Cal. July 15, 2003) ............. 14

*In re AST Research Securities Litigation*,
   887 F. Supp. 231 (C.D. Cal. 1995)............................................................................ 13, 16

*In re CMS Energy Securities Litigation*,
   236 F.R.D. 338 (E.D. Mich. 2006) .......................................................................... 24

*In re Connectics Corp. Securities Litigation*,
   No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515 (N.D. Cal. Aug. 14, 2008) .................... 15

*In re Cornerstone Propane Partners, L.P. Securities Litigation*,
   No. C 03-2522 MHP, 2006 U.S. Dist. LEXIS 25819 (N.D. Cal. May 3, 2006).............. 19, 20

*In re Countrywide Financial Corp. Securities Litigation*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................... passim

*In re Enron Corp. Securities Litigation*,
   206 F.R.D. 427 (S.D. Tex. 2002)........................................................................... 6

*In re Federal National Mortgage Association Securities Derivative & ERISA Litigation*,
   503 F. Supp. 2d 25 (D.D.C. 2007) ...................................................................... 14, 17

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
   574 F.3d 29 (2d Cir. 2009) ................................................................................. 19

*In re Genentech, Inc. Securities Litigation*,
   No. C-88-4038-DLJ, 1990 U.S. Dist. LEXIS 11389 (N.D. Cal. June 8, 1990)...................... 7

*In re Mercury Interactive Corp. Derivative Litigation*,
   487 F. Supp. 2d 1132 (N.D. Cal. 2007) ............................................................. 8

*In re MicroStrategy, Inc. Securities Litigation*,
   115 F. Supp. 2d 620 (E.D. Va. 2000)....................................................... 14, 16

*In re Petco Animal Supplies Inc. Securities Litigation*,
   No. 05-CV-0823-H (RBB), 2006 U.S. Dist. LEXIS 97927 (S.D. Cal. July 31, 2006).......... 17

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

*In re Quarterdeck Office Systems, Inc. Securities Litigation*,
No. CV 92-3970-DWW (GHKX), 1993 U.S. Dist. LEXIS 19806, at *17 (C.D. Cal.
Sept. 30, 1993) ........................................................................................................... 10

*In re Safeguard Scientifics*,
216 F.R.D. 577 (E.D. Pa. 2003)................................................................................... 7

*In re Salomon Analyst Metromedia Litigation*,
544 F.3d 474 (2d Cir. 2008)....................................................................................... 20

*In re Spectrum Brands, Inc. Securities Litigation*,
461 F. Supp. 2d 1297 (N.D. Ga. 2006) ...................................................................... 18

*In re Swift Transportation Co. Securities Litigation*,
No. CV04-2435PHX-NVW, 2006 WL 1805578 (D. Ariz. Mar. 29, 2008)........................ 24

*In re Williams Securities Litigation-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009)................................................................................... 22

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*,
616 F. Supp. 2d 461 (S.D.N.Y. 2009)........................................................................... 9

*Kelley v. Mid-America Racing Stables, Inc.*,
139 F.R.D. 405 (W.D. Okla. 1990)............................................................................. 10

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)....................................................................................... 24

*Lubin v. Sybedon Corp.*,
688 F. Supp. 1425 (S.D. Cal. 1988) ........................................................................... 10

*Margaret Hall Foundation, Inc. v. Strong*,
No. 84-405-N, MDL No. 584, 1987 U.S. Dist. LEXIS 7517 (D. Mass. July 30, 1987) .......... 7

*Neubronner v. Milken*,
6 F.3d 666 (9th Cir. 1993).......................................................................................... 12

*Oscar Private Equity Investments v. Allegiance Telecom, Inc.*,
487 F.3d 261 (5th Cir. 2007)...................................................................................... 20

*Rocco v. Nam Tai Electronics, Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007) .............................................................................. 7, 8

*Rolex Employees Ret. Trust v. Mentor Graphics Corp.*,
136 F.R.D. 658 (D. Or. 1991) ................................................................................ 7, 10

*Saylor v. Lindsley*,
456 F.2d 896 (2d Cir. 1972)........................................................................................ 10

*Shiring v. Tier Technologies, Inc.*,
 244 F.R.D. 307 (E.D. Va. 2007) ........................................................................... 8, 10

*Simon v. Eastern Kentucky Welfare Rights Org.*,
 426 U.S. 26 (1976) ................................................................................................. 12

*Welling v. Alexy*,
 155 F.R.D. 654 (N.D. Cal. 1994) .......................................................................... 8, 10

*West v. Prudential Securities, Inc.*,
 282 F.3d 935 (7th Cir. 2002) ................................................................................... 6

*Westways World Travel, Inc. v. AMR Corp.*,
 218 F.R.D. 223 (C.D. Cal. 2003) ............................................................................ 6

**STATUTES**

15 U.S.C. § 78u-4 *et seq.* ............................................................................................... 8

**RULES AND LEGISLATIVE HISTORY**

17 C.F.R. § 240.10b5-1 .................................................................................................. 18

Fed. R. Civ. P. 23 ................................................................................................... passim

Fed. R. Evid. 702 ........................................................................................................... 22

Report on the Private Securities Litigation Reform Act of 1995, S. REP. No. 104-98
 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679 .......................................................... 8

IRI-4647v8

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

# I. INTRODUCTION[1]

Defendants submit this memorandum of points and authorities, as well as the declarations of David Tabak, Ph.D., and Travis Biffar, in opposition to Lead Plaintiffs' motion for class certification.  Lead Plaintiffs have proposed a single unitary class consisting of "all persons who purchased [Novatel] common stock between February 27, 2007 and November 10, 2008." (Plaintiffs' Memo., at 1.)  The following problems exist with respect to class certification, among others:

*First*, there should be two classes, because Lead Plaintiffs assert two distinct sets of claims, *i.e.*, an insider trading claim and a misrepresentation claim.

*Second*, neither class should be certified, because Plumbers and Western Penn are not adequate class representatives for lack of typicality and adequacy.

*Third*, an insider trading class may not be certified, because Plumbers and Western Penn did not purchase contemporaneously with any of the alleged inside sales.

*Fourth*, with regard to the misrepresentation class, the "fraud on the market" presumption does not apply to the alleged disclosures on July 20, 2007 and November 10, 2008.  Consequently, the misrepresentation class must be redrawn to exclude purchasers who sold before the first corrective disclosure (February 20, 2008), as well as those who bought after the last corrective disclosure (August 19, 2008).

---

[1] "Plumbers" means Plumbers & Pipefitters Local No. 562 Pension Fund; "Western Penn" means Western Pennsylvania Electrical Employees Pension Fund; "Lead Plaintiffs" means Plumbers and Western Penn; "Novatel" or the "Company" means defendant Novatel Wireless, Inc.; "Plaintiffs' Memo." means the Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification (Dkt. No. 121-1); "Dr. Tabak" means Dr. David Tabak, Ph.D.; "Tabak Decl." means the Declaration of Dr. Tabak; "Mr. Steinholt" means Bjorn I. Steinholt, CFA; "Steinholt Decl." means the Declaration of Mr. Steinholt, dated January 8, 2010; "Biffar Decl." means the Declaration of Travis Biffar; "Complaint" or "CC" means the consolidated complaint filed in this action on January 9, 2009 (Dkt. No. 23); "Sprint" means Sprint Nextel Corporation; "Britton Decl." means the Declaration of Douglas R. Britton in Support of Lead Plaintiffs' Motion for Class Certification (Dkt. No. 121-2); "Stoss Depo." means the transcript of the deposition of Anthony Stoss (Biffar Decl., Ex. I); "Wallace Depo." means the transcript of the deposition of Michael Wallace (Biffar Decl., Ex. H); "Anguilm Depo." means the transcript of the deposition of Derek Anguilm (Biffar Decl., Ex. J); "Dunleavy Depo." means the transcript of the deposition of Michael Dunleavy (Biffar Decl., Ex. E); "Murphy Depo." means the transcript of the deposition of Daniel Murphy (Biffar Decl., Ex. F).

