**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAUREEN BACKE, Individually, and on Behalf Of All Others Similarly Situated, | Lead Case No. 08-CV-01689-H(RBB) |
| Plaintiffs, | |
| vs. | |
| NOVATEL WIRELESS, INC., et al. | |
| Defendants. | |

# DECLARATION OF DAVID TABAK, PH.D.

## I.   SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1.   This case is brought "on behalf of all persons who purchased Novatel Wireless, Inc. ('Novatel' or the 'Company') common stock between February 27, 2007 and November 10, 2008 (the 'Class Period')."[1]  As part of the material supporting their Class Certification Motion, Plaintiffs have included a Declaration of Bjorn I. Steinholt (the "Steinholt Declaration") that purports to show that there were statistically significant price declines in response to alleged corrective disclosures on July 20, 2007, February 20, 2008, April 14, 2008, and August 19, 2008.  Counsel for Novatel has asked me to review the loss causation portion of the Steinholt Declaration.

---

[1] Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification ("Class Certification Motion"), p. 1.  (Concluding footnote omitted.)

2. My findings are as follows:

    A. The Steinholt Declaration does not claim that there was any statistically significant price decline associated with any alleged corrective disclosure on any date after August 19, 2008. Thus, it provides no support for a class period that covers the period from August 19, 2008 through November 10, 2008. In fact, a review of the statistical analysis in the Steinholt Declaration shows that the November 10, 2008 price movement was statistically *insignificant* at standard levels, thereby providing affirmative evidence that any class period should not extend past August 19, 2008.

    B. The Steinholt Declaration's analysis shows that the price decline on July 20, 2007 is not statistically significant at standard levels. The Steinholt Declaration's attempts to gloss over this issue by changing the way it interprets its analysis for that date, and for that date only, in fact highlight that the July 20, 2007 price decline should not be considered material.

    C. Consequently, any class should be limited to shareholders who purchased in the class period and held over at least one of the three dates on which Plaintiffs may potentially argue for loss causation in a manner consistent with Mr. Steinholt's statistical analysis: February 20, 2008, April 14, 2008, and August 19, 2008.[2]

3. These conclusions are discussed in more detail in the following sections.

---

[2] It is my understanding that Defendants may have other arguments related to these three dates. Should the Court find that there is no proper allegation of loss causation for any or all of those three dates for reasons beyond those given in this declaration, the class period, if any, can be modified accordingly. It is also my understanding that while Plaintiffs could argue for loss causation in a manner that contradicts or ignores the findings of their own expert, such arguments would, by undercutting their expert, come at the expense of class members who could benefit from the statistical analysis submitted by Mr. Steinholt.

## II.   QUALIFICATIONS AND REMUNERATION

4.   I received Bachelors degrees in Physics and in Economics from the Massachusetts Institute of Technology and a Masters degree and a Ph.D. in Economics from Harvard University.  I have appeared as an expert in federal district courts; state trial courts; bankruptcy court; and in arbitration forums, including the National Association of Securities Dealers, the International Chamber of Commerce International Court of Arbitration, and the American Arbitration Association.  I have published in my fields of expertise on subjects such as market efficiency, loss causation, statistics, and the analysis of stock price movements.

5.   National Economic Research Associates ("NERA") was established in 1961 and now employs over 600 people in over twenty offices worldwide.  NERA provides consulting for economic matters to parties for their internal use, to parties in litigation, and to governmental and regulatory authorities.  I have worked at NERA for over a dozen years and am a senior vice president in NERA's securities and finance practice.  My work entails providing analyses for parties in litigation and consulting for parties in non-litigation settings.  I have served as a speaker at events providing CLE credits for attorneys and at academic conferences on areas related to securities litigation.  My curriculum vitae is attached to this report as Exhibit 1.

6.   NERA is being compensated for out-of-pocket costs and at our usual rates for time.  My billing rate is $655 per hour.

## III.   MATERIALS CONSIDERED

7.   Materials considered for the purposes of this report are listed in Exhibit 2.

## IV.   NOVEMBER 10, 2008

### A.  *There is No Analysis of November 10, 2008 in the Text of the Steinholt Declaration*

8.   While the proposed class period runs through November 10, 2008, the text of the Steinholt Declaration does *not* include this date in its section entitled "Disclosures of the Relevant Truth."[3]  The Steinholt Declaration closes this section by claiming that "when the relevant truth was publicly disclosed, Novatel's stock price declined, causing Class members to suffer economic damages as a result of the alleged fraud."[4]

9.   Notably, the Steinholt Declaration does not say it examined what happened to Novatel's stock price when some of the relevant truth was publicly disclosed, but instead examined the stock price movements when "the relevant truth" was disclosed.

10.  Moreover, Plaintiffs' Class Certification Motion also asserts on page 20, "As established in the Declaration of Bjorn Steinholt, Novatel's stock price declined when the relevant truth was revealed on July 20, 2007, February 20, 2008, April 14, 2008, and August 19, 2008, causing class members to suffer economic damages as a result of the alleged fraud."  Counsel for Plaintiffs joins me in recognizing that their own expert does not assert November 10, 2008 to be the date of a statistically significant price decline and that Plaintiffs are putting forth no such evidence on behalf of the proposed class.  Instead, the Class Certification Motion argues, in that same paragraph, that the "stock price decline on November 11, 2008 was greater than expected," offering arguments about the meaning of that price movement that Mr. Steinholt, Plaintiffs' expert on loss causation and event studies, chose not to include in his declaration.[5]

---

[3] See ¶¶37-54 of the Steinholt Declaration, explicitly discussing four other dates alleged to be corrective disclosures.

