UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MAUREEN BACKE, individually and on behalf of all others similarly situated, | ) ) ) | CASE NO. 08-CV-01689-H (RBB) |
| Plaintiff, | ) ) | **REBUTTAL DECLARATION OF BJORN I. STEINHOLT, CFA** |
| vs. | ) ) | |
| NOVATEL WIRELESS, INC.; PETER V. LEPARULO; GEORGE B. WEINERT; ROBERT M. HADLEY; SLIM S. SOUISSI; and CATHERINE F. RATCLIFFE , | ) ) ) ) ) | |
| Defendants. | ) ) | |

## I.     BACKGROUND

1.      On January 8, 2010, I submitted a declaration opining on various economic issues relating to Novatel Wireless, Inc. ("Novatel" or the "Company") common stock traded from February 27, 2007 through November 10, 2008 (the "Class Period") ("Steinholt Decl."). Specifically, I opined that:

- The market for Novatel's common stock during the Class Period was impersonal, open, well-developed, and efficient, in that the market price of the Company's common stock during this time period reflected the publicly available information concerning Novatel.

- The allegedly false and misleading statements contained, or omitted, information that a reasonable investor would have wanted to consider prior to making an investment decision and caused Novatel's common stock to trade at artificially inflated prices during the Class Period.

- When the relevant truth was publicly disclosed, Novatel's stock price declined, causing Class members to suffer economic damages as a result of the alleged fraud.

2.      Plaintiffs' counsel has now asked me to review and respond to a declaration submitted by defendants' expert Dr. David Tabak, dated March 12, 2010 ("Tabak Decl."). In his report, Dr. Tabak only takes issue with one of my many analyses: my analysis of the July 20, 2007 disclosure that Sprint would discontinue further orders for the Company's 720 USB card, and whether it negatively impacted Novatel's stock price. According to Dr. Tabak, the information disclosed on July 20 was immaterial to the market, and caused no losses to any of the Class members. Tabak Decl., ¶¶28, 39. For the many reasons discussed in greater detail below, I strongly disagree. Below, I will also discuss Dr. Tabak's argument that the Court should take the rather unusual step of limiting the Class definition based on my loss-causation

analysis. As explained in greater detail below, it is my opinion that Dr. Tabak's additional limitation is an inappropriate use of my loss-causation analysis. Furthermore, changing the Class definition is unnecessary as it is already limited only to those investors who "were damaged" by the alleged misrepresentations.

## II. IMPACT OF THE JULY 20, 2007 DISCLOSURE ON NOVATEL'S STOCK PRICE

3. Dr. Tabak takes issue with my analysis of whether the July 20, 2007 disclosure that Sprint would discontinue further orders for the Company's 720 USB card negatively impacted Novatel's stock price. In my opinion, the evidence clearly shows that this new information caused Novatel's stock price to decline on July 20, 2007. Dr. Tabak disagrees. In his report, Dr. Tabak ignores evidence, mischaracterizes evidence, and reaches a conclusion by employing an absolute statistical benchmark without explaining why this benchmark equates to plaintiffs' burden of proof in a civil litigation. I strongly disagree with Dr. Tabak's approach and believe his opinion is seriously flawed.

4. Below, I will first review and discuss my comprehensive analysis of the evidence that forms the basis for my opinion that the disclosure that Sprint would discontinue the 720 USB modem caused Novatel's stock price to decline. Next, I will review and discuss Dr. Tabak's limited statistical analysis, his reliance on an absolute statistical benchmark, and explain how he ignores and mischaracterizes the evidence.

### _Analysis of the July 20, 2007 Disclosure_

5. In my opinion, the evidence clearly shows that the July 20, 2007 disclosure revealing that Sprint would discontinue Novatel's 720 USB modem caused the Company's stock price to decline. In forming my opinion, I performed a comprehensive analysis of all the evidence available to me. First, I analyzed the disclosure that Sprint, one of Novatel's key

customers, would discontinue the Company's 720 USB modem from an investor's perspective.[1] As explained in my prior report, "any information that has future cash flow implications would be important to a reasonable investor because changes in future cash flows impact the value of an investment." Steinholt Decl., ¶29. Regarding the July 20 disclosure, I determined that the information disclosed had negative future cash flow implications, explaining that "[t]he foreseeable economic consequence of Sprint discontinuing further orders for the Company's 720 USB card by the end of July 2007 [was] that revenues and earnings from the discontinued orders [would] not materialize, thereby negatively impacting future revenues, earnings and cash flows." Steinholt Decl., ¶30. My conclusion that the July 20 disclosure had negative cash flow implications was consistent with contemporaneous market commentary, including the July 20 downgrade by JMP Securities of Novatel from "market outperform" to "market perform" as a result of this information. Steinholt Decl., Ex. D at 136.

