EXHIBIT "A"

1

2

3

4

5

6

7

8

9          UNITED STATES DISTRICT COURT

           SOUTHERN DISTRICT OF CALIFORNIA
10

11  In re NOVATEL WIRELESS SECURITIES    )   Lead Case No. 08-CV-01689-H(RBB)
    LITIGATION                           )
12  _____)   CLASS ACTION
                                         )
13  This Document Relates To:            )   EXPERT REPORT OF PROFESSOR M.
                                         )   TODD HENDERSON
        ALL ACTIONS.                     )
14  _____)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    Introduction

## A.    Scope of Engagement and Report

Robbins Geller Rudman & Dowd LLP retained me to render expert opinions on behalf of the members of the above-noted class action. My opinions will primarily address Rule 10b5-1 Sales Plans ("10b5-1 Plans") and Defendants' use of purported 10b5-1 plans during the time of the Class Period in this case.[1]  My opinions are based on: (a) a review of the documents in this case; (b) my experience as a management consultant at McKinsey & Company advising companies, and especially telecommunications and high-tech companies, on corporate policies, including executive compensation and governance; (c) my experience as an academic consultant to companies on the same matters; (d) my extensive empirical research on thousands of Rule 10b5-1 trading plans used at thousands of American companies over the past decade; and (e) my expertise in the areas of executive compensation, insider trading, corporate governance, and other business-law areas raised in this case.

In particular, I will show in this Report:

1.    Rule 10b5-1 trading plans were intended to provide executives with the ability to trade for diversification reasons and not on the basis of material, nonpublic information;

2.    All that a Rule 10b5-1 plan does is to move the date on which the question about what information the insider possessed from the date of the trade to the date when the trade was planned using a 10b5-1 plan;

3.    There are seven hallmarks of a plan that is benign (that is, for random diversification trades) and consistent with best practices:

(a)    a significant time lag between adoption and first trade;

(b)    regularly scheduled trades;

(c)    sales over long periods of time;

---

[1]    I use the term "purported 10b5-1 plans" because the plans used by Defendants do not comply with the terms or requirements of Rule 10b5-1, and therefore are not valid 10b5-1 plans.

**EXHIBIT A
PAGE 3**

1    (d)    sales of relatively consistent size and relatively small amounts compared with

2    overall share holdings;

3    (e)    sales at a range of stock prices;

4    (f)    no changes or cancellations of plans; and

5    (g)    a high level of board and general counsel involvement in adoption, alteration,

6    and termination decisions.

7    4.    Defendants' plans (or amended plans) contained few or none of these hallmarks, and

8    therefore are not consistent in any way with best practices, and are, in fact, consistent with plans

9    from my empirical research in which insiders earned large abnormal returns based on inside

10    information;

11    5.    Empirical research shows insiders systematically abuse the Rule by using it to shield

12    trades based on material, nonpublic information; and

13    6.    The characteristics of Defendants' trades under their plans are consistent with plans

14    that this empirical research shows are abusing the Rule and are based on material, nonpublic

15    information.

16    *    *    *

17    The Report is organized as follows: the remainder of this section sets forth my qualifications,

18    my prior work as an expert witness, my publications over the past ten years, my compensation

19    agreement, the basis for my opinion, and the documents considered in rendering it. Section II

20    describes what a Rule 10b5-1 sales plan is and what its purpose is. Section III describes the proper

21    and improper use of a 10b5-1 plan. Section IV provides my analysis of why I believe Defendants'

22    use of 10b5-1 Plans in this case was not proper. Section V sets forth my conclusions based on the

23    evidence I reviewed to date.

24    **B.    Summary of Qualifications**

25    I, M. Todd Henderson, am a Professor of Law at the University of Chicago Law School. I

26    have taught at the Law School since 2004. I have taught and teach the following courses: Corporate

27    Law, Mergers & Acquisitions, Securities Regulation, a seminar on executive compensation,

28    Derivatives (including the pricing and other issues surrounding stock options), and other business-

law courses.  I have also taught and teach at the University of Chicago Graduate School of Business "Directors' Consortium" executive education program for corporate directors, on subjects such as corporate governance and executive compensation.  In addition, I have taught at a program for financial analysts and financial planners for the Investment Management Consultants Association on the subject of executive compensation, especially issues involving stock options and Rule 10b5-1 Plans.

Prior to becoming a corporate law academic, from 2001 to 2004, I was a management consultant for McKinsey & Company, where I worked with companies of all sizes on business and regulatory strategy, corporate governance, and other high-level management issues.  During this time, I presented numerous reports on corporate governance, executive compensation, and strategy to corporate management and boards of directors.  My specialty was working with telecommunications and high-tech companies, including numerous providers of technology similar to that made and sold by Novatel.  I continue to work as a consultant to some of the companies that I served while employed at McKinsey.

Before working at McKinsey, from 1999 to 2001, I worked at Kirkland & Ellis in Washington, D.C.  At Kirkland, I counseled clients in regulatory issues, practicing primarily before the SEC and FCC.  I served as regulatory counsel for the IPO of telecommunications and technology firms, handling issues from early financing stages through a final equity offering.  As at McKinsey, my specialty was in telecommunications and high tech.

Over the past five years while teaching at the University of Chicago Law School, I have advised numerous investors and corporate clients on a range of corporate law, governance, and executive compensation-related topics.

I was recently named the Roger J. Traynor Summer Professor in Corporate Law at the University of California, Hastings School of Law and Fresco Chair in Corporate Law at the University of Genoa in Italy, where I will be a visiting scholar on issues of executive compensation.

I have a J.D. with high honors from the University of Chicago Law School (1998), and a B.S.E. in engineering with honors from Princeton University (1993).  I am a member of the

EXHIBIT A
PAGE 5

1    Maryland Bar (inactive due to my academic status and the fact that I no longer represent clients) and

2    numerous federal district and appellate courts. My résumé is attached as Exhibit 1.

3    **C.**      **Prior Expert Opinions, Testimony, and Depositions**

4    I have served as an expert witness in four other cases during my time as a legal academic.

5    (1)     Year: 2007

6    Case: *CareerBuilder.com v. Stirling Bridge Corp.*
     Court: Arbitration of state-law claims
7    Location: Chicago, IL
     Role: Expert witness on piercing the corporate veil for plaintiff (represented by
8    Latham & Watkins)

9    (2)     Year: 2008-present

10    Case: *CDX v. Venrock*
     Court: United States District Court, Northern District of Illinois
11    Location: Chicago, IL
     Role: Expert witness on corporate governance for plaintiff (represented by McBreen
12    & Kopko)

13    (3)     Year: 2009

14    Case: *Reuter v. Advance America, Cash Advance Centers of Florida, Inc.*
     Court: Florida State Court (Circuit Court of the Fifteenth Judicial Circuit in and for
15    Palm Beach County, Florida)
     Location: Palm Beach, FL
16    Role: Expert witness on law and economics for defendants (represented by Buckley
     Sandler LLP)
17

18    (4)     Year: 2009

     Case: *Patterson v. iPCS, Inc.*
19    Court: Illinois State Court (Circuit Court of Cook County – Chancery Division)
     Location: Chicago, IL
20    Role: Expert witness on corporate governance and telecommunications industry best
     practices for plaintiffs (represented by Mayer Brown LLP)
21

22    In addition, I have authored, co-authored, or signed several *amici* briefs, including in the

23    matter SEC v. Cuban (on behalf of defendant) and Kirschner v KPMG (on behalf of defendant).

     **D.**      **All Publications**
24

25    I have written on a variety of corporate law topics related to the issues raised in this

26    litigation. Example papers include: Strategic Disclosure of Rule 10b5-1 Plans (in review at Journal

     of Legal Studies); Insider Trading and CEO Pay (Vanderbilt Law Review, forthcoming 2011);
27

28

Paying CEOs in Bankruptcy: Executive Compensation When Agency Costs are Low (Northwestern Law Review, 2007).

My complete list of publications is as follows:

**Book Chapters**

"Everything Old Is New Again: Lessons from *Dodge v. Ford Motor Company*," In Corporate Law Stories, Foundation (2009)

"Insider Trading and Executive Compensation: What We Can Learn from the Experience with Rule 10b5-1," In *Executive Pay Handbook*, Edgar Elgar, forthcoming

**Journal Articles**

"Insider Trading and CEO Pay," *Vanderbilt Law Review*, forthcoming 2011

"Strategic Disclosure of Rule 10b5-1 Trading Plans," under review at the *Journal of Legal Studies* (with Alan Jagolinzer and Karl Muller)

"Do Accounting Rules Matter: The Dangerous Allure of Mark to Market," *Journal of Corporation Law* (with Richard Epstein), forthcoming 2011

"Justifying Jones," 77 *University of Chicago Law Review* 1027 (2010)

"Predicting Crime," 52 *Arizona Law Review* 15 (2010)

"Credit Derivatives Are Not 'Insurance'," 16 *Connecticut Insurance Law Journal* 1 (2009)

"The Nanny Corporation," 76 *University of Chicago Law Review* 1517 (2009)

"Introduction to *The Going Private Phenomenon*: *Causes and Implications*," 76 *University of Chicago Law Review* 1 (2009) (with Richard Epstein)

"The Impotence of Delaware's Taxes: A Response to Barzuza's Delaware's Compensation," 95 *Virginia Law Review In Brief* 49 (2009)

"Corporate Philanthropy and the Market for Altruism," 109(5) *Columbia Law Review* 571 (2009) (with Anup Malani)

"One Hat Too Many? Investment Desegregation in Private Equity," 76(1) *University of Chicago Law Review* 45 (2009) (with William Birdthistle)

"Two Visions of Corporate Law," 77(3) *George Washington Law Review* 708 (2009)

"Citing Fiction," 11 *Green Bag* 2nd (2008)

"From 'Seriatim' to Consensus and Back Again: A Theory of Dissent," *Supreme Court Review* (2008)

"Other People's Money," 60 *Stanford Law Review* (2008) (with Douglas Baird)

"Deconstructing Duff and Phelps," 74 *University of Chicago Law Review* 1739 (2007) (Special Issue: Commemorating Twenty-Five Years of Judge Richard A. Posner)

"Paying CEOs in Bankruptcy: Executive Compensation When Agency Costs Are Low," 101 *Northwestern University Law Review* 1543 (2007)

"Prediction Markets for Corporate Governance," 82 *University of Notre Dame Law Review* 1343 (2007) (with Michael Abramowicz)

"Corporate Heroin: A Defense of Perks, Executive Loans, and Conspicuous Consumption," 93 *Georgetown Law Journal* 1835 (2005) (with James C. Spindler)

"The Influence of F. A. Hayek on Law: An Empirical Analysis," *NYU Journal of Law and Liberty* (2005)

**Newspaper Articles**

"Capitalism 2.0," *Forbes.com*, March 10, 2008 (with Anup Malani)

**E.     Compensation Agreement**

My professional billing rate is $500 per hour. In accordance with the ethics of the legal profession, my fees for preparing this Report and testifying in this case are not contingent on the outcome of the proceedings or on the opinion presented herein. The opinions in this Report are my own.

**F.     Basis of Opinion**

As noted above, my opinion is based on my practical experience advising companies on issues of governance and executive compensation, both prior to and as a part of my current employment, on my extensive research on the use of 10b5-1 Plans, and on my knowledge and expertise on executive compensation and insider trading generally as part of my work as a teacher and scholar.

