1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re NOVATEL WIRELESS SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) | Civil No.08cv1689 AJB RBB ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS AND GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT [Doc. Nos. 289 and 290] |

17    Currently before the Court are two motions: (1) Defendant Peter Leparulo's Motion for

18 Judgment on the Pleadings, Doc. No. 289; and (2) a Motion for Summary Judgment, Doc. No. 290, by

19 Defendants Robert Hadley, Peter Leparulo, Novatel Wireless, Inc., Catherine Ratcliffe, Slim Souissi,

20 and George Weinert.  The Plaintiffs filed oppositions, Doc. Nos. 327 and 328 respectively, to these

21 motions and Defendants filed replies, Doc. Nos.325 and 338 respectively.[1]  Based upon the parties

22 arguments and moving papers, and for the reasons set forth herein, Defendant Leparulo's Motion for

23 Judgment on the Pleadings, Doc. No. 289, is hereby GRANTED and Defendants' Motion for Summary

24 Judgment, Doc. No. 290, is hereby GRANTED IN PART AND DENIED IN PART as set forth below.

25 ///

26 ///

27 ///

28

---

[1] Hearings were held on the record for both motions.  *See* Doc. Nos. 392 and 383.

**_Background_**

**_I. Factual Background_**

   **_A. Parties_**

     Lead Plaintiffs, Pension Fund Group is comprised of: (1) Plumbers & Pipefitters' Local #562 Pension Fund; and (2) Western Pennsylvania Electrical Employees Pension Fund. Plaintiffs brought this securities class action against Defendants Novatel, Peter V. Leparulo, George B. Weinert, Robert M. Hadley, Slim S. Souissi, and Catherine F. Ratcliffe claiming that they purchased securities during the Class Period[2] and were allegedly damaged as a result of these purchases.  (Compl. ¶42-48.)

     Plaintiffs alleges that during the Class Period, Novatel employed 300 people company-wide, with only 44 employees, including all five individually named Defendants, in "operations." (_Id._ at ¶34.) Plaintiffs allege that the individual Defendants essentially controlled Novatel, including its accounting practices, earning announcements, and SEC filings. (_Id._ at ¶34.)

   **_1. Defendant Novatel_**

     Novatel is headquartered in San Diego, California and trades stock under the symbol NVTL on the Nasdaq. Novatel is a provider of wireless broadband access solutions for the worldwide mobile communications market and produces about 25 different products for the wireless communications industry.  (Consolidated Complaint ("CC") Doc. No. 23, filed Jan. 9, 2009), ¶ 43.)  In 2007, Novatel sold  the "Ovation" product line, including the first-generation U720 and the next-generation U727 wireless modems.  (Ex. 4, at 39-40.)

   **_2. Defendant Peter V. Leparulo_**

     Leparulo was, at relevant times, Chairman and Chief Executive Officer ("CEO") of Novatel. (Compl. ¶44.)  During the Class Period, Leparulo prepared and signed Novatel's Form 10-K, attesting that he had reviewed the contents of the filings to confirm that they did not contain untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances, not misleading.  (_Id._)  Leparulo issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as the primary person,

---

[2] The class period as been defined by Plaintiffs is between February 27, 2007 and November 10, 2008.

along with Weinert, with knowledge about Novatel's business, outlook, financial reports, and business practices. (*Id.*) Plaintiffs allege that while in possession of non-public material information, Leparulo sold 473,357 shares of his Novatel stock for insider trading proceeds of $11,530,258 during the Class Period. (*Id.*)

### 3. Defendant George Brad Weinert

Weinert was, at relevant times, President of Novatel. (CC, Doc. No. 23, at ¶45.) During the Class Period, Weinert prepared and signed the Company's Form 10-K and 10Q, and Sarbanes-Oxley Act of 2002 ("SOX") certifications filed with the SEC, attesting that he had reviewed the contents of the filings to confirm that they did not contain untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances, not misleading. (*Id.*) Weinert also issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as the primary person, along with Leparulo, with knowledge about Novatel's business, outlook, financial reports, and business practices. (*Id.*) Plaintiffs allege that while in possession of non-public material information, Weinert sold 121,985 shares of his Novatel stock for insider trading proceeds of $3,305,560 during the Class Period. (*Id.*)

### 4. Defendant Robert M. Hadley

Hadley was, at all relevant times, Senior Vice President of Worldwide Sales and Marketing of Novatel. (CC, Doc. No. 23, at ¶46.) Plaintiffs allege that while in possession of non-public material information, Hadley sold 247,198 shares of his Novatel stock for insider trading proceeds of $4,681,696 during the Class Period. (*Id.*)

### 5. Defendant Slim S. Souissi

Souissi was, at all relevant times, Senior Vice President and Chief Technology Officer of Novatel. (CC, Doc. No. 23, at ¶47.) Plaintiffs allege that while in possession of non-public material information, Souissi sold 272,560 shares of his Novatel stock for insider trading proceeds of $5,488,870 during the Class Period. (*Id.*)

### 6. Defendant Catherine F. Ratcliffe

Ratcliffe was, at all relevant times, Senior Vice President of Business Affairs and General Counsel of Novatel. (CC, Doc. No. 23, at ¶48.) Plaintiffs allege that while in possession of nonpublic

08cv1689

material information, Ratcliffe sold 143,366 shares of her Novatel stock for insider trading proceeds of $3,646,804 during the Class Period.  (*Id.*)

### B.  *Plaintiffs Allegations*

Plaintiffs allege that between February 27, 2007 and November 10, 2008 (the "Class Period"), Defendants engaged in a fraudulent scheme to inflate Novatel's stock value so that Defendants could sell their stock in the company for a profit.  (*Id.* at ¶¶1, 12.)  Plaintiffs contend that Novatel's success was largely dependent on its ability to supply wireless modems to its two largest customers, Sprint and Verizon, which in 2006 accounted for 38.2% and 19.7% of Novatel's revenue respectively. (*Id.* at ¶14.) According to Plaintiffs, "defendants knew that the market was particularly sensitive to information about these customers" and "[s]trong financial results would surely spur an increase in Novatel's stock price whereas any negative information regarding these customers would reduce it." (*Id.* at ¶14.)

Plaintiffs allege that throughout the Class Period, Defendants Weinert and Leparulo misrepresented the financial condition of the Company because they told investors that the Company was seeing strong demand for its products, and did not disclose to investors that Novatel did not have an adequate "product mix" to meet the needs of its customers.  (CC, Doc. No. 23, at ¶¶ 57(a)(iii)), 62(a)(ii), 66(a)(ii), 73(a)(ii)).)  Plaintiffs also allege that Novatel covered up the slowdown in its business by shipping product "early," which purportedly violated accounting rules governing revenue recognition. (*Id.*, ¶¶ 6.) Plaintiffs claim that four specific stock price declines—on July 20, 2007; February 21, 2008; April 15, 2008; and August 20, 2008—purportedly resulted from the market learning of these allegedly concealed facts.  (*Id.*, ¶¶ 125-28.)  Plaintiffs further allege that Defendants sold Novatel stock because they learned that Sprint would stop placing additional orders for Novatel's U720 modem.  (*Id.*, ¶ 4.)

### 1. *Financial Condition of Novatel*

#### a. *Sprint Cancellation*

On January 8, 2007, Tamara Juenger of Sprint forwarded an email to three low-level Novatel employees stating that Sprint planned to replace the U720 modem.  (Ex. 14, at 267.)  Ms. Juenger informed the Novatel employees that the last purchase order for U720s would probably be for the week of April 1, 2007.  (*Id.*)  Within Novatel, word that a customer would no longer be ordering a certain product was not unusual.  (Ex. 16 [Weinert Dep., 79:16:80:6].)  In Novatel's industry it was and is quite

common, and is most often a prelude to pricing negotiations, particularly when competitive product is available and next generation product is expected in the near term. (*Id.*; Exs. 6 [Souissi Expert Dep., 51:25-10]; 17 [Leparulo Dep., 220:17-222:14].) In this case, Novatel was the first to market, and when Sierra Wireless (Novatel's competitor) readied its competing wireless USB modem for sale, Sprint leveraged the opportunity to negotiate. Mot. at 4. Novatel's Acting CEO, Mr. Weinert, was upset by Sprint's decision, but immediately set out to convince Sprint to continue placing orders for the U720 to ensure a smooth transition to the successor U727, which was anticipated to be faster and smaller than Sierra's Wireless' product. *Id.* Just two weeks after Ms. Juenger's email, representatives of Sprint and Novatel met, and Tim Hipsher of Sprint said that contrary to Ms. Juenger's email, the U727 would be removed from only one channel. (Ex. 18, at 298-99.) Mr. Hipsher also said the end of life plan for the U720 might drag out for some time. (*Id.*) On March 1, 2007, Ms. Juenger emailed four lower-level Novatel employees that the discontinuation of the U720 would be pushed back to the middle or end of May. (Ex. 19, at 301.) All the while, Sprint kept ordering the U720. As late as May 18, 2007, Sprint was sending forecasts to Novatel showing product being anticipated for delivery through the third quarter of 2007. (Ex. 20, at 303.) On May 24, 2007, a Sprint representative finally told Novatel employees in a conference call that Sprint would not order any more U720s; however, delivery of open orders for the U720 would continue through June 2007. (Ex. 21, at 309.) Sprint placed its first orders for the next generation U727 shortly thereafter, in late July 2007. (Ex. 99.)