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

## II. PERTINENT FACTS

**A.     The Insider Trading Class.**

According to Lead Plaintiffs, at some point in time in 2007, defendants learned that Sprint planned to transition from an older Novatel USB modem, the "720," to a newer Novatel USB modem, the "727." Lead Plaintiffs allege that defendants knew this transition would have a negative impact on Novatel's stock price and, therefore, sold their stock before this news became public through a rumor which allegedly circulated on or about July 20, 2007. Class discovery has revealed that the rumor regarding the Sprint transition actually had been public for days prior to July 20, 2007 (*see* Biffar Decl., Ex. I, Stoss Depo., at 20:5-27:6, Exs. 4, 15, 16). Significantly, Novatel's stock price did not move at the time the rumor was first circulating. Lead Plaintiffs did not purchase stock on the same day that any of the defendants sold their stock before the market learned of the rumor.

**B.     The Misrepresentation Class.**

Plaintiffs allege two sets of misstatements by defendants Peter Leparulo, Novatel's CEO, and George B. Weinert, Novatel's former president: (1) statements concerning Novatel's revenue reported in the first quarter of 2008 (CC, ¶¶ 33-37); and (2) statements concerning the competitive position of the Company and general level of market share and demand for the Company's products (CC, ¶¶ 51-55, 58-60, 63-64).

With respect to revenue recognition, Lead Plaintiffs allege the following sequence of events. On April 14, 2008, in light of deteriorating market conditions, Novatel issued a press release stating that its revenues for the first quarter of 2008 were expected to be $91 million, or $19 million less than the Company's prior "guidance." (CC, ¶ 76.) On May 1, 2008, Novatel announced its first quarter 2008 results, which included $91 million in revenues. (CC, ¶ 78.) Plaintiffs allege that $3.4 million, or less than four percent (4%) of this revenue figure, was comprised of "false" revenue. (CC, ¶¶ 33, 37.) Less than two weeks later, on May 13, 2008, Novatel publicly announced, in a Form 12b-25, that it would be unable to file its Form 10-Q for the first quarter of 2008. (CC, ¶ 35.) Novatel also publicly announced, in the same Form 12b-25,

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

1    that its audit committee had voluntarily undertaken an enhanced review of the accounting for a

2    specific customer contract. (Biffar Decl., Ex. AA, at 672.) One week later, on May 20, 2008,

3    Novatel publicly announced that its audit committee had undertaken an ongoing, "expanded

4    enhanced review of the Company's revenue cut off procedures and internal controls related to

5    certain customer contracts…." (*Id.*, Ex. BB, at 676.) On August 19, 2008, Novatel filed another

6    Form 8-K, stating that the audit committee's review resulted in a preliminary determination to

7    move $3.4 million in actual revenue from the first quarter of 2008 to the second quarter of 2008.

8    (CC, ¶ 36.) After the audit committee had completed its review, Novatel filed its Forms 10-Q for

9    the first and second quarters of 2008, on November 10, 2008, and confirmed the movement of

10   $3.4 million from the first quarter of 2008 to the second quarter of 2008 (with no impact on

11   earnings per share). (CC, ¶ 37.) Also at this time, Novatel publicly announced that it had

12   concluded that there was a material weakness in its internal financial controls that existed as of

13   March 31, 2008 and June 30, 2008. (Biffar Decl., Exs. CC, at 701; DD, at 746.)

14         With respect to the general statements concerning the Company's performance, Lead

15   Plaintiffs allege that Messrs. Leparulo and Weinert made affirmative statements about the level of

16   demand for Novatel's products (CC, ¶¶ 51, 54-55, 59-60, 64), even though they were generally

17   aware of a loss of market share (CC, ¶¶ 57(a)(iii), 62(a)(ii), 66(a)(ii), 73(a)(ii)). Class discovery

18   has revealed that Lead Plaintiffs' investment managers independently tracked and were aware of

19   Novatel's actual demand and market share (*see* Biffar Decl., ¶ 3, Exs. H, Wallace Depo., at 43:1-

20   48:18; J, Anguilm Depo., at 39:1-40:12, 41:17-47:8), and that the investment managers did not

21   consider the alleged accounting error to be relevant or material to their investment decisions. (*See*

22   *id.*, Exs. H, Wallace Depo., at 67:1-69:16; J, Anguilm Depo., at 122:8-124:15.) Contrary to Lead

23   Plaintiffs' contentions, there was no cover-up; the information that was supposedly kept from the

24   investing public was, in fact, public and known to Lead Plaintiffs' own managers.

25   **C.    The Curious Timing of Lead Plaintiffs' Stock Purchases.**

26         Even though the rumor of the Sprint transition was supposedly a "red flag" which

27   indicated that "Novatel was losing position at its largest customer and precious market share,"

28

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

(Plaintiffs' Memo., at 4),[2] and even though the individual defendants' stock sales prior to this transition were publicly announced on Forms 4, Lead Plaintiffs continued to purchase Novatel stock.  Indeed, Lead Plaintiffs continued to purchase Novatel stock during the putative class period and beyond despite repeated "partial revelations" of the alleged fraud.  For example,

- Western Penn purchased Novatel stock on June 26, 2008, despite Novatel's release of disappointing first quarter 2008 results on April 14, 2008 (which allegedly revealed the "partial" truth of the demand for its products, CC, ¶ 127), and Novatel's announcement on May 13, 2008 that it would be unable to finalize its financial statements to file its Form 10-Q on time due to an "enhanced review" of Novatel's accounting by the audit committee.  (Britton Decl., Ex. 3, at 508; Biffar Decl., Ex. AA, at 672.)

- Plumbers was completely divested of Novatel stock during most of the putative class period, waiting to purchase stock until May 28, 2008, after the rumored Sprint cancellation, after the disappointing revenue guidance on February 20, 2008 and alleged "partial" revelation of truth regarding product demand, after the disappointing first quarter 2008 results on April 14, 2008 and further "partial" truth regarding demand, and after the Company announced on May 13, 2008 that it would be unable to finalize its financial statements to file its Form 10-Q on time due to an "enhanced review" of Novatel's accounting by the audit committee.  (Britton Decl., Ex. 2, at 508.)

Finally, although it might seem incredible, Lead Plaintiffs continued to purchase Novatel stock after the filing of this lawsuit.  The initial complaint in this action was filed on September 15, 2008.  On November 17, 2008, Plumbers and Western Penn moved for appointment as lead plaintiffs.  Each signed sworn certifications that they had reviewed and authorized the filing of a complaint.  (Biffar Decl., Exs. N-O.)  Nevertheless, Lead Plaintiffs continued to purchase Novatel stock *after* they signed their certifications.  (Britton Decl., Exs. 2-3.)  When confronted with these facts, Lead Plaintiffs denied responsibility – it was their *investment managers* who were actually purchasing Novatel stock, *not them*.  (Biffar Decl., Exs. E, Dunleavy Depo., at 113:5-117:6, 178:15-179:14, 189:13-191:25; F, Murphy Depo., at 24:1-14.)  Moreover, even after the filing of the initial complaint, which accused defendants of fraud, Plumbers did not advise its investment managers to stop purchasing Novatel stock.  (*Id.*, Ex. F, Murphy Depo., at 162:11-165:20, 181:2-

---

[2] The other "red flag," according to plaintiffs, was Sprint's decision to "exclude" Novatel as a vendor for its new WiMax platform.  (Plaintiffs' Memo., at 3-4.)  Although plaintiffs allege that this decision was made "[b]y the third quarter of 2007" and represented a "dramatic loss for Novatel," (CC, ¶ 20), Lead Plaintiffs have since admitted that Sprint publicly announced its WiMAX vendors in March of 2007 (*i.e.*, the first quarter, not the third quarter).  (Biffar Decl., Exs. T, at 606; U, at 617.)