[4] Steinholt Declaration, ¶54.

[5] Certain members of the proposed class (those whose claim is based on the price movement on November 10, 2008) would therefore have to argue that one should ignore standard rules about statistical significance.  In contrast, other members of the proposed class (those with claims based on earlier price declines that are statistically significant) would strengthen their case by highlighting how following such rules makes the evidence and analyses they rely upon more credible.

### B. The Statistical Analysis in Steinholt Exhibit D Shows that the Price Decline Following the November 10, 2008 News Was **Not** *Statistically Significant*

11. Even though the text of the Steinholt Declaration does not discuss Novatel's stock price movement following the November 10, 2008 news, we can find its statistical analysis of that date on page 397 of Steinholt Exhibit D.

12. On that page, we see that the relevant price movement would have occurred on November 11, 2008, because the announcement came out after market hours on November 10.  On the following page of Steinholt Exhibit D, we see that the market-adjusted price change on November 11, 2008 is associated with a "t-statistic" of -1.36.[6] As discussed in the next few paragraphs, this result would not be considered statistically significant at the standard five-percent significance level.  Therefore, following standard practice among statisticians, one would not claim that there was a statistically meaningful price movement on that date, but instead would find the price movement to be statistically *insignificant*.  (The Steinholt Declaration often uses the terminology "99% level of confidence," apparently as a shorthand for the "99% confidence interval," which corresponds to a 1% significance level.  Similarly, a so-called "95% level of confidence" would correspond to a 5% significance level.[7]  For ease of reference to the academic literature, I use standard terminology in this declaration.)

13. A t-statistic is a measure of how unusual a result, such as a market-adjusted price movement, is.  A t-statistic is measured in terms of the number of standard errors (sometimes described using a related term, standard deviations) a result is from some

---

[6] For the purposes of this declaration, I accept all of the statistical methodology in the Steinholt Declaration and focus solely on the interpretation of the results of Mr. Steinholt's analyses.

[7] Note that a "level of confidence" does not refer to how confident one is in a result, and should not be treated as if it corresponds to concepts such as "beyond a reasonable doubt" or "preponderance of the evidence."  See, for example, the *Reference Guide on Epidemiology*, fn 67: "A common error made by lawyers, judges, and academics is to equate the level of alpha [the level of statistical significance] with the legal burden of proof. Thus, one will often see a statement that using an alpha of .05 for statistical significance imposes a burden of proof on the plaintiff far higher than the civil burden of a preponderance of the evidence (i.e., greater than 50%). … This claim is incorrect, although the reasons are a bit complex and a full explanation would require more space and detail than is feasible here." (The *Reference Guide on Epidemiology* is a part of the *Reference Manual on Scientific Evidence*, Second Edition, published by the Federal Judicial Center.)

baseline, such as a zero movement. The t-statistic of -1.36 means that the market-adjusted price movement on November 11, 2008 was 1.36 standard errors below the baseline of zero. To achieve statistical significance at the five-percent level (corresponding to the "95% level of confidence" discussed in the Steinholt Declaration), the t-statistic must be greater than 1.96 in absolute value. See, for example, footnote 117 of the *Reference Guide on Statistics*, a portion of the *Reference Manual on Scientific Evidence*, published by the Federal Judicial Center: "statisticians often use ±1.96 SEs [standard errors] for a 95% confidence interval. … For simplicity we use ±2 SEs for 95% confidence."

14. See also the Supreme Court opinion *Castaneda v. Partida*, 430 U.S. 482 (1977), footnote 17: "As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." The analogy to a price movement is that if the difference between the expected movement (based on market and/or industry effects) and the observed movement is greater than at least two standard deviations (i.e., that the price movement is statistically significant), the hypothesis that the news was random (i.e., similar to the normal background news that would appear on a random date) is rejected. That is, a statistically significant price movement is one that is unusual compared to the normal movements that occur with ordinary background news, implying that the news on that date is material; conversely, a statistically insignificant price movement is one that is similar to the normal movements that occur with ordinary background news, implying that the news on that date is not materially different from that background news.

15. The five-percent level is the standard in finance and economics studies. As noted on page 124 of the *Reference Guide on Statistics*, "In practice, statistical analysts often use certain preset significance levels—typically .05 or .01. The .05 level is the most common in social science, and an analyst who speaks of 'significant' results without specifying the threshold probably is using this figure." (Internal footnotes omitted.)

16. In examining the proper significance level for an event study, one court held, "Plaintiff has, however, provided no explanation for why a 95% confidence interval is inappropriate, other than its failure to pick up the 2.64% price change."[8]

17. This issue was also addressed in *In Re American International Group Securities Litigation*, in which a recent opinion (on February 22, 2010) specifically found that defendant has shown "that there is a distinction between reporting and drawing conclusions based on a 10% level of statistical significance. Accordingly the Court finds that Defendant AIG … has rebutted the fraud-on-the-market presumption for the dates" on which the price decline was statistically significant at the ten-percent but not the five-percent level.[9]

18. Thus, the Steinholt Declaration's decision *not* to list the price movement following the November 10, 2008 news as one that is statistically significant is in accordance with statistical practice, as well as guidance given by the Federal Judicial Center, the Supreme Court, and with common practice in the use of event studies in securities litigation. In fact, the analysis in the Steinholt Declaration finds that the price movement following the November 10, 2008 news is statistically insignificant. Thus, with regard to this date, we are not in a position in which there is any disagreement about the methodology for calculating statistical significance, or even in a position in which I am disagreeing with a statement in the Steinholt Declaration; instead, I am merely pointing out that Mr. Steinholt's own reported analysis shows that there was not a statistically significant movement following the November 10, 2008 news, meaning that the analysis provided in the Steinholt Declaration affirmatively refutes the claim that the news released on that day was material to the market.