6.   Second, after determining that the information disclosed on July 20 had negative cash flow implications, I analyzed whether the information disclosed on July 20 caused Novatel's stock price to decline. I did not consider whether the information caused a price increase because, as basic financial theory dictates, negative information does not cause positive price increases. Steinholt Decl., ¶29. Consequently, I presented the statistical results using a so-called one-tailed test. Based on this statistical analysis, I determined that the July 20 decline

---

[1]   A key source disseminating this information was the JMP Securities analyst report issued in the morning of July 20, 2007. It stated: "We are reducing our rating on Novatel Wireless from Market Outperform to Market Perform. We have been able to confirm that Sprint is discontinuing the very popular Novatel U720 USB modem as the carrier awaits availability of Novatel's next-generation, small form factor wireless USB solution. Sprint was a 38% customer of Novatel in 2006 and has remained a very significant customer through 1H07. Sources indicate that the U720 end of life could come as early as July 23, and we have already picked up indications that it is harder to find the U720 in Sprint's channel now." Declaration of Douglas R. Britton in Support of Lead Plaintiffs' Reply in Support of Their Motion for Class Certification ("Britton Reply Decl."), Ex. 10.

"was statistically significant at the 90% level of confidence using a one-tailed test." Steinholt Decl., ¶40. This is a factually true statement. I also explicitly explained that a stock price decrease is defined as being statistically significant at the 90% level of confidence if it is greater than 90% of the price decreases in a random sample. Steinholt Decl. at 11 n.13. In other words, there was less than a 10% chance of a day with a price decline equal to or greater than the July 20 decline occurring randomly.

7.      Third, I examined the intra-day trading prices and found that "Novatel's stock price trad[ed] sharply down more than 10% in the early hours on July 20, then rebound[ed] somewhat later in the trading session." Steinholt Decl., ¶40. I attached a graph showing the intra-day trading prices for all of July 20. Steinholt Decl., Ex. I. The graph illustrates that Novatel's stock price declined rapidly, much greater than the daily decline, following the initial revelation regarding Sprint's discontinuation of the Company's 720 USB modem. The graph also shows that there was a partial rebound after a Craig-Hallum analyst report argued that the loss of 720 USB modem sales to Sprint would be replaced so that "there [would] be little or no gap in the sales of the two cards and as a result, no loss of market share."[2] Steinholt Decl., ¶¶39-40. This intra-day trading evidence is consistent with investors viewing the information disclosed on July 20 as material, and consistent with the information impacting Novatel's stock price.

8.      Fourth, I analyzed the reported trading volume on July 20 and found that it was "more than 3.8 times the median volume during the Class Period." Steinholt Decl., ¶40. In fact, the large trading volume on July 20 was greater than 98% of all other trading days during the

---

[2]      According to plaintiffs' allegations, defendants knew that the claim in the Craig-Hallum report that there would be no loss of market share was false. Consequently, the July 20 disclosure represents a partial disclosure of the relevant truth regarding the loss of product sales to Sprint.

Class Period. The reason that the daily trading volume may be important is that large trading volume may indicate whether new, material information is disclosed on a particular day that causes investors to trade. Notably, each of the eight days during the Class Period with greater trading volume than that on July 20 also had new, material information disclosed and statistically significant price movements at the 95% level of confidence.[3] Steinholt Decl., Ex. D. The high trading volume on July 20 is consistent with a large number of investors viewing the information disclosed as material and trading on this information.

9. Fifth, I reviewed contemporaneous securities analyst commentary to gain further understanding of a potential linkage between any new information disclosed and Novatel's stock price. Specifically, the Craig-Hallum analyst report issued during trading on July 20 stated that "NVTL shares were off sharply this morning, we believe in response to a rumor that NVTL may lose market share at Sprint . . . ." Steinholt Decl., ¶¶39-40. In other words, the analyst at Craig-Hallum specifically opined at the time that the information revealing Novatel's loss of Sprint sales negatively impacted the Company's stock price. Based on my experience, such contemporaneous statements by market professionals are very helpful in explaining the likely reasons for specific stock price movements.