Based on my training and experience, I am deeply familiar with issues of executive compensation, Rule 10b5-1 trading plans, corporate finance, securities regulation, and the proper conduct of directors and officers in firms of all sizes. I believe that my practical and academic experience makes me qualified to render an expert opinion on the issues raised by this litigation.

I have set forth in this Report a summary of the testimony I expect to provide during a deposition and at trial. This Report does not provide a verbatim account of every detail of my expected testimony, and I may address additional topics in response to arguments or assertions offered by Defendants or their experts during the course of the proceedings.

**G.    Documents Considered**

In order to prepare this report, I requested that Robbins Geller Rudman & Dowd LLP provide me with access to documents and deposition testimony in connection with this litigation. I was given online access to all documents in the case via a secure web site. I conducted a detailed review and analysis of this material, focusing primarily on the insider trading and Rule 10b5-1 trading plan issues raised throughout. In reviewing this material and reaching the opinions outlined herein, I applied my experience as a practicing lawyer, management consultant, and executive compensation consultant, as well as my expertise in corporate and securities law developed as a professor of corporate law, securities law, and executive compensation at the University of Chicago Law School.

Specifically, I reviewed:

(1)    The Operative Complaint;

(2)    Defendants' Answer;

(3)    Defendants' answers to interrogatories;

(4)    Defendants' Rule 10b5-1 trading plans and amendments;

(5)    All Form 4 and 8-K filings made by Defendants over the period 2004 to 2010;

(6)    Relevant minutes of the Compensation Committee of the Board of Directors of Novatel (*e.g.*, May 17 and June 12, 2006);

(7)    Novatel's insider trading policy (dated July 20, 2006);

(8)    All documents produced in discovery cited by Plaintiffs and Defendants in their court filings;

(9)    A sample of all documents produced in discovery based on searches of the online dataroom for documents related to insider trading, Rule 10b5-1 trading plans, and other information pertaining to the issues discussed in my report.

**H.    Overview**

My report concludes that Defendants did not properly use Rule 10b5-1 to make trades during the Class Period. The Rule was intended to allow executives to trade for diversification purposes when they had no superior knowledge of the future stock price. Although Defendants claimed in their filings with the SEC that this was the purpose of their plans, it is my opinion that this was not

the case, but rather their plans were used to try to shield informed trades from scrutiny by prosecutors or shareholders. At the very least, Defendants' plans have all the hallmarks of improperly used plans, and none of the ones used for benign, diversification trades. Furthermore, the behavior of Defendants and their use of Rule 10b5-1 before and during the Class Period are consistent with the behavior of executives in other cases in which, according to my empirical research, the Rule was abused to allow insiders to trade based on inside information.

## II.      What Is a Rule 10b5-1 Sales Plan and What Is the Purpose of a 10b5-1 Plan?

### A.      Summary

In October 2000, the Securities Exchange and Commission promulgated Rule 10b5-1, which established a safe harbor from insider trading allegations for firm insiders who precommit to stock trades when they do not have material, nonpublic information, even if they have such information when the trades execute.[2] The intent of the Rule was to provide insiders additional opportunities for uninformed, diversification trades. The way the Rule tried to do this is by broadening the times when insiders could trade by moving the inquiry into the possession of inside information from the time of the trade to the time when the trade was planned. This is all the Rule does – it changes the date of the insider-trading inquiry; it doesn't alleviate the need for the inquiry. Stated differently: plans do not insulate trades, they merely change the time when the insider-trading analysis is performed. So if on January 1 an insider with no informational advantage plans trades for June 1, the trades may safely execute on that day, even if the insider comes into possession of material, nonpublic information on May 31. In the absence of a plan, such a trade – planned and executed on June 1 – could not legally happen. Obviously, if the plan is entered into on May 31 instead of January 1, the law asks what the insider knew on May 31, and, in this case, the trade would be illegal.

---

[2]      *See* 17 CFR §2401.10b5-1.

**B.     Before the Rule**

The SEC established 10b5-1 Plans as a defense to allegations of illegal insider trading after it adopted a broad interpretation of the "on the basis of" language in Rule 10b-5.[3]  Until this time, the SEC's position was the disclose-or-abstain rule, which was a de facto rule of mandatory abstention for insiders in possession of material information unknown to outsiders.[4]  Mandatory abstention from trading is undoubtedly overinclusive. A rule of this nature would unnecessarily deter insiders from making trades even at times when insiders do not have inside information or are not using it to inform a trading decision.  As a result, firms will face additional costs from having to compensate managers for bearing more firm-specific risk.

Some courts recognized this problem, and accepted an "I-would-have-traded-anyway" defense. In SEC v. Adler, the Eleventh Circuit held that the government had to prove not only that an insider "possessed" inside information at the time of trading, but also the insider "used" the information to make the trading decision.[5]  The prototypical case was an insider claiming she planned to make a trade on the date in question some time before when she did not possess inside information, and the possession of inside information at the time was purely an unfortunate and

---

[3]     Rule 10b-5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   a.     To employ any device, scheme, or artifice to defraud,

   b.     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   c.     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

[4]     The other option, disclosure, is unavailable since the information is likely unknown to outsiders for a (corporate) reason. Taking the information for personal use would be both a violation of an insider's fiduciary duties (to not profit against the corporation or its shareholders) and, according to the SEC, unfair to market traders outside of the firm, and thus degrading of the public's confidence in public securities markets.

[5]     137 F.3d 1325 (11th Cir. 1998).  The Ninth Circuit adopted the same "use" standard in *United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998).

unintended coincidence.  These cases routinely include a reason for the planned sale, such as the expiration of a mandatory holding period following an IPO or other transaction, or in order to pay extraordinary expenses.  The SEC, supported by other circuit courts, continued to claim the statute banned trading while merely in "possession" of inside information, and its burden was only to show this.[6]

With Rule 10b5-1, the SEC formally codified the "knowing possession" standard, making federal prosecutions of insider trading significantly easier.  Recognizing this tightening of the legal standard put even more pressure on executives trying to execute uninformed diversification trades, the SEC provided insiders with a new affirmative defense for trades planned at a time when the insider was uniformed, regardless of whether the insider was informed when the trades executed. In other words, the SEC codified a version of the I-would-have-traded-anyway defense in cases in which the insider complied with the provisions of the Rule.

### C.    The Rule

Rule 10b5-1 provides that insiders trade "on the basis of" for purpose of Rule 10b-5 and Section 10(b) when they are "aware of material nonpublic information when [they] made the purchase or sale."[7]  In other words, the SEC adopted the stricter possession standard.  But the SEC provided an affirmative defense if the insider can show that "before becoming aware of the information" the insider:

- "(1) entered into a binding contract to purchase or sell the security; (2) instructed another person to purchase or sell the security for the [insider's] account, or (3) adopted a written plan for trading securities."[8];

- put in the plan "(1) . . . the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold; (2) . . . a written formula or algorithm . . . for determining the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be

---

[6]    *See* for example, *United States v. Teicher*, 987 F.2 112 (2d Cir. 1993).

[7]    *See* 17 CFR §240.10b5-1(b).

[8]    Rule 10b5-1(c)(i)(A)(1)-(3).

purchased or sold; or (3) [did] not permit the [insider] to exercise any subsequent influence over [transactions]"[9]; and

- did not "alter[] or deviate[] from the contract, instruction, or plan to purchase or sell securities (whether by changing the amount, price, or timing of the purchase or sale), or enter[] into or alter[] a corresponding or hedging transaction or position with respect to those securities."[10]

This final prerequisite could be read as limiting the ability of an insider to selectively cancel plans based on inside information, however, the SEC does not take this position. Believing there can be no securities fraud without an actual purchase or sale transaction, the SEC stated – in a non-binding telephone interpretation – that canceling a plan based on private information is not inconsistent with the Rule.[11]

The SEC did state, however, that canceling a plan in this way could raise questions about whether the plan was entered into in "good faith," as required by the Rule. The Rule includes a catchall provision intended to avoid manipulation that complies with the letter but not the spirit of the Rule. Plans that are not entered into in "good faith" or are entered into "as part of a plan or scheme to evade" the Rule do not get the benefit of the affirmative defense.[12] But it is not clear that the SEC can readily enforce this good faith requirement because it is procedurally costly,[13] and empirically, insiders appear to retain a strategic advantage when using 10b5-1 Plans.

The Rule as promulgated did not require disclosure of any kind. In April 2002, the SEC proposed mandatory disclosure, through 8-K filings, of insiders' use of Rule 10b5-1 trading plans.[14]

---

[9]      Rule 10b5-1(c)(i)(B)(1)-(3).

[10]     Rule 10b5-1(c)(i)(c)(1)-(3).

[11]     *See* SEC Division of Corporation Finance, Manual of Publicly Available Telephone Interpretations, Fourth Supplement, Rule 10b5-1, Question 15 (issued May 2001).

[12]     Rule 10b5-1(c)(ii).

[13]     The SEC would have to show both the fact of possession of material, nonpublic information and the lack of good faith, instead of just having to show the former. In addition, the attenuation in time will make the case more difficult.

[14]     SEC Release No. 33-8090, Proposed Rule: Form 8-K Disclosure of Certain Management Transactions.

EXHIBIT A
PAGE 13

1   Specifically, the proposal required disclosure of the name and title of the director or executive

2   officer, the date on which the director or executive officer entered into the 10b5-1 Plan, and a

3   description of the contract, including duration, the aggregate number of securities to be purchased or

4   sold, and the name of the counterparty or agent. The proposal also required disclosure if the director

5   or executive officer later terminated or modified a plan.[15] The disclosure proposal was tabled

6   indefinitely, so there is currently no requirement for firms or insiders to provide details regarding

7   whether or how they participate within their trading plans. Many firms, however, choose to disclose

8   information regarding insiders' trade plans. There is, however, substantive variation in disclosure

9   detail regarding insiders' trade plan structures. As mentioned below, my empirical research shows

10  disclosure practices are correlated with abuse of the Rule.

11  **III.     WHAT IS A PROPER AND IMPROPER USE OF A 10B5-1 PLAN?**

12         **A.     Proper Use**

13         The SEC intended the Rule to give insiders more opportunities to diversify their holdings of

14  firm stock by allowing them to precommit to trade at times when they did not have inside

15  information. It should be obvious therefore that the proper use of the Rule is one in which the

16  corporate insider does not possess material, nonpublic information about the firm or the likely course

17  of its stock price at the time in which the insider decides to trade in the future.

18         Firms could require (or simply allow) executives to make certain or all trades pursuant to pre-

19  commitment trading plans pursuant to SEC Rule 10b5-1(c). These plans could serve as substitutes

20  for contractually imposed blackout windows, since a plan could permit trades inside windows so

21  long as it was made outside of a blackout window and at a time when the insider did not have

22  material, nonpublic information.[16] For example, an insider with no legally significant information

23  _____

24  [15]    Specifically, firms would disclose the date of the termination or modification and a
        description of the modification, including duration, the aggregate number of securities to be
25      purchased or sold, the interval at which securities are to be purchased or sold, the number of
        securities to be purchased or sold in each interval, the price at which securities are to be purchased or
26      sold, and the identity of the counterparty or agent.

27  [16]    Netflix's insider trading policy is typical: "[Trading window] restrictions on trading shall not
        apply to transactions made under a trading plan adopted pursuant to . . . Rule 10b5-1(c)." *See* Netflix

possession on January 1st could enter into a trading plan on that day, agreeing to buy or sell shares pursuant to a set schedule, a pre-set trading algorithm, or merely designate authority to a broker. Thus, in June when the insider obtains possession of inside information, purchases or sales are still possible. According to the Rule, the June sales are not "on the basis of" inside information because of the pre-commitment. These plans are often explicit substitutes for compliance with trading windows, meaning that sales can be made under these plans at any time.