### b. Novatel's Public Statements

In early 2007, Novatel reported strong financial results. It told investors that its USB modem was extremely successful in the market, and that Novatel was seeing strong sales to Verizon and Sprint. (CC, Doc. No. 23, at ¶15). On February 27, 2007, Defendant Weinert, in a press release, stated with respect to the first quarter of 2007, that Novatel would "continue to ramp to meet increasing demand in the marketplace." (*Id.* at ¶51). Weinert also stated that day, during the Company's earnings conference call, that competitors are using "fairly well tried out, older technologies and really the market isn't ready for that right now." (*Id.* at ¶52). In a press release on May 1, 2007, Novatel reported first quarter revenue increases of 174% year over year and Weinert stated that "[o]ur first quarter performance was the best in Company history . . . Sales were even higher than forecasted in our revised guidance due to strong

end-of-the-quarter momentum for newly introduced ExpressCards and Ovation USB devices." (*Id.* at ¶¶53-54). On May 1, 2007, during the Company's earnings conference call, Defendant Leparulo stated that "the market for 3G Wireless is taking off and we believe we're perfectly positioned to take advantage of that growth." (*Id.* ¶55.) Defendant Weinert stated that, "[w]e certainly see strong demand for [our first generation] products, and we're leading the way, we're actually in a leadership position, in both the express card and the USB markets." (CC, Doc. No. 23, at ¶55.) On May 10, 2007, Novatel filed its Quarterly Report on Form 10-Q containing Sarbanes-Oxley Act of 2002 ("SOX") certifications with the SEC, which was signed by Defendant Weinert and which reaffirmed Novatel's financial results previously announced on May 1, 2007. (*Id.* 56.)

Plaintiffs allege that these statements about the Company's financial results and market share were false and misleading because they did not fairly present the financial condition of the Company throughout the first quarter of 2007. (*Id.* ¶57.) Plaintiffs allege that Novatel failed to disclose it was prematurely shipping product to meet or exceed its quarterly and yearend forecasts, failed to disclose that Sprint would discontinue all further orders of the Company's popular 720 USB card by the end of July 2007, concealed that the Company's product mix failed to meet the immediate needs of its two largest domestic customers, Sprint and Verizon, which was causing Novatel to lose market share, and signed false SOX certifications attesting to the accuracy of the financial results and effectiveness of Novatel's

internal controls, as the Company admitted on November 10, 2008 that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness. (*Id.* ¶57.) Plaintiffs allege that at the same time, Defendants were selling significant amounts of their Novatel holdings. (*Id.*) Plaintiffs allege that during the Class Period, Defendants sold

1,258,466 shares of Novatel stock for almost $29 million in proceeds. (*Id.* ¶15.) Plaintiffs allege that 62% of the Defendants' Class Period sales occurred in June and July 2007, just before the market learned that Sprint would no longer be purchasing Novatel's 720 USB modem, information the company allegedly knew "for some time." (*Id.* ¶16.) Defendants sold this stock at the same time that Novatel was certified by Vodafone to sell its products in late June 2007, and when Novatel was on the verge of being

certified at Telefonica and T-Mobile. (CC, Doc. No. 23, at ¶18.) Novatel's stock price fell from $29 in late July to almost $20 by the beginning of August. (*Id.* ¶17.) According to an analyst on July 20, 2007, "NVTL shares were off sharply this morning, we believe in response to a rumor that NVTL may lose market share at Sprint . . . We agree with the notion making the rounds indicating that the popular EU 720 USB card from NVTL will in fact be end-of-lifed at Sprint as early as next week."[3] (*Id.* ¶17.)

### 2. Loss of Market Share

Plaintiffs allege that Novatel not only lost market share with Sprint's cancellation of the 720 USB modem, but throughout 2007 and continued to mislead investors. (CC, Doc. No. 23, at ¶20.) On June 8, 2007, Defendant Weinert in a press release stated, "[w]e are currently seeing strong demand across our major product lines, most notably for our ExpressCards and Ovation USB devices." (*Id.* ¶58.) Novatel reported 113% revenue growth in 2Q07 and 90% revenue growth in 3Q07, which Defendants emphasized exceeded previous guidance. (*Id.* ¶¶59, 63.) In a press release dated August 6, 2007, Weinert stated that, "[d]emand is strong across a wide range of products" and that "[a]doption of USB wireless modems has been a primary growth driver with over $85 million in sales in the nine months since its introduction." (*Id.* ¶59.) On November 5, 2007, on the Company's earnings conference call, Defendant Leparulo stated, "[we] saw strong demand for these products, and beat guidance and expectations once again. Our market continues to grow rapidly as 3G wireless data proliferates into mainstream technology." (CC, Doc. No. 23, at ¶64.) On the same call, Weinert stated that demand for Novatel's Next Generation USB products was so strong that, "our major hurdle is tightness in our supply channel for selected components due to the strong demand." (*Id.* ¶64.) Weinert stated on August 6, 2007, on the Company's earnings conference call that, "[w]e had an exceptionally strong first half of the year with Sprint." (*Id.* ¶60.)

---

[3] The Complaint only partially quotes the analyst report. The quote goes on to state: however our sources have indicated that Sprint has ample inventory and that the cards will continue to be sold at Sprint stores likely through the end of August. We further believe that NVTL will begin shipping the new smaller form factor USB product in August (earlier than expected) and that the cards will likely begin showing up on Sprint shelves in early September, immediately after the EU720 inventory sells out. We understand this transition has been jointly planned for some time by NVTL and Sprint. As a result, we think there will be little or no gap in the sales of the two cards and as a result, no loss of market share. (Doc. No. 79, Ex. A.)

08cv1689

Plaintiffs allege that these statements and the Company's 10-Q filings were false and misleading because Novatel was losing market share to competitors. Other wireless carriers were targeting the consumer market by slashing monthly service fees. (*Id*. ¶23.) Novatel did not have a viable USB product to immediately compete in this retail market and lost market share to its competitors not only at Sprint, but also at Verizon and in Europe at T-Mobile, Telefonica/O2, and Orange. (*Id*. ¶24.) Plaintiffs also allege that Novatel shifted its focus to the European market in the second half of 2007 because Defendants knew that Novatel was losing market share in the United States. (*Id*. ¶¶25-27.) Novatel's international sales trended upward throughout 2007, even though international sales adversely affected Novatel's profit margins. (CC, Doc. No. 23, at  ¶¶25-27.)

Plaintiffs allege that Novatel's statements concerning the demand for its products were also false and misleading because Defendants failed to disclose that Novatel was prematurely shipping products. (*Id*. ¶28.) Plaintiffs allege that in early 2007, Novatel began shipping as much product as it could to its customers to meet its quarterly and year-end forecasts. (*Id*. ¶28.) A former Novatel employee explained, there was always a crunch time at the end of each quarter and that Novatel would frequently ship large amounts of product up to four weeks early so it allegedly could recognize the revenue up front in the current quarter and meet or exceed Wall Street expectations. (*Id*. ¶28.) Novatel sold product on credit with extended payment terms in 2007 to Sprint and Verizon in order to ship product early and increase its financial results. (*Id*. ¶30.) This practice caused Verizon and Sprint to be flush with inventory by 4Q07. (*Id*. ¶31.) Novatel admitted on November 10, 2008, in its delayed Form 10-Qs for the first and second quarters of 2008, that there were several control deficiencies in the Company's internal control over financial reporting that in the aggregate constituted a material weakness. (CC, Doc. No. 23, at ¶¶28, 62.) Plaintiffs allege that Novatel's stated financial results misled analysts about end-market demand and sales execution because of this practice of early shipment to post strong results throughout 2007. (*Id*. ¶29.)

### 3. Prematurely Recognized Revenue in Violation of Novatel's Revenue Cut-Off Procedures and Generally Accepted Accounting Principles ("GAAP")

Plaintiffs allege that Defendants' scheme to inflate revenues began to unravel in the first quarter of 2008. (*Id*. ¶32.) On February 20, 2008, Novatel issued a press release forecasting $110 million in

revenues for 1Q08, which was $10 million below analysts' estimates. (*Id.* ¶¶67-68.) Novatel attributed this guidance to a consolidation issue at its customers who were supposedly focusing on eliminating inventory from Novatel's competitors, stating that, "[w]e believe that the major North American carriers are looking to significantly consolidate vendors down to two suppliers . . . this may have some modest impact as carriers flush through competitors' products as they consolidate vendors and lower inventory." (CC, Doc. No. 23, at ¶68.) Defendants also disclosed on February 20, 2008 that Novatel was seeing the market shift to the consumer segment, and that this "is a positive move that increases our addressable market." (*Id.* ¶70.) Defendants' forecasts for 1Q08 and their explanations for them took analysts by surprise as none of Novatel's competitors had mentioned the consolidation issue at Sprint and Verizon when raising their outlooks for the quarter. (*Id.* ¶¶67-70.) Plaintiffs allege that in reality, Novatel's main customers were overextended because of early shipments and had to clear their inventory. (*Id.* ¶32.) Novatel's stock price dropped from approximately $14 to as low as $10.20, or roughly 27%, after Defendants' disclosures. (*Id.* ¶33.) On March 3, 2008, Novatel filed its Annual Report on Form 10-K with the SEC largely reaffirming the financial results for 4Q07 and fiscal year 2007 announced on February 20, 2008, which was signed by Defendants Weinert and Leparulo and contained SOX certifications. (*Id.* ¶72.)