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

5.)  Western Penn said that it did, but its investment managers nonetheless continued to buy Novatel stock.  (*Id.*, Ex. E, Dunleavy Depo., at 113:5-117:6.)  When shown the pleadings and other documents in this action which Lead Plaintiffs supposedly had authorized or verified, Lead Plaintiffs again denied responsibility – this time it was their *attorneys* who actually reviewed documents, it was their attorneys who knew the facts, and it was their attorneys who told them to sign verifications without knowledge of the actual facts.  (*Id.*, Exs. E, Dunleavy Depo., at 95:4-98:3, 117:9-122:10, 132:7-140:15; F, Murphy Depo., at 101:4-102:17, 118:2-125:12.)

### III.  STANDARDS GOVERNING THIS MOTION

As the proponents of class certification, plaintiffs must meet the requirements of Rule 23(a) and Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997).  Rule 23(a) requires that plaintiffs establish that:

> (1)  the class is so numerous that joinder of all members is impracticable;
> (2)  there are questions of law or fact common to the class;
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Where the principal relief sought consists of money damages, as is the case here, Rule 23(b) also requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Before certifying a class, the district court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Rule 23.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982).  To demonstrate that each of the elements of Rule 23 have been met, plaintiffs may not rest on mere allegations, but must provide facts to support class certification.  *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992) (the trial court is "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence

may also relate to the underlying merits of the case."); *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) ("A district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits.").  Indeed, the Advisory Committee notes to the 2003 amendments to Rule 23 state that "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." Fed. R. Civ. P. 23(c)(1)(C) Adv. Comm. Notes 2003. After these amendments, doubts can no longer be resolved in favor of class certification.

Pertinent here, "[w]here a defendant objects on the basis of standing, class certification must be considered on a claim by claim basis."  *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 231 (C.D. Cal. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC) Inc.*, 528 U.S. 167, 185 (2000)).  Thus, the propriety of class treatment must be assessed separately for plaintiffs' insider trading claim and plaintiffs' misrepresentation claim.

## IV.  ARGUMENT

### A.   Separate Classes Are Necessary for the Insider Trading and Misrepresentation Claims.

A single class should not be certified because, contrary to Lead Plaintiffs' assertion, all class members do not assert the same legal theories and do not allege the same facts.  Indeed, there are separate theories of recovery being advanced for, on the one hand, insider trading and, on the other hand, misrepresentations concerning revenue recognition and the Company's general performance. *See* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").

Lead plaintiffs conceded that class certification requires that class members' claims be based on the same legal theory (Plaintiffs' Memo., at 13), but gloss over the fact that their insider trading claim is a fundamentally different claim than their misrepresentation claims.  *See In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 441 (S.D. Tex. 2002) (typicality requires that the class members' claims arise "from the same event or course of conduct that gives rise to claims of other class members and….[are] based on the same legal theory.").  Given the fundamental differences between these two theories of recovery, separate insider trading and misrepresentation classes are

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

warranted, as courts throughout the county have widely recognized. *See Feldman v. Motorola, Inc.*, No. 90 C 5887, 1994 U.S. Dist. LEXIS 14809, at *4 n.2 (N.D. Ill. Oct. 14, 1994) ("Because an insider trading claim must be based on a particular inside trade, it will probably be necessary to certify subclasses of class members who traded Motorola stock contemporaneously with a particular trade by defendant.") (citation omitted); *In re Genentech, Inc. Sec. Litig.*, No. C-88-4038-DLJ, 1990 U.S. Dist. LEXIS 11389, at *20-21 (N.D. Cal. June 8, 1990); *Margaret Hall Foundation, Inc. v. Strong*, No. 84-405-N, MDL No. 584, 1987 U.S. Dist. LEXIS 7517, at *3 n.2 (D. Mass. July 30, 1987).

**B.**    **Lead Plaintiffs Fail to Meet the Typicality and Adequacy Requirements of Rule 23.**

**1.**    **Lead Plaintiffs' Stock Purchases After Public Disclosure of the Alleged Fraud Render Them Atypical and Not Proper Class Representatives.**

Because Plumbers and Western Penn continued to purchase stock after they had notice of their purported insider trading and fraud claims, they are subject to unique defenses of non-reliance. This was recently expressed by *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (holding that "a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative.") (quoting *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000)); *see also In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003); *Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991).[3]

Western Penn purchased Novatel stock on the same day the rumor of the Sprint transition allegedly surfaced (July 20, 2007) and, then again, a week later, notwithstanding their litigation position that Sprint's decision was a "red flag[] that Novatel was losing its position at its largest

---

[3] Some courts have held that post-disclosure purchases do not automatically result in a finding of atypicality, reasoning that a post-disclosure purchase is still made in reliance on the integrity of the market price. Lead Plaintiffs here cannot avail themselves of this line of reasoning because they knew neither when their investment managers purchased Novatel stock nor what their investment managers relied on in purchasing Novatel stock. (*See* Biffar Decl., Exs. E, at 166:17-169:10, 178:21-179:14; F, at 24:1-14, 114:17-117:2, 172:17-173:7, 181:6-9.) In fact, their investment managers testified that they independently tracked Novatel's demand and market share and that the accounting error was *not* relevant to their decisions to invest in Novatel. (*See* Section II.B., *supra*.) Undoubtedly, Lead Plaintiffs would have bought regardless of the misstatements or omissions they allege. Significantly, all doubt need not be erased; Lead Plaintiffs only need be subject to an arguable defense, a standard clearly met here.

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

1   customer and precious market share." (Plaintiffs' Memo., at 4; Britton Decl., Ex. 3, at 529.) Of

2   course, plaintiffs and the market had long known of defendants' plans to sell their stock, as

3   defendants had adopted or amended their Rule 10b5-1 sales plans "months before" the market

4   learned of the Sprint decision.[4] (CC, ¶ 117.)

5          Further, Lead Plaintiffs repeatedly purchased after disclosures of the alleged frauds, buying

6   after Novatel's May 13, 2008 disclosure that it was reviewing its revenue recognition for the first

7   quarter of 2008,[5] and even after their counsel filed the initial complaint in this action on

8   September 18, 2008.[6] The pattern of Lead Plaintiffs' transactions "could therefore become the

9   focus of the litigation and thus detract from the ability of absent class members to recover

10  damages." *Rocco*, 245 F.R.D. at 136. These post-notice purchases by Lead Plaintiffs raise an

11  arguable defense, which is all that is required to defeat typicality. *Shiring v. Tier Technologies,*

12  *Inc.*, 244 F.R.D. 307, 314 (E.D. Va. 2007) ("[I]t does not matter whether a unique defense

13  ultimately will prove meritorious, instead, the presence of an arguable defense is sufficient to find

14  atypicality.") (citing *Beck v. Status Game Corp.*, No. 89 Civ. 2923 (DNE), 1995 U.S. Dist. LEXIS

15  9978, at *11 (S.D.N.Y. July 14, 1995)).[7]

16         **2.      Lead Plaintiffs Are Not Adequate Class Representatives Because They Have
                    Abdicated All Control to their Attorneys.**

17

18         One of the principal goals of the Private Securities Litigation Reform Act of 1995

19  ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*, was to put an end to "lawyer-driven" securities class

20

21         [4] As with every stock sale by each defendant, the adoption or amendment of a Rule 10b5-1
    sales plan by each defendant was publicly announced in filings with the SEC. (Biffar Decl., Exs.
22  X, Z.)