---

[8] *Goldkrantz v. Griffin*, No. 97 Civ. 9075 (DLC), 1999 WL 191540, at *5 (S.D.N.Y. April 6, 1999), *aff'd* 201 F.3d 431 (2d Cir. 1999).

[9] *In re Am. Int'l Group, Inc. Sec. Litig.*, No. 04 Civ. 8141 (DAB), 2010 U.S. Dist. LEXIS 15453, at *103-04 (S.D.N.Y. Feb. 22, 2010).

## V.   JULY 20, 2007

### A.   *The Statistical Analysis in Steinholt Exhibit D Shows that the Price Decline Following the July 20, 2007 News Was* **Not** *Statistically Significant*

19. Among the four dates for which the Steinholt Declaration claims there was a statistically significant price response is July 20, 2007.  However, as seen on page 136 of Steinholt Exhibit D, the t-statistic for that date is only -1.45, below (in absolute value) the value of 1.96 needed for significance at the standard five-percent level.

### B.   *The Use of An Alternative Interpretation of the Statistical Results in the Text of the Steinholt Declaration Highlights that July 20, 2007 is Associated with a Statistically Insignificant Result*

20. To see how the Steinholt Declaration attempts to justify calling this result statistically significant, it is instructive to compare its description of this result with its discussion of the other three alleged corrective disclosures it discusses.  For July 20, 2007, the Steinholt Declaration states in ¶40 that "the price decline was statistically significant at the 90% level of confidence using a one-tailed test."  However, in ¶¶44, 49, and 53, when discussing the other three dates, the Steinholt Declaration consistently states, "This price decline was statistically significant at the 99% level of confidence."

21. There are two differences in the descriptions, the "level of confidence" and the use of a one-tailed test for July 20 versus the (unstated) use of the two-tailed test for all of the other dates.  I discuss each of these in turn.

22. As noted above, the *Reference Guide on Statistics* notes on page 124, "In practice, statistical analysts often use certain preset significance levels—typically .05 or .01. The .05 level is the most common in social science, and an analyst who speaks of 'significant' results without specifying the threshold probably is using this figure." (Internal footnote omitted.)

23. For any given test, the lower the significance level, the stronger the results are. Thus, the 99% "level of confidence" that the Steinholt Declaration uses for three dates is the stronger of the two typical levels described in the *Reference Guide on Statistics*. In contrast, the 90% "level of confidence" would correspond to a significance level of 10%, or .10, which is weaker than both of the significance levels described as typical in the *Reference Guide on Statistics*, as well as weaker than the corresponding levels discussed in the court cases cited in the discussion of the analysis of November 10, 2008.

24. The second change that the Steinholt Declaration makes solely for its analysis of July 20, 2007, is to switch from a two-sided test to a one-sided test. In brief, a two-sided test allows for the possibility of finding that a result, in this case a stock price movement, is abnormally positive or negative. A one-sided test assumes that the result is meaningful only if it goes in one direction. In this instance, that would mean that the Steinholt Declaration would consider the possibility that the stock price movement could have harmed investors because the news was worse than expected but would *a priori* rule out the possibility of finding that the news on that date was better than expected as evidenced through stock price movements. Because news can be either better or worse than expected, financial economists typically, if not nearly exclusively, rely on two-sided tests.

25. In terms of how this change affects an analysis, the use of a one-sided test looking only for price declines effectively doubles the error rate of incorrectly declaring a random price movement to be statistically significant and negative while eliminating the probability of finding a random price movement to be statistically significant and positive. As noted above, the *Reference Guide on Statistics* describes the construction of a confidence interval by stating that "statisticians often use ±1.96 SEs [standard errors] for a 95% confidence interval." With a one-sided test, the 95% confidence interval would stretch from -1.64 standard errors up to positive infinity (i.e., no matter how large a positive a result is, it would not be considered unusual enough to indicate that there was material news).

26. As one Circuit court noted:[10]

> A commentator has made the same observation about the "one-tail" test, describing it as "'data mining' *per se*" which is "the statistician's term for manipulating data to prove a desired result." Harper, *supra,* 32 Hastings L.J. at 1355, n. 65, citing Freedman, Pisani and Purves, *Statistics,* 494-96 (1978).   Still another text is more specific in its description of the "one-tail" test.  In Friedman, *Introduction to Statistics,* 146-47 (Random House, 1972), the author explains:
>
>> "Note that, although at [sic] value of 1.96 is required to reject Ho at the 5 percent level with a two-tailed test, a value of only 1.64 is needed if a one-tailed test is used.  Many investigators find it tempting to use a one-tailed probability level to facilitate obtaining 'significant' results.
>>
>> "... the safest procedure in virtually all situations is to use two-tailed values.   Using one-tailed values to make rejection of Ho (*i.e.,* the null hypothesis) 'easier' serves to increase type I errors, while the size of the difference, as measured by rm is unaffected.   A strict application of one-tailed values includes the danger of overlooking important results in the non-predicted direction, and any attempt to test for such outcomes leads to inaccurate probability values.  Analysis of data based on two-tailed probability levels can be reported without apology, while it is almost always necessary to 'explain away' the use of one-tailed probability levels."
>
> …
>
> We repeat, however, that we are not persuaded that it is at all proper to use a test such as the "one-tail" test which all opinion finds to be skewed in favor of plaintiffs in discrimination cases…

---

[10] *E.E.O.C. v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 655-56, 661 (4th Cir. 1983), *rev'd on other grounds* 467 U.S. 867, 882 (1984).