10. Sixth, subsequent to my report, I was provided documents produced in discovery. Among other things, I was provided internal e-mails that indicated that Novatel, in the morning of July 20, received numerous calls regarding the JMP analyst report revealing that Sprint would discontinue the 720 USB modem.[4] This is further evidence that at least some investors

---

[3] The eight days with greater trading volume than that on July 20, 2007, during the Class Period were: March 26, 2007; May 2, 2007; July 27, 2007; November 6, 2007; November 15, 2007; February 21, 2008; April 15, 2008; and August 20, 2008.

[4] Britton Reply Decl., Ex. 24 (NOV-E-0579457-58).

considered this news important.  These e-mails also provided evidence that Novatel internally believed that its stock price declined in the morning of July 20 as a result of discontinued Sprint sales, one e-mail stating "we are getting a bit hammered this morning, partially at least on this news [referring to the JMP report]."  Britton Reply Decl., Ex. 24 (NOV-E-0579457-58).  These contemporaneous e-mails provide further evidence that the information disclosed was viewed as important by many investors, and that it negatively impacted Novatel's stock price.

11.     Seventh, subsequent to my report I have also reviewed the report by Dr. Tabak, defendants' expert.  I will discuss the content of Dr. Tabak's report in the next section.  However, it is notable what is not in Dr. Tabak's report.  Dr. Tabak performs no independent statistical analysis.  Instead, Dr. Tabak explicitly accepts "all of the statistical methodology in the Steinholt Declaration."  Tabak Decl. at 5 n.6.  Nor does Dr. Tabak discuss any additional evidence, such as media or analyst commentary or internal documents that could help explain the reasons for the July 20 price decline.  Dr. Tabak's failure to identify and discuss any such evidence further supports my opinion that the information disclosed caused Novatel's stock price to decline.

12.     Based on the above evidence, including the evidence I obtained following my initial report, it is my opinion that the July 20 disclosure that Sprint would discontinue the 720 USB modem caused Novatel's stock price to decline.  In fact, I find it highly unlikely that: a) investors would not consider the discontinuation of Novatel's 720 USB modem by Sprint (a key customer) material, b) the large decline in Novatel's stock price (only 10% chance of occurring randomly) was just a random event, c) the large decline in Novatel's intra-day stock price (greater than 98% of the other intra-day declines during Class Period) was just a random event, d) the large reported trading volume in Novatel's stock (also greater than 98% of the daily trading volumes on other days during the Class Period) was just a random event, e) the

contemporaneous Craig-Hallum analyst report just happened to erroneously attribute Novatel's stock price decline to the Sprint discontinuation of the 720 USB modem, and that f) internally Novatel just happened to erroneously attribute its stock price decline to the Sprint discontinuation of the 720 USB modem.

### *Dr. Tabak's Analysis*

13.     According to Dr. Tabak, the information disclosed on July 20 was immaterial to the market, and caused no losses to any of the Class members.  Specifically, he states that the evidence "affirmatively refutes the claim that the news on [July 20] was material to the market," and that "there is no statistical basis for claiming loss causation for any stock price decline on July 20, 2007."  Tabak Decl., ¶¶28, 39.  Dr. Tabak does not provide his own independent analysis of the evidence to determine whether the information disclosed on July 20, 2007, caused Novatel's stock price to decline.  Instead, he ignores evidence, mischaracterizes evidence, and reaches his conclusion by employing an absolute statistical benchmark without explaining why this benchmark equates to plaintiffs' burden of proof in a civil litigation.  Below I will address the many flaws in Dr. Tabak's report.

Ignoring Evidence:

14.     Dr. Tabak ignores much of the evidence relating to Novatel's July 20, 2007 price decline.  Although Dr. Tabak opines that the information disclosed on July 20 was immaterial, he never even once mentions in his report what the information disclosed was.  He ignores my economic assessment that this information would have been important to investors because losing the Sprint sales had negative future cash flow implications.  He ignores the JMP analyst report viewing the information important enough to downgrade their rating on Novatel.  He ignores Craig-Hallum also viewing the information material enough to comment on, and attributing the decline in Novatel's stock price to this information.  He ignores Novatel's large

trading volume (greater than 98% of the daily volumes on the other days during the Class Period) and the likelihood that the large volume was a result of new, material information causing investors to trade more frequently.  Instead, Dr. Tabak focuses exclusively on the price decline in Novatel's stock, and his view that it is plaintiffs' burden to prove loss causation solely based on the magnitude of this price decline at a 95% level of confidence.