The real world is not always so clear, however, especially since in this example any allegations of insider trading at future dates have to determine whether an insider had a materially significant informational advantage on January 1. This will necessarily be a fact-intensive inquiry, and will turn on what the SEC or plaintiffs can show about what the insiders knew on that day.

But we can generalize about what proper plans look like based on certain clearly identifiable features. These hallmarks of legal plan usage have been determined based on my empirical research on the use and abuse of plans and based on my experience consulting with firms on their use of these plans. I have personally examined the plans, disclosures, and trades of thousands of firms and plans. I have also done a significant number of advanced statistical studies on these plans, making discoveries about the ways that these plans can be used and abused by executives. In addition, I have worked with approximately 30 companies on how to use and deploy these plans. These experiences have given me broad exposure to the types of plans used in a variety of circumstances, and allow me to make some general observations about what good and bad plans look like.

Based on this academic and practical work, I've identified seven hallmarks of proper plan usage, all or nearly all of which are commonly part of plans used for diversification purposes: (1) a significant time lag between adoption and first trade; (2) regularly scheduled trades; (3) sales over long periods of time; (4) sales of relatively consistent size and relatively small amounts compared with overall share holdings; (5) sales at a range of stock prices; (6) no changes or cancellations of

---

Insider Trading Policy, available at http://ir.netflix.com/documentdisplay.cfm?DocumentID=74 (last visited August 28, 2006).

1  plans; and (7) a high level of board and general counsel involvement in adoption, alteration, and
2  termination decisions.

3      ***Time lag***.  The first feature of a proper plan is a significant time period between the adoption
4  of the plan and the time at which the first trade happens under the plan.  This time lag is crucial to
5  ensuring that the plan is not used opportunistically to shield trades that may be based on short-term
6  informational advantages.  A lag of 30 days or longer is typical so that any information advantage
7  will dissipate by the time the first trades happen.  (This is consistent with the practice of firms
8  generally in trying to police insider trading: firms typically restrict the ability of insiders to trade
9  within 30 to 45 days before earnings announcements, when informational asymmetries between
10  insiders and outsiders is presumed to be the greatest.  Thirty days or longer is presumptively the
11  amount of time over which information advantages are expected to dissipate.)  Obviously the longer
12  the lag between initiation and trading, the more powerful the claim that the plan was not tainted by
13  inside information.  A lag of six months is, all else being equal, a stronger signal of no information
14  advantage than a three-month lag than a one-month lag and so on.

15      But this feature alone is not dispositive.  My empirical research shows that insiders can often
16  predict many months in advance certain catastrophic events, like the loss of a key customer, a
17  significant drop in customer orders, or the failure of the FDA to approve a key drug.  As shown
18  below, there are dozens of cases in which I (along with my co-authors) have uncovered insiders in
19  these cases predicting by up to six months drops in stock prices of 25 percent based on these kinds of
20  events.

21      Of course, a trade that happens less than 30 or 60 days after a plan is adopted is not
22  necessarily improper.  Other facts and circumstances will determine whether the plan is legal.  For
23  instance, if there is no plausible information advantage at the time the plan is initiated, this would cut
24  strongly against a finding that trades under a plan were improper.

25      ***Regularized trading***.  The second feature of a typical diversification plan (as opposed to an
26  opportunistic plan) is monthly trading on specific dates, like the first, fifteenth, or thirtieth of the
27  month.  (Commonly, plans call for trading on the first trading day of the month.)  Insiders looking
28  for pure diversification trades will often choose to trade each month of the year as shares vest or to

diversify other shares they hold.  The use of specific dates each month that repeat through the year creates a regularity that demonstrates the foresight of a precommitment plan and reduces the probability that trades will be construed as opportunistically using the Rule.  For instance, trades that occur on the first trading day of the month demonstrate to other traders in the market that the sales are part of a regularized plan, and therefore do not contain information about the seller's view of the market price.  This strategy is in the interest of diversification traders, since otherwise the stock price may be adversely affected by a faulty interpretation by the market that the sales are based on superior information.

Alternatively, or sometimes in combination with a monthly approach, insiders will delegate full authority over trades to a broker (with a target number of shares or dollar amount to diversify over a year).  A final approach is to use price targets that are laddered over time – *e.g.*, trade 100 shares on February 1 if the price reaches $50; trade 100 shares on March 1 if the price reaches $55, etc.  These targets ensure that the shares are not made at undesirable prices or that options are not exercised at a loss.  If these approaches are used, the importance of the other hallmarks will increase, since the market will see trades that have the appearance of opportunistic timing.  Best practices for firms allowing such laddering is to put in place very rigorous controls to ensure insiders are not gaming the Rule and imposing costs on the firm or its shareholders.

***Long duration***.  A third feature of a properly designed diversification plan is trades happening over a long period of time.  This is related to the time-lag feature discussed above, since trades happening many months after plan adoption are very unlikely to be based on inside information.  So it follows that in general, longer plans will contain more legitimate trades than shorter plans, as executed.

There is another reason why observing trades over a longer period of time is a sign of a diversification strategy in using a plan.  Longer plans reflect a more genuine commitment to trade consistently to maintain an optimal level of portfolio diversification.  If that is the stated goal, as it was in every plan used in this case, such diversification is achieved over long periods of time and is tied to share inflows (either new grants or vesting of older ones).  If an insider wants to maintain a set percentage of stock in his or her portfolio, planning for this generally involves planned sales over

1 a year period instead of a short-term sale which will result in ad hoc and dramatic shocks to one's
2 portfolio instead of gradual smoothing.

3      For instance, consider an insider who begins a year with 100,000 shares and expects to have
4 24,000 shares vest over the year. If the insider wants to diversify her portfolio to maintain a constant
5 share ownership at the start of the next year, she will need to sell an average of 2,000 shares per
6 month or as they vest to do this. So if the board of directors wants to keep the executive with a
7 constant ownership stake in order to provider her with the right incentives, the board would allow the
8 insider to set up a plan on, say, January 1 to trade monthly or as shares vest. This precommitment
9 does three related things. It reduces the probability that outsiders will see sales and believe wrongly
10 that they are informed. It also ensures that insider sales trickle out to the market instead of coming
11 in large clumps, which might have an adverse impact on the market. Finally, it reduces the potential
12 that insiders will try to time the trade of 120,000 shares at a stock high, believing that the expected
13 profits exceed the potential legal risk.

14      ***Small amounts***. A fourth feature of a typical diversification plan is sales in relatively
15 consistent and small amounts relative to total stock holdings. In my experience and based on my
16 research into stock holdings of executives at publicly traded firms, it is common for executives to
17 sell shares to achieve what they think is their optimal stock portfolio. These sales are staged to keep
18 the executive's balance of firm stock, securities in other firms, cash, and other investments in some
19 rough balance. Accordingly, as the percentage of wealth in firm stock rises, executives often sell (or
20 hedge) to keep that amount at a pre-determined level. Since stock options are often issued at
21 predictable times, and since shares owned vest on a predictable schedule, these sales often match
22 these events.

23      In addition, for most long-serving executives, the amount of new grants or newly vested
24 shares is small relative to shares owned and to total wealth. Therefore rebalancing through sales
25 happens gradually over time and in small amounts relative to the executive's total holdings. As
26 noted above, if an executive owns 100,000 shares at the time a plan is initiated, and expects to
27 receive or vest another 24,000 shares over the next year, the executive may plan a sale of 2,000
28 shares per month, thus maintaining a 100,000-share portfolio going into the following year by

1  converting the 24,000 shares to cash on an ongoing basis.  This is the most commonly observed

2  feature of diversification trading plans I've seen in my research.  When we see this kind of pattern,

3  abnormal returns for firm insiders are exceedingly rare.

4      ***Range of stock prices***.  A fifth hallmark of a plan intended to diversify as opposed to take

5  advantage of inside information is observing sales under the plan at a range of stock prices.  The

6  intuition here is simple: if the plan represents a precommitment to sell over a long time period (such

7  as a year) at a time when the insider does not have good information about the future course of the

8  stock price, then it is very likely that sales planned to happen each month will happen at a range of

9  prices, some of which are high and some of which are low within the range of the firm's 52-week

10 average.  The diversification plans I've observed in practice have this feature.

11     It is true that insiders can use price triggers that will bias sales in ways that tend for sales to

12 happen at relatively higher prices.  For instance, an insider could plan for sales in each month but

13 only if the stock price reached a target price significantly above the price at the time of the plan.

14 Imagine an insider enters into a plan to sell if the stock price, currently trading at $15, rises to $25.

15 This could be a legitimate diversification plan, since at the point at which the price rises that high,

16 the insider might have too much value from firm stock in his or her portfolio.

17     This is in contrast, however, with a plan in which the insider initiates a plan when the stock is

18 trading at $25 to trade at this price, and then we observe the stock price quickly drop below that

19 level, at which point few if any trades happen.  The former looks like an executive planning for a

20 potential future rise in stock price, while the latter looks more like an opportunistic creation of a

21 plan.  Consistent with a board's desire to provide incentives for stock price maximization, when

22 price triggers are used, best practice is for the price trigger to be set at a premium that gives the

23 manager a strong incentive to reach that stock-price target.

24      ***Example***.  To tie these last three hallmarks together, consider an example.  Imagine

25      sitting down at the beginning of the year and planning your wealth portfolio strategy

26      for the year.  If you are adopting a plan in order to maintain a certain percentage of

27      your wealth in stock as you receive more stock (as a result of new option grants or

28      vesting of old grants), then you would likely schedule trades to correspond to

1   expected increases in the value of stock in your wealth portfolio.  Such a plan would

2   schedule sales in set increments (perhaps tied to vesting) and may use stock-price

3   triggers at a premium to the current price, since as the stock price rises a greater

4   portion of your wealth will be in firm stock.

5   If one then looked at the outcome of such a plan after a one-year period (the standard

6   length of such plans), one would see regular trades at random prices throughout the

7   year (and perhaps every month), as well as some non-regularized trades at higher

8   prices, but in size and amounts consistent with the regularized trades.  And, as noted

9   above, at times in which there would be less doubt about the possibility of such

10   trades being made on inside information.  For instance, well-advised executives will

11   use price triggers only after several months of scheduled trades in order to reduce the

12   possibility of an informational advantage infecting these trades.

13   ***No changes***.  A sixth hallmark of a properly used plan is the absence of any significant

14   changes in a plan once initiated.  As described below, my empirical research demonstrates that Rule

15   10b5-1 is being abused by insiders, and that the biggest source of abuse is the alteration or

16   cancellation of plans after initiation.  Although the Rule permits insiders to alter plans after their

17   formation, there are two limitations.  First, any changes reset the date at which the information

18   inquiry is made from the date of the original plan to the date of the amendment or change.  So if the

19   plan were started on January 1 and amended on July 1, a trade made on July 2 would be judged by

20   what the insider knew on July 1, not on January 1.  It is as if a new plan was started on July 1 and the

21   old plan cancelled.  Second, any alteration, amendment, or cancellation must be made in "good

22   faith" and not as part of a "plan or scheme to evade" the Rule.[17]  Although not well explored in the

23   case law as of yet, the logical import of these requirements is that any change to a plan must be made

24   under the same scrutiny as when a plan is started.  This means that the other safety valves, like time

25   lags and such, must be deployed to avoid the potential for opportunism.  And, since my research

26

---

27   [17]     Rule 10b5-1(c)(ii).