Through 1Q08, Defendants repeated the Company's guidance and told analysts that "we are very pleased with the long-term trends and how we are positioned to fulfill them." (CC, Doc. No. 23, at ¶¶33, 74.) On April 14, 2008, Novatel disclosed preliminary results for 1Q08 that were $19 million below the Company's original forecast of $110 million, and $29 million below the original analyst estimates of $120 million. (*Id.* ¶76.) Defendant Leparulo partially attributed this shortfall to the fact that Novatel was "between product launch cycles for our USB devices and demand in the current environment has shifted toward lower end products" and that, "in some cases, we did not have the right products for the right customers." (*Id.* ¶¶76, 77.) On May 1, 2008, Novatel issued a press release which stated that, "revenues for the first quarter of 2008 were $91.3 million." (*Id.* ¶78.) On May 13, 2008, Novatel filed a Form 12b-25 with the SEC for an extension of time to file its Form 10-Q, disclosing that Novatel could not file its Form 10-Q for the quarter because the Company and its Audit Committee undertook an enhanced review of the accounting for a specific customer contract, stating that the review was substantially

completed. (*Id.* ¶79.) Novatel claimed that the review was not expected to change any previously reported financial statements or earnings. (CC, Doc. No. 23, at ¶79.)

Plaintiffs allege that Novatel's financial results concerning 1Q08 revenues and earnings, as reported in press releases, SEC filings, and conference calls were false and misleading. (*Id.* ¶80.) Plaintiffs allege that Novatel failed to disclose that the Company was recognizing revenue in violation of its own revenue cut-off procedures and GAAP, thus rendering the Company's publicly reported financial results materially false. (CC, Doc. No. 23, at ¶80.) On August 19, 2008, Novatel announced that it had broadened its accounting review and determined to move at least $3.4 million in revenue out of 1Q08. (*Id.* ¶81.) Plaintiffs allege that as a result of this disclosure, Novatel's stock price dropped from $8.40 to $6.29 in one day. (*Id.* ¶83.) On November 10, 2008, Novatel issued its delayed Form 10-Qs for the first and second quarters of 2008, disclosing that the revenues for the first quarter were misstated by $3.4 million due to improper revenue cut-off procedures and accounting irregularities relating to certain customer contracts. (*Id.* ¶84.) The Form 10-Qs also indicated that there were several control deficiencies in Novatel's internal control over financial reporting that in the aggregate constituted a material weakness during the Class Period. (*Id.* ¶84.) After the November 10 disclosure, Novatel's stock slid below $5 per share, trading as low as $3.90 per share by November 17, 2008. (*Id.* ¶85.)

***Discussion***

Currently before the Court are Defendant Leparulo's motion for judgment on the pleadings and a Motion for Summary Judgment by Defendants Robert Hadley, Peter Leparulo, Novatel Wireless, Inc., Catherine Ratcliffe, Slim Souissi, and George Weinert.

### I. *Leparulo's Motion for Judgment on the Pleadings*

Defendant Leparulo, filed a Motion for Judgment on the Pleadings, [Doc. No. 289], seeking judgment on all insider trading claims against him.  Leparulo argues that neither of the class representatives in this case traded Novatel stock contemporaneously with his trades.  Inasmuch as Plaintiffs failed to establish contemporaneousness, Leparulo seeks judgment on the pleadings with respect to all of Plaintiffs' insider trading claims against him.

### A. *Legal Standard Under Rule 12(c)*

Rule 12(c) provides:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(c). When deciding a Rule 12(c) motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (citing *Doleman v. Meiji Mutual Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984); *Austad v. United States*, 386 F.2d 147, 149 (9th Cir. 1967)). The court construes all material allegations in the light most favorable to the non-moving party. *Deveraturda v. Globe Aviation Sec. Servs.*, 454 F.3d 1043, 1046 (9th Cir. 2006). Furthermore, judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law.  However, judgment on the pleadings is improper when the district court goes beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment.  *Hal Roach Studios*, 896 F.2d at 1550 (citations omitted).

Documents attached to, incorporated by reference in, or integral to the complaint, however, may be properly considered under Rule 12(c) without converting the motion into one for summary judgment. *Rose v. Chase Manhattan Bank USA*, 396 F. Supp. 2d 1116, 1119 (C.D. Cal. 2005) (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)).

### B. Discussion

Plaintiffs second cause of action is against all Defendants for insider trading in violation of §10(b) and Rule 10b-5 on the basis of Defendants' knowledge about Sprint's cancellation of its orders for Novatel's 720 USB modem. (CC, Doc. No. 23, at ¶¶146-53.)  To establish a violation for insider trading under §10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must establish that: (1) Defendants traded in the securities of their corporation on the basis of material nonpublic information; (2)

08cv1689

Defendants acted with scienter when making these trades; and (3) these trades were contemporaneous with the trades of class members.[4]

To maintain a cause of action for insider trading, Plaintiffs must have traded "contemporaneously" with Defendants. *Neubronner v. Milken*, 6 F.3d 666, 669 (9th Cir. 1993). The Ninth Circuit has not "define[d] the exact contours of the [time] period." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1002 (9th Cir. 2002); *see also Neubronner*, 6 F.3d at 669 (stating the time period is "not fixed").[5] This Court previously concluded that Plaintiffs' trades occurring within four business days after Defendants' sales are sufficiently contemporaneous.[6] A four day trading period reasonably protects Plaintiffs and class members, serves as a legitimate proxy for the traditional privity requirement, and protects Defendants from limitless liability. *See e.g. Johnson v. Aljian*, 257 F.R.D. 587, 595 (C.D. Cal. 2009) (holding trades within four days of defendant's sales were contemporaneous).

The Plaintiffs' proposed Class Period is from February 27, 2007, the date when Novatel issued a press release announcing Novatel's financial results for 4Q06 and the full fiscal year, to November 10, 2008, the date when Novatel issued its Form 10-Q and announced the results of its internal accounting review, disclosing it misstated revenue due to improper cut-off procedures and outlined its internal control weaknesses. (*See* Doc. No. 121-1 at 9, 14.) Lead Plaintiffs - Pension Fund Group is comprised of: (1) Plumbers & Pipefitters' Local 562 Pension Fund; and (2) Western Pennsylvania Electrical Employees Pension Fund. Upon review of the record, none of the Plaintiffs' trades were made contemporaneously with trades by Defendant Leparulo.[7] The closest trades by Plaintiffs' during the

---

[4] *United States. v. O'Hagan*, 521 U.S. 642, 651-52 (1997); *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002); *United States v. Smith*, 155 F.3d 1051, 1067-69 (9th Cir. 1998).

[5] *Brody*, 280 F.3d at 1002 (holding that trades more than two months apart are not contemporaneous); *see also Neubronner*, 6 F.3d at 669- 70 (indicating trades one month apart are not contemporaneous).

[6] This Court's Order of May 10, 2010, Doc. No. 180, at 14-15; *See In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 761 ("Given that stock trades settle within three days . . . [o]nce an insider's sale settles, other traders are no longer in the market with that insider and risk no relative disadvantage from that insider's failure to disclose.").

[7] Defendant Leparulo traded Novatel stock during the class period on the following dates: 5/18/2007; 5/29/2007; 5/29/2007; 5/30/2007; 7/2/2007; 7/3/2007; 7/5/2007.

class period were by Western Pennsylvania Electrical Employees Pension Fund.[8]  Both of these trades, which occurred on May 3, 2007 and July 20, 2007, were within 15 days of trades executed by Defendant Leparulo.

Plaintiffs concede that: (1) to pursue insider trading claims under Rule 10b-5, at least one class representative must have traded contemporaneously with each defendant, and (2) neither class representative traded contemporaneously with Mr. Leparulo. However, in opposing the Defendants' motion, Plaintiffs instead argue the novel theory that they may sue based on Mr. Leparulo's passive investment Artis Capital Management ("Artis"), which sold Novatel stock contemporaneously with one of the class representatives.  (*See* Pla's. Opp., Doc. No. 327, at 1-2.) The Court finds this argument unpersuasive and without merit since this argument is being presented for the first time in Plaintiffs' opposition papers and was never alleged in Complaint. As such, Plaintiffs' arguments and facts alleged are outside the pleadings and therefore excluded by the Court.  The Court finds judgment on the pleadings to be proper as Defendant Leparulo has clearly established that on the face of the pleadings, no material issue of fact remains to be resolved and Defendant Leparulo's motion is hereby GRANTED.