23         [5] Plumbers purchased shares on May 28, 2008, June 3, 2008, June 6, 2008 and June 25,
    2008. (Britton Decl., Ex. 2, at 508-11.) Western Penn purchased shares on June 26, 2008. (*Id.*,
24  Ex. 3, at 568.)

25         [6] Plumbers purchased shares on November 26, 2008, and Western Penn purchased shares
    on October 13, 2008. (Britton Decl., Exs. 2, at 528; 3, at 572.)

26         [7] The federal securities laws do not permit Lead Plaintiffs to buy a lawsuit. *In re Mercury
    Interactive Corp. Deriv. Litig.*, 487 F. Supp. 2d 1132, 1140 n.15 (N.D. Cal. 2007); *Welling v.
27  Alexy*, 155 F.R.D. 654, 658 (N.D. Cal. 1994) (a defense arises where "a plaintiff buys stock not
    because it is a strong performer on the market, but rather, to have a 'piece of the action' in the
28  event a lawsuit arises").

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

1  actions by ensuring that "investor[s], not their lawyers, control securities litigation."[8]  In part, the

2  adequacy prong of Rule 23 serves to ensure that this goal is fulfilled.  Rule 23(a)(4) requires a

3  showing that "the representative parties will fairly and adequately protect the interests of the

4  Class." Fed. R. Civ. P. 23(a)(4).  The requirement is grounded in constitutional concerns that the

5  rights of absent class members be afforded adequate representation.  *Hanlon*, 150 F.3d at 1020.

6              **(a)      Lead Plaintiffs' Monitoring and Retainer Agreements With
                           Counsel Skirt Ethical Boundaries and Demonstrate
7                          Inadequacy.**

8              Both Lead Plaintiffs have nearly identical "monitoring agreements" with Coughlin Stoia.

9  (Biffar Decl., Exs. A-B.)                        **REDACTED**

10

11                         [9]  In a recent decision involving the very same counsel, the Honorable Jed

12  Rakoff of the Southern District of New York observed that the use of the same types of

13  monitoring agreements by lead counsel in this action raised a "seeming conflict of interest." *Iron*

14  *Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616

15  F. Supp. 2d 461, 464 (S.D.N.Y. 2009).

16                                      **REDACTED**

17

18

19            Going far beyond any traditional contingency arrangement of which the Court
              is aware, this practice, on its face, creates a clear incentive for Coughlin Stoia
20            to discover "fraud" in the investments it monitors and to recommend to the
              Fund's non-lawyer administrator (and, through him, to the trustees) that the
21            Fund, at no cost to itself, bring a class action lawsuit.  In other words, the
              practice fosters the very tendencies toward lawyer-driver litigation that the
22            PSLRA was designed to curtail.

23  *Id.*                                 **REDACTED**

24

25  _____
           [8] Report on the Private Securities Litigation Reform Act of 1995, S. REP. No. 104-98, at 6
26  (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 685.
           [9]
27                                      **REDACTED**

28
                                                     OPPOSITION TO MOTION FOR
                                                     CLASS CERTIFICATION
                                9                    08-CV-1689-H (RBB)

**REDACTED**

These arrangements are fundamentally inconsistent with Rule 23(a)(4).

    (b)    **Lead Plaintiffs' Actions Confirm They Have Abdicated All Control to Their Attorneys.**

Judicial scrutiny of a proposed representative's adequacy includes an analysis of whether they are fulfilling "the necessary role of 'checking the otherwise unfettered discretion of counsel in prosecuting the suit.'" *Welling*, 155 F.R.D. at 659 (quoting *Weisman v. Damielle*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978)). "There is no doubt that in enacting the PSLRA, Congress wished to ensure that investors, rather than lawyers, would control securities litigation." *Ferrari v. Gisch*, 225 F.R.D. 599, 608 (C.D. Cal. 2004). Courts have found that when class counsel has total control of the litigation, plaintiff becomes no more than "a key to the courthouse door dispensable once entry has been effected." *Saylor v. Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972). Thus, courts have declined to certify class representatives who:

- "did not become involved in the case until after the basic groundwork had been laid" and "contributed nothing to the drafting of the complaint," *Rolex Employees*, 136 F.R.D. at 666;

- "elected to pursue litigation only after responding to a press release distributed by the [plaintiffs' securities law firm] and even then based only on the [firm's] investigation and research," *Shiring*, 244 F.R.D. at 316;

- "leave the conduct of the litigation to [the] attorneys," *In re Quarterdeck Office Sys., Inc. Sec. Litig.*, No. CV 92-3970-DWW (GHKX), 1993 U.S. Dist. LEXIS 19806, at *17 (C.D. Cal. Sept. 30, 1993); *see also Ballan v. Upjohn Co.*, 159 F.R.D. 473, 486 (W.D. Mich. 1994);

- failed to read documents at issue or challenged by their complaint, *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1462 (S.D. Cal. 1988) (Enright, J.); and

- "know little, if anything, about their case other than that told them by their counsel," *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 412 (W.D. Okla. 1990); *see also Shiring*, 244 F.R.D. at 316.

1       Here, deposition testimony obtained from each Lead Plaintiff's "person most

2  knowledgeable" designee revealed Plumbers and Western Penn to be merely illusory parties, who

3  abdicated total control to counsel and, thus, do not qualify as class representatives.

4                **(i)**     **Plumbers.**

5       Plumbers' designee testified at deposition that its attorneys control this case.  (Biffar Decl.,

6  Ex. F, Murphy Depo., at 66:23-68:8.)  This designee had no knowledge of Plumbers' role in

7  another class action securities lawsuit in which it sought to become appointed lead plaintiff just

8  last year.  (*Id.* at 41:18-42:9.)

9

10                                   **REDACTED**

11

12                                                        Despite

13  having signed a sworn certification that Plumbers had made certain purchases of Novatel stock,

14  Plumbers' designee testified that the certification was prepared solely by Plumbers' counsel and

15  he had done nothing to verify the accuracy of the information contained therein.  (*Id.* at 101:4-

16  102:17.)  Despite having signed verifications to interrogatory responses, Plumbers' designee had

17  done nothing to assist in the drafting of the responses and relied solely on counsel to verify their

18  accuracy.  (*Id.* at 118:2-125:12.)

19                **(ii)**    **Western Penn.**

20                                    **REDACTED**

21

22  This designee could not recall seeing any complaint in this action prior to its filing, and did not

23  recall authorizing any complaint to be filed.  (*Id.* at 95:4-98:3, 117:9-122:10.)  Despite having

24  signed a sworn certification that Western Penn had made certain purchases of Novatel stock,

25  Western Penn's designee testified that he did not know who prepared the certification and he

26  relied on counsel to tell him what he was signing was accurate.  (*Id.* at 102:12-106:19.)  Despite

27  having signed verifications to interrogatory responses, Western Penn's designee had done nothing

28

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

to assist in the drafting of the responses and relied solely on counsel to verify their accuracy. (*Id.*, at 132:7-140:15.) Western Penn's designee never saw a document that had not already been completed by its counsel. (*Id.* at 102:12-105:16.) Western Penn's designee did not do anything to verify the accuracy of any interrogatory responses, and recalled almost no specifics about anything Western Penn did to assist in the prosecution of this action. (*Id.* at 102:12-106:5; 132:7-140.15.)