27. The same logic applies in a securities fraud case.  The t-statistic threshold of 1.96 with a standard two-tailed test at the five-percent level is reduced to 1.64 with a one-tailed test, a level that the July 20, 2007 price movement still fails to reach.  While two-tailed tests "can be reported without apology," it is indeed necessary to "explain away" the use of a one-tailed test.  Moreover, just as one-tailed tests are skewed in favor of plaintiffs in discrimination cases, one-tailed tests are skewed in favor of plaintiffs in securities fraud cases when they are used to examine potential corrective disclosures.

28. The Steinholt Declaration's use of a weaker statistical criterion than what the *Reference Guide on Statistics* considers typical and its use of a one-tailed test, without even "explaining away" why it uses that test for one date but not for any other, is strong evidence that the price movement on July 20, 2007 is not statistically significant.  In fact, had just one of these standard criteria been applied to this one date, it would not have been considered statistically significant.  Once again, the analysis in the Steinholt Declaration affirmatively refutes the claim that the news on this date was material to the market.

### C. The Use of an Intraday Analysis by the Steinholt Declaration is Unscientific

29. As perhaps an attempt to "explain away" its weaker standard and use of a one-tailed test for July 20, 2007, the Steinholt Declaration notes that the news that day was "consistent with Novatel's stock price trading sharply down more than 10% in the early hours on July 20, then rebounding somewhat later in the trading session."[11]  This explanation is unscientific and unreliable, and ultimately does not even support a finding of loss causation for this date even if it were correct.

30. First, this story does nothing to truly explain away the results that are not statistically significant under standard analyses.  If the end result is that after considering all of the information, the net price movement is not statistically significant, then that is the ultimate finding: no statistical significance, and therefore no statistical basis for finding loss causation for this date.

---

[11] Steinholt Declaration, ¶40.

31. Second, to the extent that the Steinholt Declaration is trying to argue that the entire pattern of the price movement should be considered, it has failed to implement the most basic steps in a statistical analysis: finding a control or baseline group and comparing the results of the date examined to that control group. There is no evidence of how volatile Novatel's stock is in a typical day or of whether the price movement during the course of July 20 differs from the typical pattern in any statistically meaningful way.[12]

32. But, even if the intraday price movement was statistically unusual, the purported reason for the rebound, that an analyst "argued that this decline [in the stock price] represented a buying opportunity"[13] should best be interpreted as a market participant arguing that the initial price decline was too large. Moreover, if the market rebounded as a result of the analyst report, that would mean that upon consideration, the market also believed that the initial price decline was too large. Thus, only the ultimate price decline, which was not statistically significant under standard levels of analysis, would be meaningful.

## VI.  PURCHASERS MUST HAVE HELD OVER AN ALLEGED CORRECTIVE DISCLOSURE TO HAVE BEEN DAMAGED AND BE IN THE PROPOSED CLASS

33. The first paragraph of the Complaint states, "This is a class action for violations of the federal securities laws on behalf of all purchasers of Novatel Wireless, Inc. ('Novatel' or the 'Company') common stock between February 27, 2007, and November 10, 2008 (the 'Class Period') *who were damaged thereby*." (Emphasis added.)

---

[12] Finally, by employing a second attempt to show that the price movement on July 20, 2007 was meaningful (even if not through a formal statistical test), the Steinholt Declaration increases its potential error rate, because the probability of "finding" something that appears to be meaningful increases as the number of tests performed goes up.
[13] Steinholt Declaration, ¶40.

34. In the years since the Supreme Court's ruling in *Dura Pharmaceuticals, Inc. v. Broudo*[14] ("*Dura*"), it has become increasingly clear that the economic reasoning in that opinion implies that potential plaintiffs in a securities class action who do not purchase a security within a class period and hold that security over an alleged corrective disclosure are not damaged, and thus should not be part of a class. This follows from the *Dura* language that "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."

35. A similar result had previously appeared in the *Worldcom* case in the Southern District of New York, in which the court held, "A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public. *Id.* at \*12 n. 4."[15] Economically, the reasoning behind these statements is that if an investor purchases shares that are priced in the market based on some misrepresentation, then until there is a corrective disclosure, the shares continue to be priced, and suffer gains or losses, based on the information in that misrepresentation. These gains or losses, however, are exactly the gains and losses that the investor agreed to experience upon buying the stock. It is only when the misrepresentation is corrected, or a concealed risk due to that misrepresentation becomes realized and known to the market, that the investor suffers an economic loss that she did not accept by purchasing shares in the market.

36. Since *Dura*, several circuit courts faced with cases in which this issue arose have noted that if a price decline before a corrective disclosure cannot be the basis for alleging loss causation, then that price decline could not be included in damages. See, for example, *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006, 1026-27 (9th Cir. 2005):[16]

---

[14] *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

[15] *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 375314, at \*6 (S.D.N.Y. Feb. 17, 2005). The internal reference in the quotation is to *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).

[16] See also *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 479 (4th Cir. 2006) ("It is only after the fraudulent conduct is disclosed to the investing public, followed by a drop in the value of the stock, that the hypothetical investor has suffered a 'loss' that is actionable after the Supreme Court's decision in *Dura*. In other words, so long as the fraud is undisclosed, normal fluctuations in price attendant to any market may have a direct effect on the value of the investor's portfolio, but cannot be said to be a 'loss' (continued)

> We note that, as the TAC currently reads, at the time when Daou began to reveal its true financial health in August 1998, its stock was trading at $18.50 per share and not at the class high of $34.375.   The TAC does not allege any revelation of Daou's true financial health prior to August 1998.   Thus, as the TAC reads now, any loss suffered between $34.375 and $18.50 cannot be considered causally related to Daou's allegedly fraudulent accounting methods because before the revelations began in August 1998, the true nature of Daou's financial condition had not yet been disclosed.