Benefits of Statistics:

15.     Given that Dr. Tabak's entire argument is based on statistics, I will provide some background on the benefits of statistics and also discuss potential dangers when the meaning of the statistical data is not fully explained.  Statistics can provide an objective context to evidence that otherwise may be rather subjective.  For example, how tall is tall?  Instead of simply describing a person as tall, statistics can provide a more objective description, for example: taller than 90% of the overall population, or taller than 99% of the overall population.  Now, one could define "tall" to mean a person that is taller than 95% of the overall population.  This, of course, limits the description to only two possibilities, either the person is tall, or the person is not tall.  It also means that two individuals of almost the same height are classified differently if one is slightly below the 95% benchmark while the other slightly above.  That is why it is often beneficial to simply explain the statistical evidence without limiting it to a binary result based on an absolute benchmark.

16.     The statistical evidence provided by my event study has some similarities to the above example.  Instead of height, my study focuses on Novatel's daily stock price changes after adjusting for market factors.  These daily stock price changes are then compared to the price changes during a control period, a period of normal returns (similar to comparing result to an overall population in the above example).  A stock price increase (or decrease) is then defined as being statistically significant at the 90%, 95% or 99% level of confidence if it is greater than

90%, 95% or 99% of the price increases (or decreases) in a random sample, respectively, after adjusting for market factors.  Steinholt Decl. at 11, n.13.

17.     It is true that statistical significance can be defined solely by using an absolute benchmark, for example the 95% level of confidence.  However, doing so in a legal proceeding may improperly imply that the 95% confidence level equates to plaintiffs' burden of proof in civil litigations.  It also limits the entire statistical analysis to a binary result, either the absolute benchmark is met or it is not.  In other words, if Novatel's stock price decline is one penny more than the benchmark then it is statistically significant (material), while if it declined one penny less it is not (immaterial).  The fact is that there should be little difference in the interpretation of these two declines given that they have virtually the same magnitude.  In my report, I used a different approach.  I simply explained the meaning of the statistical results on which I based my opinions.  This also enables the statistical evidence to be properly considered in combination with other evidence, thereby arriving at a more informed conclusion.  It also provides the finder of fact with a better ability to evaluate the basis for the opinions provided by the experts.

Dr. Tabak's use of an Absolute Benchmark:

18.     Dr. Tabak uses the 95% confidence level as an absolute benchmark to assess materiality.[5]  His reasoning appears to be that the 95% benchmark is more often used than the 90% or 99% threshold.  However, he fails to explain the more relevant issue of why his 95% benchmark equates to a plaintiff's burden of proof in a civil litigation.  If the 95% benchmark truly does represent a plaintiff's legal burden of proof, then Dr. Tabak's approach makes sense.  If it does not, my approach of not using an absolute benchmark, instead clearly stating the level

---

[5]     Interestingly, Dr. Tabak takes issue with my terminology characterizing statistical significance at a particular % confidence level, for example the "95% level of confidence." Tabak Decl., ¶12.  Ironically, in the published article quoted below co-authored by him, Dr. Tabak uses the identical terminology.

of significance and explaining its meaning, is the appropriate approach as it conveys much more relevant information and enables the results to be considered in combination with all the other economic evidence in the case. According to an article co-authored by Dr. Tabak, the 95% confidence level does not equate to a plaintiff's legal burden of proof in civil litigations. The article states:

> It is not clear what level of statistical significance corresponds to a legal definition of materiality. As Mitchell and Netter point out, the 95 percent confidence level is commonly used, while the 90 percent and 99 percent levels are also options. **There is no definitive case law on how statistical confidence levels relate to burden of proof in civil (or criminal) litigation.** [6]
> (Emphasis added.)

19. Still, Dr. Tabak is steadfast in his opinion in this case that the statistical analysis of the daily price return on July 20, by not meeting his absolute benchmark of a 95% confidence level, "affirmatively refutes the claim that the news released on that date was material to the market." Tabak Decl., ¶28. Dr. Tabak is incorrect. Not meeting his 95% benchmark does not mean that the market viewed the new information disclosed as immaterial. Furthermore, by limiting the statistical analysis to a binary result (either meeting the 95% absolute benchmark or not), Dr. Tabak also limits the informational value of the statistical analysis and the ability to consider the analysis in combination with all the available evidence.