28

EXHIBIT A
PAGE 20

shows that amendments or other changes are often the way in which the Rule is most commonly abused, best practice is for firms (*i.e.*, the board) to require additional levels of proof from insiders that they do not have material, nonpublic information. Allowing amendments or changes without rigorous oversight is a sure path to violating the Rule.[18]

***Board oversight***.  A seventh and final hallmark of a properly used plan is the significant involvement with the board of directors.  The board has the statutory responsibility for setting the compensation of executives, including granting options that are designed to create incentives for executives to perform in ways desired by shareholders.  This compensation generally includes cash (in the form of salary and bonuses), stock (either options or restricted shares), and long-term incentives, such as pension plans.  An important component of the stock component of pay is the money a manager expects to make from trading in these shares.  Not only are the shares valued at the grant stage, but the board has reason to estimate their value on an ongoing basis, if for no other reason than to determine the optimal level of compensation in later periods.

For instance, if an insider has $100 worth of options, and the board decides to limit the ability of the insider to trade the shares, the value of the shares as held by the insider will fall, and therefore the board may need to pay additional cash to offset this.  Conversely, if the insiders are trading more and have the ability to earn more profits as a result of the trading, then the board will want to know this too, so it can offset pay accordingly.  In both cases, to faithfully fulfill its duties to the shareholders, the board will need to be informed about the general trading structure and habits of insiders.  This is born out in my research.  Well-governed firms have their boards commonly involved in approving the use of the Rule by managers, the disclosure choice of managers, and all deviations from existing plans.  The last of these is especially important given the fact that changing plans after they begin appears to be the most common way to abuse the Rule.

---

[18]     There is little reason to amend or change plans midstream, other than simple resetting of price targets in unusual cases of dramatic changes in stock price.  More generally, in my research, changes in plans, either amendments or cancellations are highly correlated with insiders earning insider-trading profits.

Beyond this, the board has a fiduciary duty to the firm's shareholders to ensure that compensation decisions, including trading, are maximizing shareholder value. This means taking potential litigation risk arising from trading into account when overseeing pay practices. So if a manager can make a decision that significantly increases the litigation risk for the firm, the board has a duty to monitor that manager and that decision. Before Rule 10b5-1, blackout windows were the primary way in which boards did this. But even outside of blackout windows, boards (often with the help of the general counsel) of well-governed firms routinely review trading decisions of covered executives to ensure they were not trading based on material, nonpublic information. Once Rule 10b5-1 was passed and deployed, the need for board involvement did not go away, but instead changed to ensuring that executives are not abusing the Rule. In some ways, since the Rule liberalizes trading but does not change the potential litigation risk arising from illegal trades, the board's duties are increased when executives use Rule 10b5-1 trading plans.

\*       \*       \*

From these seven hallmarks of proper trading plans it is relatively straightforward to identify plans that comply with the Rule and justify an affirmative defense provided by it. A typical benign plan might be initiated on January 1 at the start of the fiscal or calendar year. It would last a year and would schedule trades of a certain number of shares or dollar amount every month starting in the second or third month of the year. It would be approved by the board of directors, and would not be altered, amended, or cancelled over the course of the year. One observing the trades (*e.g.*, by reading Form 4s for the executive in question) would see regularized trades of, say, 10,000 shares hitting the market on, say, the 15th of each month.

If this pattern is observed, then it would be much more difficult for a plaintiff or the government to prove scienter if the firm's stock price fell significantly on May 16th, even if the plaintiff could show that the insider possessed inside information on May 14th, the day before the pre-planned trade executed. Not only does this pattern suggest that the insider is not making any individual trade based on inside information, but also that the trades are designed to meet a certain portfolio diversification schedule.

The pattern would not be significantly altered if the insider used price triggers to sell additional shares beyond the, say, 10,000 shares per month, if the price rises significantly. The reason why is because such "bonus" sales are usually in similar share increments as the standard sales. This would mean that in a particularly good month for the firm where the stock price rises significantly, one might observe another 10,000 shares sold at the higher price.

Such regularized trades help not only deflect accusations of insider trading, but they also avoid sending negative signals to markets about the insiders' confidence in the firm's stock price. If an insider is truly engaging in diversification trades, such trades provide the market with no new information. Thus if the market knows that a sale of 10,000 shares is coming on the 15th of each month and that an additional 10,000 shares will be sold if the stock rises by, say, 10 percent in any month, then these trades will not give the market any reason to doubt the validity of the stock price. As such, any sales should not be associated with a drop in the stock price – the sales will be truly random, in that they do not add information to the market. Accordingly, one should not expect to see a drop in the stock price following insider sales, either after regular or bonus share trades.

Any deviations from such a plan would obviously be a sign of improper use, although not always a dispositive one. For instance, if the market is expecting sales of 10,000 or even 20,000 shares in a given month, depending on the stock price, and instead the insider amends his plan to sell 50,000 or 100,000 shares, such a change will transmit information to the market about the insiders' view about the future stock price, as well as suggest that the amendment was motivated by material, nonpublic information. This latter concern is especially true where the trades under the amended plan happen quickly in time to the amendment.

## B. Improper Use

In contrast, an improper plan will be one in which the corporate officer is abusing the Rule to try to achieve litigation protection for informed trades. In my research on nearly every plan used over the first seven years of the Rule's existence, I identified several strategies that insiders can employ to use the Rule improperly. In this section, I will briefly identify those strategies, and then discuss the hallmarks of suspicious plans that should cast their use into doubt.

1

## 1.     Strategies for Abusing the Rule

### a.     Attenuating the Use Inquiry

3     Rule 10b5-1 shifts the focus of whether the insider possesses inside information to the plan

4     initiation date in lieu of the trade execution date.  One possible way to obtain some protection from

5     the Rule while still earning abnormal return profits is to initiate a plan based on short-term

6     information.  For example, an insider with inside information that the firm's stock price is likely to

7     drop in the next month could initiate a plan based on information but under the guise of an

8     uninformed trading plan.  Such a blatant attempt to evade the purpose of the Rule does not seem

9     likely to work, however, when the time between the initiation and the first trade is short (*e.g.*, less

10    than a month).  Not only will it be relatively easy to show that the insider had the information on the

11    date the plan was initiated, but such a strategy obviously violates the "good faith" provision of the

12    Rule.

13         But, as time between the initiation of the plan and the allegedly informed trades increases, the

14    case against potentially informed insiders will be more difficult relative to the pre-Rule world.  Thus,

15    the Rule offers marginally greater protection (albeit unintended by the SEC and outside the Rule) if

16    insiders can plan their trades well in advance of a pending event.  This change in application timing

17    may make the government or plaintiff's case harder because it must prove the knowledge or use of

18    information months before the trade.  In the usual insider trading case, the mere appearance of

19    impropriety – earning large profits (or avoiding large losses) immediately before a large stock price

20    rise (or fall) – is enough for the SEC or private plaintiff to be able to make out a case.  When

21    examining trade execution dates, proving the insider possessed the information is often fairly

22    straightforward, and flows directly from the timing of the trade.  When the government or private

23    plaintiff must prove possession earlier, perhaps months earlier, the burden of proof likely becomes

24    much more difficult.  Memories and evidence weaken, but more importantly, the circumstantial

25    linkage between information and trade is a much more difficult leap for the trier of fact.  This is

26    especially true since the whole purpose of the trading plans is to create a presumption of propriety.

27    Plan initiation dates that well precede pending news events are less likely to receive legal scrutiny.

28

Consider an insider who believes with great confidence on January 1st that an important drug being developed is unlikely to receive FDA approval six months hence. A Rule 10b5-1 plan is a potentially advantageous way in which the insider can profit from this news with less legal risk. The insider can set up a plan on January 1st to trade over the next six months, thereby profiting from the inside information. The use of a 10b5-1 plan makes proving that the insider used or possessed inside information to make the trades more difficult, because the Rule moves the inquiry back six months. (When this is one day or one month, the potential for abuse of the Rule is obviously less.)

To be sure, an insider with six months warning about negative news could trade as soon as he learned of the news, and this attenuation from the time of the public announcement would provide greater protection than sales made closer to the public revelation. There are several aspects of this alternative strategy, however, that make the use of 10b5-1 Plans preferable, perhaps strongly so. Most obviously, using a trading plan allows the insider the risk-free option of profiting from any increase in the firm's stock price before the final news event. This is possible because the insider can time sales closer to the bad news announcement coupled with a sales trigger in the event the price falls below a set price.[19] This ensures that insiders can profit from run-ups and avoid any losses.

Another reason is trading outside of a plan may be impossible because the insider is covered by blackout windows restricting sales to certain times. Firms may be willing to permit these formerly forbidden trades because plans may provide or be thought to provide additional legal risk reduction. The legal inquiry is the same in both cases, asking whether the insider possessed information on January 1st (either the trade or the plan initiation day), but a marginal risk reduction may arise from the psychological or procedural benefits of falling within an explicit safe harbor.

_____

[19] For example, if the stock price is $10 on January 1, the insider can plan sales starting in March if the stock price is $10 or greater. In this way, the minimum the insider will get for her shares is likely to be $10, and she is able to reap any potential gains above that amount. Other plans are possible in the event the stock price was likely to fall immediately, although a direct sale at that point would likely be a superior strategy.

589718_1            08-CV-01689-H(RBB)

### b. Attenuating the Manner of Sale

Insiders may also be able to use a broker to make the government or plaintiff's case more difficult. The Rule permits insiders to, among other things, delegate trading to a broker as a way of insulating trades from government scrutiny. Delegation is equivalent to creating a trading algorithm with price ceilings or floors, and so long as the insider is not influencing the decisions, achieves the same result. The appeal of this approach is obvious – it is the corporate law equivalent of a politician putting her assets in a blind trust to short-circuit any allegations of corruption. An independent decision by a third party suggests that the insider's information did not influence the trades. In this way, suspicious trades – ones that earn profits or avoid losses around large stock price moves – are protected by the independence of the broker.

Consider the government's burden in the following two cases: In case 1, the insider learns on June 1st that the firm is going to lose its biggest customer in the next quarter, then sells a large block of stock on June 2nd, one day before the information is released to the public. In case 2, the insider enters into a trading plan on January 1st, delegating the trading of a percentage of his shares to a broker. The insider learns the information about the customer on June 1st, and the broker trades on June 2nd helping the insider avoid large losses. Although it is perhaps likely that the government or plaintiff could prove that the insider tipped the broker, this is a much more difficult case to make than in case 1 where there is no attenuation between the information and the trade. This problem becomes more difficult as the time between the plan initiation and the trade becomes longer, independent of the government's challenge in linking the executive to the broker.

Recognizing this potential loophole, some institutional investors have proposed requiring insiders to use different brokers than they've used in the past for other transactions.[20] It is difficult to see how this would be effective at reducing the risk of insiders using this attenuation to make the government or plaintiff's case more difficult.

---

[20]     *See* "Stockholder Proposal Regarding the Use of Rule 10(b)5-1 Trading Plans," DEF 14A SEC Filing, filed by Safeway Inc., Apr. 2, 2008 (Precatory Proposal of shareholder, The American Federation of State, County, and Municipal Employees), available at www.sec.edgar-online.com/2008/ 04/02/0001193125-08-072906/Section20.asp.