## II. Defendants' Motion for Summary Judgment

### A. Legal Standard

#### 1. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a triable issue of fact. That burden may be satisfied, however, "by showing – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party satisfies that burden, to avoid summary judgment a plaintiff must set forth specific facts showing the existence of a genuine issue of material fact. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must point to specific evidence "from which a reasonable

---

[8] *See* Doc. No. 10-4, filed Nov. 17, 2008, p. 4.

jury could return a verdict in its favor." *Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

### 2. Plaintiffs' Claims Under Section 10(b) and Rule 10b-5

Plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against Novatel Wireless, Inc., and individual Defendants Robert Hadley, Peter Leparulo, Catherine Ratcliffe, Slim Souissi, and George Weinert. Section 10(b) forbids (1) the use or employment of any deceptive device, (2) in connection with the purchase or sale of any security, and (3) in contravention of Securities and Exchange Commission ("SEC") rules and regulations.  15 U.S.C. § 78j(b); *see Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  Rule 10b-5, promulgated by the SEC under § 10(b), forbids the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made not misleading."  17 C.F.R. § 240.10b-5; *see Dura Pharmaceuticals, Inc.*, 544 U.S. at 341.  In order to succeed in a private civil action under § 10(b) and Rule 10b-5, a plaintiff must establish "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss."  *Dura Pharmaceuticals, Inc.*, 544 U.S. at 341-42.

### 3. Scienter

The Supreme Court has explained that scienter for purposes of § 10(b) and Rule 10b-5 is "the defendant's intention to deceive, manipulate or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2504 (2007).  To satisfy this standard, a plaintiff must show that a defendant acted intentionally or with "deliberate recklessness."  *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).  The Ninth Circuit has held that "recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct."  *Id.* at 977.  Deliberate recklessness is "conduct [that] may defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the

defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc); *see In re Silicon Graphics*, 183 F.3d at 976.  "The mere publication of inaccurate accounting figures, or a failure to follow GAAP [Generally Accepted Accounting Principles], without more, does not establish scienter."  *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996).

### 4. Materiality

Defendants' motion for summary judgment also challenges the materiality element of Plaintiffs' § 10(b) and Rule 10b-5 claims.  A misrepresentation or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996). The Ninth Circuit has stated that, as a general matter, "[m]ateriality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement."  *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).

### B. Discussion

The Defendants move for summary judgment on four separate grounds: (1) Plaintiffs cannot prove that any of Defendants' statements were materially false or misleading and cannot satisfy their burden of showing scienter with respect to each alleged misrepresentation; (2) Plaintiffs cannot demonstrate loss causation; (3) Plaintiffs have presented no evidence that any Defendant possessed material non-public information at the time he or she sold stock; and (4) there is no primary liability on the part of Defendants for Plaintiffs' claims under section 20(a). Defendants' motion for summary judgment focuses on scienter and materiality.

### 1. Statements Alleged to be Materially False or Misleading

Defendants contend that summary judgment should be granted on: (1) Plaintiffs' claims of accounting fraud due to purported 'channel stuffing,' because Novatel's revenue recognition complied with GAAP and the Plaintiffs have presented no evidence of falsity, materiality or scienter; (2) the Plaintiffs' claims based on fraudulent statements regarding Defendants' 'product mix' omissions; and (3) Plaintiffs' claims based on fraudulent statements regarding the alleged Sprint omission.

### a. Plaintiffs' Channel Stuffing Claims

Plaintiffs contend that Defendants "did not fairly present the financial condition of the Company" because of Novatel's supposed "channel-stuffing"[9] at the ends of quarters. (CC, ¶¶ 57(a)(i)), 62(a)(i), 66(a)(i), 73(a)(i); 80(a)(i); 87). They make two related claims in this regard. First, Plaintiffs claim that the Company violated accounting rules by prematurely recognizing revenue. Second, they argue that Novatel inflated perceptions of demand for its product by engaging in undisclosed "channel stuffing." Defendants move for summary judgement on these claims arguing that Plaintiffs have provided no evidence that Novatel's actions or accounting practices were improper.

Accounting principles are subject to good faith disagreement, and therefore to prove falsity in financial statements, Plaintiffs must prove that the company's accounting treatment was wholly outside the zone of reasonable disagreement. As the Supreme Court has explained:

> Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management.

*Thor Power Tool Co. v. C. I. R.*, 439 U.S. 522, 543 (1979); *REMEC*, 702 F. Supp. 2d at 1215. As such, the opinion of an expert that a defendant's accounting should have been different is not sufficient to defeat summary judgment. "In order to create a triable issue of fact on falsity, plaintiffs must demonstrate more than a 'difference between two permissible judgments, but rather must present facts explaining that the statement is the result of a falsehood.'" *REMEC*, 702 F. Supp. 2d at 1215 (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994); *cf. In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002) ("mere second-guessing" of accounting determination is insufficient to defeat summary judgment on fraud claims). Plaintiffs must further prove that the defendants—who, as

---

[9] The Ninth Circuit definition of 'channel stuffing' is "shipping unneeded products to customers in order to inflate sales and revenue in the short term" and may support a 10b-5 claim only if it involves "the premature pushing of product into the wholesale channels to artificially inflate sales." *Broudo v. Dura Pharms., Inc. ("Dura I")*, 339 F.3d 933, 940 (9th Cir. 2003), rev'd on other grounds by 544 U.S. 336 (2005); *see also In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 575 (N.D. Cal. 2009).

08cv1689

here, may not be accountants themselves knew, or at least recklessly disregarded, that the accounting was inaccurate. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc) (defining "recklessness" as conduct "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or so obvious that the actor must have been aware of it."); *In Re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999) ("recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct.").

### i. Evidence of Falsity

Defendants argue that courts have repeatedly recognized that pressing to make and recognize sales at the end of a quarter typically does not give rise to a cognizable claim of securities fraud. As the Ninth Circuit observed recently in *Oracle*, it is not unusual for even a majority of a company's sales to regularly be "made in the final days of a quarter," after the company "lower[s] prices in attempt to meet its quarterly projections." *Oracle*, 627 F.3d at 383. Accordingly, "[c]hannel stuffing" may support a 10b-5 claim only if it involves "the premature pushing of product into the wholesale channels to artificially inflate sales."[10]  The key terms in these definitions are "artificially" and "unneeded." Channel stuffing only crosses the line into securities fraud when it involves a deception of investors. This may occur when a company ships unneeded or unordered product.[11]  Practices of "pulling sales forward, accelerating sales, or incentivizing sales" do not state a claim for a securities fraud. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, --- F. Supp. 2d ----, No. 02 C 4356, 2010 WL 3275284, at *42 (N.D. Ill. Aug. 13, 2010) (plaintiffs must allege that defendants shipped "unordered products or products that the customers did not want").

---

[10] *Broudo v. Dura Pharms., Inc. ("Dura I")*, 339 F.3d 933, 940 (9th Cir. 2003), rev'd on other grounds by 544 U.S. 336 (2005); *see also In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 575 (N.D. Cal. 2009) (channel stuffing is "shipping unneeded products to customers in order to inflate sales and revenue in the short term").

[11] *See In re Watchguard Sec. Litig.*, No. C05-678LR, 2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ("'Channel stuffing' is merely good business when the customers want or keep the products they receive; it is bad business when the customers do not want the products and return them."); *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192 (D. Ariz. 2009) (an "allegation of channel stuffing might be more indicative of scienter if Defendants had intentionally distributed products they knew would be returned in an attempt to show increased revenue").

Defendants argue that Plaintiffs have failed to produce any evidence that Novatel shipped unneeded or unordered product.  Representatives of Novatel's two largest customers—Sprint and Verizon—both testified that they knew of no instances in which their company purchased product from Novatel that they did not need. (*See* Exs. 37 [Hipsher Dep., 159:22-160:21]; 38 [Krolian Dep., 125:5-22]; 5 [Lendez Report, at 66-67].) Nor can Plaintiffs point to any example of Novatel shipping product that a customer did not order. Although Novatel once refused to postpone a shipment to Verizon from December 2007 to January 2008, that merely reflected Novatel's perfectly permissible insistence on holding Verizon to a purchase order that had been placed for December delivery. (Ex. 56 [Duckworth Dep., 58:1-61:2]; Ex. 102].) Verizon accepted, and did not return the product, and Novatel's auditor concurred with management's conclusion that the revenue was appropriately recognized, even after reviewing the transaction in detail during the audit committee investigation. (Ex. 57 [Slaughter Dep., 85:18-86:18].)