**C.     An Insider Trading Class Should Not Be Certified Because Lead Plaintiffs Lack Standing to Assert the Insider Trading Claims.**

A class representative must demonstrate individual standing to pursue the claims asserted on behalf of a class. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976).  To have standing to pursue an insider trading claim, plaintiffs must have traded contemporaneously with defendants. *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993).  Here, Lead Plaintiffs do not have standing to pursue their insider trading claims against any of the defendants because their purchases were not contemporaneous with defendants' sales.  Moreover, the nature of the sales, trading volumes, and purchase and sales prices only serve to confirm that Lead Plaintiffs could not have traded with defendants.  Without standing, an insider trading class cannot be certified.

**1.     The Contemporaneous Trading Requirement Is a Privity Substitute, Intended to Filter Out Plaintiffs Who Did Not Trade With Defendants.**

The contemporaneous trading rule is a "judicially-created standing requirement," which requires a plaintiff asserting an insider trading claim to have purchased a company's stock "contemporaneously" with each of the selling individuals against whom they are pursuing the claim. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002); *Neubronner*, 6 F.3d at 670 & n.5.  "Since identifying the party in actual privity with the insider is virtually impossible in transactions occurring on an anonymous public market," the "requirement of contemporaneousness developed as a proxy for the traditional requirement of contractual privity between plaintiffs and defendants."  *Buban v. O'Brien*, No. C94-0331 FMS, 1994 U.S. Dist. LEXIS 8643, at *7-8 (N.D. Cal. June 22, 1994), citing William Wang, *The Contemporaneous Traders Who Can Sue an Inside Trader*, 38 Hastings L. Rev. 1175 (1987).

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

In keeping with its function as a privity substitute, the "contemporaneous trading rule ensures that only private parties who have traded with someone who had an unfair advantage will be able to maintain insider trading claims." *Neubronner*, 6 F.3d at 670. Consistent with the directive that the contemporaneous period be determined on a case-by-case basis, the Ninth Circuit has not delineated a fixed time period for contemporaneous trading, but has emphatically rejected the use of any expanded time period which would "gut" the rule's premise function – "the need to *filter out* plaintiffs *who could not possibly have traded with the insider, given the manner in which public trades are transacted.*" *Brody*, 280 F.3d at 1002 (emphasis added).[10]

### 2. Given the Manner in Which Trades on National Exchanges Are Transacted, the Contemporaneous Trading Period Must Be Limited to One Day.

Admittedly, case law does diverge. However, the better reasoned line of authority limits the contemporaneous trading period to the same day as the insider's trade. Judge Wilson has explained that this "is the only reasonable standard given the way the market functions," and the rule's function as a privity substitute. *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995); *see also In re Aldus Sec. Litig.*, No. C92-885C, 1993 U.S. Dist. LEXIS 5008, at *22 (W.D. Wash. Mar. 1, 1993) ("given the unquestionably high volume of Aldus stock traded during the period in question, it is clear that plaintiffs did not trade with defendants…as no plaintiffs traded on the days of the allegedly wrongful trades."). Because the market functions as an auction, stocks sold are absorbed into the market on the same day that they are sold, and cannot have been purchased by a plaintiff trading on a later date. As Judge Wilson explained:

> Stock trading on NASDAQ occurs auction style: stock is sold to the highest bidder and purchased from the lowest offeror in every transaction. Thus, supply and demand determine whether stock transactions occur. Thus, the fact that defendants "sold" shares over a seven day period.. . necessarily means that there were purchasers for the shares sold on each of these days.… If there were no takers on these days, no stock transactions would have taken place.
>
> Plaintiff Marschall's purchase of AST stock was not made on any of the days the named defendants sold shares. This necessarily means that [plaintiff]

---

[10] Of course, the insider must have sold before the plaintiff purchased in order for there to be a possibility that the trade was between them. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1204 (C.D. Cal. 2008).

could not have purchased any of the shares sold by the defendants, since the market had already absorbed these shares.

*AST*, 887 F. Supp. at 234.

"Courts which have adopted th[e] same day standard have concluded that where a large volume of securities are sold on a daily basis on a national exchange, plaintiffs could not have realistically traded with a defendant *unless* they traded on the same day." *In re Fed. Nat'l Mortgage Ass'n Sec. Deriv. & ERISA Litig.*, 503 F. Supp. 2d 25, 47 (D.D.C. 2007) (emphasis in original); *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 663 (E.D. Va. 2000) (one-day contemporaneous trading period applied where stock traded on NASDAQ and purchase and sales prices of plaintiffs and defendants differed); *Aldus*, 1993 U.S. Dist. LEXIS 5008, at *22 (dismissing claims for lack of standing, and stating that "given the unquestionably high volume of Aldus stock traded daily during the period in question" it is "clear that plaintiffs did not trade with [all but one of the defendants] as no plaintiffs traded on the days of the allegedly wrongful trades").

More recently, Judge Pfaelzer recognized the "emerging consensus" that contemporaneous purchases in actively traded markets occur on the same day after the insider sold. *Countrywide*, 588 F. Supp. 2d at 1204. Indeed,

> an evolution of the contemporaneity requirement to require a shorter temporal separation between the trades of investors and insiders is reasonable, if not inevitable, as the modern realities of the securities market support an increasingly strict application of contemporaneity in order to satisfy the requirement's privity substitute function and to guard against "making the insider liable to all the world."

*MicroStrategy*, 115 F. Supp. 2d at 663 (citations omitted).[11]

---

[11] To the extent that plaintiffs rely on *In re Applied Micro Circuits Corp. Securities Litigation*, No. 01CV0649 K (AJB), 2003 U.S. Dist. LEXIS 14492, at *16-17 (S.D. Cal. July 15, 2003), for the proposition that the Court cannot rule on the appropriate period of contemporaneousness on a motion for class certification because of the need to resolve questions of fact, *Applied Micro* misapplied binding Ninth Circuit precedent and cannot be followed. Contemporaneousness is a question of standing to assert a claim, *see Brody*, 280 F.3d at 1001, and "[s]tanding is a question of law," *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 929 (9th Cir. 2010). Moreover, to the extent that the determination of the period for contemporaneous trading requires analysis of fact, standing of the proposed class representatives is a prerequisite for certification under Rule 23, and such factual issues must be resolved in ruling on class certification. *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001) (proposed class representative must have standing); *Hanon*, 976 F.2d at 509 (court should resolve factual issues that relate to Rule 23 requirements).

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

3.    **For Purposes of Standing, the Court Need Not Define a Contemporaneous Trading Period Where It Is Apparent From Market Realities that Plaintiffs Did Not Trade With Any Defendant.**

In the Ninth Circuit, the touchstone inquiry is whether plaintiffs *could have* traded with defendants, "given the way the market operates." *Brody,* 280 F.3d at 1002.  Thus, where the parties could not have traded with each other, the Court should reject a plaintiff's claim.  *See id.*  Both before and after *Brody*, district courts have dismissed plaintiffs' claims as a matter of law where it is apparent from the market realities that the parties could not actually have traded with each other.  *See Buban*, 1994 U.S. Dist. LEXIS 8643, at *3; *In re Connectics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515, at *44-45 (N.D. Cal. Aug. 14, 2008).

4.    **Lead Plaintiffs, Who Purchased on Different Days and More than a Million Share Sales After Defendants Sold, Did Not Trade Contemporaneously With Any Defendant.**

Each Lead Plaintiff must satisfy the contemporaneous trading requirement with regard to *each* of the selling defendants.  In other words, establishing a contemporaneous trade vis-à-vis one defendant does not satisfy the contemporaneous trading requirements vis-à-vis any other defendant.  *See In re Connetics Corp.*, 2008 U.S. Dist. LEXIS 62515, at *41-42.