37. The economic reasoning extends beyond just those shareholders who sold before the first corrective disclosure, and in fact applies equally to any shareholders with no alleged corrective disclosure between their purchase and sale dates.[17]  For such shareholders, any price declines between those dates cannot be due either to an earlier disclosure (as that would have already been incorporated into the stock price in an efficient market) or to a later disclosure (for the same reasons that price movements before the first disclosure are not a proper part of damages).

## VII. CONCLUSION

38. The Steinholt Declaration does not claim that there was a statistically significant price decline in Novatel's stock following the news on November 10, 2008; in fact, its analysis shows that the relevant price movement was statistically *insignificant*.  Members of the proposed class who wish to argue that the November 10, 2008 stock price decline was meaningful would need to argue that one should ignore standard statistical rules, a

---

that is actionable under the federal securities laws, or as here, the common law of Virginia.") and *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) ("Thus, there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines.")

[17] See, for example, *In re Cornerstone Propane Partners*, No. C-03-2522 (MHP), 2006 U.S. Dist. LEXIS 25819, *27-28 (N.D. Cal. May 3, 2006) ("Here, since corrective disclosure is alleged to have occurred only from July 2001 onwards, under <u>Dura</u> there can be no loss causation for plaintiffs who purchased and sold stock at the inflated share price prior to that disclosure, and thus these plaintiffs may not recover at all." Concluding footnote omitted.)

position that would undercut other potential class members' claims that standard statistical rules provide a strong basis for the portion of their claims based on such analyses.

39. While the Steinholt Declaration claims that Novatel's stock price decline following July 20, 2007 was statistically significant, it makes this claim only by (1) using a weaker standard than is considered typical in the academic literature or by the *Reference Guide on Statistics* published by the Federal Judicial Center, and by (2) using a "one-tail" test, which is highly unusual in the field of financial economics and which one circuit court has noted is described as "data mining *per se*" and "skewed in favor of plaintiffs."[18]  Commonly accepted statistical practice would be to treat this price movement as not statistically significant, meaning that there is no statistical basis for claiming loss causation for any stock price decline on July 20, 2007.

40. Consequently, the class should be limited to shareholders who purchased during the proposed class period and held over at least one of the remaining alleged disclosures on February 20, 2008, April 14, 2008, and August 19, 2008.  It is my understanding that counsel for Defendants may provide additional reasons why one or more of these dates should not be considered relevant for loss causation purposes.

        I reserve the right to modify or extend my opinion in light of any new information, including submissions by experts for Plaintiffs, that becomes available to me.

March 12, 2010

_____
                                    David Tabak

---

[18] *E.E.O.C. v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 655-56, 661 (4th Cir. 1983), *rev'd on other grounds* 467 U.S. 867, 882 (1984).

NERA
Economic Consulting

**David I. Tabak**
Senior Vice President

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 2176
david.tabak@nera.com
www.nera.com

# EXHIBIT 1
# DAVID I. TABAK
## SENIOR VICE PRESIDENT

Dr. Tabak earned his Ph.D. and M.A. degrees in Economics from Harvard University and his B.S. in Economics and B.S. in Physics from the Massachusetts Institute of Technology. While at Harvard, Dr. Tabak participated in teaching courses in micro- and macroeconomics and American economic policy at the undergraduate and graduate levels and in the creation of an undergraduate textbook and accompanying software package.

Dr. Tabak has appeared as an expert in state, federal, and bankruptcy court, and before arbitration panels, including the National Association of Securities Dealers, the American Arbitration Association, and the International Chamber of Commerce International Court of Arbitration. He has published in his areas of expertise in forums such as *St. John's Law Review* and *Shannon Pratt's Business Valuation Update*, and has published peer-reviewed articles in *Litigation Economics Review* and the *Journal of Forensic Economics*. Dr. Tabak is also the author of book chapters and has served as a member of *BV Q&A Update's* expert author panel and as a referee for peer-reviewed journals. His publications have covered topics such as the use of event studies to measure damages in commercial disputes, economic analysis of market efficiency, valuation discounts for lack of marketability, and the application of statistics in litigation analyses. Dr. Tabak has been an invited presenter at the Securities and Exchange Commission and has spoken at forums that provide continuing legal education credits or continuing professional education credits for appraisers.

At NERA, Dr. Tabak is a member of the Securities and Finance Practice. In the area of securities class actions, Dr. Tabak has performed analyses involving issues of class certification, liability, materiality, affected trading volume, and damage calculations. He has also performed valuations of equity, options, other financial derivatives, businesses, and financial institutions. Dr. Tabak has been retained as an expert to address issues including allegations of options backdating, market timing of mutual funds, contract disputes, commercial damages, and disputes between brokers and customers. His non-litigation work has included developing a risk-scoring model for a reinsurance company, assisting financial institutions in new product development, and interpretation of statistical analyses of treatment effectiveness for a program for at-risk youth.