Appropriate Use of One-Tailed Test:

20. Dr. Tabak takes issue with my factually true statement that Novatel's July 20, 2007 price decline was "statistically significant at the 90% level of confidence using a one-tailed test." Steinholt Decl., ¶40. For the record, I also explicitly explained that a stock price decrease is defined as being statistically significant at the 90% level of confidence if it is greater than 90%

---

[6] David I. Tabak & Fredrick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert*, at 19-9 (3d ed. 2001).

of the price decreases in a random sample. Steinholt Decl. at 11 n.13. Furthermore, a one tailed-test was appropriate in this case because I was only interested in whether there was a price decline (not a price increase) given that the information disclosed had negative future cash flow implications and, therefore, could not have caused a price increase. Steinholt Decl., ¶¶29-30. While Dr. Tabak quotes the *Reference Guide on Statistics*, he fails to quote the two paragraphs in the *Guide* that specifically cover the issue of using a one-tailed test versus a two-tailed test. It explains that the difference he complains about is "largely illusory."[7] It states:[8]

> In many cases, a statistical test can be done either one-tailed or two-tailed. The second method will produce a *p*-value twice as big as the first method. Since small *p*-values are evidence against the null hypothesis, a one-tailed test seems to produce stronger evidence than a two-tailed test. However, **this difference is largely illusory.**
>
> Some courts have expressed a preference for two-tailed tests, but a rigid rule is not required if *p*-values and significance levels are used as clues rather than as mechanical rules for statistical proof. One-tailed tests make it easier to reach a threshold like .05, but **if .05 is not used as a magic line, then the choice between one tail and two is less important – as long as the choice and its effect on the *p*-value are made explicit.**
> (Emphasis added.)

21. Dr. Tabak then grossly mischaracterizes my analysis, stating that I somehow "changed" my analysis from a two-tailed test to a one-tailed test when analyzing the July 20, 2007 price decline, thereby implying that I was improperly presenting my statistical results. Tabak Decl., ¶24. This is false. First, nowhere in my report do I state that a two-tailed test was used when presenting the statistics for the other price declines. Frankly, for all of the other price

---

[7]     Instead, Dr. Tabak uses an entire page to selectively quote from a 26-year old Fourth Circuit Court decision regarding a discrimination case without even disclosing what type of data was being analyzed, or explaining how the facts of the discrimination case relate to the facts of this securities fraud case.

[8]     The *Reference Guide on Statistics* is part of the *Reference Manual on Scientific Evidence*, 2nd ed., published by the Federal Judicial Center 2000, pages 126-27.

declines and price increases it did not matter whether a two-tailed or one-tailed test was used. Second, unlike Dr. Tabak, I did not base my analysis on an absolute benchmark, or a "magic line." Rather, if the price decline (or increase) was statistically significant at the 99% level of confidence, that was how I characterized it in my report. The same was true if the price decline (or increase) was statistically significant at a lower level. One important benefit of characterizing the statistical results as they are and explaining their meaning, as opposed to just reporting whether they meet an assumed absolute benchmark or "magic line," is that it gives the finder of fact the informational power to more adequately assess the basis of the expert's opinion.

22.     Finally, Dr. Tabak provides the generic argument for using a two-tailed test, but fails to do any analysis of whether this generic argument holds true in this particular case. This is a fatal mistake. The generic argument is that a two-tailed test should be used when "news can be either better or worse than expected." Tabak Decl., ¶24. The real issue, however, is whether the new information relating to Sprint discontinuing Novatel's 720 USB modem in this case could possibly be interpreted by the market as "better . . . than expected" information? Dr. Tabak never analyzes this issue, he simply assumes that it could. Of course, the July 20 disclosure regarding Sprint discontinuing Novatel's 720 USB modem was new, negative information, and, therefore, could only have had a negative impact on Novatel's stock, not a positive one. Consequently, the very premise of Dr. Tabak's criticism is erroneous.

Dr. Tabak's Failure to "Explain Away" the Initial 11.6% Intra-day Price Decline:

23.     The initial 11.6% intra-day decline in Novatel's stock price is important because it better reflects the impact of the initial information that Sprint would discontinue the Company's 720 USB modem, while the total 4.7% decline for the day also includes the partial rebound following Craig-Hallum arguing that the lost sales would be replaced and not result in

loss of market share.[9]  When I wrote my report, I believed that the unusual nature of the initial 11.6% decline, almost 2.5 times larger than the daily decline, was fairly self evident.  However, Dr. Tabak disputes this, at least partially, so I will examine it below.