### c. Opportunistic Cancellation

Another way for insiders to strategically abuse the Rule is to opportunistically cancel planned trades based on private information. As noted above, trading plans may be cancelled even based on inside information, and this gives insiders a valuable real option on future firm performance. As interpreted by the SEC, the Rule gives insiders a put option – the right to sell shares at a given price – on the firm's future performance. So if the insider believes there is some chance the firm's stock will fall in the future, she can pick the price at which she will sell (the strike price of the put) and plan sales periodically between the initiation of the plan and the expected bad news. If the bad state of the world happens, the insider exercises the put, and sells the shares under the plan. If not, she cancels the plan (equivalent to letting the put expire) and retains the shares.

For example, an insider who believes on January 1st that there is a 20 percent chance the firm will suffer the loss of its biggest customer in the third quarter, could enter into a trading plan on January 1st to sell a large block of stock at the end of the second quarter, when the stock price did not yet include the loss of the customer. If the bad state of the world for the firm does come to pass, the insider lets the pre-committed trade execute, and he avoids losses; but if the good state of the world happens, the insider simply terminates the trading plan. In effect, the Rule can turn the decision to sell based on inside information into a decision not to terminate based on inside information, only the former of which is illegal by statute.

Such a strategy may, however, run afoul of the "good faith" requirements of the Rule, as described above. The SEC's position, expressed in a telephone interpretation, has, to the best of my knowledge, yet to be considered by a court, and so it is possible that such opportunistic cancellation would be illegal.

### 2. Hallmarks of Improper Plans

Opportunistic or illegal use of Rule 10b5-1 trading plans will therefore be identifiable by features suggesting the use of one or more of these strategies. And, not surprisingly, these will be the opposite of plans with hallmarks of proper use. Plans initiated close in time to trades, plans without long duration of actual trades, plans in which trades happen irregularly, trades without board involvement, and trades involving cancellation of planned trades or last-minute amendments are all

1  highly suspect.  Again, any of these features standing alone or a group of these together does not

2  prove the Rule was used improperly.  But their presence is characteristic of plans that have been

3  used opportunistically and in ways not intended by the Rule.

4      **C.**      **Empirical Evidence on Abuse of the Rule**

5         These concerns about misuse of the Rule are not theoretical or speculative, but rather

6  documented by a body of large and growing empirical data and results.  Some of this data is

7  summarized here to provide some evidence that the Rule can be and is abused.  The studies show

8  how insiders can abuse the Rule to retain or even increase their trading advantage.

9         **1.**      **Managers Using Plans Outperform Managers Not Using Plans**

10         In the first study, Alan Jagolinzer found sales executed within Rule 10b5-1 plans earn returns

11  that are, on average, greater than returns earned by the market index and also returns earned by

12  insiders who execute sales outside of Rule 10b5-1 plans.[21]  The study finds "insiders' sales

13  systematically follow positive and precede negative firm performance, generating abnormal forward-

14  looking returns larger than those earned by non-participating colleagues."[22]  After rejecting several

15  possible innocent explanations for this finding,[23] the study concludes "trading within the Rule does

16  not solely reflect uninformed diversification."[24]

17         More specifically, the Jagolinzer study examines over 100,000 10b5-1 trades by more than

18  3,000 insiders at over 1,000 firms.  These trades beat the market average by nearly 4 percent over a

19  six-month period, compared with a negligible (less than 0.3 percent) return for insiders trading

20  _____

21  [21]    Jagolinzer, Alan D. 2009, SEC Rule 10b5-1 and Insiders' Strategic Trade, Management
Science Quarterly, available at http://ssrn.com/abstract=541502.

22  [22]    *Id.*

23  [23]    The benign explanations considered and rejected by the data are: (1) mean reversion; (2)
24  market reaction to sales by insiders; and (3) abnormally negative returns for the firm in question.
Explanation (1) was rejected because a control group of firms with similar run-ups in prices did not
25  show a similar magnitude mean reversion over the same period.  Explanation (2) was tested and
rejected using a 3-day abnormal return, which showed no extraordinary returns.  Explanation (3) was
26  rejected after looking at a comparison of returns across industry SIC codes, and finding no bear
market to speak of in these firms. *See id.*

27  [24]    *Id.*

28

outside 10b5-1 trading plans.  *See* Figure 1.  According to the study, this result is statistically extremely unlikely, and can be explained only as a result of some aspects of the Rule or the way in which plans are being used.  The SEC expected the Rule to reduce insider abnormal returns, but the opposite happened.  Trading within the Rule is more likely to be informed trading than diversification trading.



*Figure 1.  Returns to firm stock following sales in plans (solid line) and outside plans (dotted line) (Jagolinzer 2009, Figure 1, Panel C).*

Let me explain this figure. The "0" on the X axis is the date of the first sale under 10b5-1 Plans for the firms using them or the date of non-plan sales by firms not using plans.  The two lines represent the market returns (basically the change in the stock price) for the two sets of firms.  As can be seen on the chart, the firms not using plans (dotted line) saw their stock prices basically stay flat around zero, while the firms using plans (solid line) saw their stock prices trend downward following 10b5-1 sales by insiders.  In other words, insider sales outside of 10b5-1 plans do not predict anything about the future of the stock price, while insider sales inside of 10b5-1 plans predict drops in firm stock price.  This means that relative to a hold strategy, insiders using plans avoid significant losses compared with the case in which they had not used plans to sell their shares.

At the very least, the Jagolinzer study should call into doubt any claims that the mere existence of a Rule 10b5-1 plan is proof or even evidence that the insider did not trade on the basis of material, nonpublic information.  Jagolinzer showed that insiders using plans were systematically doing exactly that.

## 2.     Managers Using Plans Outperform Managers Not Using Plans

Another study by Jagolinzer, Muller, and me supports the finding that insiders can abuse the Rule by using it to shield otherwise illegal informed trades.[25]  This study examined 7,927 insiders at 2,934 firms using Rule 10b5-1 Plans from 2001 to 2007.  It compared the disclosure practices of firms to see how these correlated with the returns insiders in the plans earned from trades in firm stock.  The results support Jagolinzer's conclusion: insiders who disclose the existence of their plans publicly (either in a bare bones manner ("limited" disclosure) or in detail ("specific" disclosure)) earn very large abnormal returns from their trades.  These results are shown on Figure 2 and Figure 3.

Sales within "limited disclosure" 10b5-1 Plans, on average, precede negative firm performance relative to the market.  As shown on Figure 2, these firms experienced an average of about -6 percent market adjusted returns in the six-month period following sales by insiders making limited disclosures.[26]  These results are statistically significant at the 1 percent level.



*Figure 2: Stock price before and after limited disclosure sales*

---

[25]     Henderson, M. Todd, et al. Strategic Disclosure of 10b5-1 Trading Plans, University of Chicago  Law  &  Econ.  Working  Paper,  2011,  available  at http://papers.ssrn.com/sol3/papers.cfm?abstractid=1137928 (under consideration at the Journal of Legal Studies).

[26]     The median was -5 percent return.

1    As in Figure 1, the "0" day on the X axis represents the first day of a trade using a Rule
2    10b5-1 plan in a given year.  If these trades were uninformed, the abnormal returns after sales should
3    be zero in expectation (that is, a flat line to the right of the "0" in Figure 2[27] ).[28]  The fact that insider
4    sales following limited disclosures systematically precede drops in firm value suggests abuse of the
5    Rule, since, as in Figure 1, insiders' 10b5-1 sales predict future drops in stock prices.  (This was not
6    true for insiders who did not disclose the existence of their plans.)

7        Managers making more specific disclosures also are systematically abusing the Rule.
8    Interestingly, these insiders seem to have knowledge of significant negative events many months in
9    advance, and they set up plans in order to take advantage of the Rule's defense.  To see how this
10   strategy might work, consider the CEO of a small biotech firm.  On January 1st, she sees
11   confidential reports from doctors conducting clinical trials on her firm's key drug suggesting the
12   drug is likely (say, 90 percent likely) to be rejected by the FDA when it makes a decision in
13   September.  Wanting to profit from this information, the CEO can trade now on the news or she can
14   put in place a plan to trade on the news sometime in the future, as the decision date is closer.  These
15   two courses are seemingly of equal risk.  The inquiry into the possession of inside information
16   centers on the same day – January 1st – when the trade was made or the plan to trade was made.

17       The latter course is, however, likely to be more profitable for two reasons.  First, it allows the
18   insider to profit from any increase in the stock price from January until September.  Delaying trading
19   without a plan for some time would also have this benefit, but in the pre-Rule world, any delay
20   increases the likely litigation risk.  The Rule thus allows the insider the riskless option (compared
21   with the pre-Rule sale on January 1) of earning any stock price appreciation between the time of the
22   knowledge and the time of the sale.  Importantly, an insider can do this without risk (compared with

23

24   _____

25   [27]    This is the result for the non-disclosure group.

26   [28]    As shown on Figure 2, the decline in stock price performance following insider trades for
27   firms making limited disclosures occurs after a run up in the stock price.  This is expected because
     increases in firm stock price lead to a greater percentage of insider wealth being held in firm stock,
     which under normal circumstances would result in sales under most plans.

28

1  the trade immediately strategy), since the plan can bake in price floors at which sales are

2  automatically triggered.

3        Second, it allows insiders to sell more shares with the same legal risk, since sales can be

4  spaced out over time in a way that may reduce the attention of either private lawyers or the

5  government. Large sales in advance of bad news look suspicious, while smaller sales on a regular

6  basis look more like random, diversification trades. Plaintiff's lawyers and prosecutors have limited

7  resources and are likely to focus on the most vulnerable potential defendants; this type of

8  concealment is bound to distinguish insiders using hiding in plain sight in a way that deters suits.

9        The data show that sales within "specific disclosure" 10b5-1 Plans, on average, precede large

10  negative firm performance relative to the market. The average cumulative abnormal return in the six

11  months after the first trade for companies making specific disclosures is -12 percent.[29] This result is

12  statistically significant at the 1 percent confidence level. As shown on Figure 3, there is a large

13  decline in stock price performance following insider trades for firms making specific disclosures

14  occurring after a run up in the stock price.



*Figure 3: Stock price before and after specific disclosure sales*

---

[29]    The median firm returns were -7 percent for the six months following the first sales transaction.

Consistent with the strategic use of disclosure, insiders making specific disclosures also appear to be trying to hide their trades by spacing them deliberately in time between the plan initiation and the revelation of bad news. Insiders making specific disclosures trade much more often than other insiders, averaging about 25 trades within their plans compared with about 5 for insiders making no disclosures and 10 for insiders making limited disclosures.[30] The average size of each transaction is also much smaller for insiders making disclosures: non-disclosing insiders' trades were six times larger than those of insiders making specific disclosures.[31] (These trades are less likely to garner negative attention, both because of their smaller size and their pattern, which both suggest random, diversification trades.)

The idea of insiders planning to trade well in advance of bad news is hard to reconcile with a view that the future is highly uncertain for firms and that accordingly informational asymmetries are dissipated quickly. (This view is widely held for many firms, and undergirds most firms' blackout windows, which are only several weeks prior to quarterly earnings announcements.) But the firms using the specific-disclosure approach show how for some firms, the future can be known many months in advance. Among the nearly 70 firms in this sample, the average firm experienced a very large price drop (that is, greater than a 25% change in stock price in one week), an average of about five months from the date of adopting a trading plan. In each of these cases, the firm experienced the loss of a large customer, negative approval of a key drug or patent, or other singularly dramatic corporate event that could be known in advance.