In response, the Plaintiffs primarily argue, through their expert D. Paul Regan, that a number of Novatel's end-of-quarter transactions were allocated to the wrong quarter because products were shipped prior to when Mr. Regan believes Novatel was authorized to ship them. (Ex. 58 [Regan Report, at 28-39].) The Court finds that Mr. Regan's opinion is based upon an incorrect assumption about when Novatel was authorized to ship products[12] and is not supported by any evidence.[13]  Even if Mr. Regan's opinion were fully supported, which it is not, at most it would establish the existence of "two permissible judgments," which amounts to nothing more than a difference of opinion on accounting practices and is not enough to "create a triable issue of fact on falsity." *REMEC*, 702 F. Supp. 2d at 1215 (internal quotation marks omitted).

### ii. Evidence of Materiality and Scienter

---

[12] *See* Ex. 58 [Regan Report, at 31]; Leddon Decl., ¶ 3.

[13] *See In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999) (affirming summary judgment for defendants "[b]ecause there is no evidence in the record establishing" the factual assertion upon which the expert's opinion was "founded"); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[W]hen indisputable record facts contradict or otherwise render [an expert's] opinion unreasonable it cannot support a jury's verdict.").

Even if Mr. Regan's opinions of the amount of channel stuffing in any given quarter were taken as true, the channel stuffing alleged by Plaintiffs when the netting effect[14] is taken into account, did not raise the Company's revenue by more than 5%, the standard measure of materiality, in any quarter during the class period.[15]  As such, the Court finds that the Plaintiffs' have failed to demonstrate materiality with regard to their channel stuffing claims.

Plaintiffs have also failed to show that Defendants Weinert and Leparulo knew or recklessly disregarded that the judgments of their accountants or that these judgments were so wrong as to be outside the bounds of professional disagreement and that the resulting errors were serious enough to render the Company's financial statements materially false or misleading. Neither Defendant is an accountant, and Plaintiffs have presented no evidence that Defendants ever made decisions concerning how to account for any particular transactions or that they were given reason to believe that any accounting or auditors' conclusions were wrong.  "[A] CEO's responsibility to oversee the business[] . . . does not demonstrate [his] involvement in [accounting determinations]" and does not support a finding of scienter. *See REMEC*, 702 F. Supp. 2d at 1240.

Based upon the foregoing the Court concludes that Plaintiffs have failed to satisfy their burden to come forward with evidence demonstrating falsity, materiality or scienter for their channel stuffing claims and as such, Defendants' motion for summary judgment on Plaintiffs' channel stuffing claims is hereby GRANTED.

### b. Plaintiffs' 'Product Mix' Claims

---

[14] Plaintiffs allege long term channel-stuffing, under Plaintiffs' own theory the additional revenue at the end of any quarter merely offset a comparable amount of beginning-of-quarter revenue that would have been moved back to the previous quarter. As Judge Carter has observed:

> for channel stuffing to be improper logically it must be a short-lived scheme in which the wrongdoer attempts to capitalize on artificially increased sales before the resulting drop in sales. If channel stuffing occurs over time, the pattern of increased sales toward the end of each quarter and lower sales at the beginning of each quarter would be quite transparent to investors, and thus could not form the basis for an allegation of fraud. *ICN Pharms*, 299 F. Supp. 2d at 1062.

[15] If Novatel had accounted for its supposed channel stuffing as Mr. Regan claims, Novatel would have recorded 4.13% more revenue in Q1 2007, 4.86% more revenue Q2 2008, and 5.08% more in Q3 2008.

08cv1689

Defendants argue that affirmative misrepresentations alleged by Plaintiffs are based on allegedly misleading omissions regarding "product mix." (Mot. at 9-11.) However, Plaintiffs contend that Defendants' affirmative misrepresentations throughout the Class Period go beyond product mix to the superiority of Novatel's products enabling it to outperform the competition in a growing market. Plaintiffs contend that every statement Defendants made in 2007 about the financial condition of the Company was false because Defendants failed to disclose that Novatel's "product mix" did not "meet the immediate needs" of Sprint and Verizon.[16] Plaintiffs contend that Weinert and Leparulo knew that Novatel would perform poorly in the new market conditions, but did not disclose this.

At the start of the Class Period, Defendants told investors that "[Novatel] continue[d] to ramp to meet increasing demand in the marketplace," which distinguished Novatel from the competition because the competition was purportedly using "fairly well tried out, older technologies and really the market isn't ready for that right now," and described Novatel as being "perfectly positioned" for a market that they claimed was "taking off." (Ex. 7 at NOV-E-2961556; Ex. 8 at NOV-E-5062387; Ex. 20 at 3; Ex. 34 at NOV-E-4788441.)

As the Class Period progressed, and simultaneously with reports of "record" financial results, Defendants claimed that Novatel was "leading the way, we're certainly in a leadership position, in both the express card and the USB markets" (Ex. 20 at 7.) and even claimed that Novatel "had an exceptionally strong first half of the year with Sprint." (Ex. 27.) However, this statement is directly contradicted by the January 8, 2007 cancellation notice from Sprint, by Weinert's response to the news[17]

---

[16] Defendants Weinert and Leparulo made various statements in press releases and conference calls during the Class Period that there was strong demand for Novatel's products, including for its USB products. (CC, Doc. No. 23, at ¶¶51, 52, 54, 55, 57(a)(iii)), i59, 60, 62(a)(ii), 63, 64, 66(a)(ii), 67, 73(a)(ii).) Plaintiffs allege that these statements were false and misleading because during the Class Period Novatel was losing USB domestic market share to its competitors, because it did not have a modem to compete in the low-end market, Sprint cancelled its use of the 720 USB modem, Novatel could not compete for a contract with Sprint to provide WiMax data cards and USB modems, and Novatel shifted focus to the European market. (*Id*. ¶¶16-18, 20-27.)

[17] Weinert's response to this news did not mince words – "If it's true that we loose [sic] this business to Sierra it would have a major impact on our business. This cannot be allowed to happen." Ex. 1. In May 2007, Sprint stopped ordering the U720, just as it had promised. Ex. 2 at NOV-E-2796544. Upon learning this information, Weinert wrote to all the defendants: "THIS IS KILLING ME! And I am about to return the favor!!!! We cannot loose [sic] all of our SPRINT business. I made this clear in January didn't I??????" *Id*. at NOV-E-2796543.

and by the subsequent loss of market share to Sierra Wireless, which was characterized internally as a "bomb [being] dropped" on Novatel. Ex. 48 at NOV-E-2796853.

By the end, Defendants were telling investors that demand for Novatel's second generation USB 727 was so strong that "our major hurdle is tightness in our supply channel for selected components due to the strong demand."[18]  However, the JMP Securities analyst report confirmed the cancellation of the U720 at Sprint in May, provided new information about when the 727 would be available (Aug. or Sept.), and expressed the concern that Novatel would be losing market share to Sierra Wireless.  Ex. 134, ¶¶33-34.

Defendants argue that even if it could be shown that Novatel had some duty to publicly project whether its "product mix" was likely to match future developments in the industry,[19] which it does not, Plaintiffs would have the burden of showing that its statements "were known to be false or misleading at that time by the people who made them." *Ronconi*, 253 F.3d at 430; *Kaplan v. Rose*, 49 F.3d 1363, 1378 (9th Cir. 1994).  Defendants also contend that Plaintiffs cannot prove the truth of the allegedly omitted facts or demonstrate scienter.

The Court concludes that Plaintiffs have met their burden to come forward with evidence demonstrating the existence of a genuine dispute for trial with respect to scienter and the materiality of Plaintiffs claims regarding Novatel's financial condition under § 10(b) and Rule 10b-5.  Plaintiffs have supplied sufficient evidence to demonstrate that Defendants statements "were known to be false or

---

[18] Ex. 34 at NOV-E-4788443; Ex. 20 at 7.

[19] These affirmative misrepresentations belie Defendants' argument that they did not have a duty to disclose.  Mot. at 11, 21-22, 26; *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth.").  Defendants cite a handful of cases to argue otherwise.  Mot. at 11 n.10, 26 n.20.  Defendants' cases are inapposite.  The court in *Verifone* dismissed a complaint where "[e]very allegation of  misrepresentation or material omission ultimately relie[d] on the failure to disclose a forecast of future sales or revenues" – not the case here.  *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1484 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993); Walker v. Action Indus., 802 F.2d 703, 708-10 (4th Cir. 1986) (same).  In *FoxHollow and Burlington*, the courts rejected the "duty to update" – not at issue here.  *In re FoxHollow Tech., Inc.*, No. C 06-4595 PJH, 2008 U.S. Dist. LEXIS 52363, at *46-*47 (N.D. Cal. May 27, 2008), aff'd, 359 F. App'x 802 (9th Cir. 2009); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997).  And, in Convergent, the Ninth Circuit affirmed dismissal because "*Convergent* was not obliged to disclose these internal projections" – again, not at issue here.  *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991).  While *Convergent* contained the sound-bite cited in defendants' brief, it did so in the context of finding that "[t]he securities laws do not require management 'to bury the shareholders in an avalanche of trivial information.'"  *Id.*  The facts rendering Defendants' statements false here – its loss of market share – were not internal forecasts and certainly were not "trivial."

misleading at that time by the people who made them." *Ronconi*, 253 F.3d at 430; *Kaplan v. Rose*, 49 F.3d 1363, 1378 (9th Cir. 1994).  The parties' dispute the materiality of the Defendants statements regarding product mix and superior positioning in the market, and each side can point to evidence that favors its position.  The Ninth Circuit has stated that, as a general matter, "[m]ateriality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement."  *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).  Based upon the foregoing, the Court concludes that genuine disputes of fact exist and the Court, therefore declines to grant summary judgment on the Plaintiffs' 'product mix' claims.