(a)    **During the Class Period, Lead Plaintiffs Did Not Trade Within One Day of Any Defendant.**

Plumbers lacks standing to assert an insider trading claim because it did not purchase, within the class period, any Novatel stock before the Sprint transition rumor allegedly became public on July 20, 2007.[12]  For Plumbers, the Court need not even reach the issue of contemporaneous trading.  (Compare Britton Decl., Ex. 3, with CC, ¶ 116.)  Indeed, Plumbers' first class period purchase of Novatel stock was not until May 28, 2008 – more than *nine months* after the last alleged inside sale.  As a matter of law, Plumbers could not have traded contemporaneously with any inside sale.  *Brody*, 280 F.3d at 1002 (rejecting two month period for contemporaneous trading).

---

[12] Because liability for insider trading is predicated on sales of stock based on material, nonpublic information, a claim for insider trading cannot exist after the material, nonpublic information becomes public.  *O'Hagan*, 521 U.S. at 652; *see also Countrywide*, 588 F. Supp. 2d at 1204.

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

Western Penn also lacks standing to assert an insider trading claim because its purchases of Novatel stock were not contemporaneous with sales by any defendant. Prior to the rumor of the Sprint transition, there were no purchases by Western Penn that could meet the contemporaneous trading requirement vis-à-vis any individual defendant's stock sales. *None* occurred on the same trading day, or even the day after. (Compare Britton Decl., Ex. 3, with CC, ¶ 116.)

### (b) The Nature of the Transactions in the Market and Heavy Trading Volumes Establish that Lead Plaintiffs Could Not Have Traded With Any Defendant.

As the emerging consensus of courts have recognized, shares traded in heavy volumes on a national exchange make it a certainty that trades occurring more than a day apart were truly contemporaneous. *See Countrywide*, 588 F. Supp. 2d at 1204; *AST*, 887 F. Supp. at 234; *Buban*, 1994 U.S. Dist. LEXIS 8643, at *3. The market realities here – in particular, the auction style of trading on NASDAQ and the high trading volumes – establish that Western Penn could not have traded with any defendant. Millions of shares were traded at the time of defendants' sales and Western Penn's purchases, meaning that there were countless interceding sales separating the transactions where defendants sold their stock from the transactions in which plaintiffs bought their stock. Indeed, plaintiffs claim that "Novatel had more than 31 million shares of common stock outstanding during the Class Period, a reported trading volume of more than 556 million shares, and an average reported daily trading volume of more than 1.28 million shares," which they describe as an "enormous trading volume." (Plaintiffs' Memo., at 10.) Trading volumes a fraction of those present here have been found to negate a finding of contemporaneous trading. *See, e.g., Buban*, 1994 U.S. Dist. LEXIS 8643, at *3 (140,000 shares traded on the date of defendant's last sale); *see also Aldus*, 1993 U.S. Dist. LEXIS 5008, at *223 n.6 (average *weekly* trading volume of 1,349,498 shares).

Expanding the period of contemporaneous trading past the same day as defendants' trades would reverse the rule's intended functions. Far from guarding against making defendants liable to all the world, *see Microstrategy*, 115 F. Supp. 2d at 663, *Brody*, 280 F.3d at 1001, an expanded interpretation of contemporaneousness would potentially expose defendants to liability to

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

countless plaintiffs with whom they could not possibly have traded.  Lead Plaintiffs admit that their proposed class period sweeps in the trades of more than 556 million shares.  (Plaintiffs' Memo., at 10.)  It is impossible for those 556 million shares to have been purchased from defendants:  defendants are alleged to have sold 1,169,511 shares before the rumored Sprint transition allegedly became known to the public, less than one-tenth of one percent of the volume during the proposed class period.  (CC, ¶ 116.)  *See also Fed. Nat'l Mortg.*, 503 F. Supp. 2d. at 47 (expanding contemporaneousness "beyond same day trades would, in effect, permit plaintiffs to assert claims where it is implausible that they traded with defendants.").  Expanding the contemporaneous trading period beyond same day purchasers to include hundreds of millions of non-contemporaneous trades would make a mockery of the rule's origin as a privity substitute and gut the rule's function to "filter out plaintiffs who could not possibly have traded with insider, given the manner in which public trades are transacted."  *Brody*, 280 F.3d at 1002 (emphasis added).

Lead Plaintiffs undoubtedly will argue, albeit incorrectly, that *In re Petco Animal Supplies Inc. Securities Litigation*, No. 05-CV-0823-H (RBB), 2006 U.S. Dist. LEXIS 97927 (S.D. Cal. July 31, 2006), established a hard and fast eight-day rule for contemporaneous trading.  To the contrary, the Court struck a balance in that case based on the facts and circumstances at bar, 2006 U.S. Dist. LEXIS 97927, at *114, which did not include evidence of market data which refuted the possibility of a contemporaneous trade.  Given the way the market for Novatel stock functioned, with "enormous" trading volume and price differentials between Western Penn's purchases and defendants' sales, it is abundantly clear that Western Penn did not trade with any defendant.  Thus, "there is no reason for the Court to apply a more liberal standard to determine contemporaneousness."  *Buban*, 1994 U.S. Dist. LEXIS 8643, *8.[13]

---

[13] Even under the standard for contemporaneousness adopted by the Court in *Petco*, neither Lead Plaintiff has standing to pursue an insider trading claim against Mr. Leparulo, as the shortest period between a sale by Mr. Leparulo and a purchase by a Lead Plaintiff was *15 days*.  (CC, ¶ 116; Britton Decl., Ex. 3, at 540.)

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

**5.      If An Insider Trading Class Is Certified, It Should Be Limited to Those Who Purchased Novatel Stock on the Same Day of a Sale By a Defendant From May 18, 2007 Until July 18, 2007.**

**(a)      Any Insider Trading Class Cannot Begin Until May 18, 2007.**

Only Messrs. Hadley and Souissi sold Novatel stock within the putative class period prior to May 18, 2007.  (*See* CC, at ¶ 116.)  These sales could not have been based on the material nonpublic information of a rumored Sprint transition, because they were made pursuant to Rule 10b5-1 sales plans adopted in 2006.  (Biffar Decl., Ex. X, at 647.)  Not only were these plans adopted and publicly announced before the February 2007 start of the class period sought by plaintiffs, but also before the Complaint alleges that defendants traded on inside information regarding the rumored Sprint transition.  (*See* CC, ¶ 121 (alleging that defendants knew of the Sprint cancellation "when they sold their stock"); CC, ¶ 116 (identifying first sale placed at issue by plaintiffs as occurring in February 2007).)  These plans provide an affirmative defense to a claim of insider trading for sales pursuant to the plans. *See* 17 C.F.R. § 240.10b5-1(c)(1); s*ee also In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1317 (N.D. Ga. 2006).[14] Accordingly, any insider trading class cannot begin until May 18, 2007, the date of the first sale not conducted pursuant to a Rule 10b5-1 sales plan adopted or amended before defendants are alleged to have known of the rumored Sprint transition.  (Biffar Decl., Exs. X, at 647; Z, at 668.)

**(b)      The Insider Trading Class Should End on July 18, 2007 and, in Any Event, No Later than July 20, 2007 Because Plaintiffs Allege the Market Learned of the Rumored Sprint Transition on that Date.**

Liability for insider trading is predicated on sales of stock based on material, nonpublic information.  It should be axiomatic that a claim for insider trading cannot exist after the material, nonpublic information becomes public. *O'Hagan*, 521 U.S. at 652; *see also Countrywide*, 588 F. Supp. 2d at 1204.

---

[14] In opposing defendants' motions to dismiss, plaintiffs argued that the sales plans that were adopted or amended in 2007 cannot be the basis for a pleading-stage defense.  The sales of Messrs. Hadley and Souissi before May 18, 2007 were not made pursuant to the 2007 plans, but pursuant to plans adopted in 2006, the propriety of which plaintiffs have never called into question.