David I. Tabak

## Education

**Harvard University**
Ph.D., Economics, 1996
M.A., Economics, 1992

**Massachusetts Institute of Technology**
B.S., Economics, 1990
B.S., Physics, 1990

## Professional Experience

**NERA Economic Consulting**
2005-        *Senior Vice President*
             Provide written and oral testimony on behalf of clients. Conduct and supervise
             economic analyses, with a focus on securities litigation and valuation cases.
2001-2005    *Vice President*
1998-2001    *Senior Consultant*
1996-1998    *Senior Analyst*

**Harvard University**
1991-1996    *Teaching Fellow in Economics*
             Participated in teaching various courses from introductory principles of
             economics to graduate macroeconomics. Ran coursewide tutorial program for the
             largest class at Harvard for two academic years, with a staff of over fifty part-time
             employees.

**Worth Publishers**
1991, 1993   *Research Assistant/Independent Contractor*
             Worked on data collection, software analysis, and creation of a problem bank for
             an educational economics software package.

**National Bureau of Economic Research**
1991         *Research Assistant*
             Performed data collection and econometric analysis for a project on comparisons
             of international growth rates.

## Honors and Professional Activities

Member, American Economic Association, 1993-present

Referee, *Journal of Forensic Economics*, 2005, 2006, 2008, 2009

David I. Tabak

Referee, *Litigation Economics Review*, 2002, 2003, 2004

William M. Mercer Securities Corporation, Registered Representative, Series 7 and 63, 2000 - 2002

Marsh & McLennan Securities Corporation, Registered Representative, Series 7 and 63, 1998 - 2000

Adjunct Member, Committee on International Trade, Association of the Bar of the City of New York, 1998 – 2001

Harvard University Scholarship, 1990-1992

Derek Bok Teaching Award, 1993, 1994, 1995, and 1996

Allyn Young Teaching Award, 1996

David I. Tabak

## Expert Reports and Testimony

Testimony before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, November 6, 2009.

Expert Rebuttal Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, October 19, 2009.

Expert Report of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, September 17, 2009.

Expert Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, September 10, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, July 16, 2009.

Declaration of David Tabak before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, July 13, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, June 26, 2009.

Deposition before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, June 16, 2009.

Declaration and Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, May 29, 2009.

Deposition Testimony before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, May 6, 2009.

Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, April 15, 2009.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, February 17, 2009.

Declaration of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, January 5, 2009.

Expert Report of David Tabak, Ph.D., before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, December 15, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, November 7, 2008.

Deposition Testimony before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* October 31, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* September 23, 2008.

Cross-Examination before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, June 23, 2008.

Surrebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, January 11, 2008.

Affidavit of David I. Tabak before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, December 19, 2007.

Rebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 19, 2007.

Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 3, 2007.

Deposition Testimony before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund, et al. vs. The Coca-Cola Company*, August 23, 2007.

Deposition Testimony before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, June 13, 2007.

Expert Report of David Tabak before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund,* et al. *vs. The Coca-Cola Company*, May 30, 2007.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, April 27, 2007.

Expert Report of David Tabak before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, April 4, 2007.  (Amended report, June 25, 2007.)

Rebuttal Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, January 18, 2007.

David I. Tabak

Expert Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, December 18, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, November 9, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 13, 2006.

Affidavit of David I. Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, October 11, 2006.

Rebuttal Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 4, 2006.

Expert Report before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, October 4, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, September 15, 2006.

Expert Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, August 25, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, July 20, 2006.

Deposition Testimony before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, May 25, 2006.

Affidavit before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, April 14, 2006.

Deposition Testimony before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 24, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, March 17, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 9, 2006.

Expert Report of David Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, February 13, 2006.

Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, February 1, 2006.

David I. Tabak

Rebuttal Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 30, 2005.

Deposition Testimony before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 9, 2005.

Expert Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, October 3, 2005.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Pennsylvania in *Sean Fitzpatrick v. Michael Queen, Thomas McGreal, Joseph W. Luter, IV, Michael H. Cole, Smithfield Foods, Inc., Showcase Foods, Inc., and Pennexx Foods, Inc.*, March 25, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 24, 2005.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 18, 2005.

Affidavit of David Tabak, Ph.D. and Stephanie Plancich, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Doug Sutton and Prescott Nottingham v. Robert F. Bernard, Robert T. Clarkson, and Bert B. Young*, January 11, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, January 5, 2005.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Phoenician Trading Partners, L.P. v. Blue Water Fund Ltd., et al.*, January 3, 2005.

Affidavit of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, December 14, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, December 10, 2004.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, October 4, 2004.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, September 22, 2004.

David I. Tabak

Deposition Testimony before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, September 9, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, August 20, 2004.

Further Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, July 30, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, June 30, 2004.

Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 7, 2004.

Deposition Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 2, 2004.

Expert Report of David Tabak before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, March 31, 2004.

Statement of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *United States of America v. Morris Weissman*, February 10, 2004.

Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, December 17, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of Ohio Eastern District (at Columbus) in *Barry F. Bovee, et al. v. Coopers & Lybrand, et al.*, December 16, 2003.

Deposition Testimony before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation* and in *In Re Safety-Kleen Rollins Shareholders Litigation*, October 23, 2003.

Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, October 1, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation*, August 28, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Rollins Shareholders Litigation*, August 28, 2003.

Testimony before the NASD in *Ralph Rubenstein, JANT Foundation, et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* June 19, 2003.

David I. Tabak

Affidavit of David Tabak, Ph.D. and Ramzi Zein, Ph.D. in Support of Norwegian Cruise Line's Opposition to Proposed Rule before the Federal Maritime Commission, May 30, 2003.

Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, March 11 and 12, 2003.

Declaration of David I. Tabak in Support of Defendant's Motion in Opposition to Appointment of Additional Lead Plaintiffs and Class Certification before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, June 21, 2002.

Affidavit before the United States District Court for the District of Rhode Island in *George Kinney et al. v. Metro Global Media, Inc., et al.* May 15, 2002.