24.     Dr. Tabak first argues that the 11.6% decline may not be statistically significant at standard analyses and, if so, there would be no basis for finding loss causation.  Tabak Decl., ¶30.  Of course, as a statistician, Dr. Tabak could independently analyze the evidence himself, and then draw his own conclusion whether the 11.6% decline was significant at whatever levels he deems appropriate.  Dr. Tabak fails to do so.  Using the low price/value for both Novatel and the index, and using the same methodology I used previously (and Dr. Tabak accepted), Novatel's 11.6% intra-day stock price decline ends up being statistically significant at the 99% level of confidence.[10]

25.     Recognizing that the initial price decline was statistically "unusual," Dr. Tabak's second argument is that: "even if the intraday price movement was statistically unusual, the purported reason for the rebound, that an analyst 'argued that this decline [in the stock price] represented a buying opportunity' should best be interpreted as a market participant arguing that the initial price decline was too large." [11]  Tabak Decl., ¶32.  Of course, this would mean that the market found the initial information material, that this information caused the initial decline in Novatel's stock price, and, therefore, that the information also caused potential economic losses

---

[9]     In my prior report I stated that the intra-day price decline was greater than 10%.  In this section, I go into greater detail and use the exact intra-day decline of 11.6%.

[10]    This is also true if the regression is re-run using the maximum intra-day declines for both Novatel and the index.

[11]    It should be noted that the Craig-Hallum report did not simply argue that the price decline was "too large" as Dr. Tabak claims.  The report argued that the lost Sprint sales would be replaced and that, therefore, Novatel would not lose market share.  Steinholt Decl., ¶39.

to investors who sold their shares on July 20 at prices down as much as 11.6%. In other words, the logical implication of Dr. Tabak's most likely scenario is that the information regarding Sprint discontinuing Novatel's 720 USB card was viewed as material by the market, caused Novatel's stock price to decline, and thereby caused Class members to suffer economic losses.

Conclusion:

26.     As discussed above, Dr. Tabak does not identify any additional relevant evidence that would be useful when analyzing the July 20, 2007 disclosure. He does not provide his own, independent analysis of Novatel's July 20, 2007 stock price decline. His discussion ignores much of the relevant evidence, instead focusing almost exclusively on the magnitude of decline in Novatel's stock price on July 20. As a result, his opinion rests on his use of the 95% confidence level as an absolute benchmark for assessing materiality, but he never explains or provides any evidence supporting the notion that his benchmark equates to plaintiffs' burden of proof in a civil litigation. In fact, his prior writings contradict his use of the 95% level as an absolute benchmark for this purpose. When discussing the difference between a one-tailed and two-tailed test, Dr. Tabak grossly mischaracterizes my analysis, opting to selectively quote a 26-year old court decision in a discrimination case rather than the more relevant *Reference Guide on Statistics* that explains the validity of my approach. Finally, in an attempt to "explain away" the initial 11.6% price decline, Dr. Tabak effectively concedes that, under the most likely explanation of Novatel's stock price decline, the new information disclosed was material to the market, it caused Novatel's stock price to decline, and, as a result, caused economic losses to Class members. Consequently, the report by Dr. Tabak does not change my loss-causation opinion regarding Novatel's July 20, 2007 stock price decline.

### III.    NOVATEL CLASS DEFINITION

27.     In his report, Dr. Tabak argues that the Court should take the rather unusual step of limiting the Class definition in this case based on my loss-causation analysis.  In my opinion, this is an inappropriate use of my loss-causation analysis as it goes beyond its intended purpose. My loss-causation analysis focused on the existence of damages.  It is not the comprehensive damage analysis that plaintiffs intend to ultimately present at trial based on a full understanding of the entire factual record.  Dr. Tabak's proposed Class limitations would effectively convert my loss-causation analysis into plaintiffs' "best-case" future damages analysis.  Such a limitation, in my opinion, would be unfair to plaintiffs.  Not surprisingly, no court that I am aware of has adopted this approach, nor does Dr. Tabak identify any court that has done so.[12] Below I will further explain the difference between a loss causation analysis and a comprehensive damage analysis presented at trial based on a full understanding of the factual record.