IV.     **The Defendants' Purported 10b5-1 Plans Have All the Characteristics of Improper Plans**

The improper and illegal nature of Defendants' use of Rule 10b5-1 can be seen by comparing their plans and usage during the Class Period in this case (and before) with the features of plans that my empirical research on thousands of insiders and firms using 10b5-1 Plans suggests are used consistent with benign, diversification trades. To recapitulate, the seven factors identified with

---

[30]     *See* Henderson et al. 2011, supra note 26.

[31]     *Id.*

589718_1                                                    08-CV-01689-H(RBB)

**EXHIBIT A PAGE 33**

proper plan usage are: (1) a significant time lag between adoption and first trade; (2) regularly scheduled trades; (3) sales over long periods of time; (4) sales of relatively consistent size and relatively small amounts compared with overall share holdings; (5) sales at a range of stock prices; (6) no changes or cancellations of plans; and (7) a high level of board or general counsel involvement in adoption, alteration, and termination decisions. And, as noted above, if one looks at Form 4 data on sales actually executed under proper plans, one would observe consistent trades of similar dollar or share amounts executed over a long period of time and without any correlation between trade timing or amounts and drops in stock price.

Instead, in this case, Defendants' trading plans had few or none of these features. Even where there are indications of proper use, these are overwhelmed by egregious violations of the letter and the spirit of Rule 10b5-1. There are two types of plans and problems with plans among the Defendants.

One set of Defendants – Leparulo, Ratcliffe, and Weinert – used plans that had none of the hallmarks of a proper plan. They put plans in place for the first time right before a large stock drop, concentrated their sales in a short period time, sold all the shares under the plan at relatively high prices, and sold in large amounts relative to other sales before using their plans.

The other set of Defendants – Souissi and Hadley – provide a nice contrast that highlights the problems with the plans of the first set: their plans had, before the Class Period, all the attributes of proper diversification trading plans. The plans were put in place long before any stock drop, they had sales in small amounts sold regularly per month, and had sales at relatively high and low prices. These plans do not necessarily indicate proper use, as the empirical research about executives trading well in advance of bad news suggests – it is still possible, and there is some evidence, that these Defendants knew about future bad news when they entered into their original plans. Since these two Defendants were on the front lines of the information known at that time, it is possible they set up plans based on this information.

In addition, however, Defendants Souissi and Hadley also did things with their plans during the Class Period that make them look even more like the first set of Defendants. Souissi and Hadley amended their plans around the same time that the first set of Defendants started their plans (May-

1  June 2007), and with similar instructions to sell large amounts quickly. So from the period when

2  they were started, around the beginning of 2007, until May-June 2007, Souissi's and Hadley's plans

3  had many of the hallmarks of proper plans, while from May-June 2007 forward, they looked like the

4  improper ones used by the other Defendants.

5         In each case, however, the board was not as active or informed as it should have been for the

6  plans to pass the smell test. A crucial reason for this is a change in company policy effective in June

7  2006. Apparently, under the then insider-trading policy of the firm, the Compensation Committee of

8  the board of directors was responsible for reviewing proposed 10b5-1 Plans for compliance with the

9  company's insider trading policy and to ensure that the plans furthered (instead of thwarted) the

10  firm's compensation policy. At the board meeting on June 12, 2006, however, the board, led by Mr.

11  Leparulo, discussed this policy and voted to amend the Insider Trading Policy to delete this pre-

12  approval requirement.[32]

13         In the absence of proper board oversight, the general counsel can often fill the role of

14  shareholder representative in policing insiders' use of plans. The facts in the case show, however,

15  that instead of acting as a gatekeeper for these plans, Defendant Ratcliffe provided little more than a

16  rubber stamp, as well as jumping on the bandwagon of insiders setting up short-term sales plans.

17  This is not how firms using governance best practices see the role of general counsel – the head

18  lawyer is supposed to play devil's advocate and take steps to ensure the Rule is not being abused.

19         This section compares the characteristics of the plans as used during the Class Period with

20  the characteristics of proper and improper plans as determined by research into thousands of plans

21  used at other firms over the same time periods.

22         **A.      Defendant Leparulo**

23         Peter Leparulo, CEO of Novatel, entered into a Rule 10b5-1 trading plan on June 1, 2007.

24  According to the 8-K disclosure of the plan on June 22, 2007, the purpose of the plan was "in order

25

26  _____

27  [32]      Minutes of the Compensation Committee of the Board of Directors of Novatel Wireless, Inc.,
   June 12, 2006 (NOV003083).

28

to gradually diversify assets for estate planning purposes."[33]  It is interesting to stop here and take

note that the plan was not disclosed for three weeks. This is in stark contrast to best practice –

immediate disclosure – as well as the use of 10b5-1 Plans for diversification trading at other

companies, according to my research.  There is no reason for this sort of delay in disclosure, and it is

inconsistent with prior practice at Novatel, when plans were disclosed immediately.  For instance,

Defendants Hadley and Souissi entered into plans in December 2006 and disclosed them five days

later. In my experience, delayed disclosure allows insiders to shield potentially informed trades

while still generating a public filing for admission during the early stages of potential litigation.  As

noted above and discussed below, the Hadley and Souissi plans may still be suspect given the

evidence about what they knew in December 2006,[34]  but there was no reason to delay their

disclosure since the trades were regularized and delayed by several months.  This is in contrast with

what was obviously a massive sales order put in place by Leparulo and the other Defendants in late

spring of 2007.

Leparulo's plan called for the orderly disposition of 150,000 shares (about 18 percent of his

total share holdings at the time) in 30,000-share increments each month for five months beginning in

July 2007.  This (barely) meets the best practices standards and the idea of "gradually" diversifying

his portfolio.

But, the plan contained accelerators that would trigger the immediate sale of all 150,000

shares plus an additional 87,699 shares if the stock price reached $22, and another 100,000 shares if

the stock priced reached $24.  On the date Leparulo signed his 10b5-1 plan, the stock price was

above $22; therefore the "accelerator" was not a typical one, in which there are incentives to raise

the stock price, but rather a simple market sales order to liquidate the bulk of his shares.  Given this

fact, the recent trajectory of Novatel's stock price, and the good news that was being released to the

market, it is not surprising that both accelerators were triggered in July.  Accordingly, Leparulo sold

---

[33]  http://www.sec.gov/Archives/edgar/data/1022652/000119312507140329/d8k.htm

[34]  *See, e.g.*, NOV000761.

1 337,699 shares in the first week of July at prices of between $24 and $26.[35]  His plan, which was

2 scheduled to last for one year, lasted for just one week at the beginning of July, resulting in the sale

3 of nearly 40 percent of Leparulo's shares then owned.

4          This plan bears none of the hallmarks of a proper plan.  First, all the trades under the plan

5 happened on three days in one week, just one month after the plan was executed and two weeks after

6 the plan was disclosed to the public.  Unlike typical proper plans in which insiders sell gradually

7 over long periods of time, this plan, through the use of accelerators, concentrated all sales at the very

8 beginning of the plan.

9          Second, the trades were large relative to the size of Leparulo's stock portfolio.  Selling

10 almost half of one's shares in a one-week period is not "gradually diversifying assets for estate

11 planning purposes," in the way that gradual sales of smaller-increment allotments over many months

12 would be.  Although price triggers are often used in such plans, it is very uncommon for these

13 triggers to result in such significant jumps in the number of shares sold.  This structure makes sense

14 only if one believes that the stock price is not likely to rise further over the short run.

15          Third, sales were made in a very narrow range of prices ($24.09, $25.90, and $25.99, all

16 about the highest prices the stock reached over the five previous years).[36]  Diversification sales are

17 usually made across a much wider range of prices, as the stock moves up and down over the course

18 of the plan and the insider does not appear to time sales well but rather simply converts shares to

19 cash at prevailing prices.

20          Fourth, the board of directors did not approve the plan after a showing that Leparulo did not,

21 at that time, possess material, nonpublic information.  Although the plan was adopted during an

22 open-trading window, this does not answer the question of whether the insider had inside

23 information when entering into the plan.  Requiring an insider to make a showing to the board of

---

25 [35]     Overall, between May 18 and July 5, 2007, Leparulo sold 473,357 shares of his Novatel
26 stock for insider trading proceeds of more than $11.5 million.

27 [36]     The only time the stock price was higher was prior to July 2001 when after its IPO and
during the dot.com boom, the stock traded for over $100 for a period of months.

28

EXHIBIT A
PAGE 37

1  directors that the insider did not have an informational advantage when entering the plan is the
2  approach that should be followed in order to reduce the chances of opportunism.

3      In my review of thousands of Rule 10b5-1 Plans, I have never seen a plan like this: having an
4  "accelerator" below market price, which allows relatively massive sales so close in time to the
5  initiation of a plan, and is followed quickly by a huge stock price drop. This is the most egregious
6  misuse of a Rule 10b5-1 I have seen in my review of thousands of plans, including many hundred in
7  which insiders were abusing the Rule to earn informed trading profits.

8      **B.    Defendant Souissi**

9      As noted above, the trading plan used by Slim Souissi, Senior Vice President and Chief
10  Technology Officer of Novatel, provides a useful example of both what a diversification plan
11  typically looks like, as well as an example of how such a plan can still be abused.

12      Souissi entered into a 10b5-1 trading plan on December 15, 2006; it was scheduled to last
13  one year. The existence of the plan was disclosed by an 8-K filing five days later. (Already here one
14  can see a substantial difference in disclosure practice compared with the delay in disclosing the
15  Leparulo plan.) The 8-K said the plan was planning sales "in order to gradually diversify assets for
16  estate planning purposes."

17      For the first five months of 2007, the sales made pursuant to the plan have all the indications
18  of being uninformed diversification trades as the 8-K and the underlying plan suggest was the intent.
19  Souissi's first trade under the plan did not come for over two months: on February 23 he sold 15,000
20  shares at $13 per share. Three more monthly trades were made over the next three months with
21  similar characteristics and in a regular pattern: 15,000 shares on March 15 at $14.65; 15,000 shares
22  on April 2 at $15.99; and 15,000 shares on May 1 at $18.20. These sales were made over time, in
23  regular allotments, and at a range of prices. These sales were all specified in his 10b5-1 plan, and
24  were scheduled to be sold on a regular basis (on the first trading day of the month, or, as in the case
25  of the March sale, on that date). In addition, sales of 6,947 ESPP shares were made as planned on
26  March 15. Such extra sales are commonly part of legal Rule 10b5-1 Plans.

27      This does not necessarily mean that Souissi's December 2006 plan was in compliance with
28  the requirements of Rule 10b5-1 and was not based on material, nonpublic information. In fact, the

record suggests that Souissi knew in December 2006 that there were going to be serious problems with Novatel's business in the coming year, after the first quarter.[37]  More generally, the empirical evidence presented above shows how insiders with inside information are able to put in place plans well in advance of bad news and shield them from scrutiny by structuring them to appear like diversification trades.

My research on 10b5-1 Plans shows that insiders often knew about the loss of key customers or other significant events well in advance, and they set up otherwise benign looking trading plans to take advantage of this information.  In my research, a group of firms suffered very large stock drops. In each case, this was from the loss of a key customer or the failure of a key product to win regulatory approval.  In such cases, the insiders set up their plans an average of 140 to 180 days in advance of the public disclosure of these events. One of the nearly 100 examples like this in our dataset is shown in Figure 4.



*Figure 4: Example of Advanced Knowledge and Rule 10b5-1 Abuse*

---

[37]    *See, e.g.*, NOV000761.