### c. Plaintiffs 'Sprint Omission' Claims

Plaintiffs contend that Novatel's public statements in early 2007 were materially misleading because, by failing to disclose that Sprint would stop ordering Novatel's U720 modem in July 2007, the statements "did not fairly present the financial condition of the Company." (CC, ¶ 57(a)(ii).) Defendants argue that Plaintiffs cannot identify any statements rendered misleading by this alleged non-disclosure; cannot establish any basis for a free-standing duty to disclose the expected lifecycle of a single product with a single customer; and cannot identify evidence of scienter.

"[A] private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).  But at summary judgment, the standard is less stringent – the PSLRA requirement of pleading a "strong" inference of scienter "puts securities fraud claims in the interesting posture of requiring plaintiffs to plead more than they must prove at trial, where a simple inference of scienter is sufficient to support a jury's verdict."  *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1323-24 n.9 (E.D. Wash. 1998).  The Ninth Circuit has confirmed that "the PSLRA did not alter the substantive requirements for scienter under §10(b)" and that "the standard on summary judgment or JMOL remains unaltered."  *Howard*, 228 F.3d at 1064.  As long as a reasonable jury could conclude that the danger of misleading investors was either "known" or "so obvious" that defendants "must have been aware of it," a triable issue of fact exists.  *Id.* at 1063.

Defendants' contention that Sprint's cancellation of the U720 modem was immaterial as a matter of law is not well taken.  (Mot. at 43-4.) The Ninth Circuit has stated that as a general matter,

"materiality typically cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement." *In re Petco Corp. Sec. Litig.*, No. 05cv0823 H (RBB), slip op. at 18 (S.D. Cal. Apr. 29, 2008) (Doc. No. 368)(hereinafter, "Petco"); Ex. F (quoting SEC v. Phan, 500 F.3d 895, 908 (9th Cir. 2007).  At the very least, there are serious questions of fact regarding the overall impact of Sprints' cancellation and since each side can readily point to evidence that favors its position, the Court concludes that genuine disputes of fact exist and, therefore, the Court declines to grant summary judgment on the Plaintiffs' Sprint cancellation claims.

### 2. Evidence of Loss Causation

Plaintiffs allege that they paid an artificially inflated price for Novatel's stock due to false and misleading statements concerning Novatel's relationship with Sprint, financial results, product demand, and internal controls. Plaintiffs allege that on each of the following dates: July 20, 2007, February 20, 2008, April 14, 2008, August 19, 2008 and November 10, 2008, Novatel's stock price fell after the truth regarding these false and misleading statements became known.

Defendants contend that summary judgment should be granted on Plaintiffs claims of loss causation for February 21, 2008,[20] April 15, 2008[21] and August 19, 2008, because the Plaintiffs' cannot prove loss causation under the Ninth Circuit's decision in *Oracle*.  Defendants' argue that on three of the four dates that Plaintiffs allege corrective disclosures occurred: February 20, 2008; April 14, 2008; and

---

[20] On February 20, 2008, Novatel issued a press release forecasting $110 million in revenues for 1Q08, which was $10 million below analysts' estimates. (CC, Doc. No. 23, at ¶¶67-68.) On the same day, Novatel disclosed that carriers were emphasizing the consumer market where Novatel "historically had not placed an emphasis," which undermined Novatel's statements concerning product demand and the superiority of its products. (*Id.* ¶7.) On February 20, 2008, Novatel's stock closed at $13.86 per share and after trading on February 21, 2008 had fallen to $10.69 per share, on trading volume of over 11 million shares. (Doc. No. 84, Ex. 3 at 128; CC, Doc. No. 23, at ¶7.)

[21] On April 14, 2008, Novatel announced that 1Q08 revenues were $19 million short of Novatel's estimates. (CC, Doc. No. 23, at ¶8.) Defendant Leparulo partially attributed this shortfall to the fact that Novatel was "between product launch cycles for our USB devices and demand in the current environment has shifted toward lower end products" and that, "in some cases, we did not have the right products for the right customers." (*Id.* ¶¶76, 77.) These disclosures undercut Defendants' previous statements concerning product demand and ability to compete. On April 14, 2008, Novatel's stock closed at $10.01 per share and after trading on April 15, 2008 had fallen to $7.76 per share, on trading volume of over 12 million shares. (Doc. No. 84, Ex. 3 at 127-28; CC, Doc. No. 23, at ¶8.)

August 19, 2008,[22] Novatel's stock price declined following the disclosure of disappointing results. (Exs. 35, 66-67.)  Defendants argue that all three of these price declines fall squarely within Oracle's admonition that "[l]oss causation requires more than an earnings miss," *Oracle*, 627 F.3d at 392, and Plaintiffs have failed to identify evidence from which a jury could reasonably conclude that the market "learned of and reacted to the practices the plaintiff contends are fraudulent." *Id.*

### a. Loss Causation Standard

In order to succeed on a private right of action brought pursuant to § 10(b) of the Securities and Exchange Act, Plaintiffs must prove, inter alia, "loss causation."[23]  To meet this burden, Plaintiffs must provide sufficient evidence to show "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342, 125 S.Ct. 1627. Price inflation alone is insufficient.  Plaintiffs must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *Id.* at 346–47, 125 S.Ct. 1627. "[L]oss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent . . . . [I]n order to establish loss causation, the market must learn of and react to those particular practices themselves." *Oracle*, 627 F.3d at 392.  Furthermore, the decline in stock price caused by the revelation of that truth must be statistically significant. *Id.* at 342–47, 125 S.Ct. 1627; *Metzler*, 540 F.3d at 1063. Simply put, "loss causation" is an "exotic name" for "the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir.1990).

In the context of a summary judgment motion, failure to establish that the disclosure of the relevant wrongdoing played a significant role in a loss merits entry of summary judgment for failure to show loss causation.[24]  Plaintiffs can survive the motion if the defendant is unable "to establish that, as a

---

[22] Plaintiffs' complaint alleges that Novatel's disclosure on August 19, 2008, stated that Novatel had broadened its accounting review and determined to move at least $3.4 million in revenue out of 1Q08 revealed the truth concerning a prior misstatement and caused a resulting stock price drop. (CC, Doc. No. 23, at ¶¶81 and 126-28.)

[23] *See Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 156–57, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *Dura*, 544 U.S. at 346–48, 125 S.Ct. 1627.

[24] *In re Mercury Interactive Corp. Sec. Litig.*, 2007 WL 2209278, 2007 U.S. Dist. LEXIS 59171 (N.D.Cal. July 30, 2007) (citation omitted).

matter of undisputed fact, the depreciation in the value of the [stock] could not have resulted from the alleged false statement or omission of the defendant." *In re Motorola Sec. Litig.*, 505 F.Supp.2d 501, 550 (N.D. Ill. 2007) (citing *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649–50 (7th Cir. 1997)). In this regard, plaintiffs often hire experts to opine on loss causation. Generally, the starting point of an expert's analysis on this issue is the identification of one or more corrective disclosures during the class period. "A 'corrective disclosure' is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market. It stands to reason then that '[a] disclosure that does not reveal anything new to the market is, by definition, not corrective.' " *Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*, 633 F.Supp.2d 763, 818 (D. Ariz. 2009) (citations omitted).

### b. Plaintiffs Claims of Loss Causation for February 21, 2008

On February 20, 2008, Novatel announced disappointing 4Q07 results and lower than anticipated 1Q08 financial guidance. (Ex. 39 at NOV-E-1192406; Ex. 40; Ex. 135, ¶¶69-70.) The next day, Novatel's stock price declined by 22.9% to $10.69. (Ex. 135, ¶72.) Contrary to defendants' argument (Mot. at 30), this price decline was substantially related to defendants' fraudulent accounting practices and loss of market share to Sierra Wireless, and at least nine different analyst reports attributed Novatel's disappointing results to excessive inventory build-up at Sprint and/or Verizon.[25]  Two other analyst reports attributed the miss and disappointing guidance to "a loss of share to NVTL's largest competitor Sierra Wireless" and the fact that "it is clear Novatel is losing market share to its main rival [Sierra Wireless]." Ex. 135, ¶71.