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

Lead Plaintiffs' verified interrogatory responses confirm that the rumored Sprint transition is the sole basis for their insider trading claim. (Biffar Decl., ¶ 11, Exs. V, at 626-28; W, at 638-40.) The class period for the insider trading claim must close no later than the date on which the rumored Sprint transition became public knowledge. According to the Complaint, this occurred on July 20, 2007. (CC, ¶ 125.)

However, the analyst, Anthony Stoss, whose report is the entire basis for this allegation in the Complaint, testified at deposition that the rumor had been circulating for "a few days" prior to July 20, 2007, and recalled reports substantially similar to those introduced at deposition, dating back to July 18, 2007. (*See* Biffar Decl., Ex. I, Stoss Depo., at 25:4-27:6, Exs. 4, 15, 16.) Mr. Stoss testified that "there were a bunch of articles talking about" the rumor, and that the rumor had been publicly reported for at least "a few days" by July 20, 2007. (*See id.* at 25:4-18, 27:3-12.) For example, the website *http://www.evdoinfo.com* published a news article on July 18, 2007 reporting the *exact same information* about a rumor, even using the phrase "End of Life" that the Craig-Hallum report adopted two days later. (*See* Biffar Decl., Ex. L.)

Since the rumored Sprint transition was public knowledge no later than July 18, 2007, any sales after that time could not have been on the basis of insider information, and the insider trading class must be cutoff by July 18, 2007. Even under plaintiffs' theory, the class must end no later than July 20, 2007.

**D.** **The Misrepresentation Class is Overbroad and Should Be Redrawn.**

**1.** **"In-and-Out" Traders Must Be Excluded.**

To have suffered a loss and be able to maintain a cause of action, a trader must have *purchased* after a fraudulent representation or non-disclosure and also *sold* after the subsequent corresponding corrective disclosure. "In-and-out traders," who both purchased and sold a stock while its value was inflated, do not suffer any damages, and as such must be excluded from the class. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (vacating order granting class certification to the extent that it included in-and-out traders); *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, No. C 03-2522 MHP, 2006 U.S. Dist. LEXIS

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

25819, at *29-30 (N.D. Cal. May 3, 2006) (amending class definition to exclude in-and-out

traders; "since corrective disclosure is alleged to have occurred only from July 2001 onwards,

under [*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)] there can be no loss causation

for plaintiffs who purchased and sold stock at the inflated share price prior to that disclosure, and

thus these plaintiffs may not recover at all.").

### 2. No Fraud on the Market Presumption Applies to the July 20, 2007 and November 10, 2008 Disclosures.

Regardless of the number of classes, defendants are entitled to rebut the fraud on the

market presumption to defeat class certification, in whole or in part, through expert testimony.  *See*

*In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008) (*quoting Basic v.*

*Levinson*, 485 U.S. 224, 248 (1988)); *In re Am. Int'l Group, Inc. Sec. Litig. ("AIG")*, --- F.R.D. ---

, No. 04 Civ. 8141 (DAB), 2010 U.S. Dist. LEXIS 15453, at *82-105 (S.D.N.Y. Feb. 22, 2010).[15]

Plaintiffs are proceeding under the fraud on the market theory, which was adopted by the

Supreme Court in *Basic*, and allows plaintiffs in securities class actions to not have to bear the

burden of establishing direct reliance.  *Basic*, 485 U.S. at 246-47; *see also Desai v. Deutsche Bank*

*Sec. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009).

Defendants are, of course, entitled to present evidence to rebut the presumption.  As the

Supreme Court held, "[a]ny showing that severs the link between the alleged misrepresentation

and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market

price, will be sufficient to rebut the presumption of reliance."  *Basic*, 485 U.S. at 248; *see also*

*AIG*, 2010 U.S. Dist. LEXIS 15453, at *82.  *Basic* explained that a successful rebuttal defeats

class certification by defeating the Rule 23(b)(3) predominance requirement.  *Basic*, 485 U.S. at

---

[15] The Ninth Circuit has not addressed the Fifth Circuit's decision in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), which held that plaintiffs in a securities class action must establish loss causation at the class certification stage to avail themselves of the fraud on the market theory.  *See id.* at 269.  Although *Oscar* was correctly decided and could be applied here, the Court need not decide whether to adopt *Oscar*.  Rather, the analysis applied in *AIG* is used by courts that do *not* follow *Oscar*.  *AIG*, 2010 U.S. Dist. LEXIS 15453, at *80-81 (rejecting *Oscar*).  Defendants reserve the right to raise *Oscar* at a later juncture.

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

242-43. A defendant can rebut the presumption through the use of expert testimony. *See AIG*, 2010 U.S. Dist. LEXIS 15453, at *83-84.

Here, Lead Plaintiffs and defendants have both submitted expert testimony. In support of class certification, Lead Plaintiffs have submitted the declaration of Mr. Steinholt, a chartered financial analyst. Defendants have submitted the declaration of Dr. Tabak, who holds a Ph.D in Economics from Harvard University.

Dr. Tabak's analysis confirms that plaintiffs will not be able to demonstrate loss causation for two of the dates on which plaintiffs allege corrective disclosures occurred, and refutes the fraud on the market theory for those dates. First, Lead Plaintiffs' expert did *not* find a causal relationship between disclosure and a falling stock price on November 10, 2008. Despite being asked to opine on whether there existed a causal relationship between misrepresentations and economic losses during the entire putative class period, Lead Plaintiffs' expert was unable to tie any purchases after August 19, 2008 to a corrective disclosure and a stock drop. To the contrary, Lead Plaintiffs' expert's event study actually demonstrates that "the November 10, 2008 price movement was statistically *insignificant* at standard levels, thereby providing affirmative evidence that any class period should not extend beyond August 19, 2008." (Tabak Decl., at 2.)

Second, Dr. Tabak refutes loss causation, and the fraud on the market theory, for the stock price movement on July 20, 2007, the rumored Sprint transition disclosure date that Mr. Steinholt discusses in his declaration. Dr. Tabak explains that Mr. Steinholt applied a lower and not commonly accepted confidence interval of 90%, as opposed to the standard confidence intervals of 99% or 95%. The Court will note that Mr. Steinholt applied the correct confidence intervals to the stock price movements on February 20, 2008, April 14, 2008, and August 19, 2008. (Tabak Decl., ¶¶ 20-28.) In other words, Mr. Steinholt *cheated* to find statistical significance on July 20, 2007. Had Mr. Steinholt used standard accepted criteria, the stock price movement on July 20, 2007

1   would not have been considered statistically significant and, thus, he could not have offered any

2   support for loss causation.  (*Id.*, ¶ 28.)[16]

3       This scenario bears a striking resemblance to the fraud on the market analysis in *AIG*.

4   There, at class certification, plaintiffs attempted to support their putative class period with an

5   expert report containing an event study and loss causation analysis for each of the alleged

6   corrective disclosure dates.  However, the AIG plaintiffs' expert, like Mr. Steinholt here, drew

7   conclusions for two dates in question based on a 10% significance level (*i.e.*, a 90% confidence

8   interval), which conflicts with standard statistical methodology that "5% [*i.e.*, a 95% confidence

9   interval] is the minimum level of statistical significance that conventional statistical methodology

10  would accept in making a finding that the decrease in stock price is attributable to AIG's

11  disclosures."  *AIG*, 2010 U.S. Dist. LEXIS 15453, at *99.  The court held that defendants, through

12  their challenge to plaintiffs' methodology, had rebutted the fraud on the market presumption for

13  the dates in question, and, in turn, limited class certification.  *Id.* at *103-04.  The same result

14  follows here.