Testimony before the American Arbitration Association in *Beth Kaplan v. Rite Aid Corporation; Rite Aid Corporation v. Beth Kaplan and Bruce Sholk*, May 2-3, 2002.

Expert Report of David I. Tabak before the United States District Court for the District of Idaho in *Pippin v. ICF Kaiser International, et. Al, Wood v. Edwards et al.*, February 11, 2002.

Deposition Testimony before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, February 7, 2002.

Deposition Testimony before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Securities, Inc. Litigation*, January 17, 2002.

Affidavit before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, January 10, 2002.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Inc. Securities Litigation*, December 28, 2001.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Castle Creek Technology Partners LLC against Cellpoint Inc.*, December 13, 2001.

Deposition Testimony before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, October 11, 2001.

Deposition Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, September 6, 2001.

David I. Tabak

Testimony before the United States District Court for the Eastern District of New York in *United States of America against Harry Shuster*, July 30, 2001.

Declaration before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, July 23, 2001.

Testimony before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, May 29, 2001.

Opinion Letter before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, May 24, 2001.

Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, May 22, 2001.

Testimony before the Supreme Court of the State of New York, County of New York in *Robert Klein against 5B Technologies Corporation f/k/a Paramount Financial Corporation and Deltaforce Personnel Services, Inc.*, May 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, April 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *In Re Imperial Credit Industries, Inc. Securities Litigation*, April 5, 2001.

Affidavit before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, February 8, 2001.

Deposition Testimony before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 19, 2001.

Expert Report of David I. Tabak before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 11, 2001.

Supplemental Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, September 13, 2000.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Martin R. Lautman v. The Loewen Group Inc., et al.*, September 6, 2000.

Supplemental Affidavit of David I. Tabak before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.*, May 25, 2000.

David I. Tabak

Affidavit of David I. Tabak and Christoph Muelbert before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 23, 2000.

Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, April 28, 2000.

Testimony before the American Arbitration Association in *Roderick Covlin against C.S. Block New York, LLC, Dr. Sharaif Amanat, Omar Amanat*, March 30, 2000.

Expert Report of David I. Tabak before the National Association of Securities Dealers Office of Dispute Resolution in *Brooks, Houghton & Company, Inc. Private Corporate Advisors, Inc., and Brooks, Houghton Securities, Inc. against BIG Entertainment, Inc.*, March 17, 2000.

Declaration of David I. Tabak before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* February 21, 2000.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *The Klass Report LLC and Christopher M. Klass against Telemation, Inc.*, December 15, 1999.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* November 26, 1999.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *A.R. DiGima, Inc. vs. A.G. Edwards & Sons, Inc. and Eugene Damico*, November 5, 1999.

Deposition Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, October 22, 1999.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, September 16, 1999.

Expert Report of Frederick C. Dunbar and David I. Tabak before the United States District Court for the Northern District of Alabama, Southern Division in *MedPartners, Inc. v. Dun & Bradstreet, Inc*, July 28, 1999.

Testimony before the International Chamber of Commerce International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, April 13, 1998.

Expert Witness Statement of David I. Tabak before the International Chamber of Commerce, International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, March 13, 1998.

David I. Tabak

## Publications

"Comment: 'A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, December 2009.

"Use and Misuse of Event Studies to Examine Market Efficiency," NERA Working Paper, September 2009.

Book Review of *Business Valuation: In Integrated Theory (Second Edition)* in *Valuation Strategies,* November/December 2008.

Guest Author/Respondent, *BVUpdate*, published by Business Valuation Resources, LLC, *Special Report:* What Will the Wall Street Meltdown Mean to the BV Profession? (with Raymund Wong), November 2008.

"Guideline Companies in Valuation: The Economist's View of the Market Approach," NERA Working Paper, October 2008.

"Inflation and Damages in a Post-*Dura* World," NERA Working Paper, September 2007.

"Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics,"* Volume XIX, Number 2, published March 2007.

"Making Assessments About Materiality Less Subjective Through The Use of Content Analysis," NERA Working Paper, March 2007.

"Risk Disclosures and Damages Measurement in Securities Fraud Cases," published in the *Securities Reform Act Litigation Reporter*, April 2006. Previously published as a NERA Working Paper.

Guest Author/Respondent, *BV Q&A Update*, published by Business Valuation Resources, LLC., January, March, June, and July 2004; February, May, August, and September 2005.

"Loss Causation and Damages in Shareholder Class Actions: When it Takes Two Steps to Tango," in *Securities Litigation & Enforcement Institute 2004,* published by the Practising Law Institute. Previously published as a NERA Working paper.

"The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-On-The-Market Cases" (with Paul A. Ferrillo and Frederick C. Dunbar), *St. John's Law Review,* Winter 2004. Previously published as a working paper by NERA and Weil, Gotshal & Manges, LLP.

"Determination of the Appropriate Event Window Length in Individual Stock Event Studies" (with Dmitry Krivin, Robert Patton, and Erica Rose), NERA Working Paper, November 4, 2003.

"Inflation Methodologies in Securities Fraud Cases: Theory and Practice" (with Chudozie Okongwu), published in *Securities Litigation & Enforcement Institute 2003,* by the Practising Law Institute. Previously published as a NERA Working Paper.

David I. Tabak

"Hedging and the Estimation of Marketability Discounts," in *Shannon Pratt's Business Valuation Update*, published by Business Valuation Resources, LLC, August 2003. (Also reprinted in *BVR's Guide to Discounts for Lack of Marketability*, 2007.)

 "Shareholders' Suit against Corporation," in *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, edited by Jack P. Friedman and Roman L. Weil, published by John Wiley & Sons, Inc., 2003.