28.     My loss-causation analysis focused on "whether the alleged misrepresentations in this case contained, or omitted, important information that a reasonable investor would have wanted to consider prior to making an investment decision, and whether the alleged misrepresentations caused economic losses to investors who purchased Novatel common stock during the Class Period."  Steinholt Decl., ¶4.  As part of my analysis, I analyzed the materiality of the alleged misrepresentations.  Steinholt Decl., ¶¶30-36.  Then I examined the possible price declines in Novatel's stock price when the relevant truth relating to the alleged

---

[12]    The argument, however, is not new to me.  The same argument was unsuccessfully advanced by defendants in the *HealthSouth Securities Litigation*, a case where I was the opposing loss-causation expert on behalf of plaintiffs.

misrepresentations was disclosed.[13]  Steinholt Decl., ¶¶39-53.  The purpose of my analysis was to examine the existence of damages relating to the alleged misrepresentations suffered by Class members.

29.     Dr. Tabak argues that my loss-causation analysis should be used to define the Class in this case.   Such a limitation would effectively convert my loss-causation analysis into plaintiffs' "best-case" future damage analysis.  For example, plaintiffs would be precluded from including Novatel's statistically significant price decline following the 2Q07 earnings announcement regardless of what the factual evidence ultimately shows.  Similarly, plaintiffs would be precluded from presenting a leakage analysis, the very type of analysis that was accepted by the jury in the most recent securities class action trial – the *Household Securities Litigation* – even if the ultimate factual record would support such an analysis.  My loss-causation analysis was not intended to resolve all outstanding damages issues in this litigation.  Consequently, limiting plaintiffs' recoverable damages at this time based on my loss-causation analysis is improper.  Importantly, the limitations proposed by Dr. Tabak are not necessary because the Class definition in this case is already limited only to those investors who "were damaged" by the alleged misrepresentations.  In my opinion, Dr. Tabak's proposed limitations would unfairly restrict plaintiffs' ability to put together their best damage analysis later based on a complete understanding of the factual record.

---

[13]     Dr. Tabak finds it "[n]otabl[e]" that I use the term "the relevant truth," and suggests that I use this terminology to differentiate it from "some of the relevant truth."  Tabak Decl., ¶9.  Dr. Tabak is incorrect.  I did not (do not) intend to make such a distinction, it simply is not relevant for my purposes at this time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 9th day of April, 2010, in San Diego, California.

Respectfully submitted,

_____
BJORN I. STEINHOLT, CFA

1

<u>CERTIFICATE OF SERVICE</u>

2         I hereby certify that on April 9, 2010, I electronically filed the foregoing with the Clerk of the

3   Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

4   denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

5   foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6   indicated on the attached Manual Notice List.

7         I certify under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.  Executed on April 9, 2010.

9

10                           s/ DOUGLAS R. BRITTON
                        DOUGLAS R. BRITTON

11                           ROBBINS GELLER RUDMAN
                            &DOWD LLP

12                           655 West Broadway, Suite 1900
                        San Diego, CA  92101-3301

13                           Telephone:  619/231-1058
                        619/231-7423 (fax)

14

15                           E-mail:dougb@rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:08-cv-01689-H -RBB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Travis Biffar**
  tbiffar@jonesday.com,fswallace@jonesday.com

- **Robert S Brewer , Jr**
  rsbrewer@jonesday.com,pwalter@jonesday.com

- **Douglas R Britton**
  DougB@rgrdlaw.com,jillk@rgrdlaw.com,ldeem@rgrdlaw.com

- **Michael I. Fistel , Jr**
  mfistel@holzerlaw.com,dhotnog@holzerlaw.com

- **Michael M Goldberg**
  mgoldberg@glancylaw.com,info@glancylaw.com

- **Sabrina S. Kim**
  skim@milberg.com,mbowman@milberg.com,cchaffins@milberg.com

- **Eric Landau**
  elandau@jonesday.com,kamarkwick@jonesday.com

- **Coty Rae Miller**
  cmiller@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Matthew P Montgomery**
  e_file_sd@rgrdlaw.com

- **Eric I Niehaus**
  EricN@rgrdlaw.com,e_file_sd@rgrdlaw.com,ericniehaus@hotmail.com

- **Lucas F. Olts**
  lolts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Cary D Sullivan**
  carysullivan@jonesday.com,kamarkwick@jonesday.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Patricia J. Villareal**
Jones Day
2727 North Harwood Street
Dallas, TX 75201

- 19 -