**EXHIBIT A
PAGE 39**

As shown on this stock-price chart, the insider entered into his plan (Day 0 on the X axis) about 168 days before the stock dropped about 25 percent when the public learned that sales orders dropped unexpectedly after the loss of the company's largest customer. As shown by the vertical black bars, the CEO of the company unloaded his shares at high prices prior to this announcement. This example is typical of a pattern in the data for firms revealing this type of information, and it is largely consistent with the facts of this case.

Going back to Souissi's plan, assuming it was kept as it was under the original plan during the remainder of the year, Souissi would have sold an additional 15,000 shares each month, plus an additional 15,000 shares in the five months when Novatel's stock was trading above $22. (Here one sees the best-practices characteristic of extra, price-triggered sales being similar in size and amount as regularized sales.) Under the plan, Souissi would have sold a total of 180,000 shares at prices ranging from about $23 to $17. This would have allowed for his stated goals of portfolio diversification, and would have shown a pattern of trades that is consistent with the ones from my empirical research which are for diversification purposes. (Again, remember that this does not mean that Souissi's plan was legitimate; that conclusion depends on what Souissi knew when he set up the plan. An illegal plan can look like a diversification plan, but a diversification plan does not look like an illegal plan.)

Whether Souissi's plan that looked like a diversification plan (but might not be) was one, Souissi amended his plan on May 17, 2007, around the time that Defendants Leparulo, Ratcliffe, and Weinert were starting their plans (June 1, June 13, and May 14, respectively), and on the same day Defendant Hadley was also amending his plan. The amended plan called for the immediate (next day) sale of 110,658 shares at the market price; these shares sold on May 18 at a price of nearly $21 per share. In other words, he sold more shares in one day than he had in the five prior months under the plan (81,947 sold), and at a price higher than all other sales and higher than most sales would have executed at if the plan had not been amended. The acceleration of 110,658 out of 180,000 planned future sales allowed Souissi to trade them at the currently high price before the price dropped during the remainder of the year – he concentrated nearly 62% of the planned sales for the rest of the year in one day. Or, looking at it another way, if Souissi had not amended his plan, only

15,000 additional shares may have been sold in May, since the price rose above $22 at the end of the month; amending the plan therefore allowed him the ability to sell an additional 95,658 shares at nearly $21 per share based on information he had at that time. And yet the 8-K announcement of the amendment stated the same gradual-diversification rationale for the trades that motivated the 15,000-share increments on a monthly basis.

Importantly, the trades occurred one day after he amended his plan. From a legal standpoint, this means that the relevant inquiry about whether Souissi traded on material, nonpublic information was moved back one day from May 18, when the trades executed, to May 17, when the amendment to the plan happened. The plan therefore accomplished nothing from a legal matter. Also interesting is the fact the amendment was not disclosed to the SEC or the market until May 25, one week after the sales under the amendment were already made. This is in sharp contrast with the adoption and disclosure practice Souissi followed earlier in the year when starting his plan.

The juxtaposition of the first five months of Souissi's plan and the one-day trades on May 18 is striking. For instance, the sale of 15,000 shares made on April 2, 2007, at about $16 were planned on December 15, 2006, so the possibility that the trade was based on material, nonpublic information about the stock price on April 2 is much less likely than a trade on May 18, 2007, planned the day before. The trades separated in time are much more likely to be random diversification trades than ones made closer in time.

After the May 18 trades, the remainder of the trades made by Souissi during the year look much more like the trades before May. He sold in roughly 15,000-share increments in June, July, September, October, and November. The only difference between these sales and what would have happened under the pre-amendment plan is that triggers for sales were slightly different under the amended plan – automatic sales of 15,000 plus additional sales at higher prices (the old plan) versus sales of 15,000 based on various price triggers (the new plan).

## C. Defendant Weinert

Like Leparulo (and Ratcliffe considered next), Defendant George Weinert, the President of Novatel, did not have a Rule 10b5-1 plan operative over a long period of time during 2007, entering into a series of small trades at a range of prices, but rather adopted his plan on May 14, 2007

1   (disclosed on an 8-K on May 17, 2007), and concentrated sales of nearly 122,000 shares in a two-

2   month period from June to July 2007.  The sales were planned to be sold over a six-month period

3   ending in December 2007, but an "accelerator" clause, like the one used by Leparulo, provided for

4   the sale of the entire planned allotment immediately if the price of Novatel rose to $28.  When it did

5   on July 16, Weinert traded all the remaining shares in his plan on that day and the next.  The total

6   sales in just two months amounted to about half of Weinert's holdings at that time (121,985 out of

7   255,124 shares).  The plan was thus fulfilled entirely, and therefore effectively ended on that date,

8   just over two months after it was started.

9           As noted above, there are several attributes of this plan that raise red flags.  Most obviously,

10  it is highly unusual for plans to start and end so quickly, especially when they are for diversification

11  purposes.  For instance, Souissi's plan did not see its first sale for two months (from December 2006

12  when started to February 2007), while Weinert's saw all sales under it completed in the first two

13  months. In addition, the same defects with the Leparulo plan noted above apply here.  The plan did

14  not space out sales in relatively small increments, it did not result in sales at a range of prices, it sold

15  a large portion of the executive's portfolio in a short time, and it did not receive vetting from the

16  board of directors. In sum, this plan has all the hallmarks of plans that are not compliant with Rule

17  10b5-1 and in which insiders are using plans to shield informed trades.

18          **D.      Defendant Ratcliffe**

19          Catherine Ratcliffe, the Vice President of Business Affairs and General Counsel of Novatel,

20  entered into her Rule 10b5-1 plan on June 13, 2007, and it was announced on June 22, 2007, on the

21  same Form 8-K in which Leparulo publicly announced his plan.  She sold a total of 143,366 shares

22  under the plan over the next six months, but, importantly, she sold 115,366 (or about 81%) of these

23  shares within about one month of entering into the plan.

24          The defects in the use of her plan mirror those identified above with respect to Leparulo's

25  plan. Trades under the plan happened quickly after initiation of the plan, happened at relatively high

26  prices, happened in large chunks, and were made without meaningful and typical board involvement.

27  As to the closeness in time between the plan initiation and the trades, it is useful to compare

28  Ratcliffe's trades with the initial trades of Souissi.  As noted above, Souissi made no trades in the

first two months under his plan, and if we take his trades before he amended his plan in May 2007, it took until April (or four months) for him to sell the same percentage of shares as Ratcliffe did in the first month of her plan. In other words, Souissi (and Hadley, as described below) sold about 18 percent of the total shares sold under his pre-amended plan per month, while Ratcliffe sold over 80 percent in the first month. This does not look like "gradual diversification for estate planning purposes," but rather opportunistic dumping of shares. This view is supported by my empirical research on thousands of 10b5-1 Plans. Plans that are set up for diversification purposes look much more like the pre-amendment Souissi plan than the Ratcliffe plan (or the amended Souissi plan).

One specific similarity with Defendant Leparulo's plan bears closer examination. Ratcliffe's plan called for the orderly disposition of shares over several months, but, like Leparulo's, contained an accelerator clause that triggered the sale of virtually all of her shares if the stock price of Novatel rose to $26 and then $28. The plan also triggered sales of 50,000 shares if the price was at $22. Notably, the price on the date Ratcliffe signed her plan was nearly $25, or more than the $22 trigger and within pennies of the first accelerator. Her plan to sell 100,000 shares would therefore be triggered almost immediately, as 50,000 were triggered at a price of above $22 and an additional 45,000 at a price of $26. As it turns out, given Novatel's stock price trajectory, Ratcliffe's plan resulted in the sale of almost 100,000 shares – her planned number for the entire period of July to January – in just one month.

It is especially noteworthy that Ratcliffe as general counsel is in a privileged position and serves a special role as gatekeeper for insider use of trading plans. General counsels represent the firm (*i.e.*, the shareholders) when considering whether actions by managers should be permitted or not, and therefore have a legal and ethical obligation to exercise the utmost diligence in reviewing trading plans for compliance with the Rule. The best practice is for general counsels to rigorously question insiders proposing trading plans, especially when features of the plans, like accelerator provisions at or below market price, suggest potential manipulation. The record shows that Ratcliffe provided only rudimentary review of the proposed trading plans, and in fact followed the lead of the others in adopting plans at the same time and in very similar fashion.

**E.      Defendant Hadley**

Robert Hadley, Senior Vice President of Sales, followed a similar approach with his 10b5-1 trading plan as Souissi did with his. Hadley initiated his plan on December 15, 2006, the same day as Souissi, and public disclosure was made in the same Form 8-K filing as Souissi's. And like Souissi, the first five or six months of his plan had many of the hallmarks of a proper, diversification plan. (Again, the same questions about what Hadley knew in December 2006 are germane to whether these hallmarks are truly evidence of a diversification plan.)

Hadley's plan called for regular sales of 15,000 shares per month, and over the first three months of the plan, these sales executed on a regular schedule. In addition, the plan included laddered price triggers that would stimulate additional sales. These triggers were reached over the first four months of the plan, resulting in additional sales of over 100,000 additional shares at prices of more than $12.50, $14, and $15. Each of these features of the plan is consistent with a plan intended to comply with the letter and spirit of Rule 10b5-1. The regular, monthly sale of a certain number of shares at whatever prices prevail, as well as the sale of additional shares at higher prices, are common attributes of hundreds of plans examined in my empirical work in which insiders were found not to be abusing the Rule to earn abnormal returns.

But, like Souissi, Hadley amended his plan about half way through its duration (on May 17, 2007) to significantly change the type of trades that would be made. It is worth noting that all five executives either entered into or amended their plans within one month of this time (from May 14 to June 13).

| Insider/Defendant | Relevant date |
|---|---|
| Weinert | May 14, 2007 |
| Hadley | May 17, 2007 |
| Souissi | May 17, 2007 |
| Leparulo | June 1, 2007 |
| Ratcliffe | June 13, 2007 |

The relevant time period for the inquiry into the possession of material, nonpublic information is therefore May 14 to June 13, 2007. This extraordinary timing, especially when there is evidence that Defendants knew about the significant change in business prospects with one of Novatel's key customers, is an occurrence that is not something commonly seen in plans used at other firms. It is somewhat common for individuals to enter into plans around the same time, although this usually happens at the beginning of the year, but for other executives to amend at the same time is highly unusual.

Hadley's amendment, executed on May 17, 2007 (and disclosed one week later on May 25, 2007), called for the sale of 14,650 shares when the share price rose above $20 and the sale of the rest of his large holdings of stock option grants if the price rose above $23.50. The stock price was at $20 when the plan was amended, so the first amendment amounted to an immediate sell order at the market price of $20.90. Obviously, the use of a Rule 10b5-1 Plan here does no work. There is nothing that prevents insiders from selling shares outside of their existing 10b5-1 Plans, and by selling within the plan one day later, the plan cannot provide any legal defense since the legal inquiry about possession of inside information is the same as without the use of a trading plan.

As for the second accelerator, the stock price reached the target level of $23.50 within two weeks, and on June 1, the plan executed the sale of about 98,000 shares of stock at that price. Over the remaining six months of the plan, Hadley sold just 16,000 shares in monthly increments of about 2,667 shares. Accordingly, one gets a picture of three periods in which Hadley used his plan. The first was the first four months of the plan, in which Hadley sold 45,000 shares in regular, monthly 15,000–share increments. These sales occurred at prices ranging from $11 to $15. The second was the one-month period right after his amendment during which he sold about 98,000 shares at a price of about $23.50. The final period is one in which he sold 2,667 shares per month at prices ranging from $26 to $15.