### c. Plaintiffs Claims of Loss Causation for April 15, 2008

On April 14, 2008, the Company pre-announced its 1Q08 earnings results of $91 million, which were substantially below the prior guidance of $110 million provided on February 20, 2008. (*See* Ex. 137; Ex. 135, ¶73.) Defendants blamed the miss on the three factors: (1) "a delayed launch of the MC930D" with a major European carrier customer; (2) "sales of our Enterprise class MC727 products were lower than expected" because of a shift to lower end products; and (3) failure to "adequately

---

[25] *See* Ex. AA at 1 ("a larger impact [than from component shortage] is expected from an inventory surplus at one of NVTL's chief North American customers (we believe Verizon)"); Ex. BB at 1 ("[Q1] is plagued by key operator customers' inventory issues in all connectivity products, including PC cards and USB modems, which has prompted liquidation activity."); Ex. CC (same); Ex. 135, ¶71.

execute both from an operations basis and with our sales effort." (Ex. 45 at NOV-E-6154567; Ex. 135, ¶74.) Plaintiffs' evidence creates questions of fact whether these statements were a partial disclosure of the truth that proximately caused Plaintiffs' loss. (Ex. 135, ¶¶73-76.)

Plaintiffs' contend that the April 14 disclosure of "lower than expected sales" because of a "shift to the low end market" at Verizon was also a revelation that Novatel had misstated its sales of the U727 to Verizon[26] that Novatel was in a "revenue-crisis," and that Novatel's 727 was "dead" – all facts known to defendants before the 1Q08 guidance was announced on February 20, 2008. Gilead, 536 F.3d at 1058. Moreover, as Weinert admitted in his deposition, the February 20, 2008 statements did not fully disclose the true reasons why Verizon was slashing its demand for the 727, leaving inflation in the stock.[27] Whether defendants had knowledge of the Verizon demand collapse and reduced guidance is an issue of fact.  Also, whether Defendants statements that $10 million of the $19 million miss was "not NVTL-related." (Mot. at 35.)

### d. Plaintiffs Claims of Loss Causation for August 19, 2008

On August 19, 2008, defendants announced preliminary 2Q08 results below analysts' expectations, lowered 3Q08 guidance, and disclosed the results of the Company's accounting review. (Ex. 47 at NOV-E-1216852; Ex. 135, ¶77.) Defendants argue that "undisputed facts show" the resulting 25% drop in Novatel's share price was not caused by any disclosure of the relevant truth. (Mot. at 36.) This is a fallacy. The analyst reports following the August 19 disclosure show that, at least, a substantial portion of the drop was attributable to the results of the accounting investigation, the cost of accounting

---

[26] According to Peter Balchin, the head of Novatel's European business (called "EMEA"), "[t]he reference to O2 [in the press release] is totally wrong! O2 was 10k MC930D in Q1=$2m. EMEA has been blamed for all the Verizon shit!" Ex. 46 at NOV-E-5121117. Mr. Balchin's direct report, Bernd Overbeck, responded:

> This is totally unfair, what other truth are they twisting then also?
>
> How can we behave honestly to this email and the press announcement, when the truth is so different? [A]s questions will be asked by EMEA key customers, who do not see themselves as the cause of USD10M shortfall, especially as we asked all of them to pull business forward into Q1, and most EMEA customers did significantly well helping us out in Q1 for the Verizon issues. Others we probably pushed far too hard when they were not quite ready, and went into hiding now. *Id.* This evidence demonstrates that defendants were publicly "twisting" the truth about the true impact that the Verizon "issues" were having on the Company.

[27] Ex. 51 at 738:20-739:8 ("Q. . . . Well, you didn't mention [to analysts] that [Verizon] stopped the shipping [of 727s in Q1] because of technical issues, right? . . . A. No, I certainly didn't.").

review, and the delayed launch of Novatel's next-generation products, all of which relate to Plaintiffs'

allegations. (Ex. 135, ¶78.)

### e. Plaintiffs Claims of Loss Causation for July 20, 2007

On July 20, 2007, the JMP Securities analyst report confirmed the cancellation of the U720 at

Sprint (information that was not previously known to the market), provided new information about when

the 727 would be available (also new information), and expressed the concern that Novatel would be

losing market share to Sierra Wireless. (Ex. 134, ¶¶33-34.)

Defendants argue that the analyst reports issued on July 20, 2007, "introduced no 'new'

factual information into the market" and that "the market should have incorporated the information

prior to July 20, 2007" and it was therefore immaterial. (Mot. at 38.)  However, Defendants' own expert

contradicts this claim[28] and July 20, 2007 was not a day that analysts were scheduled to issue reports or

receive information from Novatel (as opposed to a scheduled conference call, for example), so the fact

that two analysts took the time to write reports on this issue demonstrates that the information disclosed

that day was material. *JDS Uniphase*, 2007 U.S. Dist. LEXIS 66085, at *23.

Even if some information had come into the market prior to July 20, 2007 partial disclosures at

an earlier date do not negate loss causation upon fuller disclosure of the relevant truth. *Lormond*, 565

F.3d at 266 & n.33 (series of partial corrective disclosures); *In re LDK Solar Sec. Litig.*, 255 F.R.D.

519, 528-29 (N.D. Cal. 2009) (same). Learning that Sprint "might" cancel the U720 "is quite

different from knowing they were in fact" canceling Novatel's flagship modem. *Berson v. Applied*

---

[28] In Dr. Tabak's own words:
Q. The – in your opinion, did the JMP article – the JMP analyst report that came out on the morning of July 20th, did that disclose new information to the market?
* * *
A. Yes.
Q. Okay. And what was the new information?
A. It was the analyst's belief about when Novatel's replacement model would be available.
* * *
Q. . . . So then, in your opinion, does the fact that the JMP article confirming the information regarding the cancellation of the U720, that that – that, in and of itself, constitutes new information. Right?
A. Yes.
* * *
A. In fact, you know, there's other new information in the next sentence talking about how Sprint will recommend Sierra Wireless's 595 modem.
Ex. 133 at 205:25-206:18, 209:4-21.

*Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

Defendants' remaining argument that "[t]here . . . is no proof that the July 20, 2007 statements caused a statistically significant decline in Novatel's stock price" and, therefore, the 11.6% intra-day drop was the result of "random chance" is also without merit. (Mot. at 39.)  At minimum, a question of fact clearly exists as to whether the price movement on July 20, 2007, was the result of simple "random chance" or the Company's loss of its flagship modem to its biggest competitor. (Mot. at 39.)

While the Defendants have argued that the missed financial expectations alone are an "obvious alternative explanation" for the stock price drops,[29] the Court finds that Plaintiffs have provided sufficient evidence to support their claims that the market learned of and reacted to the practices the Plaintiffs contends are fraudulent on February 20, 2008; April 14, 2008; and August 19, 2008.  Thus, Plaintiffs have adequately demonstrated loss causation with respect to Defendants statements which precludes summary judgment.

### 3. Insider Trading Claims

To prove an insider trading claim under Section 10(b) and rule 10b-5, Plaintiffs must establish: (1) that a Defendant possessed material and nonpublic information at the time he sold Novatel stock; (2) that a Defendant was aware that the information he possessed was material and nonpublic and had the "intent to deceive, manipulate, or defraud"; and (3) that the material nonpublic information played a causal role in the Defendant's decision to sell Novatel stock.[30]

Defendants argue that summary judgment should be granted on Plaintiffs' Insider Trading Claims because: (1) the allegedly nonpublic information was immaterial as a matter of law; (2) Plaintiffs have presented no evidence that Defendants were aware of the alleged material non-public information;

---

[29] Doc. No. 80 at 28.

[30] *See* 17 C.F.R. §240.10b5-1(b) (requiring that the defendant have been "aware" of the material nonpublic information when he sold stock); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976) (defining scienter required under Section 10(b) and Rule 10b-5); *Countrywide*, 588 F. Supp. 2d at 1202-03 ("[L]oss causation for insider trading requires that the insider actually use []the inside information in deciding to make the trade[]."); *SEC v. Lipson*, 278 F.3d 656, 660 (7th Cir. 2002) (plaintiff has the "burden of . . . proving that inside information had played a causal role in [the insider]'s decision to sell the shares in the amount, and when, he did."); *SEC v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1319 (N.D. Ala. 2003) (establishing intent requires proof that defendant "knew or should have known that he was breaching a fiduciary duty") (citing *SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990)); *see also Dirks v. SEC*, 463 U.S. 646, 660 (1983). Plaintiffs cannot establish any of these necessary elements.

(3) Plaintiffs have presented no evidence that the alleged non-public information played a causal role in the Defendants' sales; and (4) Defendants' 10b5-1 trading plans constitute an undisputed affirmative defense to the Plaintiffs' insider trading claims.