15      Because there is no support for Lead Plaintiffs' attempt to link a stock drop with

16  disclosures of "relevant truth" on two of the purported corrective disclosures dates – July 20, 2007

17  and November 10, 2008 – the fraud on the market presumption does not apply to those dates.

18  Without the fraud on the market presumption, individualized issues will necessarily predominate

19  over common questions concerning the alleged misrepresentations associated with alleged losses

20  occurring on July 20, 2007 and November 10, 2008.  *See Basic*, 485 U.S. at 248.  Thus, any class

21  should only include purchasers within the class period who held over one of the other three alleged

22  corrective disclosure dates:  February 20, 2008, April 14, 2008 or August 19, 2008.

23

24

25

26      [16] For this reason, defendants object to and move to strike this aspect of Mr. Steinholt's
    testimony.  Fed. R. Evid. 702; *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1139-43
27  (10th Cir. 2009) (affirming exclusion of expert witness testimony purporting to show loss
    causation because methodology was not reliable).  Defendants reserve the right to challenge Mr.
28  Steinholt's expert credentials at a later juncture.

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

1

**3.** **Establishing the End of the Misrepresentation Class.**

2

    **(a)** **The Class Should Not Include Purchasers After Novatel**
3
        **Disclosed It Would Be Unable to Timely File Its Form 10-Q on**
        **May 13, 2008.**

4

      According to Lead Plaintiffs, Novatel released disappointing guidance and at the same

5

time made "partial revelations" of the truth regarding its "product mix and demand for [its]

6

products" on February 20, 2008, causing its stock price to collapse by 23% the following day.

7

(CC, ¶ 126.) These disclosures allegedly revealed that Novatel "did not have a competitive

8

product" (CC, ¶ 7), and analysts soon afterwards purportedly confirmed what plaintiffs had

9

suspected, *i.e.*, that Novatel was "shipping product early" to increase its results (CC, ¶¶ 30-31).

10

Novatel later released disappointing first quarter 2008 results on April 14, 2008, which plaintiffs

11

allege "shocked the market" and also revealed the true state of demand for Novatel's products.

12

(CC, ¶¶ 33, 76, 127.) Then, on May 13, 2008, Novatel announced that it would be unable to file

13

its Form 10-Q for the first quarter of 2008. (CC, ¶ 35.) Novatel also announced, in the same

14

filing, that its audit committee had voluntarily undertaken an enhanced review of the accounting

15

for a specific customer contract. (Biffar Decl., Ex. AA, at 672.) With all of these red flags, Lead

16

Plaintiffs were warned and accepted the risks associated with further investments. It is black letter

17

law that "a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant

18

information, nor a child, unable to understand the facts and risks of investing." *Greenhouse v.*

19

*MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004). Common questions of law or fact arising

20

from the misrepresentations or omissions will not predominate as to those who purchased after

21

May 13, 2008. Once the red flags were raised, the class must end.

22

    **(b)** **Lead Plaintiffs' Expert Only Supports a Class Up to August 19,**
23
        **2008.**

24

      The class period cannot be extended to November 10, 2008, as Lead Plaintiffs argue, for

25

the simple reason that there was no curative disclosure on that date. Plaintiffs have proffered an

26

expert to analyze the dates on which plaintiffs claim the "relevant truth" was revealed in order to

27

opine on whether class members suffered economic losses. (Steinholt Decl., ¶¶ 4, 37-38, 54.) Mr.

28

1   Steinholt makes no mention of a disclosure of "relevant truth" on November 10, 2008 anywhere in

2   his analysis.  In fact, he pegs the last corrective disclosure on August 19, 2008, when Novatel's

3   reported preliminary second quarter 2008 results that were below expectations, and Novatel's

4   stock price fell the following day.

5          Pushing beyond their own expert into the realm of gross conjecture, plaintiffs argue that

6   the class period should extend to November 10, 2008 because "new information about Novatel's

7   internal controls disclosed on November 10, 2008 damaged investors."  (Plaintiffs' Memo., at 21.)

8   This is not sufficient.  Under any rational reading of the case law, a "curative disclosure" actually

9   must be curative, *i.e.*, it must correct a falsehood that was present in the market.  *Dura*, 544 U.S. at

10  343; *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005); *In re Swift Trans.*

11  *Co. Sec. Litig.*, No. CV04-2435PHX-NVW, 2006 WL 1805578, at *5 (D. Ariz. Mar. 29, 2008).

12  No new curative disclosures occurred on November 10, 2008.  It speaks volumes that even Lead

13  Plaintiffs' expert would not go that far.

14                      **(c)      At the Latest, the Class Must End When Litigation**
                                   **Commenced.**
15

16         The class period cannot possibly end later than September 15, 2008, the date on which the

17  first complaint in this action (the "*Backe* Complaint") was filed.  (Dkt. No. 1.)  *See In re CMS*

18  *Energy Sec. Litig.*, 236 F.R.D. 338, 342 (E.D. Mich. 2006); *Dorchester Investors v. Peak Trends*

19  *Trust*, No. 99 Civ. 4696(LMM), 2002 U.S. Dist. LEXIS 3067, at *16 (S.D.N.Y. Feb. 26, 2002).  In

20  *CMS Energy*, the Court expressed concerns that class members purchasing after a complaint was

21  filed were purchasing a lawsuit.  236 F.R.D. at 342.  *Dorchester* indicated that the filing of the

22  complaint acted as a corrective disclosure.  2002 U.S. Dist. LEXIS 3067, at *16.

23         *CMS Energy* and *Dorchester* apply here, and dictate a class period ending no later than

24  September 15, 2008.  The *Backe* Complaint, filed on September 15, 2008, placed at issue the $ 3.4

25  million of the income reported for the first quarter of 2008, and that the Board was investigating

26  control deficiencies.  (*Backe* Complaint, ¶ 47.)  The pleading specifically alleges that "the

27  Company improperly recognized revenue … and misstated its financial results during the Class

28  Period," and that "the Company lacked adequate internal and financial controls."  (*Id*., at ¶ 5.)

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)

1   The *Harms* complaint, filed by Coughlin Stoia three days later, makes similar allegations.  (*Harms*

2   Complaint, ¶¶ 41-42.)  Allowing a class period to extend beyond September 15, 2008 simply

3   allows shareholders to buy a lawsuit.

### V. CONCLUSION

5       The Court should deny Lead Plaintiffs' motion for class certification.  In the alternative,

6   the Court should certify two classes as follows:

7       (1) an insider trading class consisting of those who purchased Novatel stock on May 18,

8   2007; May 29, 2007; May 30, 2007; June 1, 2007; June 5, 2007; July 2, 2007; July 3, 2007; July 5,

9   2007; July 6, 2007; July 16, 2007; and July 17, 2007; and

10      (2) a misrepresentation class consisting of those who purchased Novatel stock and were

11  damaged by one or more of the misrepresentations alleged in the Complaint.  The class period

12  should begin no earlier than February 27, 2007 and end no later than May 13, 2008, and should

13  only include purchasers of Novatel stock who held over one of the corrective disclosure dates

14  alleged to have occurred within the class period, *i.e.*, February 20, 2008 or April 14, 2008.

15  Alternatively, the class period should end no later than August 19, 2008 or September 15, 2008,

16  and should only include purchasers of Novatel stock who held over one of the corrective

17  disclosure dates alleged to have occurred within the class period, *i.e.*, February 20, 2008, April 14,

18  2008 or August 19, 2008.

19   Dated:  March 15, 2010                    Respectfully submitted,

20                                              Jones Day

21

22                                              By:  s/Eric Landau
                                                     Eric Landau
23
                                                Attorneys for defendants
24

25

26

27

28

OPPOSITION TO MOTION FOR
CLASS CERTIFICATION
08-CV-1689-H (RBB)