"A CAPM-Based Approach to Calculating Illiquidity Discounts," NERA Working Paper, November 2002.

"A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud" (with Svetlana Starykh and Marc Shotland), *Litigation Economics Review*, Vol. 5, No. 2, Winter 2001 (printed July 2002).

"Intraday Trading Rates in Shareholder Class Actions," *NERA Securities and Finance Insights*, June 2002.

"Materiality and Magnitude: Event Studies in the Courtroom" (with Frederick C. Dunbar), *Litigation Services Handbook: The Role of the Financial Expert, Third Edition, 2001*, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, published by John Wiley & Sons, Inc. Previous versions appeared in the 2000 Supplement to the *Litigation Services Handbook* and as a NERA Working Paper.

"Are Investors Signalling You About Your Y2K Risk?" (with Vinita M. Juneja and Denise N. Martin), *Y2K Marketwatch*, December 1999.

"What Does the Market Think About Your Y2K Exposure?" (with Vinita M. Juneja and Denise N. Martin), *Viewpoint*, Issue No. 2, November 1999.

"Economic Analysis and Identification of Class Conflicts in Securities Fraud Litigation," NERA Working Paper, June 1998.

## Selected Presentations

Panelist, Forum for Institutional Investors, sponsored by Bernstein Litowitz Berger & Grossman LLP; New York, NY; October 24, 2008.

Presenter, Office of Litigation Support, Securities and Exchange Commission; Washington, DC; May 20, 2008.

Presenter, IQPC Subprime Litigation Conference; New York, New York; February 27, 2008.

Presenter, IQPC Securities Litigation Conference; New York, New York; May 18, 2007.

Presenter, "Everything You Were Afraid To Know About Experts," Fordham University; January 19, 2006.

David I. Tabak

Presenter, *Eugene P. and Delia S. Murphy Conference on Corporate Law,* Fordham University; November 4, 2005.

Panel Member, *Complex Business Disputes: Attaining a Fair & Appropriate Resolution to Financial Impact*; Columbus Bar Association; Columbus, Ohio; December 13, 2004.

Panel Member, *Directors & Officers Under Fire: Protecting Your Interests in this Hostile Environment*, a Directors Roundtable seminar; Washington, D.C.; June 8, 2004.

Guest Lecturer, Fordham University; New York, New York; March 8, 2004.

Panel Member, Business Valuation Resources audio conference on discounts for lack of marketability; May 14, 2003.

Presenter, *Third Annual Law and Business Conference,* Vanderbilt University Law School, ("Inflation Methodologies in Securities Fraud Cases: Theory and Practice"); March 28, 2003.

Guest Lecturer, Middlebury College; Middlebury, Vermont; January 28, 2003.

Panel Member, *Second Annual Grant & Eisenhofer Institutional Investor Conference;* New York, New York; December 9, 2002.

Guest Speaker, Deutsche Bank institutional investor conference call; November 22, 2002.

Panel Member, *Key Issues Facing Board Members: The Coming Tide in Securities Class Actions,* a Directors Roundtable seminar; Chicago, Illinois; February 22, 2001.

Panel Member, *Securities Litigation: Risk Management and Avoidance, Emerging Challenges for CXOs*, a seminar sponsored by Jones, Day, Reavis and Pogue and PriceWaterhouseCoopers; Reston, Virginia; September 20, 2000.

"When the Litigation Comes In and the Money Goes Out: What Determines Settlement Values?" presented at *Balancing Disclosure and Litigation Risks for Public Companies (or Soon-to-Be Public Companies)*, a seminar sponsored by Alston & Bird and RR Donnelley Financial; Raleigh, North Carolina; November 10, 1999.

December 2009

**Exhibit 2**

**Novatel Wireless, Inc.**

**Materials Considered**

*Pleadings and Opinions in this Matter*

Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification (1/11/10)

Consolidated Complaint for Violation of the Federal Securities Law (1/9/2008)

Declaration of Bjorn I. Steinholt, CFA (1/8/10)

*Academic Literature*

*Reference Manual on Scientific Evidence*, Second Edition, Federal Judicial Center (2000)

       *Reference Guide on Epidemiology,* pp.333-400 of *Reference Manual on Scientific Evidence*

       *Reference Guide on Statistics,* pp.83-178 of *Reference Manual on Scientific Evidence*

*Case Law*

*Castaneda v. Partida*, 430 U.S. 482, 97 S. Ct. 1272 (1977)

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 US 336, 125 S. Ct. 1627 (2005)

*EEOC v. Federal Reserve Bank*, 698 F.2d 633 (4th Cir. 1983)

*Glaser v. Enzo Biochem, Inc.,* 464 F.3d 474 (2006) *WL 2692848* (4th Cir. Sept. 21, 2006)

*Goldkrantz v. Griffin*, 1999 WL 191540 (S.D.N.Y.) (1999), aff'd 201 F.3d 431 (2d Cir. 1999)

*In re American International Group Securities Litigation*, 04 Civ. 8141 (DAB) (February 22, 2010)

*In re Cornerstone Propane Partners L.P. Sec. Litig.*, 355 F.Supp.2d 1069 (N.D. Cal. 2005)

*In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir. 2005)

*In re Worldcom, Inc. Sec. Litig.*, 2005 WL 375314 (S.D.N.Y.) (2005)

*Lentell v. Merrill Lynch & Co.,* No. 03 Civ. 7948, 396 F.3d 161, 2005 WL 107044 (2d Cir. Jan. 20, 2005)

*United States v. Olis*, 429 F.3d 540 (5th Cir, 2005)