The first and possibly the third period have hallmarks of uninformed diversification trading plans, while the middle period, where over 60 percent of all trades were made within one month of a change in the plan is more consistent with opportunistic sales to take advantage of temporary price distortions.

## F. Summary

While it is impossible to definitively determine whether an insider-trading plan was proper or improper without considering the issue of what the executive in question knew when he or she entered into the plan, my extensive research on thousands of plans at thousands of firms has provided some clues as to plan design and execution that are much more likely associated with abuse than compliance. The plans used by Defendants bear all the hallmarks of improperly used plans. These plans were either adopted or amended close in time to relatively large volumes of sales at relatively high prices. The plans did not receive board approval. The plans started and ended abruptly, starting during the middle of the year and ending in effect soon thereafter (or, as in the case of the amended plans, returning back to a normal state shortly thereafter). Plans that are within the letter and the spirit of Rule 10b5-1 do not generally look like this, but rather are long in duration, regular in sales, variant in prices sold at, and subject to internal checks to ensure a lack of inside information or opportunism. The plans or amended plans in this case do not have these features of legitimacy.

## V. Conclusion

The story the evidence in this case tells is a familiar one based on my empirical research into the abuse of Rule 10b5-1 trading plans. Corporate executives with advanced knowledge of bad news commonly use purported 10b5-1 plans to try to immunize trades that would otherwise be highly suspicious and illegal. If the Rule worked perfectly as intended or was enforced perfectly by the SEC, this problem would not exist, since the inquiry about what information the insiders possessed would be the same whether it was at the time of the trade or the time of the plan. But, as shown above, there are several aspects of the Rule that allow it to provide more protection than warranted. This allows insiders to illegitimately protect trades that were planned based on material, nonpublic information. The empirical research of my colleagues and me proves this.

The facts I've seen in this case show that is what Defendants were trying to do. Defendants' purported Rule 10b5-1 Plans bear all the hallmarks of improper plans designed to try to insulate informed trades. Defendants entered into their plans or amended existing plans at a time when the evidence suggests they knew of a significant change in business prospects for one of their key

1  customers.  Sales under these plans were made shortly after the plans were started or amended; sales

2  were made in large volumes relative to historical sales practices of these Defendants; sales were

3  made at consistently high relative stock prices; plans terminated shortly after the drop in Novatel's

4  stock price; and the board of Novatel was not substantially involved in approving or monitoring

5  these sales.  All of these features are inconsistent with corporate best practices regarding Rule 10b5-

6  1 Plans and are consistent with the abuse of the Rule based on my empirical research.

7       The potential abuse of Rule 10b5-1 here was evident to Novatel insiders. On June 14, 2007,

8  Novatel's head of European operations, Mr. Balchin, sent an email to Defendant Ratcliffe, in her role

9  as general counsel of Novatel, expressing his views about what Novatel insiders knew or should

10  have known at that time.[38]  Importantly, this was one day after Ratcliffe entered into her purported

11  10b5-1 trading plan and within several weeks of all other Defendants entering into or amending their

12  trading plans to sell large volumes of shares almost immediately.  Balchin peppers Ratcliffe with

13  questions about when he can sell after his options vest: "One further question: the material non-

14  public information list [in the Novatel insider-trading policy] appears to include information that

15  most/all of the senior executives at Novatel would have at least some knowledge of, so I'm not sure

16  how I will be able to declare I do not have any of this information."[39]

17       Rule 10b5-1 was designed to allow insiders the ability to set up trades in the future at times

18  when the informational advantages Balchin discussed would have been dissipated.  Instead,

19  Defendants set up plans to trade large volumes of shares quickly, at a time in which Novatel's public

20

21

22

23

24

25  _____

26  [38]    *See* NOV-E-4887857.

27  [39]    *Id.*

28

1 statements suggested a bright future but the evidence shows Defendants had knowledge of the darker

2 reality.

3        I declare under penalty of perjury under the laws of the United States of America that the

4 foregoing is true and correct.  Executed this 13th day of December, 2010, in Chicago, Illinois.

                    Respectfully submitted,

 

 

_____

            M. TODD HENDERSON

**EXHIBIT A
PAGE 48**

# EXHIBIT 1



**M. Todd Henderson**
Professor of Law
The University of Chicago Law School
(773) 834-4168
[toddh@uchicago.edu](mailto:toddh@uchicago.edu)

**Current positions:**

| | |
|---|---|
| 2004-Present | **The University of Chicago Law School**<br>Professor of Law<br>Assistant professor (2004-2009) |
| 2011-2014 | Member, National Adjudicatory Council, Financial Industry Regulatory Association ("FINRA") |
| 2011 | Roger J. Traynor Summer Professor in Corporate Law at the University of California, Hastings School of Law |
| 2011-2014 | Fresco Chair in Corporate Law at the University of Genoa, Italy |

| | |
|---|---|
| **Subjects:** | Corporations; Securities Regulation; Mergers & Acquisitions; Executive Compensation; Banking; Derivatives; Corporate Governance; Torts |
| **Awards:** | Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service awarded by the Federalist Society, 2009 |
| | Faculty Hooder, as elected by students of the Class of 2007 |

**Prior Experience:**

| | |
|---|---|
| 2001-2004 | **McKinsey & Company**, Washington, D.C., Boston, Mass.<br>Engagement manager (telecommunications, private equity) |
| 1999-2001 | **Kirkland & Ellis**, Washington, D.C.<br>Associate (telecommunications, appellate litigation) |
| 1998-1999 | **Judge Dennis Jacobs**, Second Cir. Ct. of Appeals<br>Law clerk |

**Education:**

1995-1998    **The University of Chicago Law School**, Chicago, Ill.
J.D. with high honors
Order of the Coif
Editor, University of Chicago Law Review

1989-1993    **Princeton University**, Princeton, N.J.
B.S.E. Civil Engineering & Operations Research, cum laude
J. Rich Steers Award for Academic Excellence
Elected to Sigma Xi honor society

**Academic publications:**

"Insider Trading and CEO Pay," *Vanderbilt Law Review*, forthcoming 2011

"Strategic Disclosure of Rule 10b5-1 Trading Plans," under review at the *Journal of Legal Studies* (with Alan Jagolinzer and Karl Muller)

"Do Accounting Rules Matter: The Dangerous Allure of Mark to Market" *Journal of Corporation Law* (with Richard Epstein), forthcoming 2011

"Justifying Jones." 77 *University of Chicago Law Review* 1027 (2010)

"Predicting Crime." 52 *Arizona Law Review* 15 (2010)

"Credit Derivatives Are Not 'Insurance'." 16 *Connecticut Insurance Law Journal* 1 (2009)

"The Nanny Corporation." 76 *University of Chicago Law Review* 1517 (2009)

"Introduction to *The Going Private Phenomenon: Causes and Implications*." 76 *University of Chicago Law Review* 1 (2009) (with Richard Epstein)

"The Impotence of Delaware's Taxes: A Response to Barzuza's Delaware's Compensation." 95 *Virginia Law Review In Brief* 49 (2009)

"Corporate Philanthropy and the Market for Altruism." 109(5) *Columbia Law Review* 571 (2009) (with Anup Malani)

"One Hat Too Many? Investment Desegregation in Private Equity." 76(1) *University of Chicago Law Review* 45 (2009) (with William Birdthistle)

**Academic publications (cont.):**

"Two Visions of Corporate Law." 77(3) *George Washington Law Review* 708 (2009)

"Citing Fiction." 11 *Green Bag 2nd* (2008)

"From 'Seriatim' to Consensus and Back Again: A Theory of Dissent." *Supreme Court Review* (2008)

"Other People's Money." 60 *Stanford Law Review* (2008) (with Douglas Baird)

"Deconstructing Duff and Phelps." 74 *University of Chicago Law Review* 1739 (2007) (Special Issue: Commemorating Twenty-Five Years of Judge Richard A. Posner)

"Paying CEOs in Bankruptcy: Executive Compensation When Agency Costs Are Low." 101 *Northwestern University Law Review* 1543 (2007)

"Prediction Markets for Corporate Governance." 82 *University of Notre Dame Law Review* 1343 (2007) (with Michael Abramowicz)

"Corporate Heroin: A Defense of Perks, Executive Loans, and Conspicuous Consumption." 93 *Georgetown Law Journal* 1835 (2005) (with James C. Spindler)

"The Influence of F. A. Hayek on Law: An Empirical Analysis." *NYU Journal of Law and Liberty* (2005)

**Books:**

*Law of Mergers and Acquisitions* (4th Ed.) (with Dale Oesterle) (in progress)

*Fundamentals of Corporate Law* (Insight series with Aspen) (in progress)

Corporate Finance for Lawyers (textbook with Aspen) (with George Geis) (in progress)

*Capitalism 2.0* (book project with Princeton University Press) (with Anup Malani) (in progress)

**Book Chapters:**

"Everything Old Is New Again: Lessons from *Dodge v. Ford Motor Company*." In *Corporate Law Stories*. Foundation (2009).

"Insider Trading and Executive Compensation: What We Can Learn from the Experience with Rule 10b5-1." In *Executive Pay Handbook*. Edgar Elgar, forthcoming.

**Works-in-progress:**

"Layering of Law," Working Paper

"Governance at Gunpoint: Plaintiffs' Lawyers as Corporate Reformers"

"Bankruptcy for Competitive Advantage" (with Todd Zywicki)

"The Demand for Insider Trading Regulation"

**Selected presentations:**

Stanford Directors' Roundtable, Invited Faculty, 2006-08

Chicago Booth School of Business Directors' Consortium, Faculty, 2005-Present (executive compensation)

Investment Management Consultants Association, Chartered Private Wealth Advisor program, Invited Faculty, 2009 (executive compensation, valuation of closely held businesses)

European Financial Management 2009 Symposium: Corporate Governance and Control, "Scienter Disclosure" (accepted paper)

NBER Summer Workshop, "Scienter Disclosure," 2008 (accepted paper)

Conference on Empirical Legal Studies, "Scienter Disclosure," 2008 (accepted paper)

American Law and Economics Association, "Paying CEOs in Bankruptcy," Annual Meeting 2005 (accepted paper)

**Expert witness experience:**

(1) Year: 2007

    Case: CareerBuilder.com v. Stirling Bridge Corp.
    Court: Arbitration of state-law claims
    Location: Chicago, IL
    Role: Expert witness on piercing the corporate veil for plaintiff (represented by Latham & Watkins)

(2)    Year: 2008-present
    Case: CDX v. Venrock
    Court: Federal District Court, Northern District of Illinois
    Location: Chicago, IL
    Role: Expert witness on corporate governance for plaintiff (represented by McBreen & Kopko)

(3)    Year: 2009
    Case: Reuter v. Advance America, Cash Advance Centers of Florida, Inc.
    Court: Florida State Court (Circuit Court of the Fifteenth Judicial Circuit in and For Palm Beach County, Florida)
    Location: Palm Beach, FL
    Role: Expert witness on law and economics for defendants (represented by Buckley Sandler LLP)

(4)    Year: 2009
    Case: Patterson v. iPCS, Inc.
    Court: Illinois State Court (Circuit Court of Cook County – Chancery Division)
    Location: Chicago, IL
    Role: Expert witness on corporate governance and telecommunications industry best practices for plaintiffs (represented by Mayer Brown LLP)

**Professional affiliations:**

American Law and Economics Association

**Bar admissions:**

Maryland (inactive)