### a. Allegedly Non-Public Information was Immaterial as a Matter of Law

Defendants argue that the Plaintiffs' insider trading claims are premised on the contention that Defendants possessed non-public information about Sprint's plans to transition Novatel's U720 modem, which purportedly undermined existing expectations for Novatel's performance. Defendants' argue that this information was relevant to the market, if at all, only to the extent that it undermined existing expectations for Novatel's sales and revenues. Therefore in order to show that undisclosed intra-quarter information of this sort was material, Plaintiffs must prove that it rendered existing forecasts or expectations for the quarter unreliable, i.e., that the information made it likely that the Company's performance would significantly deviate "from the range of results which could be anticipated based on currently available information."[31]

Defendants argue that Plaintiffs cannot create a triable question of fact on this issue and argue that there is no evidence that Sprint's ceasing orders of a single Novatel product had any material impact on Novatel's short or long-term prospects, because Novatel: (1) had numerous other products; (2) had other customers for the same product; and (3) would shortly be selling the next generation U727 to Sprint. Defendants argue that not only did Sprint's migration from the U720 not undermine Novatel's existing guidance, Novatel substantially exceeded its guidance for the quarter in which the product transition took place. Under these circumstances, Defendants contend that no reasonable jury could find

---

[31] *Shaw v. Digital Equipment Corp.*, 82 F. 3d 1194, 1211 (1st Cir. 1996) (nonpublic intra-quarter information does not have to be disclosed unless the "information about the company's quarter-to-date performance (e.g., operating results) indicat[es] some substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends and uncertainties."); *Oracle*, 2009 WL 1709050, at *22, *34 (rejecting an insider trading claim premised on a claim that the defendants were in possession of material intraquarter data because the intraquarter data did not render the forecast for the quarter unreliable); *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 940 (Del. Ch. 2004) ("[I]t is only when the intraquarter information makes it likely that the company will either outperform or underperform its projections in some markedly unexpected manner that the materiality threshold is satisfied.")

that this information was material. *See Oracle*, 2009 WL 1709050, at *22, *34; *Oracle Deriv. Litig.*, 867 A.2d at 940.

The Court notes, however, that Defendants' motion is prefaced on the assertion that Sprint's cancellation of the U720 modem was part of a planned "transition" to Novatel's next generation modem. (Mot. at 2-6.) This argument is directly contradicted by the evidence offered by the Plaintiffs. The January 8, 2007 cancellation notice from Sprint was characterized internally as a "bomb [being] dropped" on Novatel. (Ex. 48 at NOV-E- 2796853.) Sprint was replacing Novatel's biggest selling product (the U720 modem) with Novatel's largest competitor's (Sierra Wireless) modem, and the last Sprint order for the U720 would be in April or May—months before Novatel's next generation modem would be ready for sale. (*Id.*) Based upon the foregoing, the Court finds that Plaintiffs' have demonstrated a genuine dispute of material fact precluding summary judgment.

### b. Whether Defendants Were Aware of Material Non-Public Information

Defendants argue that even if Plaintiffs were able to raise a triable issue of fact regarding the materiality of the discontinuation of orders by Sprint, that there is no evidence that any Defendant was aware that he or she possessed material nonpublic information or that anyone at Novatel thought that Sprint's decision to transition the U720 would prevent Novatel from meeting revenue projections. Defendants argue that since there is no evidence that any Defendant was aware that the information was material, it follows that no Defendant made use of that information or have the requisite "mental state embracing intent to deceive, manipulate, or defraud." *Ernst*, 425 U.S. at 193 & n.12.

Each defendant sold large amounts of their stock for total proceeds of $23.8 million when they knew that Sprint had cancelled Novatel's USB modem and that "a LARGE portion of [Novatel's] revenue [was] dependent on the USB devices going forward." (Ex. 56 at  NOV-E-2078292; Exs. I-O; Ex. P at 31-32.) The evidence is undisputed that each defendant knew this information when they adopted/amended trading plans to sell, as they were all personally made aware of the Sprint cancellation. (Exs. 2, 57.) The Ninth Circuit has stated that "unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter." *In re Silicon Graphics*, 183 F.3d at 986; see *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996). "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and

(3) whether the sales were consistent with the insider's prior trading history." *In re Silicon Graphics*, 183 F.3d at 986.

Based upon the foregoing, the Court finds that the timing and amount of Defendants' stock sales as set forth above, creates a genuine issue of material fact precluding summary judgment.

### c. Whether Nonpublic Information Played A Causal Role In Defendants' Sales

Defendants argue that Plaintiffs have not identified a single document linking the U720 discontinuation to any Defendant's stock sales or shown that Defendants entered into trading plans for the purpose of benefitting from this information. Defendants argue that they adopted or amended their Rule 10b5-1 trading plans on days when Novatel's stock traded between $19.92 and $23.70. (Ex. 26, at 404-05; Exs. 46-50.) Plaintiffs contend that Defendants entered the plans to avoid the inevitable decline in Novatel's stock price after the market learned of Sprint's discontinuation of the U720 modem. (CC, ¶ 4.) The day that Plaintiffs argue the news about the "end of life" of the U720 hit the market, Novatel closed at $27.05. Defendants argue that they did not avoid a loss by selling when they did. They could have made more money had they waited until after the news broke.[32]

While it is true that "not every sale of stock by a corporate insider shows that the share price is about to decline," the Court must look to the timing of the sales to see if they were "at times calculated to maximize the personal benefit from undisclosed inside information." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). However, since Defendants possessed nonpublic information before they amended their 10b-5 trading plans,[33] which showed that Novatel stock was overpriced, and having this information they sold a large quantity of that stock shortly before the information became public and the stock dropped sharply in value, common sense tells us that their decision to sell when they did and how

---

[32] *See Ronconi*, 253 F.3d at 435 ("selling stock for $54, when the price subsequently rises to $74 and then sinks to $49, does not support an inference of knowing falsehood").

[33] As Judge Posner explained in *Lipson*, the defendant "might well have had two purposes, one to transfer wealth to his son and the other to avoid a loss that his inside information told him was coming. The existence of the legitimate purpose would not sanitize the illegitimate one." 278 F.3d at 661.

08cv1689

much they did, rather than sell later or sell less, was influenced by the information." *SEC v. Lipson*, 278 F.3d 656, 661 (7th Cir.2002).  Based upon the foregoing, the Court finds that Plaintiffs' evidence creates a genuine dispute of fact that precludes summary judgment.

### d. Defendants' 10b5-1 Trading Plans

Under Rule 10b5-1, a trade is not made on the basis of nonpublic information if it was made pursuant to a trading plan, the individual did not know the inside information at the time he entered into the plan, and the individual exercised no discretion over his sales after adoption of the plan. *See* 17 C.F.R. § 240.10b5-1(c)(1)(i). Defendants argue that with regard to several of the challenged trades, Defendants Souissi and Hadley sales fall within the affirmative defense afforded by 10b5-1 trading plans. Dr. Souissi and Mr. Hadley entered into trading plans on December 15, 2006. All of Dr. Souissi and Mr. Hadley's trades between December 15, 2006 and May 1, 2007 were made pursuant to those plans. (Exs. 44-45.)  Defendants argue that Plaintiffs cannot create a genuine dispute regarding Dr. Souissi or Mr. Hadley's knowledge and the 10b5-1 plans are an independent basis for granting partial summary judgment in favor of Dr. Souissi and Mr. Hadley as to any sales before May 18, 2007. Defendants claim this is supported by the Plaintiffs' counsel's instruction to Plaintiffs' damages expert Mr. Steinholt to assume there would be no liability for Dr. Souissi and Mr. Hadley's stock sales before they amended their preexisting 10b5-1 plans on May 18, 2007. (Ex. 75 [Steinholt Dep., 254:6-255:2].)

The Court notes, however, that each defendant entered new or amended 10b5-1 plans during the May 14-June 13, 2007 time frame that contained accelerator clauses that called for immediate sales, the next day under the Hadley and Souissi plans, and within two weeks under the Weinert and Ratcliffe plans.  (*See* Exs. 63-65, 67.)  The Court finds Souissi's use of 10b5-1 was particularly questionable because he sold 110,000 shares the day after entering his 10b5-1 plan,  for proceeds of over $2.2 million.  (*See also* Ex. 68 at 31-44 (analyzing each defendants' 10b5-1 plan)).  He did so because, in his opinion, an "open-window" insulated his trades. (Ex. 59 at 140:10-141:1.)  Improper use of 10b5-1 trading is evidence of scienter.  Based upon the foregoing, the Court finds that a genuine issue of material fact precluding summary judgment.

### 4. Section 20(a) Claims

08cv1689

In their Section 20(a) claims, Plaintiffs contend that Defendants acted as controlling persons of Novatel within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about Novatel, Defendants had the power and ability to control the actions of Novatel and its employees.  Novatel controlled Defendants and its other officers and employees.  Since Plaintiffs have provided sufficient evidence regarding their allegations that Defendants have violated Section 10(b), these is arguably liable pursuant to §20(a) of the 1934 Act and Defendants' motion for summary judgment on Plaintiffs Section 20(a) claims is DENIED.

### *Conclusion*

For the reasons set forth herein, Defendant Leparulo's Motion for Judgment on the Pleadings, Doc. No. 289, is hereby GRANTED and Defendants' Motion for Summary Judgment, Doc. No. 290, GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

DATED:  November 23, 2011

Hon. Anthony J. Battaglia
U.S. District Judge